Docket No.: 14-1371

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

MICHAEL T. DODSON,

      Plaintiff - Appellant,

v.

EVERETT BOOBER, ET. AL.,

      Defendants - Appellees,

APPEAL FROM THE U.S. DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
AT MARTINSBURG

JOINT APPENDIX
VOLUME I

Mark McMillian (W.Va. Bar #9912)
Robert Schulenberg, III (W.V #3301)
Mark McMillian - Attorney at Law, L.C.
Boulevard Tower - Suite 900
1018 Kanawha Boulevard, East
Charleston, West Virginia 25301
Telephone No.: (304) 720-9099
Fax No.: (304) 720-0290
Email: mark@markmcmillian.com
*Counsel for Appellant*

Bridget Cohee (W.Va. Bar #8526)
Steptoe & Johnson, PLLC
1250 Edwin Miller Boulevard - Suite 300
Martinsburg, WV 25401
Telephone No.: (304) 262-3538
Fax No.: (304) 262-3541
Email: bridget.cohee@steptoe-johnson.com
*Counsel for the Appellees*

James t. Kratovil (W.Va. Bar #2103)
Kratovil Law Offices, PLLC
211 W. Washington Street
Charles Town, WV 25414
Telephone No.: (304) 728-7718
Fax No.: (304) 728-7720
Email: kratovil@charlestown.com
*Counsel for Appellee John Griffith*

**JOINT APPENDIX**
**VOLUME I**
**TABLE OF CONTENTS**

District Court Docket Sheet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-5

Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-23

Motion to Dismiss and Answer  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24-37

Certificate of Service to Motion to Dismiss and Answer . . . . . . . . . . . . . . . . . .  38

Motion to Dismiss by Everett Boober, et al.  . . . . . . . . . . . . . . . . . . . . . . . . 39-40

Defendant's Memorandum of Law in Support of Motion to Dismiss  . . . . . . . . 41-54

Exhibits to Defendant's Memorandum of Law in Support of Motion to Dismiss

Exhibit 1  (Transcript of Civil Service Hearing Held on 1-15-2009) . . . . . 55-228

Exhibit 2  (Memorandum from Everett Boober to Michael Dodson)  . . . 229-232

Exhibit 3  (Transcript of Civil Service Hearing Held on 10-22-2008)  . . 233-400

# U.S. District Court
## Northern District of West Virginia (Martinsburg)
## CIVIL DOCKET FOR CASE #: 3:13-cv-00149-JPB

Dodson v. Boober et al
Assigned to: Chief Judge John Preston Bailey
Case in other court: 4, 14-01371
Cause: 42:1983 Civil Rights Act

Date Filed: 10/18/2013
Date Terminated: 03/19/2014
Jury Demand: Plaintiff
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Michael T. Dodson**
represented by **Mark L. McMillian**
Mark McMillian - Attorney at Law, L.C.
1018 Kanawha Blvd, East
Suite 900
Charleston, WV 25301
(304) 720-9099
Fax: (304) 720-0290
Email: mark@markmcmillian.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Everett Boober**
*individually and in his capacity as Sheriff of*
*Jefferson County, West Virginia*
represented by **Bridget M. Cohee**
Steptoe & Johnson, PLLC - Martinsburg
1250 Edwin Miller Boulevard
Suite 300
Martinsburg, WV 25404
304-262-3538
Fax: 304-262-3541
Email: Bridget.Cohee@steptoe-johnson.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Robert E. Shirley**
*individually and in his capacity as Sheriff of*
*Jefferson County, West Virginia*
represented by **Bridget M. Cohee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Peter H. Dougherty**
*individually and in his capacity as Sheriff of*
*Jefferson County, West Virginia*
represented by **Bridget M. Cohee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**James B. Crawford, III**
*individually and in his capacity as a member*
represented by **Bridget M. Cohee**
(See above for address)

*of the Deputy Sheriff's Civil Service*
*Commission for Jefferson County, West*
*Virginia*

**Defendant**

**Christopher Jackson**                              represented by **Bridget M. Cohee**
*individually and in his capacity as a member*                    (See above for address)
*of the Deputy Sheriff's Civil Service*                           *LEAD ATTORNEY*
*Commission for Jefferson County, West*                           *ATTORNEY TO BE NOTICED*
*Virginia*

**Defendant**

**Frank Rosario**                                   represented by **Bridget M. Cohee**
*individually and in his capacity as a member*                    (See above for address)
*of the Deputy Sheriff's Civil Service*                           *LEAD ATTORNEY*
*Commission for Jefferson County, West*                           *ATTORNEY TO BE NOTICED*
*Virginia*

**Defendant**

**Patsy Noland**                                    represented by **Bridget M. Cohee**
*individually and in her capacity as a member*                    (See above for address)
*of the County Commission of Jefferson*                           *LEAD ATTORNEY*
*County, West Virginia*                                           *ATTORNEY TO BE NOTICED*

**Defendant**

**Dale Manuel**                                     represented by **Bridget M. Cohee**
*individually and in her capacity as a member*                    (See above for address)
*of the County Commission of Jefferson*                           *LEAD ATTORNEY*
*County, West Virginia*                                           *ATTORNEY TO BE NOTICED*

**Defendant**

**Walt Pelish**                                     represented by **Bridget M. Cohee**
*individually and in his capacity as a member*                    (See above for address)
*of the County Commission of Jefferson*                           *LEAD ATTORNEY*
*County, West Virginia*                                           *ATTORNEY TO BE NOTICED*

**Defendant**

**Frances Morgan**                                  represented by **Bridget M. Cohee**
*individually and in her capacity as a member*                    (See above for address)
*of the County Commission of Jefferson County*                    *LEAD ATTORNEY*
                                                                  *ATTORNEY TO BE NOTICED*

**Defendant**

**Jane Tabb**                                       represented by **Bridget M. Cohee**
*individually and in her capacity as a member*                    (See above for address)
*of the County Commission of Jefferson*                           *LEAD ATTORNEY*
*County, West Virginia*                                           *ATTORNEY TO BE NOTICED*

**Defendant**

**Lynn Widmyer**                                    represented by **Bridget M. Cohee**
*individually and in her capacity as a member*                    (See above for address)
*of the County Commission of Jefferson*                           *LEAD ATTORNEY*
*County, West Virginia*                                           *ATTORNEY TO BE NOTICED*

**Defendant**

**John Griffith**

represented by **James T. Kratovil**
Kratovil & Amore, PLLC
211 W. Washington St.
Charles Town, WV 25414
304-728-7718
Fax: 304-728-7720
Email: kratovil@charlestownlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/07/2014 | 32 | ORDER granting 30 Motion for Leave to Appeal in forma pauperi. ***SEALED*** Signed by Chief Judge John Preston Bailey on 5/7/14. copy emailed to counsel of record and 4th Cir.(njz)(Entered: 05/07/2014) |
| 04/18/2014 | 31 | USCA NOTICE OF APPELLATE CASE OPENING: re 27 Notice of Appeal filed by Michael T. Dodson. USCA Case Number: 14-1371. Case Manager: Jeffrey S. Neal 804-916-2702. (njz) (Entered: 04/21/2014) |
| 04/17/2014 | 30 | MOTION for Leave to Appeal in forma pauperis by Michael T. Dodson. (Attachments: # 1 fax cover sheet(njz) (Entered: 04/17/2014) |
| 04/17/2014 | 29 | Wrong event used. (Main Document 29 replaced on 4/17/2014) (njz). Modified on 4/17/2014-nef regen (njz). (Entered: 04/17/2014) |
| 04/17/2014 | 28 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 27 Notice of Appeal (njz) (Entered: 04/17/2014) |
| 04/17/2014 | 27 | NOTICE OF APPEAL by Michael T. Dodson. (McMillian, Mark) (Entered: 04/17/2014) |
| 03/19/2014 | 26 | CLERK'S JUDGMENT in favor of Christopher Jackson, Dale Manuel, Everett Boober, Frances Morgan, Frank Rosario, James B. Crawford, III, Jane Tabb, John Griffith, Lynn Widmyer, Patsy Noland, Peter H. Dougherty, Robert E. Shirley, Walt Pelish against Michael T. Dodson. Signed by Clerk of Court on 3/19/2014. (cmd) (Entered: 03/19/2014) |
| 03/19/2014 | 25 | ORDER: granting 5 Motion to Dismiss; granting 9 Motion to Dismiss. Accordingly, this case is hereby DISMISSED and removed from the Courts docket. The Clerk is directed to enter judgment for the defendants. Signed by Chief Judge John Preston Bailey on 3/19/2014. (cmd) (Entered: 03/19/2014) |
| 01/17/2014 | 24 | RESPONSE in Opposition re 9 MOTION to Dismiss filed by Michael T. Dodson. (Attachments: # 1 Exhibit A)(McMillian, Mark) (Entered: 01/17/2014) |
| 01/13/2014 | 23 | *Certificate of Service Other Document Rule 26 Initial Disclosures* filed by Michael T. Dodson. (McMillian, Mark) (Entered: 01/13/2014) |
| 01/13/2014 | 22 | CERTIFICATE OF SERVICE by Everett Boober, James B. Crawford, III, Peter H. Dougherty, Christopher Jackson, Dale Manuel, Frances Morgan, Patsy Noland, Walt Pelish, Frank Rosario, Robert E. Shirley, Jane Tabb, Lynn Widmyer *evidencing service of Defendants' Rule 26 (a)(1) Initial Discovery Disclosures.* (Cohee, Bridget) (Entered: 01/13/2014) |
| 01/08/2014 | 21 | Memorandum in Support re 9 MOTION to Dismiss *Defendants' Response to Plaintiff's Memorandum of Law in Support of Plaintiff's Response to the Motions to Dismiss* filed by Everett Boober, Michael T. Dodson, Peter H. Dougherty, Christopher Jackson, Dale Manuel, Frances Morgan, Patsy Noland, Walt Pelish, Frank Rosario, Robert E. Shirley, Jane Tabb, Lynn Widmyer. (Cohee, Bridget) (Entered: 01/08/2014) |

| 01/08/2014 | ⬇20 | REPLY to Response to Motion re 9 MOTION to Dismiss *Reply to Response to Motion to Dismiss* filed by Everett Boober, James B. Crawford, III, Peter H. Dougherty, Christopher Jackson, Dale Manuel, Frances Morgan, Patsy Noland, Walt Pelish, Frank Rosario, Robert E. Shirley, Jane Tabb, Lynn Widmyer. (Cohee, Bridget) (Entered: 01/08/2014) |
|---|---|---|
| 01/08/2014 | ⬇19 | REPLY to Response to Motion re 9 MOTION to Dismiss *Defendants' Reply to Plaintiffs' Response to the Reply to Failure to Respond to the Motion to Dismiss* filed by Everett Boober, James B. Crawford, III, Peter H. Dougherty, Christopher Jackson, Dale Manuel, Frances Morgan, Patsy Noland, Walt Pelish, Frank Rosario, Robert E. Shirley, Jane Tabb, Lynn Widmyer. (Attachments: # 1 Exhibit 1)(Cohee, Bridget) (Entered: 01/08/2014) |
| 12/31/2013 | ⬇18 | RESPONSE by Michael T. Dodson to 15 Reply to Response to Motion,. (McMillian, Mark) (Entered: 12/31/2013) |
| 12/31/2013 | ⬇17 | Memorandum to 16 Response re 5 MOTION to Dismiss, 9 MOTION to Dismiss filed by Michael T. Dodson. (Attachments: # 1 Exhibit to Response and Memorandum)(McMillian, Mark) Modified to create link with response on 1/2/2014 (tlg). (Entered: 12/31/2013) |
| 12/31/2013 | ⬇16 | RESPONSE in Opposition re 5 MOTION to Dismiss, 9 MOTION to Dismiss filed by Michael T. Dodson. (Attachments: # 1 Exhibit Exhibits to Response and Memorandum) (McMillian, Mark) (Entered: 12/31/2013) |
| 12/31/2013 | ⬇15 | REPLY to Response to Motion re 9 MOTION to Dismiss *Reply to Failure to Respond to Motion to Dismiss* filed by Everett Boober, James B. Crawford, III, Peter H. Dougherty, Christopher Jackson, Dale Manuel, Frances Morgan, Patsy Noland, Walt Pelish, Frank Rosario, Robert E. Shirley, Jane Tabb, Lynn Widmyer. (Cohee, Bridget) (Entered: 12/31/2013) |
| 12/23/2013 | ⬇14 | SCHEDULING ORDER: Amended Pleadings and Joinder of Parties due by 2/28/2014. Discovery due by 9/15/2014. Motions due by 10/6/2014. Proposed Pretrial Order due by 12/15/2014. Final Pretrial Conference set for 1/5/2015 11:00 AM in Martinsburg District Judge Courtroom, 2nd Floor before Chief Judge John Preston Bailey. Jury Selection and Jury Trial set for 1/13/2015 08:30 AM in Martinsburg District Judge Courtroom, 2nd Floor before Chief Judge John Preston Bailey. Signed by Chief Judge John Preston Bailey on 12/23/2013. (cwm) (Entered: 12/23/2013) |
| 12/18/2013 | ⬇13 | REPORT of Rule 26(f) Planning Meeting. (Cohee, Bridget) (Entered: 12/18/2013) |
| 11/19/2013 | ⬇11 | ORDER GRANTING DEFENDANTS' MOTION TO SEAL granting 10 Motion to Seal Signed by Chief Judge John Preston Bailey on 11/19/2013. Copy emailed to counsel.(cwm) (Entered: 11/19/2013) |
| 11/18/2013 | ⬇9 | MOTION to Dismiss by Everett Boober, James B. Crawford, III, Peter H. Dougherty, Christopher Jackson, Dale Manuel, Frances Morgan, Patsy Noland, Walt Pelish, Frank Rosario, Robert E. Shirley, Jane Tabb, Lynn Widmyer. (Attachments: # 1 Attachment Memorandum of Law in Support of Motion to Dismiss, # 2 Exhibit 1 - To be filed under seal, # 3 Exhibit 2, # 4 Exhibit 3 - To be filed under seal, # 5 Exhibit 4 - To be filed under seal, # 6 Exhibit 5 - To be filed under seal, # 7 Exhibit 6 - To be filed under seal, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9 - To be filed under seal, # 11 Exhibit 10 - To be filed under seal)(Cohee, Bridget) (Entered: 11/18/2013) |
| 11/12/2013 | ⬇8 | STIPULATION *Regarding Time for Filing Responsive Pleadings* by Everett Boober, James B. Crawford, III, Peter H. Dougherty, Christopher Jackson, Dale Manuel, Frances Morgan, Patsy Noland, Walt Pelish, Frank Rosario, Robert E. Shirley, Jane Tabb, Lynn Widmyer. (Eberling, Tracey) (Entered: 11/12/2013) |
| 11/12/2013 | ⬇7 | FIRST ORDER AND NOTICE REGARDING DISCOVERY AND SCHEDULING: ***NOTICE TO ATTORNEYS***: Pursuant to Rule 7.1 of the Federal Rules of Civil |

| | | |
|---|---|---|
| | | *Procedure, ALL Non-governmental CORPORATE parties must file a DISCLOSURE STATEMENT with the Court. Forms are available on the Court's Web Site at http://www.wvnd.uscourts.gov/forms.htm*<br><br>Rule 26 Meeting to be held by 12/12/2013. Rule 26 Meeting Report due by 12/30/2013. Discovery due by 1/13/2014. Signed by Chief Judge John Preston Bailey on 11/12/2013. (cmd) (Entered: 11/12/2013) |
| 11/10/2013 | 🌙 6 | CERTIFICATE OF SERVICE by John Griffith re 5 Answer to Complaint (Kratovil, James) (Entered: 11/10/2013) |
| 11/10/2013 | 🌙 5 | MOTION to Dismiss and ANSWER to Complaint by John Griffith.(Kratovil, James) Modified on 11/12/2013 (cmd). Modified on 11/12/2013 to correct event to motion and regen NEF. (cmd) (Entered: 11/10/2013) |
| 10/21/2013 | 🌙 3 | ORDER OF RECUSAL. District Judge Gina M. Groh recused. Case reassigned to Chief Judge John Preston Bailey for all further proceedings. Signed by District Judge Gina M. Groh on 10/21/2013. (cmd) (Entered: 10/21/2013) |
| 10/18/2013 | 🌙 2 | Filing fee: $ 400.00, receipt number WVNM000384. (cmd) (Entered: 10/18/2013) |
| 10/18/2013 | 🌙 1 | COMPLAINT against Everett Boober, James B. Crawford, III, Peter H. Dougherty, John Griffith, Christopher Jackson, Dale Manuel, Frances B. Morgan, Patsy Noland, Walt Pelish, Frank Rosario, Robert E. Shirley, Jane Tabb, Lynn Widmyer, filed by Michael T. Dodson. (Attachments: # 1 Civil Cover Sheet)(cmd) (Entered: 10/18/2013) |

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF WEST VIRGINIA

at Martinsburg


MICHAEL T. DODSON,

        Plaintiff,

v.

EVERETT BOOBER, individually and in his
capacity as Sheriff of Jefferson County,
West Virginia, ROBERT E. SHIRLEY,
individually and in his capacity as
Sheriff of Jefferson County, West
Virginia, PETER DOUGHERTY, individually
and in his capacity as Sheriff of
Jefferson County, West Virginia, JAMES B.
CRAWFORD, III, individually and in his
capacity as a member of the Deputy
Sheriff's Civil Service Commission for
Jefferson County, West Virginia,
CHRISTOPHER JACKSON, individually and in
his capacity as a member of the Deputy
Sheriff's Civil Service Commission for
Jefferson County, West Virginia, FRANK
ROSARIO, individually and in his capacity
as a member of the Deputy Sheriff's Civil
Service Commission for Jefferson County,
West Virginia, PATSY NOLAND, individually
and in her capacity as a member of the
County Commission of Jefferson County,
West Virginia, DALE MANUEL, individually
and in her capacity as a member of the
County Commission of Jefferson County,
West Virginia, WALT PELISH, individually
and in his capacity as a member of the
County Commission of Jefferson County,
West Virginia, FRANCES MORGAN,
individually and in her capacity as a
member of the County Commission of
Jefferson County, JANE TABB, individually
and in her capacity as a member of the
County Commission of Jefferson County,
West Virginia, LYNN WIDMYER, individually
and in her capacity as a member of the
County Commission of Jefferson County,
West Virginia, and JOHN GRIFFITH,

        Defendants.

CIVIL ACTION NO:

3:13-cv-149 (Groh)

Electronically Filed October 18, 2013

**Joint Appendix Pg. 6**

<u>COMPLAINT</u>

Comes now your plaintiff, Michael T. Dodson, who brings this civil action alleging that the above-named defendants, alone or acting through others, have, under color of West Virginia law, regulation, ordinance, custom and usage have subjected the plaintiff to his rights, privileges, and immunities protected by the Constitution of the United States of America and the laws of the United States of America, and brings this action as follows:

### A.   Introduction.

1.  Your plaintiff, MICHAEL T. DODSON, at all times relevant herein was and is a citizen of the United States of America who resides in Jefferson County, West Virginia.

2.  Your plaintiff, MICHAEL T. DODSON, was, at all times relevant herein, employed as a civil service protected law enforcement deputy sheriff in and for Jefferson County, West Virginia, or was suffering involuntary termination from his employment as a civil service protected law enforcement deputy sheriff in and for Jefferson County, West Virginia.

3.  At the time of plaintiff MICHAEL T. DODSON's involuntary termination from his employment was specifically classified as a "Sergeant" within the civil service classification created by the Jefferson County Sheriff's Department and the Jefferson County Civil Service Commission.

**Joint Appendix Pg. 7**

4.    Defendant EVERETT BOOBER was employed as the duly elected, qualified and acting Sheriff of Jefferson County, West Virginia, between January 1, 2005, through to and including the 31st day of December, 2008.    Defendant EVERETT BOOBER was the employer of plaintiff MICHAEL T. DODSON by virtue of his position as the duly elected, qualified and acting Sheriff of Jefferson County during that time.    Defendant EVERETT BOOBER was and still is a resident of Jefferson County, West Virginia.

5.    Defendant ROBERT E. SHIRLEY was employed as the duly elected, qualified and acting Sheriff of Jefferson County, West Virginia, between January 1, 2009, until his resignation as Sheriff of Jefferson County, West Virginia, in January, 2010.    Defendant ROBERT E. SHIRLEY was the employer of plaintiff MICHAEL T. DODSON by virtue of his position as the duly  elected, qualified and acting Sheriff of Jefferson County during that time.    Defendant ROBERT E. SHIRLEY was and is a resident of Jefferson County, West Virginia.

6.    Defendant PETER DOUGHERTY is employed as the duly appointed, qualified and acting Sheriff of Jefferson County, West Virginia, from his date of appointment by the County Commission of Jefferson County, West Virginia, after the resignation of defendant ROBERT E. SHIRLEY, through to and including the date of the filing of this complaint.    Defendant PETER DOUGHERTY is maintaining the termination of defendant MICHAEL T. DODSON from his employment as a civil service protected deputy sheriff of Jefferson County, West

–3–

Virginia.    Defendant PETER DOUGHERTY was and is a resident of Jefferson County, West Virginia.

7. Your defendants JAMES B. CRAWFORD III, CHRISTOPHER JACKSON, and FRANK ROSARIO were the members of the Jefferson County Deputy Sheriff's Civil Service Commission at the time of the events which are the subject of this complaint as set forth below and were a those times residents of Jefferson County, West Virginia, and acted on behalf of Jefferson County, West Virginia.

8. Your defendants PATSY NOLAND, DALE MANUEL, WALT PELISH, FRANCES MORGAN, JANE TABB, and LYNN WIDMYER, at all times relevant herein, were and/or are sitting Commissioners of Jefferson County, West Virginia, and are residents at all times herein residents of Jefferson County, West Virginia.  Your defendants PATSY NOLAND, DALE MANUEL, WALT PELISH, FRANCES MORGAN, JANE TABB, and LYNN WIDMYER were at the times relevant to this complaint the co-employer of plaintiff MICHAEL T. DODSON by virtue of their status as co-employer of all employees of the Jefferson County Sheriff's Department.

9. Your defendant JOHN GRIFFITH was at all times relevant herein is believed to be a resident of Jefferson County, West Virginia, and was at all times relevant herein a licensed polygraph examiner in the State of West Virginia.  Your defendant engaged in conduct as set forth below at the direction of defendant EVERETT BOOBER, who was then and there the Sheriff of Jefferson County, West Virginia, and performed at least some of the acts at the direction

-4-

of the said defendant EVERETT BOOBER within Jefferson County, West Virginia.   Defendant JOHN GRIFFITH further engaged in conduct at the direction of defendant ROBERT E. SHIRLEY, within Jefferson County, West Virginia.

<div align="center">B.   Jurisdiction.</div>

10.   The United States District Court for the Northern District of West Virginia is a court of proper jurisdiction to hear this matter pursuant to 28 U.S.C. §1331 since this action arises under the Constitution of the United States of America and statutes passed by the Congress of the United States of America.

<div align="center">C.   Venue.</div>

11.   Venue rises in the United States District Court for the Northern District of West Virginia pursuant to 28 U.S.C. §1391(b)(2) since the conduct alleged hereinafter occurred in whole or in part within Jefferson County, West Virginia.

12.   Venue rises in the United States District Court for the Northern District of West Virginia pursuant to 28 U.S.C. §1391(b)(1) since all defendants are residents of Jefferson County, West Virginia.

13.   Jefferson County, West Virginia, is a county-designated political subdivision of the State of West Virginia and is located within that discrete judicial geographic area known as the Northern District of West Virginia.

D.   Allegations of Fact.

14. Plaintiff MICHAEL T. DODSON was employed as a civil service law enforcement deputy sheriff for Jefferson County, West Virginia, until the 6th day of January, 2009.  On that date plaintiff MICHAEL T. DODSON was terminated from his employment as a civil service deputy sheriff by then-sheriff of Jefferson County, West Virginia, ROBERT E. SHIRLEY as a result of an investigation commenced by the predecessor sheriff, defendant EVERETT BOOBER.

15. Defendant EVERETT BOOBER engaged in conduct as a result of his employment relationship over plaintiff MICHAEL T. DODSON which were in violation of various statutes of the State of West Virginia and various regulations of the State of West Virginia and the Jefferson County Sheriff's Department, and custom and usage of the State of West Virginia, the County of Jefferson, and the Jefferson County Sheriff's Department commencing at in 2005 and continuing through to and including the 31st day of December, 2008, including, but not limited to, the following:

a.   Defendant EVERETT BOOBER, personally and by and through members of and agents acting on behalf of the Jefferson County Sheriff's Department and the Jefferson County Commission, acting at the said defendant EVERETT BOOBER's direction, control and order, subjected plaintiff MICHAEL T. DODSON to interrogation without recording the entire interrogation as required by West Virginia law; and

-6-

**Joint Appendix Pg. 11**

b.   Defendant EVERETT BOOBER, personally and by and through members of and agents acting on behalf of the Jefferson County Sheriff's Department and the Jefferson County Commission, failed to advise the plaintiff of his right to counsel during one interrogation in violation of the then-existing General Orders of the Jefferson County Sheriff's Department and as required by the laws of the State of West Virginia, and further failed to use forms and procedures required during interrogations by the regulations of the Jefferson County Sheriff's Department and the laws of the State of West Virginia; and

c.   Defendant EVERETT BOOBER personally made threats of criminal prosecution of the plaintiff MICHAEL T. DODSON during the course of an investigation of the plaintiff, in violation of the laws of the State of West Virginia, the regulations of the Jefferson County Sheriff's Department, and the custom and usage in the State of West Virginia, as well as existing decisional law of the United States Supreme Court of Appeals; and

d.   Defendant EVERETT BOOBER personally and by and through members and agents acting on behalf of the Jefferson County Sheriff's Department and the Jefferson County Commission undertook steps to terminate the plaintiff MICHAEL T. DODSON while another deputy sheriff who was simultaneously engaged in the same acts with and as the plaintiff MICHAEL T. DODSON received a substantially lower punishment for those same and simultaneous acts; and

-7-

**Joint Appendix Pg. 12**

e.  Defendant EVERETT BOOBER, personally and by and through members, agents, and contractors of the Jefferson County Sheriff's Department and the Jefferson County Commission ordered, compelled and coerced the plaintiff MICHAEL T. DODSON to take a polygraph involuntarily and in violation of the provisions of the laws of the State of West Virginia regulating polygraph examiners in this State and in violation of the regulations promulgated by the West Virginia Division of Labor relating to the governance of polygraph examinations and as well the laws of the State of West Virginia relating to investigations of civil service law enforcement deputy sheriffs and in violation of the regulations of the Jefferson County Sheriff's Department.  Defendant EVERETT BOOBER, personally and by and through members, agents and contractors of the Jefferson County Sheriff's Department and the Jefferson County Commission, failed to require that the said members, agents and contractors engaging in the polygraph examination of plaintiff MICHAEL T. DODSON record all aspects of the pre-examination interview of the plaintiff, the examination of the plaintiff, and the post-examination interview of the plaintiff during the process of administering the polygraph examination as required by the laws of the State of West Virginia.

16.  Defendant EVERETT BOOBER intentionally and willfully employed defendant JOHN GRIFFITH to be a polygraph examiner and arranged for a polygraph examination of plaintiff MICHAEL T. DODSON relating to

**Joint Appendix Pg. 13**

the subject of the internal investigation of plaintiff MICHAEL T. DODSON.  During such activity,

a.  Defendant JOHN GRIFFITH, acting as agent and contractor for the defendant EVERETT BOOBER, the Jefferson County Sheriff's Department, and the Jefferson County Commission, failed to follow procedures prescribed by the laws of the State of West Virginia and the Jefferson County Sheriff's Department relating to the requirement that all interviews of the plaintiff MICHAEL T. DODSON are required to be voluntary and without coercion, recorded in full, and otherwise performed in conformity with the laws of the State of West Virginia and the regulations of the Jefferson County Sheriff's Department; and

b.  Defendant JOHN GRIFFITH, acting as agent and contractor for defendant EVERETT BOOBER, the Jefferson County Sheriff's Department, and the Jefferson County Commission failed to ascertain that the polygraph examination of the plaintiff MICHAEL T. DODSON was in fact not coerced, ordered and involuntary and that the said polygraph examination was involuntary under the regulations of the West Virginia Division of Labor concerning polygraph examinations.

17.  Defendant EVERETT BOOBER, personally and acting by and on behalf of the Jefferson County Sheriff's Department and the Jefferson County Commission, scheduled a predisciplinary hearing for plaintiff MICHAEL T. DODSON as required by the laws of the State of West Virginia.  However, upon defendant EVERETT BOOBER's observation of the hearing panel, defendant EVERETT BOOBER ended

**Joint Appendix Pg. 14**

the predisciplinary hearing prior to its commencement based upon an alleged conflict of a member of the said predisciplinary hearing panel. As of the date of the filing of this Complaint, no predisciplinary hearing has been held regarding plaintiff MICHAEL T. DODSON's employment.

18. Defendant ROBERT E. SHIRLEY was the successor in office to defendant EVERETT BOOBER and affirmed, adopted and ratified the actions of defendant EVERETT BOOBER during his term of office as described above in paragraphs 15, 16, and 17 of this Complaint. Additionally, defendant ROBERT E. SHIRLEY, either personally or by and through members, agents and contractors of the Jefferson County Sheriff's Department, and on behalf of the Jefferson County Commission, engaged in conduct including, but not limited to, the following:

a. Terminated the plaintiff MICHAEL T. DODSON without first conducting a predisciplinary hearing as required by the laws of the State of West Virginia and the regulations of the Jefferson County Sheriff's Department; and

b. Utilized in a hearing before the Jefferson County Deputy Sheriff's Civil Service Commission evidence taken in violation of the laws of the State of West Virginia and the regulations of the Jefferson County Sheriff's Department; and

c. Utilized in a hearing before the Jefferson County Deputy Sheriff's Civil Service Commission the evidence of defendant JOHN GRIFFITH taken and acquired in violation of the laws of the State

-10-

**Joint Appendix Pg. 15**

of West Virginia and the regulations of the Jefferson County Sheriff's Department.

19. Plaintiff MICHAEL T. DODSON to the date of the filing of this complaint has not yet received his predisciplinary hearing as required by the laws of the State of West Virginia and the regulations of the Jefferson County Sheriff's Department.

20.   Defendant PETER DOUGHERTY is the successor in office to defendant ROBERT E. SHIRLEY upon defendant ROBERT E. SHIRLEY's resignation from the position of Sheriff of Jefferson County, West Virginia. Defendant PETER DOUGHERTY affirmed, adopted and ratified the actions of defendant EVERETT BOOBER during his term of office as described above in paragraphs 15, 16, and 17 of this Complaint and the actions of defendant ROBERT E. SHIRLEY during his term of office as alleged in paragraphs 18 and 19 of this complaint.

21.   Plaintiff MICHAEL T. DODSON has yet to receive a predisciplinary hearing as of the date of filing of this complaint.

22.   The laws of the State of West Virginia clearly require a predisciplinary hearing for a law enforcement deputy sheriff before a sheriff may terminate the civil service law enforcement deputy sheriff's position or appointment.

23.   Defendants PATSY NOLAND, DALE MANUEL, WALT PELISH, FRANCES MORGAN, JANE TABB, and LYNN WIDMYER, as members of the Jefferson County Commission, failed to assure that their employee, plaintiff MICHAEL T. DODSON, received a predisciplinary hearing before his termination from his civil service position as a law enforcement

-11-

deputy sheriff with the Jefferson County Sheriff's Department by defendant ROBERT E. SHIRLEY.

24.  Defendants PATSY NOLAND, DALE MANUEL, WALT PELISH, FRANCES MORGAN, JANE TABB, and LYNN WIDMYER, as members of the Jefferson County Commission, failed to assure that their employee, plaintiff MICHAEL T. DODSON,  received a full and fair investigation and hearings at the hands of defendants EVERETT BOOBER and ROBERT E. SHIRLEY as required by the laws of the State of West Virginia and the regulations of the Jefferson County Sheriff's Department.

25.  Defendants JAMES B. CRAWFORD, III, CHRISTOPHER JACKSON, and FRANK ROSARIO are authorized under W. Va. Code §7-14-6(3), either individually or collectively, to investigate all matters touching the enforcement and effect of the provisions of Chapter 7, Article 14 of the West Virginia Code and any person in the public service with respect to the execution of the deputy sheriff's civil service law.

26.  During the course of a hearing before the Jefferson County Deputy Sheriff's Civil Service Commission relating to the termination of plaintiff MICHAEL T. DODSON, the defendants JAMES B. CRAWFORD, III, CHRISTOPHER JACKSON, and FRANK ROSARIO became actually aware that no predisciplinary hearing was held with respect to the plaintiff MICHAEL T. DODSON.  However, the defendants JAMES B. CRAWFORD, III, CHRISTOPHER JACKSON, and FRANK ROSARIO individually and collectively failed to halt proceedings against plaintiff MICHAEL T. DODSON until such time as defendant

-12-

**Joint Appendix Pg. 17**

ROBERT E. SHIRLEY provided plaintiff MICHAEL T. DODSON with a predisciplinary hearing as required by Chapter 7, Article 14C of the West Virginia Code.

27.    Defendants JAMES B. CRAWFORD, III, CHRISTOPHER JACKSON, and FRANK ROSARIO further decided not to undertake any investigation authorized under W. Va. Code §7-14-6(3) to determine whether or not defendants EVERETT BOOBER, ROBERT E. SHIRLEY, members of the Jefferson County Sheriff's Department acting at the direction and control of defendants EVERETT BOOBER and ROBERT E. SHIRLEY conformed their actions to the laws of the State of West Virginia and the regulations of the Jefferson County Sheriff's Department, including, but not limited to, the existence of any predisciplinary hearing required by W. Va. Code §7-14C-3 and regulations of the Jefferson County Sheriff's Department and/or the Jefferson County Deputy Sheriff's Civil Service Commission relating to plaintiff MICHAEL T. DODSON, the formation and conduct of a hearing panel for the plaintiff MICHAEL T. DODSON's predisciplinary hearing under W. Va. Code §7-14C-1(4) and regulations of the Jefferson County Sheriff's Department and/or the Deputy County Deputy Sheriff's Civil Service Commission, and whether there were threats of criminal action against the plaintiff MICHAEL T. DODSON in violation of W. Va. Code §7-14C-2 and the regulations of the Jefferson County Sheriff's Department and/or the Deputy County Deputy Sheriff's Civil Service Commission, and whether all proceedings relating to the interview and interrogation of

-13-

plaintiff MICHAEL T. DODSON were completely recorded as required by W. Va. Code §7-14C-2 and the regulations of the Jefferson County Sheriff's Department and/or the Deputy County Deputy Sheriff's Civil Service Commission.   Defendants JAMES B. CRAWFORD, III, CHRISTOPHER JACKSON, and FRANK ROSARIO became actually aware of the foregoing during the course of the termination hearing of the plaintiff MICHAEL T. DODSON and failed to undertake the investigation into those matters and proceeded with the termination of plaintiff MICHAEL T. DODSON intentionally and willfully in disregard of the requirements and known standards of conduct imposed by the laws of the State of West Virginia and the regulations of the Jefferson County Sheriff's Department and/or the Deputy County Deputy Sheriff's Civil Service Commission.

28.   Defendants PATSY NOLAND, DALE MANUEL, WALT PELISH, FRANCES MORGAN, JANE TABB, and LYNN WIDMYER, as members of the Jefferson County Commission, failed to assure that their employee, plaintiff MICHAEL T. DODSON,  received a full and fair investigation at the hands of defendants EVERETT BOOBER and ROBERT E. SHIRLEY, the Sheriffs of Jefferson County, and a full and fair investigation and hearing at the hands of defendants JAMES B. CRAWFORD, III, CHRISTOPHER JACKSON, and FRANK ROSARIO as members of the Jefferson County Deputy Sheriff's Civil Service Commission.

E.   Cause of Action - 42 U.S.C. §1983.

29.   All defendants in this action deprived the plaintiff MICHAEL T. DODSON of his rights, privileges, and immunities under the

-14-

Constitution of the United States of America, including, but not limited to, the Fifth Amendment to the United States Constitution, the Fifth and Fourteenth Amendments to the United States Constitution, and other provisions of the United States Constitution and federal law and did so under color of the laws of the State of West Virginia, the regulations of the State of West Virginia, the Jefferson County Sheriff's Department, the Jefferson County Deputy Sheriff's Civil Service Commission, and the customs and usages in the State of West Virginia.

30.  Specifically, the defendants violated the plaintiff MICHAEL T. DODSON's right to procedural due process under the Constitution of the United States of America and his privileges and immunities thereunder as a citizen and resident of the United States of America by depriving the plaintiff MICHAEL T. DODSON of his employment as a public employee without procedural due process of law and by depriving the plaintiff MICHAEL T. DODSON of his future employment as a public employee without procedural due process of law.

31.  Specifically, the defendants violated the plaintiff MICHAEL T. DODSON's right to substantive due process under the Constitution of the United States of America and his privileges and immunities thereunder as a citizen and resident of the United States of America by depriving the plaintiff MICHAEL T. DODSON of his substantive due process right to fair and equal treatment under the

-15-

**Joint Appendix Pg. 20**

law, his property right to continued employment, and his property right to a full and fair predisciplinary hearing.

### F.  Constitutional Tort.

29.  All defendants in this action deprived the plaintiff MICHAEL T. DODSON of his rights, privileges, and immunities under the Constitution of the United States of America, including, but not limited to, the Fifth Amendment to the United States Constitution, the Fifth and Fourteenth Amendments to the United States Constitution, and other provisions of the United States Constitution and federal law and did so under color of the laws of the State of West Virginia, the regulations of the State of West Virginia, the Jefferson County Sheriff's Department, the Jefferson County Deputy Sheriff's Civil Service Commission, and the customs and usages in the State of West Virginia.

30.  Specifically, the defendants violated the plaintiff MICHAEL T. DODSON's right to procedural due process under the Constitution of the United States of America and his privileges and immunities thereunder as a citizen and resident of the United States of America by depriving the plaintiff MICHAEL T. DODSON of his employment as a public employee without procedural due process of law and by depriving the plaintiff MICHAEL T. DODSON of his future employment as a public employee without procedural due process of law.

31.  Specifically, the defendants violated the plaintiff MICHAEL T. DODSON's right to procedural due process under the Constitution of

-16-

**Joint Appendix Pg. 21**

the United States of America and his privileges and immunities thereunder as a citizen and resident of the United States of America by depriving the plaintiff MICHAEL T. DODSON of his substantive due process right to fair and equal treatment under the law, his property right to continued employment, and his property right to a full and fair predisciplinary hearing.

32. The defendants engaged in the conduct set forth above in this complaint in known violation of a constitutional or statutory requirement.

<u>G.   Prayer for Relief.</u>

WHEREFORE, the plaintiff MICHAEL T. DODSON prays that this Court grant him the following relief:

A.    Declaratory relief and an injunction prohibiting the defendants from engaging in any further disciplinary proceedings in the underlying proceeding before the Sheriff of Jefferson County; and

B.   Nominal damages; and

C.   Compensatory damages for the injuries suffered by the plaintiff MICHAEL T. DODSON, including, but not limited to, lost wages and benefits, lost insurance benefits, lost retirement benefits, loss of accrued benefits which the plaintiff MICHAEL T. DODSON had to cash in to maintain life and health, loss of promotional opportunities, damages for defamation, humiliation, embarrassment as a result of the conduct of the defendants; and

**Joint Appendix Pg. 22**

D.   Punitive and exemplary damages as may be applicable in this action; and

E.   Costs of this action; and

F.   A reasonable attorney's fee; and

G.   Restoration of the plaintiff MICHAEL T. DODSON to his original position prior to the conduct complained of herein without suffering any loss of money or position; and

H.   Prejudgment interest; and

I.   Any other relief that this Court may deem just and proper.


Plaintiff demands a trial by jury as to issues so triable.



Respectfully presented,

MICHAEL T. DODSON,
Plaintiff,

By Counsel,

/s/ Mark McMillian
_____
MARK MCMILLIAN (WV #9912)
ROBERT WILLIAM SCHULENBERG III (WV #3301)
MARK MCMILLIAN - ATTORNEY AT LAW, L.C.
1018 KANAWHA BOULEVARD, EAST
SUITE 900
CHARLESTON, WV 25301
email: mark@markmcmillian.com
Tel:(304) 720-9099
Fax: (304 720-0290

IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT
OF WEST VIRGINIA

MICHAEL T. DODSON,

        Plaintiff,

v.                                    Civil Action no 3:13CV149-GMG

EVERETT BOOBER, JOHN GRIFFITH, et al

## MOTION TO DISMISS

Now comes your defendant and moves to dismiss the plaintiff's complaint because

it fails to state a claim pursuant to Rule 12 (b) (6) of the Federal Rules of Civil Procedure.

Specifically the complaint alleges that the defendant John Griffith failed to tape record the

psychophysiological examination given by the defendant to the plaintiff and failed to ascertain

that the examination was not coerced.

### Tape Recording

Title 42 Series 6 Section 8.2 © of West Virginia Legislative Rules effective June 1, 2004
specifically

prohibits a psychophysiological examination from being recorded by audio or video means.

### Consent by the Plaintiff

Title 42 Series 6 Section 8.1 (a) of the West Virginia Legislative rules requires that the

psychophysiological examiner obtain written consent by the person being examined prior to

conducting the psychophysiological examination.

A copy of the consent form is attached hereto and made a part hereof. Consequently the defendant John Griffith relied upon the written statement of the defendant that he was voluntarily taking the examination and not being coerced into taking it. Not withstanding the actions of others John Griffith did nothing to coerce the plaintiff into taking the examination.

## ANSWER

Now comes your defendant John Griffith and answers the plaintiff's complaint and says:

1. The defendant admits the allegations contained in paragraph 1 of the Complaint.

2. The defendant is without sufficient information to admit or deny the allegations contained in paragraph 2 of Plaintiff's complaint and therefore must deny same and demand the strictest proof thereof.

3. The defendant admits the allegations contained in paragraph 3 of the Complaint.

4. The defendant admits the allegations contained in paragraph 4 of the Complaint.

5. The defendant admits the allegations contained in paragraph 5 of the Complaint.

6. The defendant admits the allegations contained in paragraph 6 of the Complaint.

7. The defendant admits the allegations contained in paragraph 7 of the Complaint.

8. The defendant admits the allegations contained in paragraph 8 of the Complaint.

9. The defendant admits the allegations contained in paragraph 9 of the Complaint.

10. The defendant admits the allegations contained in paragraph 10 of the Complaint.

11. The defendant admits the allegations contained in paragraph 11 of the Complaint.

12. The defendant admits the allegations contained in paragraph 12 of the Complaint.

13. The defendant admits the allegations contained in paragraph 13 of the Complaint.

14. The defendant admits the allegations contained in paragraph 14 of the Complaint.

15. The defendant denies the allegations contained in paragraph 15 of the Complaint.

16. The defendant denies the allegations contained in paragraph 16 of the Complaint.

17. . The defendant is without sufficient information to admit or deny the allegations contained in paragraph 17 of Plaintiff's complaint and therefore must deny same and demand the strictest proof thereof.

18. . The defendant is without sufficient information to admit or deny the allegations contained in paragraph 18 (a) and (b) of Plaintiff's complaint and therefore must deny same and demand the strictest proof thereof. The defendant denies the allegation contained in paragraph 18 © of plaintiffs complaint.

19. . The defendant is without sufficient information to admit or deny the allegations contained in paragraph 19 of Plaintiff's complaint and therefore must deny same and demand the strictest proof thereof.

20. . The defendant is without sufficient information to admit or deny the allegations contained in paragraph 20 of Plaintiff's complaint and therefore must deny same and demand the strictest proof thereof. The defendant would again deny the allegations contained in paragraph 18 © of plaintiff's complaint.

21.. The defendant is without sufficient information to admit or deny the allegations contained in paragraph 21 of Plaintiff's complaint and therefore must deny same and demand the strictest proof thereof.

22. . The defendant is without sufficient information to admit or deny the allegations contained in paragraph 22 of Plaintiff's complaint and therefore must deny same and demand the strictest proof thereof.

**Joint Appendix Pg. 26**

23. . The defendant is without sufficient information to admit or deny the allegations contained in paragraph 23 of Plaintiff's complaint and therefore must deny same and demand the strictest proof thereof.

24. . The defendant is without sufficient information to admit or deny the allegations contained in paragraph 24 of Plaintiff's complaint and therefore must deny same and demand the strictest proof thereof.

25. . The defendant is without sufficient information to admit or deny the allegations contained in paragraph 25 of Plaintiff's complaint and therefore must deny same and demand the strictest proof thereof.

26. . The defendant is without sufficient information to admit or deny the allegations contained in paragraph 26 of Plaintiff's complaint and therefore must deny same and demand the strictest proof thereof.

27. The defendant is without sufficient information to admit or deny the allegations contained in paragraph 2 7of Plaintiff's complaint and therefore must deny same and demand the strictest proof thereof. The defendant would state that the Legislative Rule governing psychophysiological tests specifically bars the use of a recording device in conducting examinations.

28. . The defendant is without sufficient information to admit or deny the allegations contained in paragraph 28 of Plaintiff's complaint and therefore must deny same and demand the strictest proof thereof.

29. The defendant denies the allegations contained in paragraph 29 of the Complaint.

30. The defendant denies the allegations contained in paragraph 30 of the Complaint.

31. The defendant denies the allegations contained in paragraph 31 of the Complaint.

32.  The defendant denies the allegations contained in paragraph 32 of the Complaint.

The Defendant, John Griffith, having answered all of the material allegations in the

Plaintiff's complaint would demand that the complaint be dismissed and that he have his costs

expended including a reasonable attorney's fee.

<div style="text-align:right">
John Griffith<br>
Defendant<br>
By Counsel
</div>

James T. Kratovil, Esq.
WVSB # 2103
211 W. Washington Street
Charles Town, West Virginia 25414
(304)728-7718
kratovil@charlestownlaw.com

03/30/2009 14:09 FAX 304 728 3299         JCSO                                    ☑003
03/30/2009    11:13    BCI MARTINSBURG → 93047283299                   NO.253   P02

42CSR6

# TITLE 42
# LEGISLATIVE RULE
# DIVISION OF LABOR

## SERIES 6
## PSYCHOPHYSIOLOGICAL DETECTION OF DECEPTION
## EXAMINATIONS, LIMITATIONS OF USE, REQUIREMENTS,
## LICENSES AND PENALTIES

### §42-6-1. General.

1.1. Scope. -- Pursuant to the authority granted to the Commissioner of Labor in W. Va. Code §21-5-5c and in accordance with the provisions of W. Va. Code §29A-1-1 governs, clarifies and prescribe actions necessary to comply with W. Va. Code §§21-5-5a, -5b, -5c, and -5d

1.2. Authority -- W. Va. Code §§21-5-5c and 29A-1-1.

1.3. Filing Date. -- May 4, 2004.

1.4. Effective Date -- June 1, 2004

### §42-6-2. Definitions.

2.1. "Commissioner" means the Commissioner of Labor or his or her duly authorized representative.

2.2. "Internship" means a course of study in the psychophysiological detection of deception, or similar tests and the administration of the tests by a trainee registered with the Commissioner of Labor. The program shall be under the personal supervision of a licensed examiner in accordance with a course of study prescribed by the Commissioner at the commencement of the internship.

2.3. "Intern" means a person registered with the Commissioner of Labor and enrolled in an approved internship program.

2.4. "Examiner" means a person holding a current valid license issued by the Commissioner of Labor to administer psychophysiological detection of deception or other similar tests as provided in W. Va. Code

2.5. "License" means documented authority to practice as a psychophysiological detection of deception examiner as issued by the Commissioner of Labor.

2.6. "Employee" means an individual employed by an employer; except in the area of drugs as provided in W. Va. Code §21-5-5(b), employees have direct access to drugs, other than ordinary drugs, as defined in chapter thirty of the West Virginia Code, in their daily routine job duties in an area utilized by such employee which facilities have been approved by the West Virginia Board of Pharmacy shall be the only employees of such employer who shall be subject to psychophysiological detection of deception tests.

### §42-6-3. License.

3.1. Examination required. -- After the effective date of this rule, the Commissioner shall issue a license only those persons who have satisfactorily passed an examination and who have otherwise met and complied with the requirements of this rule and W. Va. Code §§21-5-5a, -5b, -5c and -5c

3.2. Form of request. -- An individual applying to be examined for an examiner's license under the provisions of this rule shall us a condition precedent to the examination furnish the Commissioner of Labor with the following:

(a) A completed application in writing on forms provided by the Commissioner, and containing the information required by the Commissioner to determine the eligibility of the applicant.

(b) A copy of the applicant's birth certificate and a

03/30/2009 14:10 FAX 304 728 3299        JCSO                                    ☎ 004
    03/30/2009    11:13    BCI MARTINSBURG → 93047283299                    NO. 253    P03

42CSR6

(c) A nonrefundable fee of one hundred dollars ($100).

(d) To qualify for a Class I license, satisfactory evidence that the applicant holds a baccalaureate degree and has graduated from a school of polygraphy accredited by the American Polygraph Association.

(e) To qualify for a Class II license, satisfactory evidence that the applicant holds an associate degree and has graduated from a school of polygraph accredited by the American Polygraph Association.

(f) Satisfactory evidence that the applicant has completed an approved internship program.

(g) Satisfactory indication that the applicant subscribes to the code of ethics and standards and principles of practice of the American Polygraph Association.

3.3. Time of request. -- Applications must comply with the requirements of Subsection 3.2 and must be submitted no later than ten (10) working days in advance of the next regularly scheduled examination in order for the applicant to receive authorization to be examined.

3.4. Authorization for examination. -- Applicants complying with Subsections 3.2 of this section and 3.3 of this section will be issued a written authorization by the commissioner acknowledging receipt of the license application fee and setting forth the time and place of the examination. The authorization also serves as evidence to the person conducting the examination that the holder is properly authorized to be examined. Applicants to be examined may be required to present further evidence of personal identification as a condition precedent to examination.

3.5 Scheduling of examination. -- The Commissioner shall prepare and offer the examination at least four (4) times each fiscal year. However, the commissioner shall not schedule an examination in any quarter in which no person has made application satisfying the requirements of Subsection 3.4. The

any additional times he or she considers necessary.

3.6 Passing grade required. -- An applicant must obtain a minimum score of seventy percent (70%) on the examination to permit the Commissioner to issue a license.

3.7 Expiration and renewal. -- The license expires on the thirtieth day of June following its issuance or renewal. The Commissioner shall reissue annually the license of any licensed examiner who qualifies and makes application for a license. A renewal fee of one hundred dollars ($100) is required for renewal. It is the individual responsibility of every license holder to contact the Commissioner and make specific request for license renewal. Licenses are not automatically renewed.

3.8. Reexamination after expiration. -- Any license not renewed in accordance with the provisions of Subsection 3.7 of this section is expired. Any expired license may be renewed without examination upon proper request to the Commissioner in the manner described in Subsection 3.7of this section: Provided, That after September 30 from the date of expiration, no expired license will be renewed until the applicant has been reexamined in accordance with this rule.

3.9. Reexamination upon failure. -- Any applicant who fails the license examination may take the test again at the next regularly scheduled time: Provided, that after the second examination the applicant shall pay an examination fee of fifty dollars ($50.00) to cover the costs for each attempt to pass the examination: Provided however, That any applicant requesting to take the examination at a time other than that time regularly scheduled by the Commissioner shall pay a separate fee of fifty dollars ($50.00).

3.10. Denial, suspension or revocation of license -- The Commissioner may deny, suspend or revoke any license on any one or more of the following grounds:

(a) A material misstatement in the application for a license or in the application for the renewal of a license.

03/30/2009 14:12 FAX 304 728 3299    JCSO    @005

03/30/2009    11:13    BCI MARTINSBURG → 9304728329 9    NO.253    P04

42CSR6

(b) A violation of, or aiding or abetting another in the violation of W. Va. Code §§21-5-5a, -5b, -5c, and -5d or any rule issued pursuant thereto.

(c) The licensee has been found guilty of the commission of a felony or a misdemeanor involving moral turpitude.

(d) The licensee has made any willful misrepresentation or false promises or has caused to be printed any false or misleading information for the purpose of directly or indirectly obtaining business or interns.

(e) The licensee has demonstrated unworthiness or incompetency to act as an examiner.

(f) The licensee has allowed his or her license to be used by an unlicensed person.

(g) The licensee has failed, within a reasonable time, to provide information requested by the Commissioner as a result of a formal or informal complaint to the Commissioner, which would indicate a violation of this article.

§42-6-4. Internship Training.

4.1 Requirements to begin internship. -- An individual may begin the six (6) month internship program only if he or she:

(a) Is registered with the Commissioner as an intern;

(b) Files with the Commissioner the name and identifying information of his or her internship supervisor who must be an examiner licensed by the Commissioner;

(c) Files with the Commissioner a written statement from his or her internship supervisor agreeing to undertake the supervisor responsibility for the training and agreeing to abide by regulations and requirements adopted by the Commissioner;

(d) Obtains the Commissioner's permission to begin the internship program under the control of the proposed supervisor.

(e) Is at least eighteen (18) years of age;

(f) Is a citizen of the United States;

(g) Has not been convicted of a felony or of a misdemeanor involving moral turpitude;

(h) Has not been released or discharged with other than honorable conditions from the armed services of the United States or that of any other nation; and

(i) Has been graduated from a polygraph school accredited by the American Polygraph Association.

4.2 Requirements of internship training. -- The intern has met the requirements of the internship training if:

1. The licensed examiner serving as supervisor has thoroughly covered the following areas with the intern:

A. The history and development of polygraph

B. The legal and ethical aspects of polygraph

(1) W. Va. Code §§21-5-5a, -5b, -5c, and -5d and accompanying rules;

(2) Statements and reports;

(3) Civil rights of examinees; and

(4) Examiner and professional ethics

C. Physiology

(1) Nervous system

(2) Autonomic nervous system

(a) Sympathetic nervous system

(b) Parasympathetic

03/30/2009 14:13 FAX 304 728 3299    JCSO                                    ☑006
03/30/2009    11:13    RCI MARTINSBURG → 93047283299                    NO.253    D05

42CSR6

heart

    (4)  Respiratory system

    (5)  Effects of drugs, alcohol and illness

  D.  Psychology

    (1)  General

    (2)  Abnormal

    (3)  As applied to polygraph

  E.  Interrogation and interviews

    (1)  Receiving case briefing

    (2)  Pre-test interview
    (3)  Post-test interrogation

  F.  Chart interpretation

    (1)  All types of tests and responses

    (2)  Chart making

  G.  Question formulation and test construction

    (1)  All types of tests

    (2)  All types of questions

    (3)  Semantics

  H.  Instrumentation

    (1)  Construction and maintenance

    (2)  Standards of accuracy

    (3)  Nomenclature

2  The internship program consisted of no less than one thousand forty (1,040) hours of work and instruction under the direct and close supervision of the licensed examiner approved as supervisor of the intern.

(520) hours of the internship, the supervisor was on the premises where the testing was being conducted by the intern, and was immediately available for instruction or consultation with the intern.  At the end of each examination conducted by an intern, the supervisor shall have reviewed and critiqued the polygraph charts of every examination conducted by the intern, and placed his or her initials and the date of the review at the end of the chart before the results of tests provided to an employer or other person requesting the test; and

  A.  At the end of the first five hundred twenty (520) hours of the internship, the intern may conduct tests upon approval of the supervisor without the supervisor being on the premises and immediately available, but must comply with all other requirements of this subsection.

  B  The intern conducted at least fifty (50) examinations during the internship program.  The Commissioner may request and require inspection and review of any or all of such charts or any other elements of the internship program at any time during the internship program.

4.  If at any time a conflict arises during an internship program, either the intern or the supervisor may appeal in writing to the Commissioner for mediation of the conflict.  The Commissioner may call upon any resident licensed examiner to assist in any hearings, reviews or critiques in order to resolve the conflict.

5  The intern and the supervising examiner shall report any infraction or violation of the rules which regulate the intern program to the Commissioner for appropriate action.

6.  The supervising examiner shall sign a release stating that all requirements of the internship program have been met by the intern and in his or her opinion the intern is competent to be a licensed examiner before the intern will be allowed to take the license examination.

7.  Supervision of interns -- Licensed examiners shall not have more than two (2) interns under his

03/30/2009 14:14 FAX 304 728 3299        JCSO                                    @007
03/30/2009    11:13    BCI MARTINSBURG → 93047283299                     NO.253    D06

42CSR6

### §42-6-5.  Reciprocity.

5.1.  Reciprocity requirements.  -- The commissioner may issue a license without examination to an applicant who is a licensee examiner under the laws of another state or territory of the United States, upon payment of a fee of one hundred dollars ($100), and the production of satisfactory proof that:

(a)  The applicant is at least eighteen (18) years of age;

(b)  He or she is a citizen of the United States;

(c)  He or she has not been convicted of a misdemeanor involving moral turpitude or a felony;

(d)  He or she has not been released or discharged with other than honorable conditions from the Armed Forces of the United States or that of any other nation;

(e)  He or she has met equivalents of all educational and training requirements established by the Commissioner of Labor;

(f)  The requirements for the licensing of examiners in the state or territory of the United States where the applicant is licensed, are substantially equivalent to the requirements in force in this State;

(g)  The applicant had lawfully engaged in the administration of psychophysiological detection of deception examinations under the laws of the state or territory in which he or she is licensed for at least two (2) years prior to application for license in West Virginia; and

(h)  The other state or territory grants similar reciprocity to license holders of this State.

### §42-6-6.   Intervention; Employee Organizations.

6.1.  Intervention; employee organization. -- With the written consent of any individual who is or would be aggrieved by a violation or

§b, §c, and §d, any appropriate employee organization may bring civil action on behalf of the individual or may intervene in any civil action.

### §42-6-7.  Standards of Accuracy.

7.1.  Standards of accuracy for machines or other devices  --  Any equipment, machines or other devices used or to be used in the psychophysiological detection of deception or similar tests shall, in addition to criteria set forth in W. Va. Code §21-5-5A, be calibrated or checked for accuracy by the licensed examiner at least once every six (6) months in a manner which meets the manufacturer's specifications. A log recording the calibration shall be kept with the machine at all times and shall include the date of calibration, the specifications met, and the signature of the person performing the calibration.  The psychophysiological detection of deception chart made in connection with the most recent calibration shall be kept with the log, and the chart shall contain a notation of the date, time and what action or adjustments were performed.  The log and chart shall be made available to the Commissioner for examination at the examiner's business location upon request by the Commissioner.

### §42-6-8.   Conditions and Procedures for Psychophysiological Detection of Deception Examination.

8.1.  The minimum standards of procedure for administering psychophysiological detection of deception examinations:

(a)  The examiner shall inform the prospective examinee that taking the psychophysiological detection of deception examination is a voluntary act and the examiner must obtain the written consent of the examinee to undergo examination;

(b)  The examiner shall not conduct an examination on any person whom he or she believes, through observation or any other credible evidence, to be physically or psychologically unfit for the examination at that time;

(c)  The examiner shall, immediately upon request of the examinee, terminate the

Joint Appendix Pg 34

Appeal: 14-1371      Doc: 24-1      Filed: 07/02/2014      Pg: 37 of 402

03/30/2009 14:16 FAX 304 728 3299          JCSO                                    ☑008
    03/30/2009      11:13      BCI MARTINSBURG → 9304720832299                 NO. 253     007

examination in progress;

(d) The examiner shall not render a verbal or written opinion based on chart analysis, until the examinee has had a reasonable opportunity to explain any reactions to pertinent questions;

(e) The examiner shall not interrogate or conduct an examination of an examinee's sexual behavior, or ask any questions that can be construed as being sexually oriented or personally embarrassing to the examinee, regardless of marital status, unless the topic is a specific issue or unless it refers to the basic matter pertinent to the examination;

(f) The examiner shall not conduct an examination when he or she has reason to believe the examination is intended to circumvent or defy the law;

(g) The examiner shall not knowingly issue a psychophysiological detection of deception examination report which is misleading, biased or falsified in any way. Each report shall be a factual, impartial and an objective account of the pertinent information developed during the examination and the examiner's professional conclusion, based on analysis of the psychophysiological detection of deception charts;

(h) The examiner shall not conduct a psychophysiological detection of deception examination without first reviewing the issues to be covered during the examination and the general content of the questions to be asked during the examination with the examinee;

(i) The examiner shall not render a conclusive verbal or written decision, based on chart analysis, as to the truthfulness or deception of the examinee without having administered two (2) or more psychophysiological detection of deception charts covering the same relevant issue. The examiner may terminate an examination in progress at his or her own discretion when, in his or her opinion, the examinee has become physically or psychologically unfit, or has become uncooperative to the point that it would be useless to continue the examination;

(j) All questions and answers asked during a psychophysiological detection of deception examination shall be marked on the psychophysiological detection of deception charts at the appropriate place on the chart where the question was asked and the answer given. If a question sheet with numbered questions is used, the number of the asked question along with the answer given shall be noted; and the question sheet shall be attached to the psychophysiological detection of deception chart and made a part of the examinee's file. Each psychophysiological detection of deception chart should be identified as to the person being examined, the examiner, time and date of the examination and the chart number;

(k) The examiner shall not, unless professionally qualified to do so, include in any written report, any statement purporting to be a medical, legal or psychiatric opinion or which would infringe upon areas under the cognizance of professionals in these fields. The examiner may describe the appearance or behavior of the examinee, if this is pertinent to the examination, as long as the examiner refrains from offering any diagnosis which he or she is professionally unqualified to make; and

(l) The examiner shall report to the Commissioner any action or misconduct on the part of another examiner which would be in violation of the provisions of W. Va. Code §621 et seq. or the rule promulgated under the Code.

8.2. Minimum standards of conditions under which a psychophysiological detection of deception or similar test may be given are:

(a) The examinee shall be afforded privacy during the examination. The only persons other than the examiner and the examinee who may be in the same room during an examination are a registered intern and/or an interpreter if necessary because of language, hearing or speech difficulties or handicap;

(b) The examination area shall be reasonably free of noise and interruption; and within the normally acceptable temperature ranges for office work;

(c) No video or audio recorders, telephonic or speakerphone devices (previously)

shall operate during the examination to record or broadcast any elements of the examination except the record of the psychophysiological detection of deception chart; and

(d) No two-way mirrors or any other devices shall be used for observation of the examination by any persons outside the examination room.

**AGREEMENT TO TAKE POLYGRAPH EXAMINATION**

I, MICHAEL TODD DODSON

do voluntarily on this 14TH day of AUGUST, 19 2008,

without threat or promise of reward or immunity agree to take a polygraph

examination, incident to the investigation of ALLEGED SEXUAL

MISCONDUCT WITH TRACY EDWARDS

_____

_____

I understand that the questions to be asked will be reviewed with me prior

to the examination.

~~I agree that a voice recording of the polygraph examination will be made.~~

_____
(Signature)

_____
(Polygraph Examiner)

WITNESS: _____

WITNESS: _____

| | TIME IN | TIME OUT |
|---|---|---|
| | 3:14 PM | 5:35 PM |
| | | |

| CASE NUMBER | DATE |
|---|---|
| # 08 008 | 8/14/08 |

PS Form  2045
Sup. 1078

## CERTIFICATE OF SERVICE

I, James T. Kratovil, Esquire, counsel for defendant, hereby certify that I served

the foregoing *Motion to Dismiss and Answer* upon the Mark McMillian, Esq. by mailing a   true

copy thereof to the below listed address on this the 10th day of November, 2013: and by filing

the same on PACER TO mark@markmcmillian.com

Mark McMillian Esq.
Mark McMillian - ATTORNEY AT LAW, L.C.
1018 Kanawha Blvd, East
Charleston, West Virginia 25301

_____

James T. Kratovil

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF WEST VIRGINIA
### (MARTINSBURG)

**MICHAEL T. DODSON,**

        **Plaintiff,**

                                          **CIVIL ACTION 3:12-cv-00149**

**v.**                                        **(JUDGE BAILEY)**

**EVERETT BOOBER, individually
and in his capacity as Sheriff of
Jefferson County, West Virginia, et al,**

        **Defendants.**

## MOTION TO DISMISS

Defendants Everett Boober, Robert Shirley, Peter Dougherty, James Crawford, III, Christopher Jackson, Frank Rosario, Patsy Noland, Dale Manuel, Walt Pelish, Frances Morgan, Jane Tabb, and Lynn Widmyer, all of whom have been named in their individual and official capacities, by counsel, Bridget M. Cohee and Steptoe & Johnson PLLC, respectfully request that the Complaint in this civil action be dismissed with prejudice, pursuant to Federal Rules of Civil Procedure, Rule 12(b)(6), for failure to state a claim for which relief can be granted. When matters outside of the pleadings are submitted with a Motion pursuant to Rule 12(b)(6), the Motion is converted to a Motion for Summary Judgment pursuant to Rule 56. The Defendants respectfully request that the Court grant Summary Judgment upon the Motion, Memorandum and submissions herewith and dismiss this matter with prejudice.

West Virginia Code Section 7-14-17 requires dismissal of a deputy sheriff be for just cause, which means misconduct of a substantial nature directly affecting the rights and interests of the public. The Plaintiff was terminated for just cause based upon substantial evidence, as

more fully set forth in the Memorandum in Support of the Motion to Dismiss, filed contemporaneously with this Motion. He has appealed the decision of the Sheriff to the Civil Service Commission, the Circuit Court and the West Virginia Supreme Court of Appeals. He has been given a pre-disciplinary hearing, has filed exceptions, requested reversal and another Notice of Appeal to the Civil Service Commission. The Sheriff's decision to discharge the Plaintiff has been upheld time and again, the Plaintiff has received due process and this matter is ripe for final disposition.

Wherefore, the Defendants respectfully request that the Court enter summary judgment and dismiss this matter with prejudice.

By Counsel,

/s/ Bridget M. Cohee
Bridget M. Cohee, Esquire (WVSB# 8625)
Steptoe & Johnson PLLC
P.O. Box 2629
1250 Edwin Miller Blvd., Ste 300
Martinsburg, WV 25404
Telephone:    (304) 263-6991
Facsimile:    (304) 262-3541

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF WEST VIRGINIA
(MARTINSBURG)


MICHAEL T. DODSON,

        **Plaintiff,**

                                      **CIVIL ACTION 3:12-cv-00149**

**v.**                                   **(JUDGE BAILEY)**


EVERETT BOOBER, individually
and in his capacity as Sheriff of
Jefferson County, West Virginia, et al,

        **Defendants.**

### DEFENDANTS' MEMORANDUM OF LAW
### IN SUPPORT OF THE MOTION TO DISMISS

Defendants, by counsel, pursuant to Federal Rules of Civil Procedure, Rule 12(b)(6), respectfully request that this case be dismissed for failure to state a claim for which relief can be granted. When matters outside of the pleadings are submitted with a Motion pursuant to Rule 12(b)(6), the Motion is converted to a Motion for Summary Judgment pursuant to Rule 56. The Defendants respectfully request that the Court grant Summary Judgment upon the Motion, Memorandum and submissions herewith and dismiss this matter with prejudice. West Virginia Code Section 7-14-17 requires that the discharge or termination of a deputy sheriff be for "just cause", which means misconduct of a substantial nature directly affecting the rights and interests of the public. The Plaintiff was terminated for just cause, and there are no genuine issues of fact which remain to be determined.

The Defendants respectfully seek judgment as a matter of law based on the following arguments: 1) The Plaintiff was terminated for just cause; 2) the Plaintiff has received due

process; 3) the Plaintiff has not plead a claim that would establish an unconstitutional custom or policy promoted by the Sheriff, the County Commission, or the Civil Service Commission, 4) The Plaintiff has failed to plead and cannot put forth any evidence to establish that the Sheriff, the County Commission or the Civil Service Commission possess final policymaking authority,

Each of the decisions of the Sheriff, the County Commission and the Civil Service Commission are appealable to the Circuit Court and the West Virginia Supreme Court of Appeals. The Plaintiff has sought such review and received due process.

## **INTRODUCTION**

The facts in this case cannot be genuinely disputed. The Plaintiff was formerly employed as a deputy sheriff in Jefferson County, WV. (Complaint, Paragraph 2). The Plaintiff engaged in sexual conduct with a female officer, on various dates in 2006, and 2007, while on duty and off duty. See Testimony of Plaintiff, Transcript, January 15, 2009, pages 139-142, Exhibit 1. The other officer, was a subordinate in rank to the Plaintiff. See August 27, 2008 Memo from Sheriff Boober to Plaintiff, Exhibit 2. Approximately a year after the relationship between the Plaintiff and the other officer ended, the Plaintiff filed an unfounded complaint against her, on June 17, 2008. See Transcript of October 22, 2008, pages 10-11, Exhibit 3. (The allegations made by the Plaintiff against the other officer were determined to be unfounded.)

The Sheriff's internal investigation of the unfounded complaint against the other officer by the Plaintiff disclosed an illegal search allegation against the Plaintiff. See July 15, 2008 Memo from Sheriff Boober to Lieutenant Dave Colbert, Exhibit 4. In addition, the sexual encounters between the Plaintiff and the female officer were disclosed by the other officer during the investigation, and the Sheriff ordered an internal investigation into the sexual conduct. *Id.*

MA.6424193.2                                     4

As a result of the internal investigation regarding the illegal search, the Plaintiff was found to have conducted an illegal search and was demoted from shift supervisor. See Transcript of October 22, 2008. The sexual conduct was the subject of another internal investigation conducted prior to discharge by Lt. Dave Colbert at the direction of then Sheriff, Everett Boober, on July 15, 2008. The Plaintiff was evasive and not forthcoming in responding to the investigating officer regarding whether he had engaged in sexual intercourse while on duty, on county property or in a county vehicle. See Internal Investigation, 2008-03, Exhibit 5. Initially, the Plaintiff denied the sexual encounters occurred while he was on duty, but when confronted with more examination, he gave varying, contradictory, misleading answers. The other officer, on the contrary, was found to have given consistent, forthright and cooperative responses. *Id.*

Upon the conclusion that some of the sexual encounters had taken place in or on Jefferson County property and in a county cruiser, while one or both of the officers were on duty, and further finding that the Plaintiff had not been truthful during the investigation, Sheriff Boober informed the Plaintiff of his decision to terminate him. See Memo from Sheriff Boober to Plaintiff dated August 27, 2008, Exhibit 2. A pre-disciplinary review board was impaneled. Due to the fact that one of the members of the board, Corporal Boyce, had been named several times in the investigation involved in incidents included in the investigation, and was as a result a potential witness, the other two hearing board members requested that the third member voluntarily recuse himself, which he did.[1] Subsequently Sheriff Boober was replaced by Sheriff Shirley and Sheriff Shirley completed the termination of the Plaintiff and gave the plaintiff an immediate full evidentiary hearing before the Civil Service Commission within ten days of his

---

[1] W. Va. Code 17-14C-1(4) defines "hearing board" and specifically excludes those who have had part in the investigation or interrogation. Corporal Boyce name appears numerous times in the internal investigation and he appropriately recused himself.

**Joint Appendix Pg. 43**

termination. See Transcript of January 15, 2009, Exhibit 1. Counsel for the Plaintiff at that time, Michael Scales, consented to and participated fully in the proceeding before the Civil Service Commission, never objecting to proceeding, and never requesting a pre-disciplinary hearing be conducted prior to the Civil Service Commission hearing. The Civil Service Commission heard the evidence and upheld the Sheriff's decision to discharge the Plaintiff. *Id.* The Plaintiff admitted to having sex in Edward's office, in his truck in War Memorial Park in Charles Town, and in a county owned unmarked cruiser. *Id*, pages 134-136.

The record demonstrated that the Civil Service Commission considered the evidence for both the Sheriff's decision to terminate and the Plaintiff's argument against termination, including the testimony of six witnesses, including the Plaintiff, and substantial cross examination and redirect[2]. The Plaintiff appealed the Civil Service Commission decision to Circuit Court. According to *Burgess v. Moore*, "[a]n appellate court may reverse a decision of the Civil Service Commission for Deputy Sheriffs, W. Va. Code § 7-14-1 (1991), et seq., as clearly wrong or arbitrary or capricious only if the Commission used a misapplication of the law, entirely failed to consider an important aspect of the problem, offered an explanation that ran counter to the evidence before the Commission, or offered an explanation that was so implausible that it could not be ascribed to a difference in view or the product of Commission expertise." Syllabus point 3, *Messer v. Hannah*, 222 W. Va. 553, 668 S.E.2d 182 (2008), as cited in syllabus point 2, *Burgess v. Moore*, 224 W. Va. 291, 292, 685 S.E.2d 685, 686 (W. Va. 2009).

The Circuit Court also upheld the decision to discharge the Plaintiff, denying the appeal of the Civil Service Commission Ruling. See Order of January 6, 2010, Exhibit 6. The Plaintiff

---

[2] The Commission is not required to discuss every piece of evidence. As the factfinder, the Commission's assessment of the evidence is required including any evidence presented to counter the Commission's position. *Messer v. Hannah*, 222 W. Va. 553, 559 (W. Va. 2008).

**Joint Appendix Pg. 44**

obtained new counsel and appealed to the West Virginia Supreme Court of Appeals, whereupon the Plaintiff raised, for the first time of record, the objection to not having received a pre-disciplinary hearing as a violation of his due process rights. By Memorandum Decision on October 28, 2011, the Court reversed and remanded the case with directions to have the pre-disciplinary review board hearing. See Exhibit 7. Upon remand, the Plaintiff complained about the composition of the pre-disciplinary hearing board. The objection was taken to Circuit Court and the Circuit Court ruling was appealed to the West Virginia Supreme Court of Appeals. On October 19, 2012, the Court denied Plaintiff's appeal and refused to rehear the petition. See Exhibit 8. The Plaintiff attempted to challenge the composition again, and filed a writ of prohibition to Circuit Court, which was denied, September 4, 2013.

On October 30, 2013, under the direction of the current Sheriff of Jefferson County, Peter Dougherty, the matter of the discharge of the Plaintiff came before the Pre-disciplinary Review Board of the Jefferson County Sheriff's Department. The Plaintiff was represented by counsel and appeared in person with his attorney. The Board consisted of Sergeant Ronald L. Fletcher, Corporal Vincent H. A. Tiong, and Deputy Douglas H. Fletcher. Upon the conclusion of the hearing, the Pre-disciplinary Review Board concluded that the Sheriff met the burden of showing just cause for the discharge and upheld the discharge of the Plaintiff. See Exhibit 9.

The procedural right to a pre-disciplinary review board has been remedied with no difference in the outcome for the Plaintiff. The Defendants respectfully request that the Complaint be dismissed.

## LAW AND ARGUMENT

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those necessary to establish the elements of a party's cause of action. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986), as cited in *Messer v. Hannah*, 2009 U.S. Dist. LEXIS 96233, 22-24 (S.D. W. Va. Oct. 15, 2009).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. *Id*. The moving party has the burden of showing -- "that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." *Messer* citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). If the movant satisfies this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial. Fed. R. Civ. P. 56(c); *Id*. at 322-23. A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant. *Id* citing *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991).

Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party. *Messer* citing *Anderson*, 477 U.S. at 248. Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute. *Id* citing *Overstreet v. Ky. Cent. Life Ins. Co.*, 950 F.2d 931, 937 (4th Cir. 1991).

A court must neither resolve disputed facts nor weigh the evidence nor make determinations of credibility. *Id* citing *Russell v. Microdyne Corp.*, 65 F.3d 1229, 1239 (4th Cir. 1995), and *Sosebee v. Murphy*, 797 F.2d 179, 182 (4th Cir. 1986). Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have

all internal conflicts resolved in his or her favor. *Id* citing *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979). Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *Id* citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962).

### The proper remedy for reversible due process procedural defects in administrative proceedings is to remand the case to the appropriate tribunal with directions to order the administrative institution to remedy the defect[3]

The Plaintiff filed suit against all three Sheriffs, all of the members of the Civil Service Commission and all of the members of the Jefferson County Commission, in their official and individual capacities, complaining that his termination was in violation of his constitutional right to procedural due process and substantive due process.

The procedural error alleged is the failure to give the plaintiff a predisciplinary hearing. That hearing was given on October 30, 2013 and the results upheld the discharge of the Plaintiff by the Sheriff for having sex while on duty and lying. The Plaintiff has been given all the process he is due and this matter is ripe for dismissal. While there is no record evidence that the Plaintiff or his counsel at the time of the Civil Service Commission hearing or on appeal to the Circuit Court ever objected to the proceedings or requested a pre-disciplinary hearing, the plaintiff has now been given a pre-disciplinary hearing and the termination was upheld. Likewise, there is no evidence of intentional or willful disregard of any obligation on the part of the Defendants. The internal investigation constituted legitimate reasons for the Plaintiff's discharge, and his unsuccessful administrative challenges have confirmed that the Sheriff had sufficient grounds for the termination when the termination took place.

---

[3] White v. Barill, 210 W. Va. 320, 323-324 (W. Va. 2001).

**Joint Appendix Pg. 47**

The Civil Service Commission, the Circuit Court and the Hearing Board allowed ample opportunity for the Plaintiff to present evidence in opposition to the termination. Indeed, the plaintiff submitted evidence and argument that the investigation was not a full and fair investigation, and challenging the use of the polygraph exam by the Sheriff. The Plaintiff likewise, has had ample opportunity and has already offered evidence and argument that the other officer received a lighter punishment than he received. Ultimately, neither the Civil Service Commission nor the Hearing Board were convinced that the investigation was not full and fair; and neither relied upon the results of the polygraph exam in making their findings upholding the termination of the Plaintiff by the Sheriff. Finally, it appeared to the investigating officer, the Sheriff, the Hearing Board and the Civil Service Commission that the other officer was forthcoming and truthful about the conduct, while the Plaintiff was evasive, though ultimately he admitted to the conduct.

West Virginia Code Section 21-5-5b expressly allows the use of a polygraph examination by law enforcement in the decision to hire or to continue to employ an officer.

> No employer may require or request either directly or indirectly, that any employee or prospective employee of the employer submit to a psychophysiological detection of deception examination, lie detector or other similar examination utilizing mechanical or electronic measures of physiological reactions to evaluate truthfulness, and no employer may knowingly allow the results of any examination administered outside this State to be utilized for the purpose of determining whether to employ a prospective employee or to continue the employment of an employee in this State: ... Provided, however, That the provisions of this *section shall not apply to law-enforcement agencies* or to military forces of the State as defined by section one [§ 15-1-1], article one, chapter fifteen of the code: Provided further, That the results of any examination shall be used solely for the purpose of determining *whether to employ or to continue to employ* any person exempted hereunder and for no other purpose.

W. Va. Code § 21-5-5b (emphasis added).

The Plaintiff has been permitted time and again throughout his challenges to the lawful discharge, to present evidence and to argue that the manner in which a polygraph examination was administered during the internal investigation was improper. The Plaintiff had notice and an opportunity to provide his evidence and argue that the manner in which the polygraph was administered and the use of a polygraph by the Sheriff, the Civil Service Commission and the hearing board was a violation of his rights.

Indeed, the credibility of an officer is of paramount consideration. Police officers are in an important position of power and are responsible for public safety. They have to be relied upon to be truthful in swearing out warrants for arrest, searches and seizures. Police officers routinely give testimony to establish the facts in criminal matters. Citizens may be put at risk if an officer is discredited on cross examination due to questions of integrity and credibility. While the West Virginia Supreme Court of Appeals has held that polygraphs are inadmissible in criminal cases[4], it has not excluded and has declined to consider their admissibility in administrative proceedings such as the Plaintiff's pre-disciplinary hearing and the Civil Service Commission hearing. In *Pryor v. Hutchison*, where the result of the polygraph did not form the basis of the Commission's opinion, the West Virginia Supreme Court of Appeals declined to address the question of admissibility, and held that where the polygraph was admitted, but the results of the polygraph did not form the basis of the decision, if the admission was error, it was harmless. 167 W. Va. 679 (1981). The Plaintiff claims that he was coerced to take the polygraph, however, he signed a consent form acknowledging the test was taken voluntarily. See Exhibit 10.

An officer's integrity and credibility is of utmost importance. The West Virginia Supreme Court of Appeals has recognized the "sensitive nature" of a law enforcement officer's job and the strict need for proper conduct. The need for propriety and the "appearance of

---

[4] *State v. Frazier*, 164 W. Va. 572 (1979).

**Joint Appendix Pg. 49**

propriety" permits a government employer to impose controls on both on duty and off duty conduct, more so on police officers than on employees in general. *McAtee v. Mentzer*, 174 W. Va. 49, 51 (W. Va. 1984).

Thus, the sexual conduct between the Plaintiff and the other officer was merely part of the evidence that formed the basis of the Sheriff's decision to terminate the Plaintiff. Of greater concern, was the Plaintiff's contradictory and unsatisfactory response to the investigation of the conduct, and his filing of an unfounded report against the other officer which ultimately led to the investigation of his illegal search and the sexual affair.

### The Complaint fails to Establish an Unconstitutional Custom or Policy

The Plaintiff's claims fail as a matter of law for two significant reasons. First, Plaintiff cannot offer any evidence that supports his allegation that he did not received due process. In addition, Plaintiff fails to establish an unconstitutional custom or policy promoted by the Defendants, Jefferson County Sheriff's Office, the Civil Service Commission, or the Jefferson County Commission.

The Plaintiff named the Defendants in their individual and official capacities. The Plaintiff has failed to offer a single allegation or fact to support that any of the named individuals acted outside of the scope of their official capacity. As for the claims against them in their official capacity for his § 1983 claim, by naming the Defendants in their official capacity, Plaintiff has essentially brought suit against the Jefferson County Sheriff's Office, the Civil Service Commission, and the Jefferson County Commission. The United States Supreme Court has held "that official-capacity suits 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)). Accordingly, claims brought against

**Joint Appendix Pg. 50**

governmental officials in their official capacity must be treated as a suit against the governmental entity itself.

If an individual wishes to recover against a governmental entity, he must establish that the entity's policy or custom was the "moving force" behind an alleged deprivation of civil rights. *Bd. of County Comm'rs. of Bryan County v. Brown*, 520 U.S. 397, 404 (1997). Liability will not attach to a municipality where the independent conduct of one its agents causes the constitutional tort:

> [A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

As an alternative to proving that an official policy is in violation of the law, the Plaintiff may argue that the Defendants possessed the final authority to establish official employment policy for the Jefferson County Sheriff's Office. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). However, a reviewing court must carefully evaluate whether the official agent actually has the authority to make final policy or if the individual merely exercises discretion when making final decisions. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126-28 (1988). As stated in *Pembaur*:

> [A] County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. If this were the case, the Sheriff's decisions respecting employment would not give rise to municipal liability, although similar decisions with respect to law enforcement practices, over which the Sheriff is the official policymaker, would give rise to municipal liability. Instead, if county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for county liability.

475 U.S. at 483 n.12.

Plaintiff cannot offer any cognizable claim that his constitutional rights were violated by the policies of the Jefferson County Sheriff's Office or the other Defendants. Instead of providing factual allegations of a specific constitutional deprivation, Plaintiff relies upon allegations that do not implicate any protections under the United States Constitution. Further, Plaintiff has not once provided evidence to show that the Defendants implemented a county-wide employment policy for the deputy sheriffs that was in violation of the laws and protections provided by the federal constitution. Thus, Plaintiff's § 1983 argument cannot be maintained because he has failed to adequately plead his claim for relief.

### The Jefferson County Civil Service Commission is Immune from Suit

While West Virginia and the Fourth Circuit have not specifically addressed the issue, the jurisdictions that have published opinions regarding suits against civil service boards, their members, both individually and in their official capacities, have ruled that absolute quasi judicial immunity applies. See *Mylett v. Mullican*, 922 F.2d 1347 (5th Cir. 1993); *Turner v. Houma Mun. Fire & Police Civ. Serv. Bd.*, 229 F.3d 478 (5th Cir. La. 2000).

The character and the duties of the civil service commission are judicial in nature and the commission members are entitled to absolute immunity. The factors for determining the application of quasi judicial immunity are:

> (a) the need to assure that the individual defendant can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; (f) the correctability of error on appeal.
>
> *Mylett v. Mullican*, 992 F.2d 1347, 1352-1353 (5th Cir. Tex. 1993)

Joint Appendix Pg. 52

The 5th Circuit in *Mylett*, after considering the factors and applying them to the Civil Service Commission in reviewing the decision of the Sheriff to terminate a deputy, found that the Commissioners were entitled to absolute immunity. Likewise, in *Dyer v. Lumpkin*, the court held that, while not members of a court, the duties performed by the Civil Service Commission are functionally comparable to the function of a judicial officer. See *Dyer v. Lumpkin*, 2001 U.S. Dist. LEXIS 11370 (N.D.Ill. Aug. 2, 2001), citing *Crenshaw*, 180 F.3d at 868. The 10th Circuit addressed the issue of quasi judicial immunity for Civil Service Commissioners citing *Atiya v. Salt Lake County* for the proposition that members of the Civil Service Commission are protected from damages by quasi judicial immunity since their role is functionally comparable to that of a judge. *Chambers v. Upper Darby Township Civil Serv. Comm'n*, 1995 U.S. Dist. LEXIS 15865, 9-10 (E.D. Pa. Oct. 25, 1995), citing *Atiya v. Salt Lake County*, 988 F.2d 1013, 1017 (10th Cir. 1993).

Therefore, the claims against James Crawford, III, Christopher Jackson, and Frank Rosario should be dismissed with prejudice.

## CONCLUSION

WHEREFORE, the Defendants respectfully request that the Court find that this matter is ripe for summary judgment and dismiss this matter with prejudice.

By Counsel,

/s/ Bridget M. Cohee
Bridget M. Cohee, Esquire (WVSB# 8625)
Steptoe & Johnson PLLC
P.O. Box 2629
1250 Edwin Miller Blvd., Ste 300
Martinsburg, WV 25404
Telephone:     (304) 263-6991
Facsimile:      (304) 262-3541

## CERTIFICATE OF SERVICE

I hereby certify that on this __18th__ day of November, 2013, I filed the ***Motion to Dismiss***

and ***Memorandum in Support of the Motion to Dismiss*** with the Clerk of the Court using the

CM/ECF system, which will send notification of such filing to the below named counsel.

> Mark McMillian
> Robert William Schulenberg III
> Mark McMillian, Attorney at Law, L.C.
> 1018 Kanawha Boulevard, East
> Suite 900
> Charleston, WV 25301

> /s/ Bridget M. Cohee
> Bridget M. Cohee

COPY

```
 1
 2
 3
 4
 5
 6                          TRANSCRIPT
 7                             OF
 8          JEFFERSON COUNTY CIVIL SERVICE HEARING
 9                  HELD ON JANUARY 15, 2009
10                  COMMENCING AT 10:00 a.m.
11    BEFORE:
12    COMMISSIONER CRAWFORD, COMMISSIONER CHRISTOPHER JACKSON,
13    and COMMISSIONER FRANK ROSARIO
14
15    APPEARANCES:
16    STEPHANIE GROVE, ESQUIRE On Behalf of the Sheriff's
17    Department.
18    MICHAEL SCALES, ESQUIRE On Behalf of the Respondent
19    Deputy.
20
21
22
23
24
```

EXHIBIT

1

```
 1                         I-N-D-E-X

 2                                                    PAGE

 3    DIRECT EXAMINATION LIEUTENANT COLBERT             7

 4    CROSS-EXAMINATION LIEUTENANT COLBERT             24

 5    REDIRECT EXAMINATION LIEUTENANT COLBERT          60

 6    RECROSS-EXAMINATION LIEUTENANT COLBERT           65

 7    DIRECT EXAMINATION TRACY EDWARDS                 67

 8    CROSS-EXAMINATION TRACY EDWARDS                  74

 9    REDIRECT EXAMINATION TRACY EDWARDS               84

10    RECROSS-EXAMINATION TRACY EDWARDS                86

11    DIRECT EXAMINATION TAMMY HOAK                    89

12    CROSS EXAMINATION TAMMY HOAK                     94

13    REDIRECT EXAMINATION TAMMY HOAK                  97

14    DIRECTION EXAMINATION JOHN GRIFFITH              98

15    CROSS-EXAMINATION JOHN GRIFFITH                 109

16    REDIRECT EXAMINATION JOHN GRIFFITH              117

17    RECROSS-EXAMINATION JOHN GRIFFITH               118

18    DIRECT EXAMINATION ROBERT SHIRLEY               119

19    CROSS-EXAMINATION ROBERT SHIRLEY                125

20    REDIRECT EXAMINATION ROBERT SHIRLEY             130

21    RECROSS-EXAMINATION ROBERT SHIRLEY              131

22    DIRECT EXAMINATION MICHAEL DODSON               132

23    CROSS-EXAMINATION MICHAEL DODSON                150

24    REBUTTAL EXAMINATION LIEUTENANT COLBERT         157
```

1    (Index continued.)

2    CLOSING ARGUMENT SHERIFF'S DEPARTMENT          159

3    CLOSING ARGUMENT RESPONDENT                    165

4

5    EXHIBITS:

6    COMMISSIONER'S NO. 1 Notice of Hearing           5

7    COMMISSIONER'S NO. 2 Memorandum                  5

8    COMMISSIONER'S NO. 3 Letter from Mr. Scales      5

9    SHERIFF'S NO. 1 Internal Investigation 2008-3   17

10   DEPUTY'S NO. 1 Writ of Prohibition Order        21

11   DEPUTY'S NO. 2 Sheriff's Rules & Regs. Manual   29

12   DEPUTY'S NO. 3 Organizational Chart             50

13

14

15   CERTIFICATE OF COURT REPORTER                  174

16

17

18

19

20

21

22

23

24

4

1            P-R-O-C-E-E-D-I-N-G-S

2        COMMISSIONER CRAWFORD:  This is a hearing to be held

3    before the Deputy's Civil Service Commission, Jefferson

4    County, West Virginia.  It is pursuant to an order of the

5    Commission of the 8th of January setting this time and

6    date for hearing on the matter that relates to a

7    memorandum dated, I believe, the 6th of January offered by

8    the sheriff and it's directed to Michael D. Dodson, Deputy

9    Sheriff.

10        I've also got in possession a letter also from

11    Mike Scales, Michael L. Scales, which basically denies the

12    allegations and demands a hearing.  So this is one of the

13    few times we're within the ten-day window.  So I'd like to

14    if you all don't object I'd like to introduce the order as

15    Commission's 1.  The letter to the sheriff as Commission's

16    2 and your response as Commission's 3.

17        MR. SCALES:  We have no objection to that.

18        THE COURT:  Do you want to look at them?

19        MR. SCALES:  Well, I'm sure there the ones we've

20    already seen.  I don't have any problem with that.  The

21    only thing I want to make sure of is that the memorandum

22    was delivered to my client on January 6, 2009.  I'm not

23    sure it's dated.

24        COMMISSIONER CRAWFORD:  It doesn't seem to be.  The

5

1  copy I have has a place for Michael Dodson to sign, the

2  word "Refused" and the sheriff's signature and 1/6 of '09.

3  So you all can argue over that.

4    MR. SCALES:  Can we refer to that as the January 6,

5  2009 memorandum?

6    COMMISSIONER CRAWFORD:  Let's do that.

7                              (Whereupon, Commissioner's

8                              Exhibits Number 1, 2, and 3

9                              were marked for

10                             identification.)

11   MR. SCALES:  Okay.  Thank you.  That's fine.  I have

12  no problem with any of these.

13   COMMISSIONER CRAWFORD:  I didn't think you would but

14  we're also trying to make the record complete.  All right.

15  Is there anything we need to -- motions or whatever to

16  hear before we proceed with the case.

17   MR. SCALES:  Not on behalf of Sergeant Dodson.

18   MS. GROVE:  No, your Honor.

19   COMMISSIONER CRAWFORD:  Then I believe the state code

20  requires the sheriff to proceed and prove the case.

21   MS. GROVE:  Did you want to do opening and closing

22  statements or -- I mean, I don't know how you all proceed

23  in these matters, or would you rather just hear the

24  witnesses?  I mean it's --

6

1    MR. SCALES:  Mr. Crawford, I'll waive my opening but

2  I would like to have a short closing if I could.

3    COMMISSIONER CRAWFORD:  Oh, sure.

4    MS. GROVE:  Okay.  Then I'll do the same.  We'll have

5  a closing.

6    COMMISSIONER CRAWFORD:  Yeah, okay.  We're here to

7  hear the evidence not what you guys think no disrespect.

8    MS. GROVE:  Okay.  That's fine.  Our first witness is

9  Lieutenant Dave Colbert.

10    COMMISSIONER CRAWFORD:  Would you like to swear the

11  witness in please.

12    THE COURT REPORTER:  Before I do that could I have

13  the names of the two judges?

14    COMMISSIONER CRAWFORD:  Oh, okay.

15    COMMISSIONER ROSARIO:  Frank Rosario, R-O-S-A-R-I-O.

16    COMMISSIONER JACKSON:  Christopher Jackson,

17  J-A-C-K-S-O-N.

18  Whereupon,

19                LIEUTENANT DAVID COLBERT

20  called as a witness, having been first duly sworn, was

21  examined and testified as follows:

22    MS. GROVE:  Just before we begin for those who don't

23  know me I'm Stephanie Grove.  I'm an assistant prosecutor

24  here in Jefferson County and I represent the sheriff.

7

DIRECT EXAMINATION

BY MS. GROVE:

    Q    Could you please state your name for the record?

    A    David Colbert.

    Q    Where are you employed?

    A    Jefferson County Sheriff's Department.

    Q    And what is your rank?

    A    I'm a lieutenant.

    Q    And how long have you held that position?

    A    Just over two years.

    Q    Okay.  Did you have the opportunity to conduct an investigation into the relationship between Sgt. Michael Dodson and Corporal Tracy Edwards?

    A    I did.

    Q    And why was this investigation initiated?

    A    The initiation of the investigation was in reference to a letter in which we received a letter of complaint that was singed by Mike Dodson.  I received that letter or June 19th.  I received a letter in which Mike Dodson addressed some issues concerning Tracy Edwards. Throughout that letter there was several things that needed to be addressed.  I gave the letter to Sheriff Boober at which time he advised me to go and get a written response from Detective Edwards.

8

1      So upon receiving the written response from

2  Detective Edwards we decided that there were three main

3  areas in much we needed to conduct investigations.  This

4  is third and it concerns misconduct and a personal

5  relationship that the two of them were involved in while

6  working at the sheriff's department and while one or both

7  were on duty.

8      Q    How did you became aware of the allegations of

9  sexual misconduct while on duty?

10     A    Well, in the bottom -- the closing of Mike

11 Dodson's complaint letter one of the sentences was,

12 "Corporal Edwards is attempting to turn something personal

13 into a continuing effort to get me fired or into trouble

14 with this department."  So in return Corporal Edwards --

15 or Detective Edwards typed in her statement that -- I'll

16 go ahead and quote what her statement says.

17      It says, "In response to Sergeant Dodson's

18 accusations that I'm trying to turn a personal matter into

19 a continuing effort to get him into trouble I feel as

20 though this couldn't be further from the truth.  The

21 personal matter in which Sergeant Dodson's referring to

22 stems from a situation that occurred back in --" and she

23 typed November of 2005 through March of 2006, once in May

24 in 2007, and shortly after she submitted that she came to

1    me in reference to those aren't the correct days.

2        COMMISSIONER CRAWFORD:  Are you going to submit these

3    documents as evidence?

4        MS. GROVE:  I am.  I'm going to eventually.

5        THE WITNESS:  And then it said, "When I became

6    involved in a physical relationship with Sergeant Dodson

7    on and off duty hours since attempting to end the

8    relationship Sergeant Dodson has refused to remain on

9    professional terms."

10        So this obviously led into an interview, an

11    interview with -- well, we addressed the other issues that

12    were in the letter that really aren't relevant to this

13    particular investigation, but then in the interview she

14    stated that they did have a physical sexual relationship

15    while both and sometimes one of them were on their tour of

16    duties, assigned to their duties, as a deputy sheriff with

17    our department.

18        She stated in her interview that there was an

19    incident that occurred where her and Mike Dodson were in a

20    police cruiser they drove up to West Ridge Hills.  She

21    stated they were both on duty, had sexual intercourse and

22    then returned.  There was another she specifically stated

23    in reference to when the two of them were on duty and had

24    sexual intercourse in her office at the Jefferson County

1    Sheriff's Office when the office was in Charles Town.

2          She also had mentioned there were times when

3    Sergeant Dodson had come to the house when he was on duty

4    and she wasn't, this type of activity also occurred.

5    Eventually -- and then she later came back to mention that

6    after, you know, careful thought there was an incident

7    that occurred when she is on duty and Sergeant Dodson was

8    not on duty and he met her in the park in Charles Town and

9    she got out of her cruiser, got in his truck, had sexual

10    intercourse in his truck and then she went back to her

11    tour of duty.

12       Q    Did you interview Sergeant Dodson about these

13    allegations?

14       A    Yes, I did.

15       Q    And what was his response?

16       A    At first when I called him in he was somewhat

17    defensive.  He said it was his personal business and I

18    agreed that, you know, what happened outside of the office

19    is his personal business.  So, I was specifically

20    interested in the conduct that occurred while they were

21    doing their duties as deputy sheriffs and, you know, on

22    their tour of duty.

23          At that time I advised him that Detective Edwards

24    had been forthcoming and provided some information.  I

1   then at that time I asked him -- I told him that she told

2   us about them having sexual intercourse in her office.

3   Then we went into a formal interview.  I kind of laid the

4   groundwork that there was information there.  You know,

5   let's talk, let's get it out, let's be honest and find out

6   what happened.

7          I asked Dodson if the two of them were engaged in

8   intercourse while on duty and at that time his response

9   was, "Um, let me think.  I was on -- I think one way or

10  the other either I was on or she was on.  I can't

11  remember.  One of us was working and I think it was

12  towards the end of the shift, her shift or my shift."

13         Sergeant Dodson goes on to acknowledge that the

14  two did have sexual intercourse in Corporal Edwards office

15  -- and this is all in a recorded interview -- but when

16  asked to confirm that either Sergeant Dodson or Corporal

17  Edwards were on their duty and responsibilities, "Yes, I

18  believe.  I don't think both of us were.  I'm trying to

19  think.  I'm pretty sure one of us was whether it was me or

20  her."

21         Then I went on to ask him if that was the only

22  occurrence when the two of them were on duty that they

23  engaged in sexual intercourse and his answer was, "What?

24  When we were at work yes that's the only time I can think

1  of." And again I initiated some information that Corporal

2  Edwards provided about the two of them having sexual

3  intercourse in the cruiser and after I provided that

4  information and asked him directly about that his response

5  was, "And, uh, I'm not going to swear to but yeah I know

6  it did happen but for some reason I don't think it was

7  both of us. I think it was towards the end of our shifts,

8  I think." And that's his quoted statement. I asked him

9  about the residence. He denied ever having sexual

10  intercourse with her at her residence while he was on his

11  assigned tour of duty.

12        So at that time I had, you know, I had

13  interviewed the both of them and we had arranged then -- I

14  discussed with him prior to the interview that it would

15  more than likely end up with a polygraph examination.

16     Q    So just to be clear it was your understanding

17  from the investigation that Sergeant Dodson was admitting

18  that at least once he had sex on duty with Corporal

19  Edwards?

20     A    Right.

21     Q    Did you interview anyone else with regard to the

22  investigation?

23     A    In reference to the investigation there's also an

24  incident that occurred that was brought to my attention

1    that dealt with the secretary, Tammy Hoak. And I

2    interviewed her because information in which Detective

3    Edwards provided that she was in court and there was an

4    incident where I guess somehow Mike and her were around

5    each other and she -- according to Detective Edwards she

6    was wearing a ring, Mike came in he saw the ring, and I

7    believe he got very upset about it.

8            He came back to the office and in the interview

9    with Tammy Hoak and Tracy, both of them, the incident --

10   he went back to the office and, you know, he was very

11   angry to the point where Tammy, who had been a friend of

12   Mike's for a very long time from what I understand, said

13   she had never seen him as angry before. He was making

14   comments about where -- and their exact words are, "I

15   fucked her here. I fucked her there. I can tell her

16   husband what the house looks like."

17           I think that's exactly the end of it and it was

18   to the point that Tammy Hoak had called Tracy and said,

19   "Don't come back to the office 'cause I'm afraid Mike

20   Dodson's going to kill you." And with that information

21   being there I interviewed Tammy and she supplied the same

22   information of the occurrence.

23       Q    She confirmed what was in Corporal Edwards'

24   statement?

14

1    A    Correct.

2    MR. SCALES:  Is Ms.  Hoak here today?

3    MS. GROVE:  She is and she'll be testifying.

4    MR. SCALES:  Will she be testifying?

5    MS. GROVE:  She will be.

6    COMMISSIONER CRAWFORD:  Yeah, I got a lot of hearsay

7  obviously.

8    MR. SCALES:  I'm not sure the rules of evidence

9  apply.

10    COMMISSIONER CRAWFORD:  Well, I think from my

11  perspective and I think the Commission in general if they

12  don't link some of the comments here then they're just --

13  obviously, admissions by him would be inadmissible.

14    MS. GROVE:  We understand that.  We're just trying to

15  lay the groundwork in the investigation.

16    COMMISSIONER CRAWFORD:  Yeah, I understand.  That's

17  why I guess Mr. Scales has been quiet because he realizes

18  -- he presumes.

19    MS. GROVE:  All of these people will testify today.

20    COMMISSIONER CRAWFORD:  Okay.

21  BY MS. GROVE:

22    Q    After the interviews did you request that either

23  Corporal Edwards or Sergeant Dodson submit to a polygraph

24  examination?

15

1    A    Yes.

2    Q    And did you speak to the polygraph examiner after

3 he conducted those examinations?

4    A    Yes.

5    Q    And do you recall what the results were of those

6 examinations?

7    A    I know on Sergeant Dodson's he said -- he came

8 and said that it showed deception and he provided

9 information to me about a week later in a written formal

10 document which I followed up with a phone conversation as

11 to information that Sergeant Dodson provided in the

12 post-interview of the polygraph examination.

13    Q    And what about Corporal Edwards, do you recall

14 the results of her polygraph?

15    A    It showed that she was being truthful and that

16 the information she provided in his opinion from the

17 examining the charts, the interview, and his experience he

18 believed that she was basically being truthful.

19    Q    As a result of all these interviews did you

20 create an investigative report based upon all the

21 interviews you conducted?

22    A    I did, yes.

23    Q    Is this your completed interview?

24    A    Yes.  Yes, it is.  Yes, ma'am.

16

1       Q    Can you just go through for the Board basically

2   what it contains?

3       A    Okay.   It initially contains the memorandum that

4   I received from Sheriff Boober to conduct this

5   investigation.   The next section is the summary of which

6   the investigation I completed was -- involved Detective

7   Edwards and Mike Dodson.

8            Then there's Sheriff Boober's memorandum for

9   corrective action.   Then there was the complaint that Mike

10  Dodson signed and provided to me, Tom Hansen, and Sheriff

11  Boober, the original complaint which all this stemmed

12  from.   There was a response to the complaint that

13  Detective Edwards supplied.   There was a transcription of

14  Sergeant Dodson's --

15       COMMISSIONER CRAWFORD:   Can I ask are you going to

16  introduce this?

17       MS. GROVE:   I am, that's why I'm going through these

18  sections right now.

19       COMMISSIONER CRAWFORD:   I mean, if it comes we can,

20  you know, look ourselves.

21       MR. SCALES:   Only to the extent it has hearsay in it

22  and you're not going to accept it until you hear it from a

23  live body, but to the extent it's an investigation report

24  we have no objection to it coming in.

1    MS. GROVE:  We would submit that the transcriptions

2    are not hearsay 'cause they're transcribed statements of

3    the witnesses.

4    COMMISSIONER CRAWFORD:  Well, there's probably

5    hearsay in here but --

6    MS. GROVE:  Well, yes.  Right.

7    COMMISSIONER CRAWFORD:  Insofar as they're probative

8    we'll use it.

9    MS. GROVE:  So at this time I would move that this

10   investigative report be submitted as the Sheriff's Exhibit

11   Number 1 or A.

12                          (Whereupon, Sheriff's Exhibit

13                          Number 1 was marked for

14                          identification.)

15   MR. SCALES:  With the understanding, I just may have

16   no objections.

17   COMMISSIONER JACKSON:  Are the statements contained

18   in this internal investigation sworn statements?

19   MS. GROVE:  You'll have to ask --

20   THE WITNESS:  I mean we sat down.  We just told them

21   we expect them, you know, we expect the truth and honesty.

22   We asked them directly about the occurrences.  They

23   weren't sworn to take an oath to provide their statement.

24   MR. SCALES:  I'm trying to find -- well, to the

18

1    extent I can follow up on your question, Mr. Jackson, I

2    thought Ms. Grove and I had an understanding.  We filed a

3    petition for a writ of prohibition in the circuit court

4    asking that the polygraph results not be admitted as part

5    of these proceedings and Ms. Grove and I had an

6    understanding that we weren't going to use the polygraph

7    results.  But I see that exhibit, I believe it was C-2

8    from Sheriff Shirley, already indicates that he's

9    accepting that entire report in its entirety so I already

10   have an objection to that extent.

11          I'm trying to find the signed order.  I have the

12   one where Ms. Grove signed off on it but I don't have the

13   one that was signed by Judge Steptoe but I know I have it.

14          MS. GROVE:  We did agree in the context of the Deputy

15   Sheriff's Hearing Board not to admit the polygraph and

16   that was under Sheriff Boober.  When Sheriff Shirley took

17   office and took this action he did not agree to eliminate

18   the polygraph and requested that it be used and so I felt

19   that I couldn't bind him to an agreement of the previous

20   sheriff and this is a different action.

21          COMMISSIONER CRAWFORD:  Oh, come on.  Well, I think

22   he has to live with his predecessor's decisions

23   personally.

24          MS. GROVE:  Well, I would ask that it be admitted

19

1   with any omissions to the polygraph then to Sergeant

2   Dodson's polygraph that's what we agreed to be omitted as

3   evidence but the rest of the report be admitted.

4        COMMISSIONER CRAWFORD:  So the polygraph

5   information's in here?

6        MS. GROVE:  Sergeant Dodson's polygraph information

7   is.

8        COMMISSIONER JACKSON:  Well, let me ask you this

9   question and this is for both parties here.  Pertaining to

10  this polygraph do you all have a signed document stating

11  that you both stipulated to the fact that this would not

12  be coming in?

13       MS. GROVE:  In a civil action in circuit court I said

14  before the sheriff's hearing board I would not bring it in

15  not before the civil service commission.

16       COMMISSIONER JACKSON:  Not before the civil service

17  commission?

18       MS. GROVE:  That's correct.  It was before the

19  sheriff's hearing board that we agreed to it.

20       MR. SCALES:  I have a copy of it.

21       COMMISSIONER JACKSON:  You have a copy of it?

22       MR. SCALES:  I have a copy of what she signed and

23  what we signed.  I don't have a -- Judge Steptoe signed

24  it.

20

1    MS. GROVE:  I'll agree Judge Steptoe signed the

2  order.

3    MR. SCALES:  If you all want to see a copy of it I'll

4  mark it as Deputy's Exhibit Number 1 if you want if you

5  want to have it marked.

6    COMMISSIONER CRAWFORD:  So in essence what you're

7  saying is if it's in here we should disregard it because

8  it's not --

9    MR. SCALES:  I'm going to leave that up to you.  I'm

10  objecting to it on that basis.  I'm going to have some

11  other issues when I get to cross-examination.

12    COMMISSIONER CRAWFORD:  Okay.

13    MS. GROVE:  And it's just on the polygraph results.

14  It's just on the results of the polygraph if you decide to

15  enforce that order that was before the sheriff's hearing

16  board.  It's just on the polygraph results not the

17  testimony of the examiner.

18    COMMISSIONER JACKSON:  In particular it was

19  pertaining to an action that occurred before we got to

20  this point here today, correct?

21    MS. GROVE:  That's correct.

22    COMMISSIONER JACKSON:  Okay.

23    MR. SCALES:  But it's based upon the same complaint.

24    COMMISSIONER JACKSON:  Yes, I understand that, sir.

1  If we don't have a copy of that then let's get a copy of

2  that.

3      COMMISSIONER CRAWFORD:  Of the order?

4      COMMISSIONER JACKSON:  Yes.

5      COMMISSIONER CRAWFORD:  Okay.

6      MR. SCALES:  Shall I call it Deputy's Number 1?

7                          (Whereupon, Deputy's Exhibit

8                           Number 1 was marked for

9                           identification.)

10     COMMISSIONER CRAWFORD:  That'd be fine.

11     MR. SCALES:  I believe Ms. Grove had stipulated that

12 Judge Steptoe did sign it if you want to look at it and

13 make sure it's the one.

14     MS. GROVE:  I did.

15     MR. SCALES:  I'm sorry I didn't make any more copies

16 of it at this point.

17     COMMISSIONER JACKSON:  That's fine.  If It's admitted

18 into evidence without objection by both parties then we're

19 fine.

20     MS. GROVE:  I do have redacted versions.  I'd have to

21 pass them out the individually.

22     MR SCALES:  Well, we've already admitted them I

23 think.

24     MS. GROVE:  Okay.  It's up to the board.  I have

22

1   versions of the report where I redacted out or blacked out

2   any reference to the results of Sergeant Dodson's

3   polygraph so it's not in here. I'd have to pass them out

4   individually to each party.

5      COMMISSIONER CRAWFORD: And that is the redacted

6   version. So it's in this document here that you're --

7      MS. GROVE: It is.

8      COMMISSIONER CRAWFORD: So you've got something --

9   pages you can substitute?

10      MS. GROVE: Sort of. Yes. I mean this would

11   substitute it.

12      MR. SCALES: Why don't we just leave it the way it

13   is. If you all decide you're going to use it you use it.

14   If you have a finding that you don't believe it should be

15   considered then you can make that finding.

16      COMMISSIONER CRAWFORD: Okay. Yeah. That's true.

17      MS. GROVE: Okay.

18      COMMISSIONER CRAWFORD: I think we've already heard

19   hearsay as to the results so --

20   BY MS. GROVE:

21      Q   Just a few more questions, Lieutenant Colbert.

22   What were the findings of your report, your investigation?

23      A   The finding of my report is based on Sergeant

24   Dodson's statement, Detective Edward's statement, John

1    Griffith's information he provided not only -- well, in

2    the preinterview phase and --

3        Q    You weren't relying just on the results.

4        A    I wasn't relying on the -- whether somebody was

5    believed to be truthful or deceptive.  It was information

6    that John Griffith had prepared in a document provided to

7    me of the statements of the conversation and the interview

8    between him and Mike Dodson.  You know, based upon the

9    conclusion of all their statements I took those three

10   things, put it together and examined it and, you know, it

11   gave me enough reason to believe that the incident did

12   occur and that Sergeant Dodson, Mike Dodson, wasn't being

13   truthful in my official capacity conducting the

14   investigation.

15       Q    This investigation was initiated, just to be

16   clear, under Sheriff Boober?

17       A    Yes, ma'am.

18       Q    Do you recall what Sheriff Boober's

19   recommendation was as a result of your investigation?

20       A    Termination.

21       Q    Just one final question.  Do you know the dates

22   of any of the alleged sexual activity between Dodson and

23   --

24       A    No, the dates were really unclear.  There was one

24

1   in May of 2007, that's the most specific they could get

2   with the gap in the timeframe.  Both parties acknowledge

3   that incidents did occur.  One said it was on duty hours,

4   one said at the end of the shift, and so forth and so on

5   but the May 2007 was the best that Corporal -- Detective

6   Edwards could provide.

7       Q   Do you feel that it's significant to know the

8   dates of the alleged incidents?

9       A   I'd say the actions and conduct are far more

10  important than, you know, the exact dates of which

11  something occurred.

12      Q   You believe they happened even though you don't

13  know the exact dates?

14      A   Yes, definitely.

15      Q   Thank you.

16      A   Yes.

17      MS. GROVE:  I'm finished.

18                    CROSS-EXAMINATION

19  BY MR. SCALES:

20      Q   Lieutenant Colbert, I'm Michael Scales.  As you

21  know I represent Sergeant Dodson.

22      A   Yes, sir.

23      Q   Lieutenant Colbert, were you -- until Sergeant

24  Dodson was terminated were you Sergeant Dodson's immediate

**Joint Appendix Pg. 78**

25

1    supervisor?

2        A    You mean when I was a sergeant is that what

3    you're saying?

4        Q    No.  Up until January 6, 2009, were you his

5    immediate supervisor?

6        A    Once I was promoted.  Yes, sir.

7        Q    When was that?

8        A    2007.  January 3rd, I think.

9        Q    Okay.  Well, if these incidents took place

10   between January 7th -- or January of 2007 and January of

11   2009 then you would have been Sergeant Dodson's immediate

12   supervisor at the time of the alleged acts, correct?

13       A    The incidents occurred -- the misconduct in which

14   I'm talking about their sexual relationship on duty was

15   best ironed down to September through December of 2006 --

16       Q    Let me start again.

17       A    -- once in May and -- go ahead, sir.

18       Q    You began this investigation in June of 2007, is

19   that correct?  Or 2008, excuse me.

20       A    That's when I received the letter from Sergeant

21   Dodson.

22       Q    And that's what initiated every thing, correct?

23       A    Yes, sir.

24       Q    And at that time and up until the time of

1    Sergeant Dodson's discharge on January 6th, 2009 by

2    Sheriff Shirley you have been Sergeant Dodson's immediate

3    supervisor, is that correct?

4        A    Yes, sir.

5        Q    Okay.  Now this sex that was reported to you by

6    both Corporal Edwards and Sergeant Dodson was it

7    consensual sex?

8        A    Yes, sir.

9        Q    We're not talking about an issue about Sergeant

10   Dodson having some sexual harassment of Corporal Edwards,

11   is that correct?

12       A    No, sir.

13       Q    He's not being charged with anything like to

14   this.  It was consensual sex, correct?

15       A    Yes, sir.

16       Q    Okay.  Now who ordered the polygraph test of

17   Sergeant Dodson?

18       A    It would be Sheriff Boober.

19       Q    And did Sheriff Boober tell Sergeant Dodson that

20   if he didn't take the polygraph test he'd be fired?

21       A    I believe the way that the information was

22   presented to me from Sheriff Boober -- I don't know what

23   Sheriff Boober told Dotson, but if you refuse to cooperate

24   then it would be considered insubordination and which

1  would be terms for termination.

2      Q    Did you tell Sergeant Dodson after he undertook

3  the polygraph test that it didn't matter what the results

4  were Sheriff Boober was going to fire him?

5      A    I don't recall, you know, using anything like

6  that. No, I don't recall having that conversation with

7  him. I did advise him that everything wasn't based on the

8  polygraph test. I remember having that conversation.

9      Q    Now, you've -- I'm sure you've heard some of the

10 office scuttlebutt. Who was it that terminated this

11 relationship? Was it Sergeant Dodson or was it Corporal

12 Edwards?

13     A    It depends on who you ask. I mean --

14     Q    What was your understanding?

15     A    To me the information I have and basically the

16 incident dealing with Tammy Hoak it sounded like, you

17 know, she was in -- it sounded of like she was moving on

18 and had this relationship with her husband and you know --

19     Q    Oh, she was married?

20     A    Yes, and obviously that doesn't --

21     Q    Okay. And was Sergeant Dodson married?

22     A    I don't believe he was ever married.

23     MS. GROVE:  Objection. That's irrelevant whether the

24 person --

28

 1      MR. SCALES:  I'm going to move on.  I'm not going to

 2  --

 3      COMMISSIONER CRAWFORD:  Yeah, I understand.

 4  BY MR  SCALES:

 5      Q    Now who is the -- who was the chief deputy of the

 6  Jefferson County Sheriff's Department in 2008?

 7      A    2008, we didn't have a chief deputy.

 8      Q    There wasn't one?

 9      A    No.

10      Q    When was the last time that the sheriff's

11  department had a chief deputy?

12      A    Can I ask the sheriff that?

13      SHERIFF SHIRLEY:  2006.

14      THE WITNESS:  2006.

15  BY MR. SCALES:

16      Q    Other than the incidents that you and I are

17  familiar with involving Sergeant Dodson how many formal

18  charges have there been against a deputy since, I guess it

19  would be Chief Deputy Jones who has retired?

20      A    None that I'm aware of.

21      Q    Now who was the complaining party against

22  Sergeant Dodson?  Who filed the complaint against Sergeant

23  Dodson for these charges?

24      A    As I've stated the original complaint was based

```
1    from the letters Sergeant Dodson submitted and then
2    Detective Edwards' response to that.  So with information
3    that was brought from those two statements Sheriff Boober
4    would be the one that advised me to conduct the
5    investigation.
6        Q    So he was the complaining party?
7        A    Yeah, he's the one that formally told me to
8    conduct the investigation.
9        BY MR. SCALES:  I'd like to have one of these marked
10   as Deputy's Exhibit Number 2.
11                           (Whereupon,Deputy's Exhibit
12                           Number 2 was marked for
13                           identification.)
14       COMMISSIONER CRAWFORD:  Yes, sir.  And what is this?
15       MR. SCALES:  This is the Jefferson County Sheriff's
16   Law Enforcement Division Manual of Rules and Regulations
17   and Department Policy.
18       COMMISSIONER CRAWFORD:  Good.  Thank you.
19   BY MR. SCALES:
20       Q    Now have you ever heard of that, Lieutenant
21   Colbert?
22       A    Yes, sir.
23       Q    What is the Jefferson County Sheriff's Department
24   Law Enforcement Division Manual of Rules and Regulations
```

30

1    and Department Policy?

2        A    It's a manual of rules and regulations.

3        Q    What does it do?  What's it for?

4        A    It's designed to provide our rules and

5    regulations.

6        Q    Including formal complaints against deputy

7    sheriffs like Sergeant Dodson?

8        A    Yes, it is.

9        Q    And tell me how many times during the course of

10   your investigation did you refer to this manual of

11   regulations and departmental policy?

12       A    Several.

13       Q    Did you?

14       A    Yes, sir.

15       Q    Who can initiate formal charges against a deputy?

16       A    I would have to read it again if you have it

17   there.

18       Q    Well, let me see if I can help you.

19       A    Okay.

20       Q    17.3-5.  "Charge."  See if that'll refresh your

21   recollection.  Could you read that 17.3-5?

22       A    "The written formal notification from the chief

23   deputy to an officer or employee based upon a written

24   complaint filed with the department stating precisely what

1    the officer or employee was accused of doing; the specific

2    violation of department of rules or criminal law which is

3    charged; the steps an individual may take to answer the

4    charge; dates and times of the board of inquiry if

5    applicable; the effective date and duration of suspension

6    or other disciplinary action pending a hearing before the

7    civil service commission if the member charges so

8    desires."

9        Q    Show me that in your investigation report.  Show

10   me that formal charge document that you're talking about.

11       A    I'm not understanding.

12       Q    Yes, sir.  It says "a written formal notification

13   from the chief deputy."  Well, we don't have a chief

14   deputy, did we?

15       A    No, sir.

16       Q    Okay.  Can you tell who did that?  Who performed

17   that function and who submitted that formal charge?

18       A    That would be Sheriff Boober.

19       Q    Show me that in your investigation report where

20   that document exists.

21       A    The document that Sheriff Boober reviewed, the

22   investigation?

23       Q    Yes, sir.

24       A    Okay.

32

1      Q   I want to make sure it contains all the elements

2    that you said 'cause I think you said a few minutes ago

3    that you didn't think that dates and times were relevant?

4      COMMISSIONER CRAWFORD:  What's the reference on that

5    rule?

6      MR. SCALES:  17.3-5.

7      COMMISSIONER CRAWFORD:  All right.  Thank you.

8      THE WITNESS:  I mean we have a three month window but

9    I will find Sheriff Boober's -- it's under Section C.

10   BY MR. SCALES:

11      Q   Under where?

12      A   Section C.

13      Q   Under Tab C?

14      A   Yes, sir.

15      Q   Okay.

16      COMMISSIONER CRAWFORD:  Did we get this into evidence

17   that you're going to testify from?

18      MR. SCALES:  We did.  Remember I told you it was

19   subject to -- if there's any --

20      COMMISSIONER CRAWFORD:  Okay.  Thank you.  So this is

21   Sheriff's 1, right?

22      MS. GROVE:  Excuse me?

23      COMMISSIONER CRAWFORD:  This is Sheriff's 1, right?

24      MS. GROVE:  Yes, that's correct.

33

1    BY MR. SCALES:

2         Q    Where is it, sir?

3         A    Where is what?  What are you looking for the

4    dates and time?

5         Q    Yes.  I want to know where 17.3-5, the written

6    formal notification one, two, three, four, and five are in

7    Tab C.

8         A    Okay.  And I'm still not clear exactly what you

9    want.  I'm sorry.

10        Q    Tell me where it says it was based on what the

11   officer or employee was accused doing.

12        A    Okay.  Let me review it real quick.  "In

13   particular this investigation involved certain

14   inappropriate activities between Sergeant Dodson and this

15   reported deputy while one or both were on a tour of duty

16   -- were on duty in Jefferson County."

17             "Additionally, during the course of this

18   investigation Sergeant Dodson willfully and knowingly made

19   certain untruthful statements to the lieutenant in his

20   official capacity as a superior."

21             "On four or five occasions" -- and this was his

22   letter to Dodson -- "on four or five occasions of your

23   sexual interludes you were delegated as the shift

24   commander and thereby represented the department in my

**Joint Appendix Pg. 87**

 1    absence.  In your official capacity as the shift commander

 2    you are directly responsible for the efficiency and

 3    effectiveness of your command."

 4         "As the shift supervisor you are expected to

 5    maintain professional demeanor and set the example of full

 6    compliance with the rules of conduct of the department

 7    regulations.  On the fifth occasion you conducted your

 8    sexual activities within a public park within the city of

 9    Charles Town while a subordinate deputy was on duty."

10         Q    Okay.  Tell me number two under 17.3-5(2) the

11    specific violation of departmental rules criminal law

12    which is charged?

13         A    That's not in the sheriff's document not that I'm

14    seeing right now.

15         Q    I'm unclear a little bit about which document

16    we're going under but the one under which Sheriff Shirley

17    is charging my client doesn't have any of the information

18    in it, does it?

19         A    I think it gives the specific reasons for --

20         COMMISSIONER JACKSON:  Let's go to it.  Gentlemen,

21    let's go to it.

22    BY MR. SCALES:

23         Q    Basically, all it says is that he incorporates by

24    reference your entire report which I guess would include

**Joint Appendix Pg. 88**

1  the polygraph results.

2     A   And in my investigation.

3     Q   No, I'm asking you about the charge, the written

4  charge, the formal charge according to the rules and

5  regulations, Lieutenant Colbert.

6     A   Okay.

7     Q   Now you will agree with me that neither Sheriff

8  Boober nor Sheriff Shirley was ever Sergeant Dodson's

9  immediate supervisor, is that correct?

10    A   Yes.

11    Q   Look at 17.3-4.  "Complaints are written

12  statements of alleged facts constituting member misconduct

13  as defined by the rules and regulations manual and or

14  other sources of law and filed by either number one the

15  object of the misconduct, the victim -- " now who's the

16  victim?

17    A   It'd be the sheriff's department I think.

18    Q   The sheriff's department's the victim of a sexual

19  act, a consensual sexual act, by Sergeant Dodson?

20    A   I would think that the sheriff is the victim

21  because it's his department.

22    Q   Okay.  "A witness thereof."  Now tell me were

23  there any witnesses to these sex acts?

24    A   The two people involved.

1   Q    Well, of course.  They're two members of the

2   internal department, correct?

3   A    Yes.

4   Q    You didn't have anyone from the public that wrote

5   a statement in here or said I saw Sergeant Dodson and

6   Corporal Edwards out in the park getting it on someplace,

7   did you?

8   A    No, sir.

9   Q    And you didn't receive any complaints from any

10  county officials that said I think that someone's out

11  using a county car and having fornication up in the park I

12  want to report a complaint.  You never received that, did

13  you?

14  A    No, sir.

15  Q    And so if you didn't know from the statements

16  that Corporal Edwards herself and Sergeant Dodson made

17  there would be no record of any of these sexual acts,

18  would there?

19  A    Correct.

20  Q    Okay.  Now let's go to the next one.  "Or the

21  accused officer's immediate supervisor wishing charges be

22  brought against the officer."  Now you were the immediate

23  supervisor of Sergeant Dodson during the time of the

24  investigation, correct?

1    A    Yes, sir.

2    Q    And since you were also the investigating officer

3 it wouldn't be proper for you to be also the one bringing

4 the charges, correct?

5    A    Correct.

6    Q    That's why we have a chief deputy, correct?

7    A    Yes, sir.

8    Q    Okay.  Now turn over in your manual if you would

9 or I'll hand it to you 'cause I don't think I have an

10 extra one for you.  Do you see where it says, "General

11 Orders"?

12    A    I don't have one.

13    Q    Okay.  I'm sorry.  I apologize.  Let me turn over

14 where it says, "GO-00-002."  It's the first thing in the

15 General Orders.  I think I've tabbed it for you folks.

16 Now would you read what it says regarding GO-00-002, when

17 is it dated?

18    A    August 25th of 2000.

19    Q    And it says, "Subject" what?

20    A    "Employee Complaints and Internal Investigation

21 Forms."

22    Q    And would you read me the first paragraph,

23 please?

24    A    "Attached to this general order you will find

1  seven new forms.  These forms are to be used when a

2  complaint is filed against a member or employee of the

3  department.  The general order -- this general order and

4  the attached forms will be placed in the General Order

5  section of your policy and procedures manual after

6  review."

7      Q    Now, Lieutenant Colbert, were you a member of the

8  Jefferson County Sheriff's Department August of 2000?

9      A    Yes, sir.

10     Q    And have you been a member ever since that time?

11     A    Yes.

12     Q    To the best of your knowledge has that General

13 Order 00-002 has that ever been rescinded?

14     A    Not to my knowledge.

15     Q    Okay.  Now tell me is Sergeant Dodson a person

16 who a complaint is filed against is he a member or

17 employee of the department or was he at the time of the

18 investigation?

19     A    Yes, sir.

20     Q    Can you tell me whether you complied with the

21 procedures set forth in General Order 00-002?

22     A    No, I didn't and I'm not aware of that.  I found

23 this and I talked to Sheriff Boober.  Originally when I

24 was given this assignment I asked exactly what he wanted

1  as far as this investigation, you know, as far as breaking

2  it into three different investigations, or what not.  He

3  said just do it like you would any regular investigation.

4        And so at that time I am negligent of using this.

5  I referred to -- I went and got the state code book out

6  and I referred to the rules of investigation in the state

7  code which is under 7-14-C and 2 and that's what I

8  utilized so no I did not use the form.

9     Q    Let's go back for a minute.  If I could I'd like

10  to direct your attention if I could to your internal

11  investigation.  I believe it is Tab B as in boy, and

12  direct your attention to page one -- one, two, three, four

13  five, fifth paragraph down.  Do you see that?

14     A    Yes, sir.

15     Q    It says, "On July 16, 2008, Sergeant Dodson was

16  asked to come into my office and in a recorded interview

17  we discussed the specifics of the Internal Investigation

18  2008-03 and the misconduct of Sergeant Dodson."

19        I guess at that time you'd already decided it was

20  misconduct even though you hadn't discussed it with him,

21  is that right?

22     A    It was the allegations.  Yes, sir.

23     Q    Alleged misconduct, isn't that the way to say it?

24     A    That will be fine.  Yes, sir.

1     Q   "I advised Sergeant Dodson that his full

2  cooperation and honesty is expected.  I advised Sergeant

3  Dodson of the content of what we were going to discuss and

4  he became somewhat defensive stating what happened between

5  him and Corporal Edwards was his personal business."

6        Now was that July 16, 2008, the first interview

7  that you had with Sergeant Dodson, first formal interview

8  you had with Sergeant Dodson regarding the specifics of

9  this investigation?

10    A   I believe so.

11    Q   Now I'd like to direct your attention if I could

12  back to the General Order 00-002 and direct your attention

13  if I could to Form 1A-4.  Are you familiar with that form?

14    A   Yes, sir.

15    Q   You've looked at it; haven't you?

16    A   Yes, sir.

17    Q   Since the investigation?

18    A   Yes, sir.

19    Q   Not before the investigation?

20    A   No, I didn't.  I went straight to the state code

21  book.

22    Q   Okay.  Tell me if this isn't the form that you're

23  supposed to have used for the first interview?

24    A   It would have been better to use it.  It's in the

1  book and it's there but like I said I followed the rules

2  that was provided in the state code.

3      Q    But you didn't follow the policy and manual of

4  the Jefferson County Sheriff's Department, correct?

5      A    That would be correct.

6      Q    Now tell me have you read this thing lately?

7  Have you read what it says?

8      A    I'll read it again.  I think --

9      Q    I'm asking you down where it says -- about

10 two-thirds of the way down where it starts out "Your

11 presence is considered voluntary."

12     A    Right.

13     Q    Would you read that paragraph to me please?

14     A    "Your presence is considered voluntary.  No

15 physical or verbal actions will be used in an attempt to

16 physically restrain or prevent you from leaving at any

17 time.  Questions that are asked during this interview will

18 be limited to the scope of the assigned duties and

19 responsibilities and to the actions during the incident in

20 question.  You have the right to have counsel present

21 during any and all questioning."

22     Q    Now I don't see that in your report, Lieutenant

23 Colbert where you indicated that "I advised Sergeant

24 Dodson that full cooperation and honesty is expected.  I

1   advised Sergeant Dodson of the conduct of what we were

2   going to discuss he became somewhat defensive stating what

3   happened between him and Corporal Edwards was his personal

4   business."

5        I don't see in here where it says you told him that

6   he had a right to have counsel present during interview,

7   did you?

8        A    He didn't ask.  I did not.

9        Q    He didn't ask.  You didn't follow the policy of

10  the department, did you?

11       A    Well, according to this --

12       Q    According to the manual of the Jefferson County

13  Sheriff's Department you didn't follow the procedures, did

14  you?

15       A    According to the manual I should have utilized

16  that form.

17       Q    And so you took a statement from him without his

18  lawyer present without advising him he had a right to

19  counsel during that interview, correct?

20       A    I did take a statement from him, yes.  And no I

21  didn't advise him that he had the right to an attorney.

22  He didn't ask for an attorney and we proceeded.

23       Q    You didn't show him the interview form, right?

24  You didn't even look at this before the interview,

43

1    correct, this general order?

2        A    No.  As said I referred to the code book not

3    that.

4        Q    Now tell me about the polygraph tests.  When are

5    you allowed to take polygraph tests and when can you use

6    them?

7        A    I am not by any means an expert on that.  I know

8    it can be utilized for investigating purposes.

9        Q    Well, I'm not asking you -- I'm asking you what

10   the policy and your manual says about polygraph tests, do

11   you know?

12       A    No.

13       Q    Let's see if we can't find out for you.  I'd like

14   to direct your attention if I could to 20.3, "Polygraph

15   Tests, Physical Tests."  Do you sea that under --

16       A    Yes, sir.  I do.

17       Q    "Conduct of Investigation," 20.3, "Physical

18   Test."  Would you read that for me?

19       A    "Police officers may be compelled to submit to a

20   breath or blood test, voice exams, handwriting samples and

21   polygraph examinations, et cetera.  Such evidence may be

22   used against officer administratively."

23       Q    What does "administratively" mean?

24       A    For administrative purposes.

44

1  Q Isn't administrative defined?

2  A Is it?

3  Q Do you know?

4  A I don't know where it would be in that book.

5  Q I do.  I've read it.  Turn to 19.3.  Can you tell

6 me what says under 19.3 on page 117?

7  A Which point one, "Administrative Correction."

8  Q Is that what you're referring to?

9  A That's what it says.

10  Q Okay.  Tell me what --

11  A "This procedure provides for immediate

12 disciplinary action against those members who fail to

13 conform to certain departmental standards of conduct and

14 appearance.  Administrative correction under this section

15 shall constitute the excusing of the member of the

16 department for that assigned tour of duty or the remaining

17 part thereof with pay.  Pending final disciplinary action

18 where the officer's conduct is such that it should be

19 excused from duty administrative correction may be imposed

20 by the highest ranking supervisory officer on duty at the

21 time of the incident."

22  Q What does that mean?  Doesn't that mean if you

23 find him out in the car someplace drunk or you find him

24 with drugs, illegal drugs, in his possession or he's done

1    something which requires immediate action you can submit

2    him to a polygraph test and terminate him?  Doesn't it say

3    "immediate"?

4        A    "Immediate disciplinary action."

5        Q    Now tell me what date is Sheriff Boober's report

6    that he sends to Mr. Dodson in Tab B?  What is that dated?

7        A    Hang on.  The administrative report that he

8    submits --

9        Q    No, his corrective action telling him he --

10       A    Right.  I'm looking.

11       Q    Yes, sir.

12       A    Wouldn't that be Tab C that you're referring to

13   not B?

14       Q    Yes, sir.

15       A    August 27, 2008.

16       Q    And isn't it a fact that Sergeant Dodson was the

17   supervisor on shifts from up until the date he was

18   terminated by Sheriff Shirley on January 6, 2009?

19       A    Yes, sir.

20       Q    So apparently whatever charges were against him

21   were not so severe that it required immediate action of

22   his termination, were they?

23       A    That would be the decision made by Sheriff

24   Boober.

46

1      Q    Well, he was the one you said a few minutes ago

2  that was bringing the charges.

3      A    I agree.

4      Q    So if he thought it required immediate action why

5  didn't he require a polygraph?

6      A    I can't answer Sheriff Boober was thinking.

7      Q    Well, you'll agree with me that 19.1 are the

8  formal charges, correct?

9      A    Yes, sir.

10     Q    19.1, "Types of Disciplinary Procedure," 19.2,

11  oral or written reprimand, and 19.3 is the "Administrative

12  Correction."

13     A    Yes, sir.

14     Q    So it appears to me that from based upon the

15  policy of your department that a polygraph can only be

16  used under the circumstances described in 19.3, correct,

17  "Administrative correction"?

18     A    Okay.

19     Q    Do you agree with that?

20     A    I agree that that's what it says.

21     Q    Okay.  And this proceeding today the formal

22  charge of discharge is under 19.1; isn't it?

23     A    Yes, sir.

24     Q    And that's why we have the Deputy Sheriff's Civil

47

1   Service convene here today, correct?

2       A    Yes, sir.

3       Q    Now tell me a little about this vehicle, this

4   cruiser that was supposed have been used.  Was that an

5   unmarked vehicle?

6       A    It didn't have stripes or exterior lights.  It's

7   a Ford Taurus.  Has sheriff's plates and inside the radios

8   and lights and so forth.

9       Q    Well, would you refer to it as an unmarked

10  cruiser?

11      A    Yeah.  I mean it's tagged.  It's not specifically

12  tagged to blend in with the rest of society where it would

13  have a West Virginia plate and so forth and so on.

14      Q    Right, but if you're looking at it at a distance

15  say up in the woods in a park you couldn't tell it was a

16  sheriff's car, could you?

17      A    Probably not.

18      Q    Okay.  Now tell me about I noticed through the

19  course of the charges brought by Sheriff Boober in his

20  complaint he keeps referring to Corporal Edwards as a

21  subordinate officer.  Was Corporal Edwards a subordinate

22  officer to Sergeant Dodson during the time of these

23  alleged sexual acts?

24      A    I believe the -- not in May of 2007 the act there

48

1  in the office but September through December I'm not for

2  sure when she went into investigation if that's what

3  you're asking but I know at some point I believe during

4  that time period she is still on road as a corporal.

5       Q    She's a detective; isn't she?

6       A    Yes.

7       Q    A plain clothes detective, correct?

8       A    She is now, yes.

9       Q    Okay.  Was she back on '07?

10      A    She was in -- yeah, '07 and I'm not for sure

11 exactly the time period when she moved into plain clothes

12 in September through December.

13      Q    But she wasn't a field officer under one of

14 Sergeant Dodson's shifts in '07, was she?

15      A    Not that I'm aware of.

16      Q    Now, Lieutenant Colbert, I'd like to hand you

17 what the reporter was kind enough to mark as Deputy's

18 Exhibit Number 3.  Can you identify that?

19      A    That's a flow cart designed by the sheriff.

20      Q    An organizational chart?

21      A    Yes, sir.

22      Q    And you will agree with me that under the --

23 about in the middle of the page at the bottom it says,

24 "Criminal Investigations Corporal Edwards and Corporal

1    Sell" and they reported to Lieutenant Hanson, do you see

2    that?

3        A    Yes, sir.

4        Q    And the Patrol Division that's you, isn't it?

5        A    Yes, sir.

6        Q    And you had Sergeant Dotson so Corporal Edwards

7    did not report to Sergeant Dodson; isn't that correct?

8        A    That would be correct.

9        Q    Okay.

10   COMMISSIONER CRAWFORD:  Can I have a date on this,

11   you know, when is this valid?

12       MR. SCALES:  Certainly.  I'm going to continue.

13       COMMISSIONER CRAWFORD:  Okay.  If you'll tie it back

14   in so I know I'm looking at something applicable to the

15   timeframe we're talking about that would be helpful.

16       MR. SCALES:  Yes, sir.

17   BY MR. SCALES:

18       Q    Was this flow chart, this organizational chart

19   Exhibit 3, Deputy's Exhibit 3, was that valid or was it in

20   force in the year 2008?

21       A    In 2008 there was a change at one point so no

22   this chart wasn't still exactly accurate.

23       Q    Well, let me cut to the chase.  Was Corporal

24   Edwards still reporting to Lieutenant Hanson in 2008?

50

1    A    During part of it.  Yes, sir.

2    Q    Who else was she reporting to?

3    A    Myself.

4    Q    To you?

5    A    Yes.

6    Q    But never to Sergeant Dodson?

7    A    Not that I'm aware of.

8    Q    The only time she reported to Sergeant Dodson was

9    when she first came on the force and was part of the

10   patrol division; isn't that true?

11   A    That would be accurate.

12   Q    And they weren't dating at that time, were they,

13   as far as you knew?

14   A    I have no idea.  No, as far as I know.

15   Q    Do you know the dates in which this Deputy's

16   Exhibit Number 3 was in effect?

17   A    I wish I could tell you.  I do not.

18   Q    But you will agree with me that the individuals

19   who were assigned the title investigators do not report to

20   Sergeant Dodson?

21   A    Correct.

22   Q    And never have?

23   A    Correct.

24   Q    As long as they were investigators.

51

1      A     Correct.

2      Q     Okay.  And you will agree with me that Corporal

3    Edwards was an investigator in 2008?

4      A     Right.

5      Q     2007?

6      A     I do not know when she went into investigations,

7    sir.  I really don't.

8      Q     Okay.  And but she's currently -- she remains in

9    the investigations division; isn't that correct?

10     A     Yes.

11     Q     Now does the sheriff keep duty logs about what

12   every individual deputy does on a daily basis?

13     A     Yes.

14     Q     Why didn't you go back and check the daily logs

15   of the sheriff back from 2006 and 2007 to determine the

16   precise dates of these alleged sexual acts and who was on

17   duty and who wasn't?

18     A     Well, during the time of this we were also in a

19   transition between offices.  We went to the basement of

20   magistrate court where logs are kept and they were weren't

21   there.  There were some logs that were of the time period

22   that were destroyed and after your letter I went and

23   digged further, talked to the secretaries and went back

24   and I was able to locate them.

52

```
 1      Q    Then why didn't you determine from your duty logs
 2   who was on duty and who was not on duty with respect to
 3   Sergeant Dodson and Lieutenant -- I mean I'm sorry --
 4   Corporal Edwards?
 5      A    Well, the issues in which I was investigating
 6   dealt specifically with those two individuals.  The
 7   direction of the investigation was to, you know, interview
 8   and conduct our investigation with those directly
 9   involved.
10      Q    Wouldn't your investigation have more credibility
11   had you been able to define precisely the date and times
12   of the duties and the times in which Corporal Edwards told
13   you that the sex was had between the two of them so you
14   could take Sergeant Dodson's duty logs and Corporal
15   Edwards' duty logs and precisely determine who was on duty
16   and who wasn't?
17      A    There was never a specific date that was provided
18   as to, you know, when this conduct occurred.
19      Q    And you will agree with me that Sergeant Dodson
20   has never admitted that he has had sex on duty with
21   Corporal Edwards, has he?
22      A    To me the only admission he had made I already
23   quoted for our statement.
24      Q    Said, "One of us, I'm not sure whether it was her
```

**Joint Appendix Pg. 106**

1    or whether it was me it could have been at the end of a

2    shift."

3        A    Right.  Same thing with the other one where it

4    was "I don't know," something to the fact of "I think it

5    was at the end of a shift."

6        Q    You can't tell me the dates or times and you

7    can't tell me from the duty logs who was really on at the

8    time, can you?

9        A    No.  The best I can tell you is September to

10   December and once in May of 2007.

11       Q    Now tell me while a deputy sheriff is on duty may

12   that deputy sheriff stop and say deliver his or her

13   uniforms to the dry cleaners either pick up some shirts

14   and deliver some shirts, is that authorized?

15       A    Yes.

16       Q    And is it possible if a deputy sheriff needs to

17   stop and get a check cashed or deposit a check that that

18   deputy may stop at the bank and do that while on duty?

19       A    Yes.

20       Q    And the only proviso is that that deputy can't

21   neglect his or her duty, correct?

22       A    I believe so, yeah.  Once they're available and

23   ready for duty.

24       Q    Okay.  Now tell me for a moment if you have ever

1  seen or defined what neglect of duty is in the manual?

2      A    I have.   I don't have it here in front of me.   I

3  may have it.

4      Q    Well, let me direct your attention if I could

5  back to 9.13.

6      A    Okay.

7      Q    9.13-1 called "Inattention to duty."  Have you

8  ever seen that?

9      A    Yes, sir.

10     Q    Can you read that for me?

11     A    "Inattention to Duty.  A member or an employee

12 shall devote full attention to the particular assignment

13 while on duty.  They shall not stop, study, play games, or

14 otherwise engage in entertainment while on duty except as

15 may be required in the performance of their duty.  They

16 shall not engage in any activities or personal business

17 which would cause them to neglect or be inattentive to

18 duty.  Under normal circumstance members will be allowed

19 to handle personal business if the job assignment is not

20 readily affected."

21     Q    "If the job assignment is not readily affected."

22     A    Right.

23     Q    Now tell me, Lieutenant Colbert, whether you had

24 any complaints that Corporal Edwards or Sergeant Dodson

1  were not responding to calls during the times in which it

2  is alleged they had consensual sex?

3      A    No, sir.

4      Q    There's no report of that, is there?

5      A    No, sir.  Not to me.

6      Q    And during the time period in which Sergeant

7  Dodson and Corporal Edwards were alleged to be having

8  consensual sex on duty was either one of them on a

9  surveillance?

10      A    I do not know.

11      Q    Well, did you have a complaint that they weren't

12  fulfilling their duty during the surveillance?

13      A    No.

14      Q    Did you have any complaints from any parents or

15  children that they saw Sergeant Dodson or Corporal Edwards

16  having sex at any location?

17      A    No, sir.

18      Q    So as far as you know to the best of your

19  knowledge there's never been any complaint that they were

20  derelict in duty during the times in which you claim that

21  they were having improper consensual sex on duty?

22      A    Correct.

23      Q    And is it still your position today as we sit

24  here that the discharge of Sergeant Dodson was proper?

56

1     A    Do you mean the procedure or that he should be

2  discharged?

3     Q    No, the acts.  The acts that he performed and I'm

4  not conceding that they were on duty but assuming for this

5  purpose that they were are you telling me that that is an

6  offense which warrants his discharge as a sergeant for

7  Jefferson County Sheriff's Department?

8     A    It is of my opinion that the actions between the

9  two of them, and what I believe to him being untruthful

10  and not providing accurate information that would be.  You

11  know I don't feel that he was a hundred percent truthful

12  with our investigation.  So I would find it hard to find

13  him credible as a law enforcement officer, you know, in a

14  court or collecting evidence, or following up another

15  investigation where I would have to interview him.

16     Q    Has there been a formal complaint filed against

17  Corporal Edwards?

18     A    Yes.

19     Q    There has?

20     A    Yes.

21     Q    And has there been a hearing?

22     A    She refused a hearing.  She accepted the

23  complaint that was given to her.

24     Q    And what was her punishment?

1    A    She was reduced in rank, reduced in pay, and a

2  suspension.

3    Q    Reduced in rank to what?

4    A    Deputy.

5    Q    How much of a reduction in pay did she have?

6    A    The difference between a corporal and a deputy.

7  I'm not for sure of the exact numbers.

8    Q    And how long does that go for?  Is that a

9  permanent --

10    A    It's permanent pending any other misconduct.

11    Q    Now does Corporal Edwards have other charges

12  against her?  Does she have prior disciplinary problems?

13    A    Not that I'm aware of.

14    Q    She does have a federal case against her, does

15  she not, a 1983 [sic] civil rights case against her?

16    MS. GROVE:  Objection, that's irrelevant and there

17  have been no charges filed against her and her conduct is

18  irrelevant in this case.  We're here to decide if Sergeant

19  Dodson had sex while on duty and if the sheriff was

20  justified in terminating him for that and for his

21  untruthfulness during the investigation.

22    MR. SCALES:  I respectfully disagree.  I think that

23  what her punishment is if she admits she had the sex on

24  duty is relevant to what the treatment was for my client

58

1  for the same charges and he does not claim that he was on

2  duty. I'd like to know why she was sustained and why my

3  client's being put to different standard.

4      COMMISSIONER CRAWFORD: Okay, but why the 1983

5  issues?

6      MR. SCALES: Because she has other prior acts,

7  improper acts, and the next question I'm going to ask him

8  is what other improper acts does my client have, prior

9  disciplinary proceedings.

10     MS. GROVE: The civil action filed against Edwards is

11 totally irrelevant to this proceeding here. There was

12 never a formal investigation requested.

13     COMMISSIONER CRAWFORD: I think if you want to ask

14 him what complaints were filed against the deputy in the

15 sheriff's office then it's, you know, legitimate what her

16 punishment was but what other issues are out there, civil

17 actions, is not.

18     MR. SCALES: I'll move on.

19     COMMISSIONER CRAWFORD: Okay.

20     COMMISSIONER JACKSON: That's a separate civil

21 action?

22     MR. SCALES: Yes, sir.

23 BY MR. SCALES:

24     Q    Now we admit there was -- there's now pending a

1  another hearing, another proceeding against Sergeant

2  Dodson that was supposed to have taken place today on

3  appeal to the civil service commission on the alleged

4  improper search and seizure of a home out by the flea

5  market on 340 north of here, but other than that

6  proceeding which is on appeal has there been any other

7  disciplinary action or proceedings against Sergeant Dodson

8  since he's been on the force as far as you know?

9       A    No, sir.

10      Q    Okay.

11      COMMISSIONER CRAWFORD:  I'm not clear on this Deputy

12  Edwards.  I mean there are no other pending matters in

13  this sheriff's office, correct?

14      THE WITNESS:  Not that I'm aware.

15      COMMISSIONER CRAWFORD:  Okay.  Fine.

16  BY MR. SCALES:

17      Q    And you told me that she was reduced in rank.

18      A    Right.

19      Q    And she's now just a deputy.  Is she in the field

20  patrol?

21      A    She stayed in investigations.

22      Q    But she's still an investigator?

23      A    Yes.

24      Q    But she lost the rank of corporal?

60

```
 1      A    Right.  Our investigators you don't have a

 2   certain rank.

 3      Q    Okay.  And but she does have a reduction in pay.

 4   How much is the reduction in pay?

 5      A    I told you I don't know.  I mean it depends on

 6   when you got hired.  I don't have those specific numbers

 7   for you, sir.

 8      Q    Okay.

 9   MR. SCALES:  At this time that's all the questions I

10   have.  Thank you.

11                  REDIRECT EXAMINATION

12   BY MS. GROVE:

13      Q    Lieutenant Colbert, there was some lengthy

14   questioning about the use of this book.

15      A    Yes, ma'am.

16      Q    Was there ever a complaint filed against Sergeant

17   Dodson or was there an investigation started pursuant to

18   the provisions of the West Virginia Code?

19      A    Provisions of the West Virginia Code is what

20   initiated this.

21      Q    And did you follow all those provisions in the

22   West Virginia Code?

23      A    Yes, I did.

24      Q    And to your knowledge when Sheriff Shirley fired
```

1  -- or terminated Sergeant Dodson did he follow all the

2  provisions in West Virginia Code 7-14-17?

3      A    Yes, ma'am.

4      Q    He filed -- the deputy was furnished with a

5  written statement with the reasons for the action?

6      A    Yes.

7      Q    During your interview with Sergeant Dodson did he

8  ever ask to stop the interview?

9      A    No, ma'am.

10     Q    Did he ever ask to leave?

11     A    No, ma'am.

12     Q    Was he barricaded in your office?

13     A    No, ma'am.

14     Q    Did you tell him it was voluntary?

15     A    I don't remember the exact verbiage there.  It

16  was very much we came in, we talked.  I advised him what

17  we needed to talk about.  He sat down.  I at no point

18  received any observation or verbal exchange that it would

19  not be a hundred percent voluntary.

20     Q    In your mind as someone who conducts these

21  investigations would it be difficult to ever complete an

22  investigation if a deputy could refuse to speak to you

23  about incident?

24     A    It would be difficult, yes.

1      Q   Did Sergeant Dodson ever ask for counsel during

2  the interview?

3      A   No, ma'am.

4      Q   Do you know why Sheriff Boober did not take

5  immediate -- did not immediately terminate Sergeant

6  Dodson?

7      A   No, I do not.

8      Q   But Sheriff Boober was trying to proceed through

9  the hearing board?

10     A   I believe so.  I think he was just going through

11  the steps of the peer review board.

12     Q   And to your knowledge under the West Virginia

13  Code is that a separate section?  Is there a different

14  standard?

15     A   Yes.

16     Q   If you're going to pursue through the hearing

17  board can you fire someone until the hearing heard has

18  met?  If you're going to proceed through the hearing board

19  and wait for the hearing board to make a decision can you

20  terminate someone if you use that method?

21     A   No.  Right.

22     Q   So in order to immediately terminate someone you

23  have to proceed through the civil service commission?

24     A   Yes, ma'am.

1    Q    And Sheriff Boober was proceeding before the

2  hearing board?

3    A    Yes, ma'am.

4    Q    We heard about the cruiser being unmarked whether

5  it was marked is it county property?

6    A    Absolutely.

7    Q    Even when the deputy takes it home it's

8  considered county property?

9    A    Yes.

10    Q    And during your investigation how many people

11  told you whether that Dodson admitted that he had sex or

12  told you that -- I'm sorry, let me go back.  How many

13  people confirmed that Sergeant Dodson and Tracy Edwards

14  had sex while on duty, whether it was by his own admission

15  to a third party, or whether it was someone involved in

16  the act with him?

17    A    Three.

18    Q    Could you outline those for the board?

19    A    It'd be Detective Edwards, John Griffith from his

20  results, and then the one admission that Mike made in his

21  statement.

22    Q    It wasn't from John Griffith's results it was

23  actually a statement made to John Griffith?

24    A    Correct.  Correct.

64

1      Q    Irrespective of the results?

2      A    Right.

3      Q    And Mr. Scales questioned you about doing

4  personal business on duty, picking up your dry cleaning,

5  things like that, getting something to eat.  Is anyone in

6  this department under the impression you can have sex

7  while on duty with another officer?

8      A    No.

9      Q    And is anyone under the impression you can have

10  sex on county property while on duty, or on county

11  property when you're off duty?

12      MR. SCALES:  Objection to the form of the question.

13  How would he know what the impressions are.  The manual

14  doesn't say that they can't have sex on duty.

15      THE WITNESS:  I think any reasonable person would

16  assume that to take care of personal business would mean

17  you were being constantly ready for duty.

18      MR. SCALES:  Well, there's a whole section on sexual

19  harassment.  I would assume that if it was not to be

20  permitted there'd be something in the manual that would

21  say that.  That's -- I'm being argumentative but --

22  BY MS. GROVE:

23      Q    Is it your impression as an employee of this

24  department that you can have sex while on duty?

1    A    No, ma'am.

2    Q    And is your impression as someone who responds to

3    calls and is on the road that you can perform your duties

4    as a deputy sheriff while you're out having sex with

5    another deputy?

6    A    No, ma'am.

7    Q    Thank you.

8    MS. GROVE:  I'm finished.

9                    RECROSS EXAMINATION

10    BY MR. SCALES:

11    Q    But you can go to the bank and make your

12    deposits?

13    A    According to -- yeah, the rules and regs you can

14    attend to --

15    Q    Personal business.

16    A    Right.

17    Q    That's what it says under 9.13, right?

18    A    Yes, sir.

19    Q    Okay.  And I'd like to direct your attention back

20    to -- let's see if I can find it.  I'd like to direct you

21    to Tab C of Sheriff's Exhibit Number 1.

22    A    Okay.

23    Q    Could you read the first paragraph please?

24    A    "You're reminded that the purpose of establishing

66

departmental rules and regulations policies and procedures

is to provide employees with guidelines in which to follow

in day to day work activities.  Noncompliance of those

guidelines creates a disruption in the service to our

community and interrupts the internal workings of our

department.  If there were no consequences for

noncompliance to these guidelines our goals and objectives

would not be met and the department would operate in total

confusion and without purpose."

    Q    And is it your impression that Sheriff Boober's

referring to the manual, the Jefferson County Sheriff's

Office manual of Rules and Regulations and Departmental

Policy?

    MS. GROVE:  I object to this line of questioning.

Sheriff Boober is not bringing this action.  Sheriff

Shirley is.

    MR. SCALES:  Well, is that your impression?

    MS. GROVE:  And Lieutenant Colbert cannot speak to

the mind of Sheriff Boober at the time he wrote the

letter.

    MR. SCALES:  Okay.  I'll withdraw the question.  I

apologize.  Thank you.

    MS. GROVE:  I think we're finished with Lieutenant

Colbert unless the civil service commission has any

1   questions for him.

2       COMMISSIONER JACKSON:  I don't have anything at this

3   time.

4       COMMISSIONER CRAWFORD:  No.

5       COMMISSIONER ROSARIO: (Indicated no by nodding.)

6       MS. GROVE:  We're going to call Tracy Edwards next.

7   Lieutenant Colbert went to get her.

8       COMMISSIONER CRAWFORD:  Just for the record let the

9   record reflect that Sheriff Shirley is present along with

10  -- and Mr. Scales is present with his client, Mr. Dodson.

11  I think it's pretty obvious we're all here but, you know.

12      MR. SCALES:  It is a cold record.

13      COMMISSIONER CRAWFORD:  Judge Yoder may not know

14  that.

15  Whereupon,

16                      Tracy EDWARDS

17  called as a witness, having been first duly sworn, was

18  examined and testified as follows:

19                  DIRECT EXAMINATION

20  BY MS. GROVE:

21      Q    Could you please state your name for the record?

22      A    Tracy Edwards.

23      Q    Where are you employed?

24      A    Here at the Jefferson County Sheriff's

1   Department.

2       Q    How long have you been employed here?

3       A    Approximately four years.

4       Q    And what's your position at this time?

5       A    Investigator.

6       Q    What's your rank?

7       A    Deputy.

8       Q    Did you come forward about a physical

9   relationship between you and Sergeant Dodson that occurred

10  while on duty?

11      A    Yes, I did.

12      Q    And why did you decide to come forward about that

13  relationship?

14      A    There was a lot of things occurring here at the

15  department unprofessional things going on of people coming

16  to me telling me Dodson was bad mouthing me about this,

17  about that, about everything I did.  And then there was

18  the incident on Allstadts Lane where a search occurred.  I

19  don't know if you want me to go into the details about

20  that but after that Dodson filed a formal complaint on me

21  about things that I had done during this search and it

22  went on to elaborate in the complaint about a bunch of

23  other things that Dodson had never come and approached and

24  said you're doing this wrong or you're doing that wrong,

or did you do something.  He just filed formal complaints

on me.

     A lot of the accusations were not true in the

complaint.  There was threatening at the end talking about

taking people to the federal court level and I felt that

it was just in the best interests of everybody that I just

come forward and tell exactly what had occurred and just

tell the truth what happened between -- why I felt he was

filing a complaint on me in this manner what it really

stepped from.

     Q    Did you think that you might be discharged for

revealing the information to the sheriff?

     A    Yes, I did.

     Q    But you came forward anyway?

     A    Yes, I did.

     Q    Would you have accepted a discharge?  Were you

prepared to accept that?

     A    Yes, I did.  During the investigation I did tell

them that if they did want me to leave the department,

they felt it was in the best interest of the department

that I would leave.

     Q    Okay.  I want the specific instances that you

alleged that the two of you had sex while one or both of

you was on duty.  Do you recall specific instances when

1    this occurred?

2        A    Yes, I do.

3        Q    But you don't have dates?

4        A    No, I do not.  It had happened quite a while

5    before this complaint had come about and at first I got my

6    years mixed up.  I was like a year behind.  I had said

7    2005-2006 but then I said no it was 2006-2007, that was my

8    error and they had asked me about the relationship and I

9    couldn't remember specific dates.  I could remember

10   specific instances.  They wanted to know specifically what

11   occurred on duty if we had engaged in sexual intercourse

12   while on duty while we were supposed to be working and I

13   told them yes we did.

14           And they wanted to know about specific instances

15   so and I was under investigation and being interviewed and

16   told them about as many times as I could recall.  And then

17   it was all in my mind and a few days later I remembered

18   more instances.  So as soon as I remembered I came back

19   and the next morning I said, "Look I forget to tell you I

20   did remember more occasions that had occurred but I still

21   don't know specific dates."

22       Q    Okay.  Well, can you tell us about the specific

23   instances whey they occurred and who was on duty?

24       A    Yes.  There was one occasion, one incident in the

1    Ford Taurus up in West Ridge Hills on the side of the road

2    and there was one instance at War Memorial Park here in

3    Charles Town.  I'm sorry, the first one we were both on

4    duty.

5        Q    Okay.

6        A    Here at War Memorial Park I was on duty, he was

7    off duty, that was in his truck.  There was two instances

8    where he come over to my house where he was on duty and I

9    was off duty.  And there was one instance in my office

10   while we were both on duty.

11       Q    Are that Sergeant Dodson was on duty you know for

12   sure when these occurred that he was on duty?

13       A    Yes, ma'am, I'm positive.

14       Q    Okay.  When did you become a detective, do you

15   remember that date?

16       A    Sometime in August of '06 I belive.

17       Q    Did you believe Sergeant Dodson to be your

18   superior officer while you were having this relationship?

19       A    At first there was a senior sergeant in

20   investigations and then when he left Dodson was senior

21   sergeant.

22       Q    So you felt he was your superior officer?

23       A    Yes, ma'am.

24       Q    Okay.  Do you recall an incident when you got a

1  phone call from another employee here at the sheriff's

2  department regarding Sergeant Dodson?

3      A    Yes, ma'am.

4      Q    Could you tell the board about that incident and

5  what occurred?

6      MR. SCALES:  Are we going to hear -- is this more

7  hearsay?

8      MS. GROVE:  She's going to say what happened.  It's

9  not hearsay.  She received a phone call.  She's not going

10 to talk -- she's going to say, "I received a phone call."

11 It's not hearsay because it's not for the truth of the

12 matter asserted and if it is hearsay it's an admission

13 against interest.

14     MR. SCALES:  I'm not sure I've heard -- the act of

15 the phone call itself may not be hearsay but what was said

16 is certainly going to be hearsay especially if the other

17 person is available.

18     MS. GROVE:  It's not asserted -- it's not presented

19 for the truth of the matter asserted.

20     COMMISSIONER CRAWFORD:  At this point I don't think

21 we're far enough into the conversation to understand

22 whether it isn't.  You know what I'm saying?  Obviously,

23 the potential for hearsay is there but whether admissible

24 or not is kind of a question that I don't think we've

73

1    gotten to yet.  We don't know what she's going to say.

2    BY MS. GROVE:

3        Q    Do you recall?

4        A    Yes, I do.

5        Q    And what happened that day?  Can you tell the

6    Board about that phone call?

7        A    Yes.  Our secretary, Tammy, who works here called

8    me and told me not to come back to the office.  See told

9    me that she believed Dodson was going to kill me.  She

10   told me that he was furious and that he -- veins were

11   popping out on his forehead and that -- I believed

12   everything she was telling me.

13           She had been friends with Dodson for a very long

14   time still -- well, whether or not they still are I don't

15   know, but she was telling these things and when I hung up

16   with her I called up Deputy Smith and when I talked to

17   Deputy Smith I said, "I don't know what to do.  Should I

18   go back to the office?  Should I go home?"  When I got to

19   the office Deputy Smith just said, "Go back to the

20   office."

21           When I got back to the office I talked to Tammy

22   more and she said that he was screaming in the front

23   office, "I fucked her here and I fucked her there and I'm

24   going to tell her fucking husband," and she just said,

**Joint Appendix Pg. 127**

74

"You should leave before he gets here."

    Q    Did you receive any punishment for your -- for having sex on duty with Sergeant Dodson?

    A    Yes.

    Q    And what was that punishment?

    A    Demotion, loss of pay, administrative leave.

    Q    And did you accept that without contesting it?

    A    Yes.

    COMMISSIONER CRAWFORD:  How long was the administrative leave?

BY MS. GROVE:

    Q    How long was the leave?

    A    Three days.

    Q    Without pay?

    A    Without pay.

    Q    Did you submit to a polygraph examination in this case?

    A    Yes, ma'am, I did.

    Q    Do you know whether you were found to be truthful?

    A    Yes, they told me I had no deception was indicated.

    Q    Okay.

    MS. GROVE:  No further questions at this time.

CROSS-EXAMINATION

BY MR. SCALES:

Q    Corporal Edwards, all this sex that you state that you and Sergeant Dodson had that was consensual sex; wasn't it?

A    Yes, sir.

Q    You're not suggesting that Sergeant Dodson made some inappropriate passes at you or anything like that?

A    That's correct.

Q    And you were married during all the time this was taking place; isn't that right?

A    That's correct.

Q    And you told Sergeant Dodson that you were going to leave your husband get a divorce and you never did that, did you?

A    Me and my husband went through a separation and we separated.  I moved out into a separate residence.

Q    Did there come a time when Sergeant Dodson terminated the relationship?

A    No, sir.  I terminated it with Sergeant Dodson.

Q    Tell me do you recall June 29, 2007?

A    No, sir, a specific date, no.

Q    Well, would it surprise you if I told you that the date that Sergeant Dodson's going to testify that he

1    had sex with you in the office between eleven and midnight

2    after you called him while he was on vacation 4th of July

3    week to come in and see you in the office.  Does that

4    surprise you?

5        A    I don't recall that.

6        Q    And tell me about this was there ever any

7    witnesses to this sex that the two of you had?

8        A    No.  I never had sex in front of anybody.

9        Q    Well, even if you didn't intend it -- I didn't

10   suggest that you were an exhibitionist -- but did anyone

11   ever complain because they had seen you in the middle of

12   some of these sexual acts?

13       A    To me?  No.

14       Q    Okay.  And so the only way that Sheriff Boober

15   Lieutenant Colbert ever learned about this is by your

16   testimony and Sergeant Dodson's testimony, is that

17   correct, or statements to them?

18       A    That's correct.  We both submitted to polygraph

19   examination.

20       Q    Now let's go back for a minute and talk about

21   have you ever seen I think this is Deputy's Exhibit 3, the

22   organizational chart, have you ever seen that before?

23       A    Yes.

24       Q    It indicates that at least at some time you were

77

1   Lieutenant Hanson's -- he was your immediate supervisor;

2   isn't that correct?

3       A    Yes.

4       Q    And tell me how long have you been in criminal

5   investigations?

6       A    At least since two years, two and a half year

7   maybe.

8       Q    Were you ever dating Sergeant Dodson while you

9   were not in criminal investigations?

10      A    We started our relationship before that.

11      Q    Are your sure?

12      A    Yes.

13      Q    And you were on patrol?

14      A    Yes.  Deputy Smith can testify to the same.

15      Q    You were on patrol at the same time that Sergeant

16  Dodson was on patrol when you first stated dating?

17      A    Correct.

18      Q    And were these during the times in which these

19  alleged sex acts took place?

20      A    No, they were not.

21      Q    So you never had consensual sex with Sergeant

22  Dodson during any of these times in which are complained

23  about when you claimed he was on duty or you were on duty,

24  correct?

78

1    A    I'm confused by your question.  I never said
2  there was any nonconsensual sex.

3    Q    Okay.  I'm just saying to you though you were --

4    A    I already answered that.  There was no time we
5  didn't have -- I didn't on my part have consensual sex.

6    Q    Okay.  My question for you is was there ever a
7  time in which Sergeant Dodson was your supervisor during
8  the time in which you were having sex?

9    A    After Sergeant Bonifant left he mostly was always
10  involved in everything I did up and to the point where we
11  no longer got along.  I felt it best just to avoid any
12  contact at all.  I felt more threatened by comments that
13  were made that were being made and people kept coming back
14  -- other deputies kept coming back and telling me.

15    Q    Well, I assume -- you don't have to tell me that.
16  I assume they'll be deputies that will testify to that.

17    A    If you want I can give you deputies' names to
18  testify.

19    Q    Well, I think that's up to Ms. Grove, but what
20  I'm saying to you is was there ever a time in which you
21  were having sex with Sergeant Dodson when he was your
22  immediate -- he was a supervisor for you and you reported
23  to him?

24    A    No, I do not think so.

1    Q    Thank you.  Now during these times in which you

2    were having sex were you in uniform?

3    A    Plain clothes.

4    Q    You were in plain clothes?

5    A    Correct.

6    Q    He was in uniform?

7    A    Yes.

8    Q    When?

9    A    The incident in West Ridge Hills, the incident in

10   my office, and the two instances where he came to my

11   house.

12   Q    You will agree this Ford Taurus is an unmarked

13   cruiser; isn't it?

14   A    Yes, it is.

15   Q    At any time that you were having these sex acts

16   with Sergeant Dodson were you on a surveillance?

17   A    Not that I know of.

18   Q    Well, you didn't miss any duty because of it, did

19   you?

20   A    What do you mean by that?

21   Q    Were you derelict in any of your duties?

22   A    I believe it's a dereliction of duty, yes.

23   That's why I accepted my punishment willingly because I

24   believe it is, that it's not something we get paid for,

80

that it is my fault for engaging in that activity and it is a dereliction of duty because when you're not dressed how can you respond to a call.

Q    Well, you can put your clothes back on; can't you?

A    You surely can but is the response time going to be the same, no.

Q    Okay.  But at any time in which you were having sex were you on a specific surveillance?

A    Not that I recall.

Q    Did you miss a call?

A    No.

Q    Okay.  To the best of your knowledge was Sergeant Dodson on a call at any of these times?  Did he miss a call during any of these times of sex?

A    I do not belive so.

Q    To the best of your knowledge was he ever on surveillance during these time periods?

A    Not that I recall.

Q    Was any part of the public ever in jeopardy during the times in which you were having sex with Sergeant Dodson?

A    No.

Q    The place at West Ridge Hills is that pretty

1    secluded where you had sex?

2        A    Yes, I'd say it is.

3        Q    How about the park, Jefferson Memorial Park?

4        A    A little less secluded.

5        Q    But still secluded.

6        A    Kind of.

7        Q    And to the best of your knowledge did anyone see

8    these acts?

9        A    Not that I know.

10       Q    And who was present during the time in which you

11   had sex in the office?

12       A    I don't know if there was any deputies in the

13   office.  I don't recall.  I don't remember if there was

14   any deputies in there or not.

15       Q    I'm sorry.  Did the time of this act take place

16   somewhere between the time of eleven p.m. and midnight?

17       A    In the office?

18       Q    Yes.

19       A    Oh, no it was much earlier than that.

20       Q    Well, tell me how much earlier it was.

21       A    It was very early in the shift.  I believe we

22   started at three o'clock and it was probably some time

23   around six or seven.  It wasn't late in the shift at all.

24       Q    And you're sure?

1    A    Yes.

2    Q    You didn't get the year right when you made your

3  complaint but you're sure today?

4    A    Right.

5    Q    Did you keep a log?

6    A    We are supposed to keep a log every shift.

7    Q    I'm talking about a personal diary.

8    A    No.

9    Q    Did you ever make the statement oh approximately

10  two months ago to Deputy Scott Demory that you were being

11  forced to make these charges against Sergeant Dodson?

12    A    No, absolutely not.

13    Q    Did you ever make any formal charges against

14  Sergeant Dodson?

15    A    No.

16    Q    No?

17    A    No.

18    Q    You ever sign any statement against him?

19    A    What do you mean "sign any statement against

20  him"?  I made a response to the complaint that was filed

21  against me.  I didn't file any complaints on Dodson.

22  There were allegations that I heard.  Other deputies came

23  to me and told me Dodson told them I filed a sexual

24  harassment complaint against him but that's not true at

1  all and you could request Corporal Williams or Deputy

2  Smith to come in here and testify to that, or Tammy, she

3  said it as well.

4      Q    Corporal Edwards, I'd like to hand you part of

5  Deputy's Exhibit Number 2, which is the manual of rules

6  regulations and department policy.  Direct your attention

7  to part of General Order Number GO-00-002 and ask you if

8  you're familiar with this particular procedure?

9      A    No, I'm not familiar.  I've never filed a

10  complaint.

11      Q    Was there ever one filed against you using these

12  forms?

13      A    I don't remember what it said.  It said "Formal

14  Complaint" at the top of the one I was given and it was

15  from Dodson.

16      Q    Dodson?

17      A    Well, I got a copy of the complaint he filed

18  against me.

19      Q    Okay.  Let me direct your attention over to Form

20  1A-1.  Did you ever fill one of those out against Sergeant

21  Dodson?

22      A    No.

23      Q    Okay.  Were you familiar with these procedures?

24      A    No.  I never -- I never -- when I first got hired

84

```
 1   I read through the regulations but I didn't memorize every

 2   section.  I suppose if I'd filed a complaint maybe I would

 3   have been more familiar with that but I'm not familiar

 4   with it.

 5        Q    You did get one of these notebooks; did you not?

 6        A    Yes, when I first got hired.

 7        Q    Everybody -- every deputy gets one, correct?

 8        A    Correct.

 9   MR. SCALES:  I think I'm just about done but give me

10   one second.

11   COMMISSIONER CRAWFORD:  Sure.

12   MR. SCALES:  That's all I have.  Thank you.

13   MS. GROVE:  I'd like to redirect.

14   COMMISSIONER CRAWFORD:  Sure.

15                  REDIRECT EXAMINATION

16   BY MS. GROVE:

17        Q    Corporal Edwards -- I'm sorry, Deputy Edwards,

18   was Sergeant Dodson ever in charge of you in terms of

19   certifying on the shooting range or things like that?

20        A    Yes.

21        Q    And did he go on detail -- surveillance details

22   with you?

23        A    I think there was one time in Rippon that he was

24   assisting me on a surveillance detail.  We were all in
```

1  separate cars.

2      Q    Okay.  When you were engaging sexual intercourse

3  could you have received an emergency call at any time?

4      A    Yes, ma'am.

5      Q    And would have been able to respond to that call?

6      A    Not immediately.

7      Q    It would have affected your response time?

8      A    Yes, ma'am.

9      Q    And would you agree that you were having sex on

10 taxpayer money?

11     A    Yes, ma'am.

12     Q    And do you think that's appropriate?  Under the

13 department's regulations is it your understanding that

14 you're permitted to have sex while on duty?

15     A    No, ma'am.

16     Q    Did you ever intend to file a complaint against

17 Sergeant Dodson?

18     A    No.  I did speak to two people about what I could

19 do only because he was slandering my name in other

20 departments and out of town and people kept coming and

21 telling me all these things and I kept thinking well it'll

22 pass.  Eventually he'll get over it.  I'm not going to go

23 confront him about it.

24          So I was just hoping it would pass and he would

1  stop it and I did ask Earl Ballenger, you know, what do

2  you think I should do and he advised --

3      MR. SCALES:  Objection of what he said, that's

4  clearly hearsay.

5      COMMISSIONER CRAWFORD:  Yeah.

6  BY MS. GROVE:

7      Q    Again, what was your purpose in coming forward

8  with these allegations?

9      A    I felt that it was just at the point where it was

10  totally out of control and I was being accused of doing

11  things that were totally inaccurate.  We just were not

12  functioning as as department together cohesively.  The

13  relationship and the falling out caused the department to

14  just split and we were not working together well.

15      It just seemed like the whole -- the department

16  as a whole it was affecting everybody.  And when this

17  complaint came forward and it was false accusations and it

18  was saying they was going to take people to a federal

19  court level I knew I had to come forward at that point

20  because the department needed to know it, you know, this

21  is what's occuring and this is why he's doing this.

22      Q    And whether or not Sergeant Dodson used the form

23  he did file a complaint or at least a report against you

24  with Lieutenant Hanson and Lieutenant Colbert, is that

1   correct?

2       A    Yes, ma'am.

3       Q    And that's in Tab D of Sheriff's Exhibit Number

4   1.  Was it your intention to get Sergeant Dodson fired by

5   coming forward?

6       A    No.  No.  When I was advised to file the

7   complaint on him I said I don't want to get him in

8   trouble.  I just want it to end.  I want the slander to my

9   name to end.  I want, you know, I want this -- this is

10  unprofessional.  I just want to work on a professional

11  basis that's all.

12          And in October of '07 I just stated that same to

13  him and told him I can only offer him my friendship that's

14  it.  I'm sorry.  It's done and it's over with.  I cannot

15  continue on with this.  And I guess it'd be hearsay if I

16  said what he said, but I ended it.

17      Q    And your admissions to the sheriff were

18  voluntary.  Were you ever coerced to come forward?

19      A    No.

20      Q    You were never threatened?

21      A    No.

22      Q    You came forward all on your own?

23      A    Yes, ma'am.

24  MR. SCALES:  I've just got two questions.

```
 1                    RECROSS EXAMINATION

 2   BY MR. SCALES:

 3       Q    Isn't it a fact that the complaint which Sergeant

 4   Dodson made against you was that you were telling a

 5   homeowner to file a lawsuit against him and the department

 6   for a search and seizure that took place up by the flea

 7   market on 340?

 8       A    That Alstadt incident, yes, that's what the

 9   complaint was about.

10       Q    Didn't you tell the owner that?

11       A    He wasn't a homeowner.  He was a renter and no I

12   did not tell him to sue anybody and I believe that was

13   investigated and the complaint was found to be false.

14       Q    But you will agree with me that you're not

15   supposed to give any type of owner any type of legal

16   advice, are you?

17       A    Why would I -- why would I tell someone to sue

18   the department?

19       Q    That's a good question.  Okay.  My next question

20   for you is isn't it a fact that the reason why Sergeant

21   Dodson was upset with you was that even after he broke off

22   the relationship you continued to call him on his cell

23   phone and continued to text message him?

24       A    That is incorrect.  I ended the relationship with
```

 1   him.  The last time he called me was in December of '07.

 2   He didn't even knew that I moved out.  I didn't even tell

 3   him.  Didn't feel it was any of his business.  He called

 4   me up asking me could he buy something for my daughter for

 5   Christmas and I stated, "No, the relationship's over."

 6            And I did not continue e-mailing him or texting

 7   him.  You can subpoena phone records, my e-mail account.

 8   You can look at my e-mail account.  You can do whatever

 9   you want to do that is not true.

10        MR. SCALES:  I don't have anything further.

11        MS. GROVE:  Could I ask just one question?

12        COMMISSIONER CRAWFORD:  (Indicated yes by nodding.)

13        MS. GROVE:  I'm sorry.  I don't have any further

14   questions.

15        COMMISSIONER CRAWFORD:  Well, good time to break for

16   lunch, 11:45?

17        MR. SCALES:  It's at your all's pleasure.  Whatever

18   you want to do is fine with me.

19        COMMISSIONER CRAWFORD:  Okay.  One o'clock.

20                           (Whereupon, the hearing was

21                           recessed until 1 o'clock.)

22        COMMISSIONER CRAWFORD:  Are we ready to proceed?

23        MS. GROVE:  We are.

24        MR. SCALES:  Yes, sir.

90

1     COMMISSIONER CRAWFORD:  Let the record reflect that

2 we have reconvened at 12:58.

3     MS. GROVE:  I'd like to call Tammy Hoak to the stand

4 please.

5 Whereupon,

6                      TAMMY HOAK

7 called as a witness, having been first duly sworn, was

8 examined and testified as follows:

9                 DIRECT EXAMINATION

10 BY MS. GROVE:

11     Q    Would you state your name for the record please?

12     A    Tammy Hoak.

13     Q    Where are you employed, Tammy?

14     A    The Jefferson County Sheriff's Office.

15     Q    How long have you been employed there?

16     A    About five years.

17     Q    What is your position with the sheriff's

18 department?

19     A    Administrative assistant.

20     Q    Okay.  And were you aware of Sergeant Dodson and

21 Detective Edwards' personal relationship?

22     A    Yes, ma'am.

23     Q    Okay.  Were you ever asked by Sergeant Dodson to

24 contact Tracy Edwards on his behalf about their personal

1   relationship?

2        A    No ma'am.

3        Q    Okay.  Were you ever asked by Deputy Edwards to

4   contact Sergeant Dodson about their relationship?

5        A    Can you explain that for me?

6        Q    Did Deputy Edwards ask you to contact Sergeant

7   Dodson on her behalf during their relationship?

8        A    To like ask a question for her?

9        Q    Yeah.

10       A    No.

11       Q    Okay.  I'm going ask you about a specific

12   incident that Lieutenant Colbert asked you about during

13   the investigation.  Did you ever recall Sergeant Dodson

14   coming into the department while you were working when he

15   became angry?

16       A    Yes.

17       Q    Do you recall why he was angry that day?

18       A    Yes, I do.

19       Q    Why was he angry?

20       A    Because of a ring that she'd been wearing that

21   day.

22       Q    Where had she worn that ring?

23       A    In the courtroom.

24       Q    What kind of ring was it was?

1     A    Some sort of ring on her finger.

2     Q    Was it a wedding ring?

3     A    I'd never seen it but it was on her wedding ring

4  finger.

5     Q    Okay.  How angry was he?

6     A    Pretty pissed.

7     Q    Okay.  Had you ever seen him that angry before?

8     A    No.

9     Q    Okay.  While he was talking to you in the office

10  did he mention their sexual relationship when he was

11  angry?

12    A    He did.

13    Q    And do you recall what he said?

14    A    He was stating that he was going to -- well, let

15  me begin.  He had had enough.  Okay.  He was going to

16  return all of her items to her.  He was going to go over

17  and explain everything to her husband, that he was going

18  to tell her -- tell him excuse me, that they had had

19  relations in their house and if he needed to he would

20  explain exactly what the sheets looked like and that he

21  had fucked her there.  He had fucked her here and there.

22  I'm sorry.

23    Q    Did you inform Tracy that you had this

24  conversation with Dodson -- with Sergeant Dodson?

1    A    I did.

2    Q    How did you inform her about it?

3    A    I called her and told her that he was very pissed

4  off.

5    Q    And what did -- did you say anything else to her?

6    A    That it wasn't a good idea for her to come back

7  to the office.

8    Q    Why did you feel like it wasn't a good idea for

9  her to come back to the office?

10    A    Because he was very mad and he was determined he

11  was going to go over to their house, Tracy and Seth's, and

12  he was going to tell Seth.  So I really felt like if she

13  came back to the office that they would have had a

14  confrontation most likely and if not if by the time she

15  got from where she was at in Martinsburg he could have

16  already been at the house and Seth and Michael could have

17  already been talking.

18    Q    And Seth is her --

19    A    Husband.

20    Q    Did you tell Sergeant Dodson that you were

21  calling Tracy?

22    A    No.

23    Q    Okay.  Was Sergeant Dodson on duty that day?

24    A    Yes.

94

1    Q    Okay.  Was Tracy -- was Corporal Edwards --

2   sorry, Deputy Edwards on duty that day?

3    A    Yes.

4    Q    Was there anyone else in the office while he was

5   having this conversation with you about how angry he was?

6    A    Yes.

7    Q    Do you recall who was in the office?

8    A    No.

9    Q    Do you recall how many people were in the office?

10    A    One.

11    Q    Was this conversation in public view?

12    A    It was in the side office.

13    Q    Is it semipublic or was it just completely out in

14   public view?

15    A    It could be public view if the door opened.

16    Q    Okay.  Did you indicate -- did you tell Tracy

17   that you thought Sergeant Dodson would kill her?

18    A    That he was -- I used that term.  It's not a good

19   term to use but yes I did and that he's that pissed.  Sort

20   of, you know, he's so pissed he could kill you, you know,

21   not literally, but I mean that's a description of how mad

22   he was.

23    Q    He was really angry that day that he was on duty?

24    A    At her.  Mad, yes.

1       Q    All right.  Thank you.

2       MS. GROVE:  I'm finished for right now.

3                   CROSS-EXAMINATION

4    BY MR. SCALES:

5       Q    I'm Michael Scales.  I represent Sergeant Dodson.

6    I met you a couple times when I came through the front

7    door.

8       A    Yes, sir.

9       Q    Did Lieutenant Colbert ever interview you

10   incident to the investigation of Sergeant Dodson?

11      A    Yes, sir.

12      Q    Where did that take place?

13      A    Please forgive me for the times.  I guess about a

14   month or so ago.

15      Q    Sometime after August of 2008?

16      A    Yes.

17      Q    Who broke off the relationship, do you know?

18      A    Dodson.

19      Q    Sergeant Dodson did?

20      A    Yes, sir.

21      Q    And has he been very friendly with Corporal

22   Edwards since then?

23      A    To my knowledge -- to my knowledge he hasn't been

24   mean or anything.

96

Q    Do they have a lot of communications as far as you know, or if you know?

A    I'm going to say no.

Q    They don't have communications, do they?

A    No.

Q    And when did -- do you know about when Sergeant Dodson broke off this relationship?

A    I don't remember the date. I don't remember. I know as of that day of that incident when he was pissed it was around then, yes, sir.

Q    Has it been over year ago?

A    Yes, sir.

Q    Now, when you said that -- did Corporal Edwards come back to the office that day?

A    I had already left but Corporal Edwards did come and tell me she did.

Q    Was she the subject of any violence or abuse when she got here?

A    Not to my knowledge.

Q    Okay. So when you said he was going kill her you were only saying that in a figurative since 'cause he was so mad, is that right?

A    Yes, sir.

Q    Did you know why he was mad?

1     A   Yes, sir.

2     Q   Why?

3     A   'Cause he was hurt.

4     Q   'Cause he was hurt?

5     A   Yeah.

6     Q   And did Sergeant Dodson when he was talking about

7 all these times that they had had sex together ever tell

8 you that he had sex with Corporal Edwards while he was on

9 duty?

10    A   No, sir.

11    Q   And the day that he was upset they hadn't had sex

12 that day he didn't say that, did he?

13    A   No, sir.

14    Q   That's a poor question let me rephrase it.   On

15 the day that you heard how angry Sergeant Dodson was he

16 never said that he had sex with her that day, did he?

17    A   Not that day, no.

18    Q   Okay.  So you really didn't believe that he was

19 actually going to hurt Corporal Edwards if she showed up,

20 did you?

21    A   No, sir.

22    Q   Okay.  And you've known Sergeant Dodson for a

23 long time; haven't you?

24    A   Yes, sir.

98

1      Q   Is he known for physical violence against

2  individuals?

3      A   No, sir.

4      Q   Okay.  Thank you.

5      A   Thank you.

6               REDIRECT EXAMINATION

7  BY MS. GROVE:

8      Q   Why didn't you tell Sergeant Dodson that you were

9  calling Deputy Edwards?

10     A   'Cause I -- how do I answer this, I guess it was

11  I wanted to give Tracy heads up that Michael was going

12  over there and he is really mad.

13     Q   Do you know if Sergeant Dodson was here when

14  Tracy came back to the office that day?

15     A   No.

16     Q   You don't know?

17     A   No, 'cause I had already left.

18     Q   Thank you.

19  MR. SCALES:  I have nothing further.

20  MS. GROVE:  We're going to call John Griffith next.

21  COMMISSIONER CRAWFORD:  Who is John --

22  MS. GROVE:  He is the polygraph examiner.

23  Whereupon,

24               JOHN GRIFFITH

99

called as a witness, having been first duly sworn, was

examined and testified as follows:

DIRECT EXAMINATION

BY MS. GROVE:

Q    Could you please state your name for the record?

A    John T. Griffith.

Q    And where are you employed?

A    I'm retired from the U. S. Postal Inspection

Service but I am -- I do have my own small polygraph

business here in the Eastern Panhandle.

Q    Okay.  When you were employed at the postal

inspection service how many polygraphs did you perform?

A    During my polygraph career from 1983 'til my

retirement in 1998 I conducted 1152 specific criminal

examinations.  Since my retirement I've conducted

approximately 300.

Q    Okay.  Are you licensed?  Are you a licensed

polygraph examiner?

A    I am in the state of West Virginia and Virginia.

Q    And where did you receive your education?

A    I went through polygraph training and that was

then called USAMS at Fort McClellan, Alabama, that was

where federal examiners were trained at that time that was

in 1983 and in 1985 it became DODPI, the Department of

1    Defense Polygraph Institute.

2        MR. SCALES:  Just to make sure that the record's

3    clear I'm not waiving the objection that we had earlier to

4    use of the polygraph test.

5        COMMISSIONER CRAWFORD:  I understand and I think just

6    a quick consensus here that we've agreed that we're going

7    to hear his testimony.  The writ of prohibition doesn't go

8    to us obviously because it goes to other parties so we're

9    not bound by the order.

10        MS. GROVE:  So are you giving me permission to

11    question him about Sergeant Dodson's polygraph?

12        COMMISSIONER CRAWFORD:  At this point, yes.

13        MS. GROVE:  Okay.

14        MR. SCALES:  Just to note I have a continuing

15    objection so I don't interrupt his examination.

16        COMMISSIONER CRAWFORD:  Right.  I understand.

17    BY MS. GROVE:

18        Q    Okay.  So you conducted an examination of both

19    Corporal Edwards and Sergeant Dodson?

20        A    I did.

21        Q    And who requested that you conduct that

22    examination?

23        A    The sheriff's department.  I think it was

24    specifically Lieutenant Colbert contacted me and requested

1   the examinations.

2       Q    Before we go over the examination I would ask you

3   could you please explain for the commission how a

4   polygraph is given just a very broad over view if you

5   could the steps involved in giving a polygraph.

6       COMMISSIONER CRAWFORD:  Mr. Scales, before we go any

7   further in this do you have any objection to his

8   qualifications.  I presume he's offered as an expert in

9   polygraph --

10      MS. GROVE:  Yes, I'm offering him as an expert.

11      MR. SCALES:  I think he's got a license in West

12  Virginia so I think that's what all he needs.

13      COMMISSIONER CRAWFORD:  Okay.  Fine.

14      MR. SCALES:  I have checked.  He does have a license.

15      COMMISSIONER CRAWFORD:  Okay.  Good.

16      THE WITNESS:  Polygraph testing consists of the

17  examinations that I conduct, and are conducive to most

18  polygraph examinations, consists of five small segments.

19  It takes approximately an hour and a half to two hours to

20  conduct.  The examination begins with the pretest

21  interview and during the pretest interview we -- because

22  most people who come in to take a polygraph test are

23  somewhat nervous I begin mine by telling the person how

24  long it's going to take and then I explain to them that

this consists of five segments.

Number one, I'm going to ask you a bit of information about your background. Pretty much where you lived, where you work, where you've gone to school, those kinds of things because that gives the person a chance to kind of settle in to the situation and that's what that's designed to do.

After that I explain the polygraph instrument. I explain to the person what it does, how it does what it does, answer any questions that they have about it and the third segment is we go over the case facts, what the requester wants verified on the test. We go over that as completely and as thoroughly as the subject can explain it.

The fourth part is we then come up with the questions that I'm going to ask on the test. Quite often I get the subject to help me formulate the questions, sometimes that's not necessary. I tell them basically what I want to verify. I often ask them how would you ask that question if you wanted to verify that kind of thing. I try to get the subject involved in that.

Then the fifth part of it is the actual collection of the polygraph charts which is the actual test.

BY MS. GROVE:

103

1    Q    And how often -- how many times do you run the

2   polygraph chart or how many times do you ask those same

3   questions?

4    A    At a minimum of three times and I explain to the

5   subjects always that we're going to go through these at

6   least three or four times to show consistency and most

7   subjects think that you're only going to go through one

8   time so I want them to be perfectly clear.

9    Q    How many times did you go through with Corporal

10  Edwards and Sergeant Dodson?

11   A    Corporal Edwards was I think I'm pretty sure -- I

12  can check my file if you want.

13   Q    Please check your file.

14   A    I think I'm pretty sure I went through the

15  questions three times.  On Corporal Edwards' test the

16  first series I ran four charts.

17   Q    Okay.

18   A    And then there was one area of ambiguity and I

19  gave her a break, a 30-minute break, brought her back and

20  then ran a second series on that specific issue and I

21  think on that one I also ran four charts.

22   Q    Was it the same with Sergeant Dodson?

23   A    Let me check.  With Sergeant Dodson I ran three

24  charts.

104

1      Q    Just to cover -- to finish up on the basic

2   overview of the polygraph would emotions such as

3   nervousness effect the result of the polygraph?

4      A    Well, basically no because it's the objective of

5   the examiner to dissipate that nervousness as much as

6   possible and we spend a great deal of time in the pretest

7   to do that.  Then, you know, we ask them throughout the

8   test how they feel about taking the test and look for --

9   we try to get them at the optimum level so we can get --

10  certainly with me so I can get the best clearest charts I

11  can get.

12     Q    I'm going to ask you about Corporal Edwards

13  specifically about each of the polygraph examinations, I'm

14  going to ask you about Deputy Edwards now.  Corporal

15  Edwards polygraph do you recall what the questions were

16  that you asked her?

17     A    Yeah, I can tell you exactly.  On the first

18  series the questions were, "Regarding your sexual

19  relationship with Michael Dodson do you intend to answer

20  truthfully each question about that?"  To which she

21  answered, "Yes."

22          The first relevant question was, "Did you lie

23  when you said you engaged in sexual activity with Mike

24  during his assigned tour of duty?"  To which she

responded, "No."

The second relevant, "Did you lie when you said you and Mike engaged in sexual activity at least five times during yours or his assigned tour of duty?"  To which she answered, "No."

The third relevant was, "In your statement to the investigator did you in anyway lie about or omit any requested information?"  To which she responded, "No."

And the last relevant was, "Did you and Mike ever engage in any other activities that were in violation of agency rules and regulations while on assigned tour of duty?"  To which she responded, "No."

Q    And did you find her to be truthful during her polygraph?

A    I found her to be basically truthful on that series.  There was one question that there was just some question about and I asked her -- at the end I asked her if -- let me see -- her polygrams on the question about her statement to the investigator did not contain strong nondeceptive responses and I asked her if she had a problem with one of the questions and she immediately stated it had to be the one about the statement to the investigator.

And she stated the word "omit" had given her a

1    problem because she was thinking she had omitted a lot of

2    details about the relationship even though the

3    investigator had not asked specific questions about that

4    and that's -- because of that I gave her a break and then

5    brought her back and ran a second series on that issue.

6        Q    And after you ran that series was she found to be

7    truthful on that series?

8        A    Yes.  Yes, she was and I can give you those

9    questions on that second series.

10       Q    Yes, please.

11       A    The first relevant in that was, "In your

12   statement to the investigator did you lie to any of the

13   questions asked?"  To which she replied, "No."

14            And the second one was, "Did you lie today

15   regarding the times and locations when you or Mike engaged

16   in sexual activity while assigned to a specific tour of

17   duty?"  To which she answered, "No."

18       Q    Moving on to Sergeant Dodson's polygraph

19   examination.  I'm sorry just one more on Deputy Edwards.

20   Did she admit to you during -- you said you have a

21   discussion with them during the pretest phase.  Did she

22   admit to you that she had sex during that -- while on

23   duty, while she and Mike were on duty?

24       A    Yes, she did.

107

1      Q    Did she admit that to you during the pretest

2  phrase?

3      A    Yes, she did.

4      Q    Okay.  Moving on to Sergeant Dodson, you also

5  conducted a polygraph examination of him and do you recall

6  what the five questions were that you asked him?

7      A    Yes.  Again, the first question that we do not

8  score but it introduces the subject of the test was,

9  "Regarding your sexual relationship with Tracy Edwards do

10  you intend to answer truthfully each question about that?"

11  To which he responded, "Yes."

12          The first relevant was, "Did you ever engage in

13  sexual activity at Tracy's house when you or she were on

14  an assigned tour of duty?"  To which he responded, "No."

15          The second relevant was, "Other than what you

16  told me in your statement to the investigator did you lie

17  to any one of the other questions he asked?"  To which he

18  responded, "No."

19          The third relevant was, "Did you ever say or do

20  anything to encourage other deputies not to cooperate with

21  or assist Tracy?"  To which he responded, "No."

22          And the last relevant was, "After the

23  relationship with Tracy was over did you try to continue

24  the relationship through any unwanted contacts?"  To which

1   he responded,"No."

2       Q    And was Sergeant Dodson found to be truthful on

3   his polygraph examination?

4       A    No, he was not.

5       Q    And moving to the pretest portion did Sergeant

6   Dodson make any admissions to you?

7       A    Yes, he did.

8       Q    Do you recall what those admissions were?

9       A    I basically began the -- remember I told you

10  there was the background data then the explanation and

11  then the case facts and when I got to that portion of the

12  test I related to Mr. Dodson, "I understand that you have

13  told Lieutenant Colbert that you never engaged in sexual

14  activity with Miss Edwards while on duty," and we had

15  specified what that meant so that we knew "on duty" was

16  referenced as their assigned tour of duty.

17           Anyway I said, "Is that true?"  And he said, "No,

18  that's not true."  And he went on to explain where he said

19  that they had engaged.  So in the pretest interview he

20  clarified that quite a bit and gave me specifics on where

21  that happened.

22      Q    Do you recall that those specifics were?

23      A    Yeah.  If I could just read that portion of my

24  report.  "During the pretest portion of the polygraph test

1  Dodson stated he and Edwards had in fact engaged in sexual

2  intercourse while one or sometimes both of them was on his

3  or her assigned tour of duty.  He stated he could think of

4  two times when they had sexual intercourse when one or

5  perhaps both of them were on their assigned tour of duty.

6  After careful consideration he stated the number

7  definitely was not more than four times.

8          However, he could only recall three instances as

9  follows:  One time in her office when both were on their

10 assigned tour of duty; one time in a cruiser when both

11 were on duty; and one time in his pickup truck at a park

12 when Edwards was on duty.  Dodson stated he definitely had

13 never gone to Edwards house for a sexual encounter while

14 he was on duty."

15      Q    Okay.  Thank you.

16      MS. GROVE:  I have no further questions at this time.

17                    CROSS-EXAMINATION

18 BY MR. SCALES:

19      Q    Mr. Griffith, I represent Sergeant Dodson.  Tell

20 me what you all to have do as a licensed polygraph

21 examiner before you take someone's polygraph test?

22      A    What you have to do as far as do you want me to

23 be more detailed about the five elements that I mentioned?

24 What we have to do basically is satisfy ourselves that the

1    person is capable of taking a valid polygraph test and by

2    that I mean --

3        Q    What do you do to do that?  What questions do you

4    ask them?

5        A    Okay.  Let me share with you some of the

6    questions.  I asked them in the pretest portion the first

7    segment of the test I asked them if they are currently

8    under a doctor's care.  To which -- you want me to tell

9    the responses?

10       Q    I do indeed.

11       A    Okay.  To which he replied, "No."   I asked him,

12   "Do you have any respiratory problems that you're aware of

13   asthma, emphysema, sinus, bronchitis, allergies, et

14   cetera?"  To which he responded, "No."

15            I asked him, "Are you currently on any medication

16   taken within the last 30 days?"  To which he replied,

17   "Yes."  He's on Coumadin as a blood thinner.

18            I asked him if he had ever had any psychiatric

19   care -- oh, on the currently on recent medications he also

20   mentioned DLT and he never did clarify what that meant.  I

21   asked him to spell it and he was unable to do that and so

22   that left a question mark.

23            Asked him about the psychiatric history.  Asked

24   him if he'd ever had a nervous breakdown or ever had to

111

1    seen a psychologist or psychiatrist for any reason to

2    which he said, "No."

3          I asked him if he'd ever been addicted to drugs

4    of any kind.  He said, "No."  I said, "Prescription?"

5    "No."  "Any others?"  He said, "No."

6          I asked him if he had ever been addicted to

7    alcohol which he said, "No."  I asked him if he was a

8    drinker of alcohol at this point in his life and he said

9    he does not drink at all.

10          I asked him if he had eaten that day, if he was

11    sufficiently -- if he had followed his normal routine as

12    far as eating goes at that point in time and he said,

13    "Yes, I followed my normal routine."

14          I asked him how many hours he had slept the night

15    before the test.  He said, "Seven to eight."  I said,

16    "What do you normally?"  He said, "Six to eight."  So I

17    said, "You're on your normal schedule."  To which he

18    replies, "Yes."

19          I asked him how he felt at this point in time

20    physically and I asked him I said, "Do you feel okay?"  I

21    say, you know, do you feel -- I asked him four things,

22    "Are you okay, very good, excellent, never felt better?"

23    To which he replied, "I feel okay physically."

24          I asked him the same question mentally.  "Do you

1    feel okay, good, very good, excellent, never felt better?"

2    To which he replied, "I just feel drained by it all."

3         I then asked him, "Have you experienced any

4    traumatic experiences in the last week or so?  Other than

5    the situation that we're testing on here today has there

6    been any traumatic event in your life in the last week or

7    that has you especially upset today such as a death in the

8    family or anything else that has you especially -- a

9    divorce or anything like that?"  To which he replied,

10   "No." So those are the health issues that --

11        Q    You asked him?

12        A    Yes.

13        Q    Tell me what type of health issues can affect

14   your type of testing?

15        A    Well, the most dramatic would be if the subject

16   tells me if I say, "Do you have any psychiatric history?"

17   And he says, "Well, yeah I see a psychiatrist on a regular

18   basis."

19        Q    What does your testing machine test of the

20   subject?

21        A    The polygraph instrument simply records the

22   physiological tracings just like a monitor in the

23   hospital.  We record the breathing pattern as the person

24   inhales exhales, inhales exhales.  We record the systolic

113

1  blood pressure tracing as the heart beats just like a

2  hospital monitor and we record the perspiration on the

3  fingertips, that's all the polygraph instrument does.

4      Q    So then would a person with an irregular heart

5  beat affect this test?

6      A    Not normally.  If you can have a, you know, we

7  deal with people with extra systoles, irregular

8  heartbeats.  We take that all into consideration and run

9  -- we run a demo test chart before we run any of the, you

10 know, the specific questions so that we see, the examiner

11 sees, what the normal tracing is like.

12     Q    Well, one of the results does involve systolic

13 and what was the other one -- diastolic blood pressure and

14 that does come from the heart; doesn't it?

15     A    Yes, it does.  Sure.

16     Q    Did you ask Sergeant Dodson if he suffered from

17 any heart conditions?

18     A    He mentioned to me that he had a heart condition

19 very, very young in life.  I forget like I don't know what

20 -- he gave me the age.

21     Q    Do you have that in your notes?

22     A    I do not.

23     Q    Is there a reason why you didn't write that down?

24     A    Simply because I think it was when he was six

114

1    years old.

2        Q    But you didn't consider that to be serious enough

3    to consider in your testing?

4        A    I did not.  I saw no reason to curtail the test

5    because of that.

6        Q    Who was present during the test?

7        A    Just the subject and myself.

8        Q    And where was this taken?  Where was this subject

9    taken?

10       A    Where was the test administered?

11       Q    Yes, sir.  I apologize that was a poor question.

12   Where was the test administered?

13       A    It was August 14th.  It was the -- I think it was

14   at the old sheriff's office or it might have been here.

15       Q    Okay.  Was it recorded?

16       A    No.  We cannot record.  The state of West

17   Virginia is the only state that does not allow any

18   recording of polygraph test either audio or video.

19       Q    And the regulations also require you not "to

20   conduct an examination on a person whom he or she believes

21   through observations or any other credible evidence to be

22   physically or psychological unfit for the examination at

23   that time."  Isn't that correct?

24       A    Yes, sir.

1    Q    And I'm reading from 42-CSR CSR six section 42-8

2    There's a whole set of regulations on what you have to do;

3    isn't there, from the state?

4    A    Yes.

5    Q    And you're telling me then that an irregular

6    heartbeat perhaps would not be something that would affect

7    your testing?

8    A    An irregular heartbeat is what we do is we

9    establish the norm, okay?  An irregular heartbeat is part

10   of the norm, that's the norm at that time, and then the

11   polygraph test looks for deviations from that norm.

12   Q    Do you know Sheriff Boober?

13   A    I do.

14   Q    How many polygraph tests did you administer for

15   Sheriff Boober while he was sheriff?

16   A    I can give you an estimate.  I certainly can't --

17   the majority of the tests that I ran for Sheriff Boober

18   were screening tests of candidates for deputy.  I have my

19   ledger at home if you need that.  I don't have it with me.

20   Q    Would it be fair to say that every one he ever

21   had to have done you did it while he was sheriff?

22   A    I can't answer that.  The state police have an

23   examiner that they use at no cost so he may have used the

24   state police examiner.

116

1      Q     During the course of your discussions prior to

2  the actual test being administered did you ever advise my

3  client that he had the right to an attorney?

4      A     Yeah.

5      Q     You did?

6      A     Yeah.  No, let me take that back.  Here's what I

7  advise.  I advised Mr. Dodson number one he signed an

8  agreement that he was taking the polygraph test

9  voluntarily.

10      Q     Yes, sir.

11      A     I explained all that.  I explained to him a few

12  things.  One, that the test was voluntary from start to

13  finish.  There's no point past which he can't get up and

14  leave.

15           And I explained to everybody I test including Mr.

16  Dodson that the questions that I'm going ask are reviewed

17  in advance, that there are no surprise questions on the

18  test.  If he had asked for an attorney, or mentioned it, I

19  would have ceased and desisted at that point until he

20  talked to an attorney but he did not request that.

21      Q     And you didn't tell him he was -- your form where

22  it says it's a voluntary act doesn't say anything about

23  being entitled to an attorney, does it?

24      A     No, the Miranda form states that.  The agreement

**Joint Appendix Pg. 170**

117

1    form does not.

2        Q    And you told Sergeant Dodson that he couldn't get

3    up and leave.

4        A    I did not.  Absolutely not.  I told him this was

5    voluntarily from start to finish, that there was no point

6    past which he couldn't get up to leave if he wanted to.  I

7    made that perfectly clear as I always do.

8        Q    So he cooperated with all your questions as far

9    as you knew?

10       A    He cooperated one hundred percent.  Couldn't ask

11   for a better subject.  He was very cooperative.

12       Q    Did you find him respectful?

13       A    Very much.

14       Q    But yet you found him to be incredible as to a

15   couple of his answers?

16       A    That's correct.

17       Q    Now you indicated that Lieutenant Colbert called

18   you for this particular polygraph test.  Did he tell you

19   what results he was looking for from you?

20       A    No.  He told me what -- I always ask what's the

21   subject, you know, what's the issue and he just said it's

22   an internal affairs situation and I can't really tell you

23   what else he told me.  I did know it was an issue

24   involving a sexual relationship between two deputies.

**Joint Appendix Pg. 171**

1    MR. SCALES:  No further questions.

2    MS. GROVE:  Just one question.

3              REDIRECT EXAMINATION

4    BY MS. GROVE:

5    Q    Just want to be clear.  During the pretest phrase

6    when you weren't testing him for truthfulness, but during

7    the pretest phase, Sergeant Dodson specifically admitted

8    that he lied to Lieutenant Colbert during his questions?

9    A    I remember that very specifically.  When I began

10   the review of the case facts I told Mr. Dodson I said, "I

11   understand that you told Lieutenant Colbert that you never

12   engaged in sexual activity when you or Tracy were in

13   uniform and on duty."  And he said -- I think he said, "I

14   did but that's not true."  And then he went right on and

15   explained the incidences where they had.

16   Q    Okay.  Thank you.

17             RECROSS EXAMINATION

18   BY MR. SCALES:

19   Q    And those were instances in which he was on duty?

20   A    Well, I told you the -- both.  Do you want to

21   hear them again?

22   Q    No, I'm just -- is it your testimony that

23   Sergeant Dodson told you that he lied to Lieutenant

24   Colbert?

1      A    He said he was not truthful what he said about

2  that and then he went right on and clarified when they had

3  one or other or both were on duty.  He clarified it.  Do

4  you want me to share specifically?

5      Q    I think you testified to it once.  I think we all

6  heard it.  Thank you.

7      MS. GROVE:  No further questions.  Call Sheriff Robert

8  Shirley to the stand now.

9  Whereupon,

10                      ROBERT SHIRLEY

11  called as a witness, having been first duly sworn, was

12  examined and testified as follows:

13                    DIRECT EXAMINATION

14  BY MS. GROVE:

15      Q    Please state your name for the record.

16      A    Robert E. Shirley.

17      Q    What's your position with the county?

18      A    Newly elected Sheriff Jefferson County.

19      Q    Did you work in the sheriff's department before

20  you were elected as sheriff?

21      A    Yes, I did.

22      Q    How long did you work here before that?

23      A    A little over 25 years.

24      Q    Okay.  Now Sheriff Shirley you didn't institute

1  -- you didn't institute this action?

2      A   No, I did not.

3      Q   This was an investigation that was pending before

4  you were elected?

5      A   That's correct.

6      Q   And when did you become aware of the

7  investigation?

8      A   It was in late 2008 that I heard some of the

9  deputies talking about the complaint, the incident itself,

10 that's how I first became aware of it.

11     Q   And did you read the complaint -- or the

12 investigation?  I'm sorry it wasn't a complaint it was an

13 investigation.

14     A   After being elected in November it was around the

15 end December the 24th -- 23rd when that's the time I was

16 starting to get in the transition period here at the

17 sheriff's department.  I at that time obtained a copy of

18 the report from -- I'm not sure if it was the sheriff or

19 Lieutenant Colbert -- so I could review that 'cause I was

20 aware of the investigation itself.

21     Q   And after you read the investigation what was

22 your reaction to that?

23     A   I was very disturbed by the contents of this

24 investigation.  It's sad to me that any person would

121

1    conduct themselves on duty to the point that this report

2    states.

3        Q    And after you read the investigation what action

4    did you take?

5        A    I met with the prosecutor about my -- how I

6    interpreted the report.  I was very upset about this

7    report because I did not like coming in the office and

8    hearing these problems.  I did not look forward to it.  I

9    kind of inherited it and after reviewing it and also

10   reviewing the action that Sheriff Boober had taken I could

11   not in good taste go along with his recommendation at that

12   time.

13           I felt after reading it three or four times that

14   this did not constitute -- because there was other

15   problems, too.  I had talked to the deputies.  They were

16   coming to me talking about the problem within the

17   department how this had separated and divided the

18   department.  There was more at issue than just the

19   contents of the report.  There was a lot of things that

20   could, that were occurring that could have led to the

21   injury of a deputy so -- and I could not let this continue

22   on.  I felt it was best for the department, best for the

23   community for me to take immediate action on this and

24   that's what I chose to do.

122

```
 1        Q    And did you proceed under the complaint procedure

 2   in the Jefferson County Sheriff's Manual, or did you

 3   proceed under the West Virginia Code?

 4        A    I acted under West Virginia Code 17 -- or

 5   7-14-17.

 6        Q    And did you provide Sergeant Dodson with a

 7   written statement as to why you were terminating him?

 8        A    I did.

 9        Q    Can you give the board those reasons?

10        A    There was eight reasons.  After reading --

11   actually, there was more but I stuck with eight that I

12   felt was more relevant than the others.  The reasons I

13   give Mr. Dodson I'll -- would it be okay to read the

14   entire --

15        COMMISSIONER CRAWFORD:  Could we dispense with this

16   'cause its already an exhibit?

17        MS. GROVE:  Okay.  That's fine.  That's fine.

18        COMMISSIONER CRAWFORD:  I know Bobby can read.

19        MS. GROVE:  Okay.  That's fine.

20        COMMISSIONER CRAWFORD:  Unless you have any objection

21   to that.

22        MR. SCALES:  No.  On cross-examination or is she

23   going to --

24        COMMISSIONER CRAWFORD:  No, he was going to read what
```

**Joint Appendix Pg. 176**

1   he gave to you I'm think it's already an exhibit.  There's

2   no sense demonstrating his reading prowess.

3   BY MS. GROVE:

4       Q    Okay.  When you presented the letter that we were

5   just talking about did Sergeant Dodson specifically deny

6   all the allegations?

7       A    No.  I brought Sergeant Dodson in my office that

8   morning it was a litter after eight.  It was on a Tuesday.

9   I had Lieutenant Hanson bring him to my office and I give

10  Mr. Dodson the opportunity to resign and he said he would

11  not do that.  And I gave him a copy of my findings here

12  and advised him that I was going to terminate him and I

13  asked him to read that and sign it that he had received

14  it.

15         He looked at it.  He read it.  He took a few

16  moments to read it.  He said he would not sign it because

17  he disagreed with -- there was four out of the eight that

18  he disagreed with.  He didn't say anything about the other

19  four, but he stated there was one, three, five, seven that

20  he did not agree with and he in turn was not going to sign

21  it.  Then I asked him just go ahead an sign -- write on

22  there "refused" and that's what he did.

23      Q    So he didn't specifically deny all the

24  allegations.  He picked certain allegations to deny?

124

1          A    That is correct.

2          Q    Sheriff Shirley, are you aware that Tracy Edwards

3    was also involved in this?

4          A    That is correct.

5          Q    And why was there a different action taken with

6    regard to her?

7          A    Quite frankly, I was unaware that Sheriff Boober

8    had already disciplined her.  My intention was to

9    terminate her immediately also.

10          Q    You would have terminated her if action had not

11    been be taken against her?

12          A    Absolutely.

13          Q    Is it your understanding that deputies are

14    permitted to engage in sexual activity while on duty?

15          A    I can't speak for prior sheriffs but under my

16    watch absolutely no.

17          Q    Again, can you tell us why you felt it was

18    necessary to immediately discharge Sergeant Dodson from

19    the department?

20          A    Based on the contents of it, of the report, and

21    knowing some of the things that was taking place up to

22    this point and I do not feel it's in the best interest of

23    this department for Sergeant Dodson to be terminated by

24    Sheriff Boober which was probably two or three months

125

1    earlier and still being a shift supervisor.

2         Quite frankly, I do not trust him out here in the

3    public eye making decisions and I was concerned about if a

4    serious case had occurred his testimony in court would be

5    questioned and I had great concern for that.  I did not

6    feel that I could trust him when in fact he was not honest

7    with the Lieutenant.  He was not truthful in any of the

8    questions that were asked.  I had great concern with that.

9         Q    Just to be clear.  Do you know what Sheriff

10   Boober's recommendation was when he was proceeding under

11   the investigation procedure?  Do you know what his

12   recommendation was?

13        A    Yes, I do.

14        Q    And what was that recommendation?

15        A    He recommended termination and -- but he also let

16   them work until the outcome of the hearings.

17        Q    And you felt that you could not do that.

18        A    I did, yes.

19        Q    Thank you.

20        MS. GROVE:  No further questions at this time.

21                    CROSS-EXAMINATION

22   BY MR. SCALES:

23        Q    Do you believe it's appropriate, Sheriff Shirley,

24   to urinate in an arrestee's hat.

**Joint Appendix Pg. 179**

1      A    Under the circumstances, yes.

2      Q    You did that; didn't you?

3      A    Yes, I did.

4      Q    And you were disciplined for that type of

5  conduct, is that right?

6      MS. GROVE:  Sheriff Shirley's conduct is completely

7  irrelevant in this case, this is about again Sergeant

8  Dodson and the relationship.

9      MR. SCALES:  I want to make sure I understand -- I'll

10  withdraw the question.

11     COMMISSIONER CRAWFORD:  Okay.  All right.

12  BY MR. SCALES:

13     Q    Now, Sheriff Shirley, did you rely upon the

14  polygraph test that was taken by John Griffith in your

15  decision to discharge Sergeant Dodson?

16     A    Not solely on the results.  A lot of it had to do

17  with his testimony itself where he in fact was giving, you

18  know, false lies back and forth.  A lot of it had to do

19  with his actions.

20     Q    You haven't heard his testimony yet, have you?

21     A    The contents of his statement to Lieutenant

22  Colbert.

23     Q    What Lieutenant Colbert believed was his

24  statement and what John Griffith believed was his

1   statement, but you've never asked Sergeant Dodson directly

2   about these charges, have you?

3      A    No, I was relying on -- this was a typed copy of

4   the audio of Sergeant Dodson.

5      Q    I want to make sure I understand this memorandum

6   that you provided to my client on January 6, 2009, and I

7   want to make sure that I have it right.

8        "In addition to the aforementioned conclusions" --

9   I'm on the second page of it -- "I incorporate by

10   reference the entire -- the entirety of Jefferson County

11   Sheriff's Office Internal Investigation Number 2008-03 as

12   the rationale for my decision to immediately terminate

13   your employment with the department." Do you see that?

14      A    Yes, sir, I do.

15      Q    Is it true?

16      A    That is correct.

17      Q    And that includes the polygraph test; doesn't it?

18      A    Yes, it is.

19      Q    And that includes the statements that was made by

20   me client to Lieutenant Colbert when he didn't have a

21   lawyer present; isn't that right?

22      A    That is correct.

23      Q    And did you tell Sergeant Dodson when you saw him

24   on January the 6th, 2009, when you called him into this

1    office and handed him his discharge papers that he had a

2    right to an attorney at that point?

3        A    No, I did not.

4        Q    Now you told me a few minutes ago that you didn't

5    go under the manual of rules and regulations you went

6    under the West Virginia Code?

7        A    That's correct.

8        Q    Can you tell me where the charges that you state

9    in this memo that you discharged Sergeant Dodson are

10   contained anywhere in Chapter 7 -- or Article 14 Chapter 7

11   of the code 'cause I can't find them anywhere?

12       A    You won't find them in specific word for word

13   it's not there.

14       Q    Well, find what you relied on, where it is if you

15   relied on it.

16       A    I relied upon -- after the completion of my

17   review of the completed report and the law gives the

18   sheriff the authority to terminate immediately and I have

19   the obligation to give him in writing why I terminated

20   him, that's what I relied on.

21       Q    There's nothing in the West Virginia Code that

22   says that having sex with another officer, consensual sex,

23   is illegal is there?

24       A    These are not criminal charges, not illegal, this

129

1  has to do with conduct unbecoming an officer.

2       Q    Well, that's in this particular manual the manual

3  that nobody listened to or nobody followed when they went

4  through this investigation.  The manual -- what did I call

5  this, Number 2, Deputy's Number 2 I think it was, is that

6  right?

7       A    I cannot speak for what the other sheriff relied

8  on.

9       Q    Let's speak to you then.  What did you do after

10 you learned about these charges?  Did you file the forms?

11 Did you start over and say, "Okay.  Well, let me go back

12 to the manual.  Let's see how we commence these charges,"

13 if you thought it was so upsetting?

14       Did you go back to General Order Number GO-00-0002

15 and file an Incident Evaluation Report IA1-2 "to be used

16 by a member of the department who wishes to file a

17 complaint against any lower ranking member of the

18 department?"  Did you start all over and --

19       MS. GROVE:  Objection.  Sheriff Shirley never said

20 that he filed a complaint.  He has testified that he

21 followed the procedure in 7-14-17 which provides that you

22 have to provide a written statement to the deputy.  He did

23 that, that's the procedure in the West Virginia Code.  He

24 has never said that he filed a complaint against Sergeant

1    Dodson.

2        MR. SCALES:  Well, I don't know maybe we're playing a

3    shell game.  When it's convenient it's Sheriff Boober's

4    complaint and when it's convenient it's now it's Sheriff

5    Shirley's complaint.  I don't know who the complaining

6    person is in this.  Still don't 'cause nobody filed a

7    complaint.

8        THE WITNESS:  You're sitting beside him.

9    BY MR. SCALES:

10       Q    I'm sorry, sir?

11       A    You're sitting beside him.

12       Q    He filed a complaint against himself?

13       A    That's correct.

14       Q    Okay.

15       MR. SCALES:  I have no further questions of this

16   witness.

17                      REDIRECT EXAMINATION

18   BY MS. GROVE:

19       Q    When you gave Sergeant Dodson your memo

20   terminating his employment did you know whether he had an

21   attorney?

22       A    I did not know, no.

23       Q    You didn't know whether he had an attorney.  You

24   didn't know that he was represented by Mr. Scales at that

131

1    time?

2        A    I'm sorry did -- not on this issues.  I knew

3    there was a earlier hearing and Mr. Scales was there with

4    him but I did not know if he was representing him in this

5    also.

6        Q    Okay.  And just to be clear you relied not solely

7    upon the results of the polygraph, is that correct?

8        A    That is correct.

9        Q    Okay.  Thank you.

10                   RECROSS EXAMINATION

11   BY MR. SCALES:

12       Q    Isn't it a fact, Sheriff Shirley, that you were

13   present at the last time we convened when we were supposed

14   to have had the peer review of this particular matter

15   before the peer review committee and it was continued and

16   you sat here and saw the proceedings and saw Sergeant

17   Dodson here with me; isn't that true, back in November?

18       A    It is true that I was here.  I did not know what

19   those proceedings were about at that time.  I did not know

20   if it was on the search warrant or this issue.  We never

21   proceeded.  Nothing took place.  So I was unaware of which

22   one it was.

23       Q    You didn't realize that was the peer review on

24   these same charges that are now being brought?

132

```
 1        A    No, sir, I did not.

 2        MR. SCALES:  I have no further questions.

 3        MS. GROVE:  No further questions.  We don't have any

 4   other witnesses.

 5        COMMISSIONER CRAWFORD:  Okay.

 6        MR. SCALES:  I just have one.  He's going to take

 7   awhile.

 8        COMMISSIONER CRAWFORD:  That doesn't surprise me.

 9        MR. SCALES:  Can we go ahead?

10        COMMISSIONER CRAWFORD:  Yes, please.

11        MR. SCALES:  I'd like to call Sergeant Michael

12   Dodson.

13   Whereupon,

14                      MICHAEL DODSON

15   called as a witness, having been first duly sworn, was

16   examined and testified as follows:

17                    DIRECT EXAMINATION

18   BY MR. SCALES:

19        Q    Sergeant Dodson, would you state your full name

20   please?

21        A    Michael Todd Dodson.

22        Q    Are you the same Sergeant Dodson who is here

23   today as the deputy sheriff involved in a discipline

24   proceeding?
```

133

1    A    Yes, sir.

2    Q    State your home address please.

3    A    It's 468 Hite, H-I-T-E Road, Kearneysville, West

4    Virginia, 25430.

5    Q    There's been a lot of testimony about sex acts

6    and I'm not going to take a whole lot of time with that

7    but I'd like to ask you if you can recall just about the

8    date in which the sex acts that you had with Corporal

9    Edwards took place?

10   A    Okay.  The only date that I can recall is a

11   Friday night which I was on vacation.  I had just gotten

12   back in town from coaching a Babe Ruth baseball all star

13   eight year old team.  It's sometime after 9 o'clock at

14   night and Corporal Edwards -- the public service man asked

15   me to come into the office when I got a chance later on to

16   come see her.

17   Q    Were you on duty?

18   A    No, sir.

19   Q    Was she?

20   A    The thing with Corporal Edwards as far as being a

21   detective is she told us that just because she's there

22   doesn't mean she's working.  Just because it's on the

23   schedule doesn't mean she's working she was allowed to

24   make her own hours if need be.  I assumed she was working

134

1    but I'm not positive.  No, sir.

2        Q    Okay.  And did you have sex in the office?

3        A    Yes, sir.

4        Q    And did there come a time when you had sex with

5    Corporal Edwards in your personal truck?

6        A    Yes, sir.

7        Q    Do you recall which day of the week it was?

8        A    It was -- would been a Monday or a Tuesday during

9    the week 'cause at that time my schedule was Wednesday

10   through Saturday.

11       Q    Now when was that?

12       A    As far as time of year?

13       Q    Yes, sir.

14       A    It would have been in late April early May of

15   '07.

16       Q    Okay.  And did this take place in your truck?

17       A    Yes, sir.

18       Q    Where?

19       A    The parking lot at War Memorial Park in Charles

20   Town.

21       Q    Was this out in the open or was this a secluded

22   area, where was it?

23       A    It was up on top of a hill where people would --

24   there's just a parking lot surrounded by some trees and

```
1    buildings where people would park or where they'd walk

2    down the hill to go to the swimming pool.

3        Q    Was there anyone else there?

4        A    No, sir.

5        Q    And were you on duty at the time?

6        A    No, sir.

7        Q    Was she?

8        A    Again, I would have to assume yes but I don't

9    know a hundred percent positive because like I said she

10   told us that she could make her schedule as she wishes if

11   she needed to go home or come back in and work later on a

12   case.  So I assume, yes.  Positively, don't know.

13       Q    Was she in plain clothes?

14       A    Yes, sir.

15       Q    Were you?

16       A    Yes, sir.

17       Q    And Mondays and Tuesdays were your off days?

18       A    Yes, sir.

19       Q    Did you recall a time when you had sex with her

20   in Jefferson Memorial Park?

21       A    Yes, sir, that was that time.

22       Q    That was in the truck?

23       A    Yes, sir.

24       Q    And did you have sex with her in your own -- in
```

**Joint Appendix Pg. 189**

1   her unmarked cruiser?

2       A    Yes, sir.

3       Q    And where did that take place?

4       A    If you go to the very last road at the top of the

5   mountain in West Ridge Hills close to where they have

6   their water treatment holding tank.

7       Q    Secluded area?

8       A    Yes, sir, very much.

9       Q    And what time of the day was this?

10      A    It would have been five-thirty, quarter of six in

11  evening.

12      Q    Were you on duty?

13      A    No, sir.  I had just gotten off at 5 o'clock.

14      Q    Were you in uniform?

15      A    Yes, sir.

16      Q    Was she in uniform?

17      A    Plain clothes.

18      Q    Now there has been some testimony by Corporal

19  Edwards and some alleged statements that you made.  Did

20  you ever have sex with Corporal Edwards at her home?

21      A    Yes, sir, I did while I was off duty.

22      Q    Did you ever have sex with Corporal Edwards at

23  her home when you were on duty?

24      A    Absolutely not.

1      Q     Did you have sex with her at a time at her home

2    in which she was on duty?

3      A     No, sir.

4      Q     Are you positive?

5      A     Yes, sir.

6      Q     Did you ever tell Lieutenant Colbert that you had

7    sex with Corporal Edwards while you were on duty?

8      A     No, sir.

9      Q     Did you tell him you were unsure?

10      A     Yes, sir.  When he brought me into his office and

11    said that we were -- he was going to ask me a bunch of

12    questions about this supposedly investigation I told him

13    at that time that if you wanted dates and times and exact

14    date and times that at this point in time without thinking

15    about it I cannot tell you that.

16      Q     But did you tell him for sure that you were or

17    were not on duty during the times of the sex acts?

18      A     When he brought me in and questioned me I told

19    him at that time I didn't know because other than one I

20    believe, and that would have been the one that was in my

21    truck, I knew I was completely off that day.  And now that

22    it's been time passed you can sit down and think about it

23    instead of being bamboozled that one day and to hear he's

24    going to ask the questions and expect to get -- I answered

138

1    them to the best of my ability.  But like I told him if

2    you want exact times and dates I can't give that to you

3    right now.

4         Q    Did you ever lie to Mr. Griffith the polygraph

5    man?

6         A    No, sir.

7         Q    Did you tell him the truth?

8         A    Yes, sir.

9         Q    Now were you ever informed when you made these

10   statements to Lieutenant Colbert or Sheriff Shirley or Mr.

11   Griffith that you may have the right to an attorney?

12        A    No, sir.

13        Q    Did you know that you had that right?

14        A    No, sir.

15        Q    Okay.  When did you find out you had that right?

16        A    After speaking with you.

17        Q    Did you review your manual?

18        A    Yes, sir.

19        Q    You knowingly waive that right?

20        A    No, sir.

21        Q    You didn't know you had it, right?

22        A    Correct.

23        Q    Now tell me a little bit about were you ever

24   Corporal Edwards' superior officer?

139

1    A    While the relationship was started?  No, sir.

2    Q    Was there a time in which you were?

3    A    Yes, sir.

4    Q    When was that?

5    A    It would have been when she was first hired with

6   the department.  Even though she was in field training

7   because of way the --

8    Q    Organizational chart?

9    A    -- was drafted up she would have been under

10  patrol at that time and at that time she would have been

11  underneath me, yes.

12   Q    And do you know when approximately the last time

13  that would have been?

14   A    My father passed away August of 2006 on the 5th

15  and I know she had already been in the detective's

16  organization for several months prior to that.

17   Q    So it would have been mid-2006?

18   A    Probably early 2006.  Yes, sir.

19   Q    And from early 2006 prior to that time had you

20  dated Corporal Edwards?

21   A    No, sir.

22   Q    So any time during which you were dating her and

23  having sex with her were you her superior officer?  Did

24  she report to you?

140

```
 1      A      No, sir.

 2      Q      Who did she report to?

 3      A      At the time according to the chart Lieutenant

 4   Hanson.

 5      Q      Now, we've heard some testimony about how this

 6   relationship was ended.  Can you tell me how it was ended?

 7      A      Yes, sir.  The time and date in question about

 8   the ring that I supposedly saw on her finger and stuff

 9   like that we were at court that day and it was for one of

10   her cases.  I don't remember the case, and I came back to

11   the office completely disgusted with myself, not mad at

12   her, not pissed at her, pissed at myself.

13          And that's -- what I told Ms. Hoak is I'm not mad

14   at her I'm mad at myself 'cause I can't believe I was that

15   stupid to fall for somebody telling me, "Yeah, I'm going

16   to leave my husband.  It's all in the works."  And you

17   know, "You and I can be together."  And I was pissed at

18   myself and you know I sat down and thought about it, you

19   know, I was going to throw away kids.  You know give up

20   half the time of being with my kids and yeah if you're a

21   man and you love your kids yeah that should tick you off

22   that you were dumb enough to fall for that.

23      Q      Did you say the things that Ms. Hoak said that

24   you said?
```

1    A    I did say -- yes, I was going to tell her husband

2    about it because I was mad.  I did say that I fucked her

3    here and there and never at one point in time at all did I

4    ever make the assumption that I would hurt Tracy Edwards.

5    I've never hurt anybody and, you know, I was completely

6    ticked at myself, you know, I lost my father and

7    grandmother all at the same time and that part of my life

8    was a very bad part of my life.  And Tracy Edwards stepped

9    in like she was concerned and cared and it took me awhile

10   to get my head screwed on back straight.  When I realized

11   that she's not leaving her husband she's using me that was

12   it I'm done.

13       Q    So you terminated the relationship at that time?

14       A    Yes, sir.

15       Q    And has she continued to try contact you since

16   that time?

17       A    Yes, sir.  She continued to text me.  We tried to

18   keep it on a professional level as far as friendships in

19   the department and it just didn't work because she can't

20   stand somebody to tell her "You're wrong.  You can't do

21   that."  Just like the one search warrant we had were she

22   blew up in front of three other deputies, threw the search

23   warrant on the ground and started screaming at me and then

24   said, "Fuck you.  Serve it yourself," which Lieutenant

1  Colbert's been advised of that and Lieutenant Hanson was

2  advised of that.  They've done nothing.  Their thing is

3  she's the sheriff's pick we can't do nothing to her you

4  know that.  That's bull crap.  You know my job the letter

5  I put in --

6      MS. GROVE:  Again, I'm going to object to his

7  statement.  This is completely irrelevant.  Again, we're

8  here to decide about the sheriff's actions with regard to

9  Mike Dodson not with regard to any -- Tracy Edwards, or

10 anybody else.

11     MR. SCALES:  We'll move on.

12     COMMISSIONER CRAWFORD:  It does kind of go to the

13 credibility of who said what when but I think you've made

14 your point.  Mr. Dodson's made his point.

15 BY MR. SCALES:

16     Q    Okay.  Tell me a little bit about your health.

17 Do you have any issues with your health?

18     A    Yes, sir.  I've been under a doctor's care since

19 I was approximately five years old.  I've had the aortic

20 valve replaced twice in those years.  The last one being

21 1990.  I've since then -- I have what you call an

22 irregular heartbeat or an arrythmia.  Mr. Griffith set up

23 here and explained that you can get a reading on an

24 irregular heartbeat, hence the word "irregular."  You

143

1    cannot get a reading on something irregular.

2           What my heartbeat does is called an atrial

3    flutter.  What it does is it may beat five times in a row

4    and then it completely stops and then it may beat ten

5    times in a row and then stops.  It may beat fifty times.

6    There is no pattern to it.

7           Since working here Lieutenant Colbert can testify

8    to this or Sheriff Shirley now can testify to this because

9    it happened when he was here as well.  I have been placed

10   into the hospital to where I had to be knocked out, placed

11   on a table, and where they take the paddles and

12   electrically shock you to get your heart back into an

13   appropriate rhythm to slow itself back down.

14          It's attempted to be done medically by

15   medication.  Medication is not a science -- I mean it's

16   not an exact science.  It keeps it in between a level.

17   You know it won't let it go 200 beats but it won't let it

18   drop down to zero.  Again, it just keeps it -- and that's

19   what I told Mr. Griffith that day this is the name of the

20   medication, DLT, that's what's on the prescription bottle.

21   What that stands for I have no idea.  I'm not a medical

22   doctor.

23          And I am on Coumadin which is a blood thinner.

24   And, you know, I've been under doctor's a care.  I go

**Joint Appendix Pg. 197**

144

1   once, twice a year.  I'm suppose to go every month and

2   have blood drawn and you know I'll do that -- I'll have to

3   do that for the rest of my life.

4       Q    Did you tell Mr. Griffith about how it affects

5   your heartbeat?

6       A    Yes, sir.

7       Q    Did you ever state that you were going to kill

8   Corporal Edwards when you were mad?

9       A    Absolutely not.

10      Q    Why did you originally file that complaint

11  against Corporal Edwards?

12     A    As I told Lieutenant Colbert when he brought me

13  in and questioned me about it after he had talked to other

14  people who were there.  I told him I said, "Look, I'm not

15  her supervisor but you are or Tom is one of the two of

16  you.  Here's the letter.  I think you guys need to check

17  into this because, you know, if she's going out here and

18  telling this" -- which the arrestee that night told us

19  that she gave him legal advice -- "you know that's

20  detrimental to this department and that she's going try

21  get us sued is not only going to fall back on me it's

22  going to fall back on the whole department."

23       And you know that's what told him I said, I can't

24  investigate her.  She's not underneath me.  I can't even

```
 1   direct her what to do.  She's under you guys.  We have
 2   nothing to do with her."  It was an informative letter to
 3   them to check into what they needed to check into.
 4        Q    She told the owner to sue you?
 5        A    The person that we arrested that night which he
 6   has now pleaded guilty to all the charges we arrested him
 7   for.  In court she, according to him, she sat out there
 8   and said "I would sue them because this is an illegal
 9   search" and that's what he told us.
10        Q    Have you ever filed any other charges against
11   her?
12        A    No, sir.
13        Q    Other than that issue about the search and
14   seizure that's now on appeal have you ever had any other
15   disciplinary proceedings against you since you've been
16   with the Jefferson County Sheriff's Department.
17        A    No, sir.
18        Q    How long have you been with the department?
19        A    This March would have made eight years, so just
20   shy eight years.
21        Q    And have you had any promotions since you came on
22   board?
23        A    Yes, sir.  I was promoted from deputy to
24   corporal, from corporal to sergeant.
```

146

Q    Now you've seen the GS 00-0002 the general order and we've gone over this before; haven't we?

A    Yes, sir.

Q    Were you ever provided any of these forms?

A    No, sir.

Q    Were you ever advised before you had a discussion with Lieutenant Colbert that you may be entitled to an attorney?

A    No, sir.

Q    Did you ever tell Mr. Griffith that you had lied to Lieutenant Colbert?

A    No, sir.

Q    What did you tell him about that?

A    I don't believe I -- I belive I told him what I told Lieutenant Colbert was, you know, the truth and I've never told anybody in this department not to help her. I've actually had to force some of the guys, order them to help her because not only do the people in this department not want to help her if you go talk to detectives in Charles Town they don't --

Q    All right.  During the course of any of these acts, sexual acts, that you had were you on surveillance at anytime?

A    No, sir.

```
 1        Q    Was Corporal Edwards on a surveillance?

 2        A    No, sir.

 3        Q    Did you ever miss a call during those time

 4   periods of sexual interludes?

 5        A    No, sir.

 6        Q    Were the interests of the public at all affected

 7   by the sex acts that you had with Corporal Edwards?

 8        A    No, sir.

 9        Q    Well, did anyone ever tell you they saw you and

10   her having sex?

11        A    No, sir.

12        Q    Ever receive any complaints from anyone about

13   that?

14        A    Not until this one.

15        Q    Other than this disciplinary proceeding.

16        A    Right.  No, sir.

17        Q    Did you have a conversation with Lieutenant

18   Colbert about the polygraph test?

19        A    Yes, sir.

20        Q    Would did he tell you about the polygraph test?

21        A    I had a conversation with Lieutenant Colbert and

22   Sheriff Boober prior to even taking the polygraph test.

23   Sheriff Boober told me at the time I will take the

24   polygraph test or it will show that I'm not cooperating
```

**Joint Appendix Pg. 201**

148

1  and would be terminated in front of Lieutenant in his

2  office.

3       After the polygraph test that night I discussed

4  with Lieutenant Colbert that, you know, Mr. Griffith told

5  me I failed.  We went over some of the questions.  I asked

6  him I said, "Well, what you did it show as far as the

7  control questions, you know, like are the lights on?  Did

8  it show I'm being deceptive with that?"  And he looked

9  down at his paper, "Yeah, it does show that you are.  This

10 is over with."  Mr. Griffith --

11     MS. GROVE:  I object.  Mr. Griffith never -- we went

12 over the questions he asked and this was not one of

13 questions he asked, but I would also ask to recall Mr.

14 Griffith as a rebuttal witness.

15     COMMISSIONER CRAWFORD:  If you want to do that.

16     MS. GROVE:  Okay.

17     THE WITNESS:  At that time he said it was over with,

18 went and got Lieutenant Colbert and Lieutenant Colbert

19 came and got me, went back here in the hallway.  I told

20 Lieutenant Colbert that it was a set up that this was bull

21 crap.  If you know that I failed why haven't you asked the

22 other deputies that, you know, are supposedly saying that

23 I'm not letting them help her and everything else.

24       He can't give me an answer why you don't ask them

1    and I told him I said, "This is bull crap."  And he says,

2    "Mike, I'm telling you it doesn't matter -- didn't matter

3    what the outcome of the polygraph is says the sheriff's

4    ultimatum is to fire you anyway."

5    BY MR. SCALES:

6        Q    That's what Lieutenant Colbert told you?

7        A    Yes, sir.

8        MS. GROVE:  Objection, that's hearsay.

9        MR. SCALES:  Well, I asked them right on his direct

10   examination and he denied it.

11       MS. GROVE:  I think that's hearsay.

12       COMMISSIONER CRAWFORD:  Okay.  You can put him on in

13   rebuttal if you want to.  Okay?

14   BY MR. SCALES:

15       Q    When were you first aware of these charges being

16   made against you?

17       A    Late August 2008.

18       Q    Did Sheriff Boober take you off of any of your

19   shifts?

20       A    No, sir.  I was still in full charge of all my

21   shifts even was given the reins of completing work out at

22   the range for training as far as the --

23       Q    Pistol range?

24       A    Yes, sir.

1    Q    When did that take place?

2    A    We started working again on it and was dealing

3    with the contractor in late August, first part of

4    September.

5    Q    And how many people did you supervise on your

6    shift from the end of August through January 6, 2009?

7    A    Mondays -- I'm sorry.  Tuesdays through Thursday

8    on average from three to four.  Wednesdays and Fridays on

9    average three to eight, nine.

10    Q    Are you guilty of any of the charges being made

11    against you?

12    A    No, sir.

13    Q    Did you make a mistake?

14    A    Yes, sir.

15    Q    Mistake in judgment?

16    A    Yes, sir.

17    Q    That's all I have.

18                    CROSS-EXAMINATION

19    BY MS. GROVE:

20    Q    Sergeant Dodson, when you were interviewed by

21    Lieutenant Colbert you seemed to have a lapse in memory

22    compared to what you testified to today.  You can only

23    recall --

24    MR. SCALES:  I think that's the Commission's

151

1    determination I think.

2        COMMISSIONER CRAWFORD:  I'll let her if she'll get to

3    a question --

4        MS. GROVE:  I am going to.

5    BY MS. GROVE:

6        Q    You could only recall the incident in the cruiser

7    at that time, isn't that correct, when he interviewed you?

8        A    At the time yes I believe that's what I told him.

9        Q    And you never had dates that you could give him?

10       A    No, sir -- or no, ma'am.  I'm sorry.

11       Q    That's fine.  In fact you only told him that you

12   never remembered anything except for the cruiser.

13       A    At that particular date, yes, ma'am.

14       Q    And now six months after that investigation you

15   remember dates.

16       A    Yeah.

17       Q    When did you first remember those dates?

18       A    When did I first come to talk to you Mr. Scales?

19       Q    So Mr. Scales helped you remember those dates?

20       A    No, ma'am.

21       Q    That's when you recalled them.

22       A    That's the time error.

23       Q    Did you get a copy of this book?

24       A    I'm sorry, I can't see what you're holding.

1    Q    It's the Jefferson County Sheriff's Manual.  I'm

2  sorry.

3    A    Yes, ma'am.

4    Q    You got a copy of it when you started here?

5    A    Yes, ma'am.

6    Q    And you're supposed to read it as a -- when you

7  get a copy of it, is that correct?

8    A    Yes, ma'am.

9    Q    And you didn't know you were entitled to an

10  attorney?

11    A    No, ma'am.

12    Q    Did you read the book?

13    A    Yes, ma'am.

14    Q    Could you please read through section 20.3?

15    A    "Physical Tests.  Police officer may be compelled

16  to submit to breath, blood tests, voice exams, handwriting

17  samples, polygraph exams, et cetera, and such evidence may

18  be used against officers administratively."

19    Q    Doesn't it say you're entitled to an attorney at

20  questioning?

21    A    No, ma'am, it doesn't not 20.3.  No, ma'am.

22    Q    I'm sorry.

23    MR. SCALES:  Ms. Grove, the only place I found it was

24  in the General Order on that one form.

153

1          MS. GROVE:  So the General Order's --

2          MR. SCALES:  I believe it's form 1A1 I believe --

3     1A4, I'm sorry.

4     BY MS. GROVE:

5          Q    Okay.  I'm sorry.  Could you read that?

6          A    Right here?

7          Q    Yes.  Just the last line.

8          A    "You have the right to have counsel present

9     during any questioning."

10         Q    And you got a copy of this?

11         A    Yes, ma'am.

12         Q    And you read it but you didn't know you were

13    entitled to counsel?

14         A    No, ma'am.

15         Q    But you admit that you had notice of that because

16    you did receive it.  You did receive the manual?

17         A    Yes, ma'am.

18         Q    You state that you're not Corporal Edwards -- I'm

19    sorry, Deputy Edwards' supervisor.  You have to recertify

20    her on things; do you not?

21         A    Actually, when we recertified firearms this time

22    I was removed from the firearms range by Lieutenant Hanson

23    and so I did not qualify her.

24         Q    Had you recertified her before that?

1    A    Before?  I'm sorry.

2    Q    Before this last time other times?

3    A    Yes, I was the only firearms certification guy

4    for the department at that time.

5    Q    When you made a complaint against Deputy Edwards

6    you fault her for not telling the shift supervisor when

7    she's not on duty; did you not?

8    A    For safety reasons.  Yes, ma'am.

9    Q    You still feel that she has an obligation to

10   report to you that she's on duty?

11   A    I have an obligation so she's not found out here

12   laying on a road dead somewhere because nobody knows what

13   she's doing.  She didn't --

14   Q    So you feel she has an obligation to report to

15   you --

16   THE COURT REPORTER:  One at a time.  I'm sorry.

17   COMMISSIONER CRAWFORD:  Okay.  Ask your question

18   again and the wait for an answer please and then -- she's

19   good but --

20   BY MS. GROVE:

21   Q    I'm sorry.  You feel she has an obligation to

22   report to you as the shift supervisor?

23   A    Not necessarily to me but to her supervisor who

24   should let me know if something's going on.  After this

155

1   was brought up Lieutenant Colbert did start doing that

2   which made things a whole lot safer for everybody.

3       Q    What if her supervisor isn't on duty, wouldn't

4   she report to you?

5       A    No, ma'am.  As far as I know anything she had to

6   get taken care of or get okayed on had to go through the

7   lieutenant.

8       Q    You just admitted that you picked up Deputy

9   Edwards in your truck.

10      A    No, ma'am.

11      Q    You didn't admit that you just --

12      A    I met her.

13      Q    You met her in your truck -- I'm sorry -- while

14  she was on duty?

15      A    I belive she was on duty.  I'm not positive.

16      Q    You believed her to be on duty at the time, is

17  that correct?

18      A    Yes, ma'am.

19      Q    And do you think it's acceptable for a supervisor

20  whether he's on or off duty to pick a deputy up for sex

21  while she's on duty?

22      MR. SCALES:  Objection to the form of the question.

23  I don't think it's ever been established that he was her

24  supervisor.

156

1    MS. GROVE:  I didn't say he was the supervisor.

2    COMMISSIONER CRAWFORD:  I think the question is "a

3  supervisor."

4    MS. GROVE:  As a supervisor not her supervisor.

5    COMMISSIONER CRAWFORD:  As a supervisor, yes.

6  BY MS. GROVE:

7    Q    As a supervisor in this department not

8  technically Edwards' supervisor do you think it's

9  acceptable behavior for a shift supervisor to pick any

10  deputy up while that deputy is on duty for sex?

11    A    Just to pick them up?  I'm sorry?

12    Q    Do you think that it's acceptable for a shift

13  supervisor whether or not that supervisor is on duty to

14  pick up a deputy who is on duty for sex?

15    A    No, ma'am.

16    Q    But that's what you did.

17    A    I did not pick her up I met her.

18    Q    Do you believe it's acceptable to meet someone

19  for those same purposes?

20    A    No, ma'am.

21    Q    And that's what you did.

22    A    Yes, ma'am.

23    Q    Thank you.

24    MS. GROVE:  No questions.

1    COMMISSIONER CRAWFORD:  Okay.  You want to --

2    MR. SCALES:  I think we've beat it to death.

3    COMMISSIONER CRAWFORD:  Okay.  Cris?

4    COMMISSIONER JACKSON:  I don't have anything at this

5    time.

6    COMMISSIONER ROSARIO:  No.

7    COMMISSIONER CRAWFORD:  Okay.  I think we're

8    complete.  So any more witness on your part?

9    MR. SCALES:  No, sir.

10   COMMISSIONER CRAWFORD:  Okay.  How about you?  Do you

11   have any rebuttal?

12   MS. GROVE:  I'd like to call Lieutenant Colbert.

13   COMMISSIONER CRAWFORD:  We're going to go over --

14   he's going to rebut, right?

15   MS. GROVE:  Just a rebuttal, yes.

16   COMMISSIONER CRAWFORD:  Okay.  Good.  He's not going

17   to testify all over again.

18   MS. GROVE:  No, he's not.

19                   REBUTTAL EXAMINATION

20   BY MS. GROVE:

21   Q    Lieutenant Colbert, did you ever tell Sergeant

22   Dodson that he would be fired no matter what the results

23   of the polygraph?

24   A    We did discuss the totality of the circumstances

158

1   of the investigation so far and we said that, you know,

2   with this going on that termination was definitely a

3   possibility.  I didn't tell him that he was definitely

4   going to be fired.

5        Q    And did you rely -- so you didn't even really

6   rely solely on the polygraph?

7        A    No.  It was the totality of the whole

8   investigation.

9        Q    And just to reiterate when Sheriff Shirley became

10  the sheriff he proceeded under the state code section, is

11  that correct?

12       A    Yes, ma'am.

13       COMMISSIONER CRAWFORD:  Anything else on your part?

14       MR. SCALES:  I don't have anything further.

15       MS. GROVE:  I have no further rebuttal.

16       COMMISSIONER CRAWFORD:  Okay.  Surrebuttal?

17       MR. SCALES:  I don't have anything.

18       COMMISSIONER CRAWFORD:  So we're done?

19       COMMISSIONER JACKSON:  Are we going to have any sort

20  of closing?

21       MR. SCALES:  I'd like a short one.

22       COMMISSIONER CRAWFORD:  Do you want a few minutes or

23  do want to just wing it?

24       MR. SCALES:  I've already got it written out.

 1      COMMISSIONER CRAWFORD:  Okay.

 2      MS. GROVE:  I'd like to have a few minutes if I

 3 could.

 4      COMMISSIONER CRAWFORD:  Okay.  Why don't we take 15

 5 minutes and we'll come back.  We'll have you all recap the

 6 testimony as you think it is.

 7                          (Whereupon, proceedings were

 8                           recessed.)

 9      COMMISSIONER CRAWFORD:  If you all are ready we're

10 ready.

11                    CLOSING ARGUMENT

12                    SHERIFF'S DEPARTMENT

13      MS. GROVE:  We heard a lot of testimony today about

14 the Jefferson County Sheriff's Manual and just to sum up

15 the testimony and to sum up why we're here the sheriff,

16 the new sheriff, proceeded under West Virginia Code

17 7-14-17 to immediately terminate the employment of

18 Sergeant Dodson.  He complied with those code sections.

19 He provided Sergeant Dodson a memorandum with a letter

20 explaining the reasons for removal.

21      In addition, there's a case interpreting that code

22 section in *King verses Logan County Deputy Sheriff's Civil*

23 *Service Commission*.  It's a 1992 case, 187 W.Va. 510 and

24 in that case the Court said, "West Virginia Code 7-14-17

1  governs the removal, discharge, suspension, and reduction

2  in rank or pay of deputy sheriffs." The sheriff followed

3  that procedure and I just want to note that the sheriff

4  did not implement this Jefferson County Handbook. He's

5  been in office for --

6      COMMISSIONER CRAWFORD: Well, okay. If I may

7  interrupt you, I mean, he's -- that's his predecessor's

8  it's his --

9      MS. GROVE: That's right, but he followed the state

10  code regulations.

11      COMMISSIONER CRAWFORD: Then can you tell me what

12  these regulations have to do with anything then. I mean

13  --

14      MS. GROVE: I don't think --

15      COMMISSIONER CRAWFORD: I mean if you can pick and --

16  I mean are saying that you can follow code over here but

17  then over here you can decide to follow the procedures

18  then or --

19      MS. GROVE: I'm saying that the West Virginia Code

20  gives the sheriff the authority to immediately terminate

21  as long as --

22      COMMISSIONER CRAWFORD: Well, clearly it said that,

23  yes, but does he have to use these procedures to get to

24  that point?

161

1          MS. GROVE:  The procedures were just for a complaint.

2     They were not for merely to -- no one initiated a

3     complaint against Sergeant Dodson.  Sheriff Boober

4     investigated as a result of the complaint Sergeant Dodson

5     file.  He initiated an investigation.  There was never a

6     complaint filed against him.  Those procedures were

7     proper.

8          COMMISSIONER JACKSON:  Can I ask you what was the

9     cite again on that case?

10         MS. GROVE:  It's 187 W.Va. 510 and the key cite for

11    what I just quoted you is 513.

12         COMMISSIONER JACKSON:  Okay.

13         MS. GROVE:  And again the civil service commission is

14    convened under the authority of 7-14-17 to determine if

15    Sheriff Shirley, he provided reasons, we can prove those

16    reasons and if those reasons merit termination.  I'd like

17    to review the testimony we've heard today.

18         First we heard from Sheriff Colbert [sic].  He

19    interviewed Sergeant Dodson.  He indicated that Sergeant

20    Dodson told him that he may have had sex while on duty in

21    the cruiser, that was the only time he remembered with --

22    Lieutenant Colbert -- sorry.  Lieutenant Colbert talked

23    about contacting all of the witnesses, doing the

24    investigation, speaking to John Griffith, the polygraph

162

1  examiner.  At the end he had Sergeant Dodson, Tracy

2  Edwards, and the polygraph examiner tell him that Sergeant

3  Dodson had had sex at least once while on duty.

4      We heard from Tracy Edwards.  She passed her

5  polygraph examination.  She had everything to lose by

6  coming forward.  She testified that she thought she might

7  lose her job as a result of coming forward and she was

8  prepared to accept that punishment.  And she testified

9  about the times that they had sex while on duty.  She has

10  no reason to lie in this, and as I said she realized that

11  she could have been fired and was prepared to accept that

12  punishment and she admitted that it was totally

13  unacceptable to have sex while on duty.

14      Then we heard from Tammy Hoak-- and the purpose of

15  calling Tammy Hoak was to demonstrate that Sergeant Dodson

16  could not keep his personal life out of the office.  Tammy

17  Hoak is a non-civil service employee.  She's an

18  administrative assistant and she was involved in the

19  middle of this.  She witnessed Sergeant Dodson come in

20  angry, using foul language and it prompted her without

21  telling Sergeant Dodson to call Tracy Edwards and tell her

22  not to come back into the office.  "I'm afraid he might

23  kill you.  It's the angriest I've ever seen him."

24      Then we heard from John Griffith who testified

**Joint Appendix Pg. 216**

1  about the truthfulness on the polygraph examinations. He

2  explained that Tracy was found to be truthful and Sergeant

3  Dodson was found to be untruthful. He also explained that

4  an irregular heartbeat would not interfere with the

5  results of his examination. It also measures breath

6  sounds as well as perspiration and he explained that when

7  someone has an irregular heartbeat they establish a

8  baseline for that person's irregular heartbeat and they

9  can go from there.

10       Again, outside the result of the polygraph

11  Sergeant Dodson made an admission against his own

12  interests. He admitted that he lied to Lieutenant Colbert

13  when he was questioned about his relationship with Deputy

14  Edwards while on duty. His story matches up with what

15  Deputy Edwards said at least in two instances, the cruiser

16  and the office, which are both county property and that

17  was an admission outside the polygraph. It had nothing to

18  do with the polygraph results. Sergeant Dodson said he

19  wanted to clear the air and he wanted to admit that he had

20  lied to Lieutenant Colbert in the course of this

21  investigation.

22       Then we heard from Sheriff Shirley who stated the

23  reasons why he felt that Sergeant Dodson could not remain

24  on the force, that he felt he was divisive force. He did

1  not in any way condone that conduct.  He told us that

2  Sheriff Boober recommended termination but wanted to the

3  proceed before the hearing board which is why Sergeant

4  Dodson was left on duty in charge.  But Sheriff Shirley in

5  his estimation could not keep him on duty.  He did not

6  feel comfortable with him representing the sheriff's

7  department to the public.

8        And then we heard from Sergeant Dodson who said he

9  felt it was inappropriate even when he was off duty to go

10  meet a deputy that was on duty to have sex.  He's a shift

11  supervisor.  He also admitted that he did have sex in the

12  cruiser and in her office both of which are on county

13  property.  Whether you're on duty or not that is not

14  acceptable to come into your place of work whether you're

15  on or off duty and have a sexual relationship with someone

16  who's on duty.

17        And again, the instances he remembered today were

18  completely different from what he told Detective Colbert

19  -- or Lieutenant Colbert in his investigation of the

20  matter.  When Lieutenant Colbert interviewed him he

21  couldn't remember any incident except the cruiser.  Today

22  we heard specific dates.  He never told Lieutenant Colbert

23  about a specific date and again he told Lieutenant Colbert

24  that it was while he was on duty in the cruiser and that's

1   in his transcribed statement in the investigative report.

2         Again, I just want to reiterate we're here under

3   7-14-17.  The sheriff provided the reasons.  Your job is

4   to determine if we've proven those and I would suggest

5   that we have three witnesses that all say that there was

6   some type of sexual intercourse on duty.  Sergeant

7   Sergeant admitted in his statement at least to Lieutenant

8   Colbert that he had sex at least once on duty.  Sergeant

9   Dodson admitted to John Griffith that he had lied to

10  Lieutenant Colbert and he actually had sex maybe three or

11  four times on duty, and then we have Tracy Edwards who was

12  involved in the conduct and she testified about the time

13  that they were both on duty and when she was just on duty

14  and he was not.

15        This conduct is obviously -- cannot be condoned by

16  the sheriff's department.  It's an embarrassment to the

17  department.  When you're on duty and you're engaging in

18  sexual intercourse you're not available for calls and

19  you're on the taxpayer dime, and you're supposed to be

20  there to protect the taxpayer and when you're out doing

21  other things you're not available to protect the taxpayer.

22  And again if the sheriff can't rely upon Sergeant Dodson

23  to tell the truth in an investigation how can he rely upon

24  him to testify in court and to investigate crimes in this

1    county and to tell the truth there and those are the

2    reasons for the termination.  I believe that we have

3    proven every reason in our letter and it's up the

4    commission to decide if that merits dismissal and I thank

5    you for your time.

6        COMMISSIONER CRAWFORD:  Mr. Scales.

7                CLOSING ARGUMENT RESPONDENT

8        MR. SCALES:  I'm still trying to find in this manual

9    what my client did wrong.  I assume it's a failure to

10   conduct himself as a proper officer because I can't find

11   where he's done anything wrong in these particular -- in

12   this manual.

13       COMMISSIONER CRAWFORD:  Frankly, Mike, if the manual

14   got down to the detail of saying having sexual intercourse

15   on duty is improper I mean that's -- I don't expect to

16   find something like that.

17       MR. SCALES:  Okay.  I'll go with you on that but how

18   do you answer the one about neglect of duty?  It says

19   neglect of duty is 9.13.  "A member or employee shall

20   devote full attention to his particular assignment while

21   on duty.  They shall not shop, study, play games, or

22   otherwise engage in entertainment while on duty except as

23   may be required in the performance of duty.  They shall

24   not engage in any activities or personal business which

**Joint Appendix Pg. 220**

1  would cause them to neglect or be inattentive to duty.

2  Under normal circumstances members will be allowed to

3  handle personal business if the job assignment is not

4  readily affected."

5  Now tell me if nobody saw it, nobody heard it,

6  nobody was affected by children seeing it, nobody called

7  made a call and a call was missed, nobody was on

8  surveillance, what is the difference if my client was in

9  the bank making a deposit or cashing a check and a call

10  came through and he didn't get it? With all due respect I

11  don't see it.

12  Let me set out as I see it the three of you have

13  several issues to deal with. Number one, what is the

14  effect of not following their own policies and procedures.

15  I tried to take a little time to go through this General

16  Order GO-00-002 and to me it can't be any plainer. It

17  says that -- in the general order that these forms are to

18  be used when a complaint is filed against a member or an

19  employee of the department. The general order and the

20  attached forms will be in the general order section of

21  your policy procedure's manual after review.

22  Now we still don't know who the complaining

23  witness is. There's nobody who ever complained. Nobody

24  will own up or fess up to the fact that there was a formal

1   complaint and there's no formal complaint under the

2   procedures.  My client was never given the incident

3   report, officer complaint report.  He was never given an

4   incident evaluation report.  He was never given a

5   notification form.  He wasn't advised of any of his

6   rights, especially the one right to counsel during all

7   these interviews and if you'll look I didn't even discuss

8   the 1A5 it indicates it tells you after going through the

9   investigation he was supposed to have been apprised

10  whether the complaint was unfounded; whether he was

11  exonerated; whether there was nonsustained evidence;

12  whether there was noncriminal but improper whether it was

13  sustained, or it was criminal misconduct and go find

14  yourself a lawyer to defend you.  He wasn't given anything

15  and now to come out at this late date and try to tiptoe

16  away from all these regulations, number one, I think the

17  whole procedure was flawed from the very beginning.

18         I think you can easily find that the procedures

19  which were rightfully set up by the department to take

20  care of one of its own weren't followed.  The fact that we

21  don't have a chief deputy is a very big problem.  I see

22  the reason for the chief deputy as a fundamental

23  procedural due process issue.  Whoever the investigating

24  officer was can't be the supervisor because to have the

1   person who is bringing the charges as well as prosecuting

2   for the charges is a problem.  Okay.  The reason why the

3   chief deputy does not have anyone who's directly under him

4   is because he's the one, or she in other cases, would be

5   able to take the evidence, take the complaints, be kind of

6   a fresh look and say okay what do we have here, what do we

7   need, what does this look like and to take it and put it

8   in one of these various procedures.  We didn't have that

9   here.

10          I think my client indicated that it was his belief

11   from what he heard from Lieutenant Colbert and from

12   Sheriff Boober that he was going to be fired whatever the

13   decision was.  So it didn't really matter how it came out.

14   So I think there's a potential here, I think you need to

15   address as you may find as to what is the effect of the

16   procedural issues that were not followed.  Okay.

17          Secondly, the polygraph test and I'm not going to

18   go through the sections again but I don't think -- you

19   have to address -- well, let me start again.  A sub issue

20   on the general procedures that were not followed is what

21   are you going to do with his statement?  If he had a right

22   to counsel are you going to hold that against him?  Are

23   you going to hold his statement against him, whatever it

24   is, if you find it's against him?  I'm not sure that it is

170

1   but are you going consider his statement?  Are you going

2   to say well the procedure may have been flawed but he did

3   have some procedural safeguards so we're going to go ahead

4   and accept the whole procedure as being satisfactory under

5   their rules and regulations but we're not going to be able

6   to consider his statement because he had a right to

7   counsel in the rules, okay?  Or you have another issue

8   what are we going to do about this polygraph test?  Is the

9   polygraph test to be admitted or not admitted, considered

10  or not considered?  I think I tried to lay out for you as

11  best I could that I believe the polygraph can only be used

12  in the administrative not the formal complaint and not the

13  reprimand.  So I think there's an issue that you're going

14  to have to address is are we going to consider what Mr.

15  Griffith did, what Mr. Griffith said, or was that not

16  supposed to be used?

17          And then cutting to the chase from the substantive

18  issue the last case that I found where the Supreme Court

19  addressed the circumstances under which a sheriff can

20  discharge a civil service deputy was decided in June of

21  2008.  The case is *Messer, M-E-S-S-E-R v. Hannah.*  I've

22  got a copy of it for everybody.  May I pass it out?

23          COMMISSIONER CRAWFORD:  Sure.  Please.

24          MR. SCALES:  I'll give one to Ms. Grove.  This is a

1   case where a deputy sheriff said he was on overtime when

2   he was going to the state police academy and apparently

3   someone took issue with his overtime statements and

4   indicated that he was trying to obtain money under false

5   pretenses because he wasn't actually spending the time and

6   apparently it took place down in Mingo County which may be

7   a finding in and of itself, but nevertheless in any event

8   the Supreme Court basically said look -- and in this case

9   even the prosecutor came in and testified that it might

10  have been taking money under false pretenses and so there

11  was a determination based on that.

12          The Supreme Court relying on one of those cases

13  that most of us or some of us are aware of the Alden case,

14  the Harpers Ferry Police Civil Service Commission if you

15  look on page three at the bottom right-hand corner and I

16  think what you have to find is -- or not find is whether

17  or not the sheriff had just cause for terminating Sergeant

18  Dodson.

19          It says, "Reviewing the just cause standard under

20  the nearly identical 1981 version of West Virginia Code

21  7-14-17a this Court in *Magnum v. Lambert* 183 W.Va. 184 394

22  S.E. 2d A79 1990 held -- requires that "the dismissal of a

23  deputy sheriff covered by civil service be for such just

24  cause what means misconduct of a substantial nature

1  directly affecting the rights and interests of the public

2  rather than upon trivial or inconsequential matters or

3  mere technical violations of statue or official duty

4  without a wrongful intention."

5      I think that's the standard that you have to look

6  at from the substantive point and it's citing again the

7  Alden case out of Harpers Ferry Police Civil Service

8  Commission and *McMillan v. Ashley* case, that's why I asked

9  Lieutenant Colbert during my cross-examination and I

10  believe even Corporal Edwards testified that the public

11  interests were not affected by the acts that were taken by

12  two of them, whatever they may have been.

13      It's a fairly substantial standard in which it

14  requires a terminated deputy and I don't think under

15  anybody's definition while you may find that Sergeant

16  Dodson did not use good judgment; perhaps he should not

17  have been dating another deputy; perhaps he should have

18  left his personal matters in other places rather than

19  sheriff department, that it is not grounds for his

20  termination because he did not affect the rights and

21  interests of the public but rather this was a trivial

22  inconsequential matter, a mere technical violation of

23  statute or official duty, and that's where I am with it.

24      COMMISSIONER CRAWFORD: Okay. Thank you. We're

1  going to deliberate a little bit then I think the

2  consensus is that we'll take reports home and have a

3  chance to read it.  It may take us a couple days to get

4  back together again and we want to at least have a chance

5  to read all this before we make an informed decision.

6       MS. GROVE:  Can I have a rebuttal?

7       COMMISSIONER CRAWFORD:  I'm sorry?

8       MS. GROVE:  It's about the admissibility of a

9  polygraph.  This is a recent code section at 21-5-5b.  It

10  specifically allows the sheriff to use polygraph

11  examinations to make decisions of hiring and firing.

12       COMMISSIONER CRAWFORD:  All right.  Thank you.

13       MR. SCALES:  Mr. Crawford, do you envision us being

14  -- are we dismissed then and you all will let us know by

15  mail?

16       COMMISSIONER CRAWFORD:  Yeah, I don't think you can

17  help us any further.  Thank you for presenting the case.

18           (Hearing concluded at 3:00 p.m.)

19

20

21

22

23

24

**Joint Appendix Pg. 227**

CERTIFICATE

1      I, Pamela Patterson, a Notary Public of the State of West Virginia, do hereby certify that the within-named proceedings took place before me at the time and place herein set out.

      I further certify that the proceedings were recorded stenographically by me and this transcript is a true record of the proceedings.

      I further certify that I am not of counsel to any of the parties, nor an employee of counsel, nor related to any of the parties, nor in any way interested in the outcome of this action.

      As witness my hand and notarial seal this 5th day of February, 2009.

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
PAMELA A. PATTERSON
262 MAPLEWOOD COURT
HARPERS FERRY, WV 25425
My Commission Expires August 13, 2017

Pamela A. Patterson

My Commission Expires:

August 13, 2017

## JEFFERSON COUNTY SHERIFF'S DEPARTMENT

### *August 27, 2008*

*MEMORANDUM*

**To:**          Michael T. Dodson
                 Sergeant

**From:**        Everett "Ed" Boober
                 Sheriff & Treasurer

**Subject:**     Corrective Action
                 (Internal Investigation 2008-003)

*You are reminded that the purpose of establishing Departmental Rules, Regulations, Policies and Procedures is to provide employees with guidelines in which to follow in day-to-day work activities. Non-compliance to those guidelines creates a disruption in service to our community and interrupts the internal workings of the department. If there were no consequences for non-compliance to these guidelines, our goals and objectives would not be met and the department would operate in total confusion and without purpose*

*I have read the investigative report (August 26, 2008) of Lieutenant David Colbert, Jefferson County Sheriff's Department concerning the events which occurred during the later part of calendar year 2006 and in May of calendar year 2007. In particular, this investigation involved certain inappropriate activities between Sergeant Michael Dodson and a subordinate deputy, while one or both were on duty in Jefferson County. Additionally, during the course his investigation Sergeant Dodson willfully and knowingly made certain untruthful statements to the lieutenant, in his official capacity as a superior.*

*On four of the five occasions of your sexual interludes you were delegated as the shift commander and thereby represented the Department in my absence. In your official capacity as the shift commander you were directly responsible for the efficiency and effectiveness of your command. As the shift supervisor you were expected to maintain a professional demeanor and set the example of full compliance with the rules of conduct and departmental regulations.*

*On the fifth occasion you conducted your sexual activities, within a public park within the City of Charles Town, while a subordinate deputy was on duty.*



EXHIBIT
2

**Joint Appendix: Pg. 220**

(2)

*I must say that I am both embarrassed and appalled at your conduct as is reflected in Lieutenant Colbert's investigative report. As a ranking official of this department, much trust was placed on you as the shift commander. In that you were intentionally not available to provide subordinate deputy's with the guidance and direction which may have been needed during normal shift activities. In being purposefully unavailable for supervision and direction, should an emergency arise requiring your direct and personal involvement. You chose to neglect and violate your oath of office and your responsibility's to your community and to this department in order to engage in sexual activities in both public places, within your work environment and in the residence of a subordinate deputy.*

*Throughout the course of this investigation it is obvious that you responded untruthfully to questions posed by Lieutenant Colbert and the polygraph examiner. There is no place within this organization for a deputy, particularly a shift commander, which can not be relied upon for his/her honesty and to tell the truth when questioned by command staff officials.*

*Therefore, you are to be <u>terminated from employment</u> with the Jefferson County Sheriff Office, effective upon receipt of this notice, or on and after the date of the final appeal process, if requested.*

*You are advised that pursuant to the Civil Service Code for Deputy Sheriff's, under W.V. Code 7-14c-3, you are entitled to a hearing before a "hearing board" on the aforementioned issues. If you so desire and request such a hearing, you must advise the Sheriff in writing within 10 days after receiving this letter and a hearing will be granted.*

*Your request for a hearing must be presented to the Sheriff on or before 9:00 A.M. Monday, September 9th, 2008.*

*Should you request a hearing, a hearing date will be scheduled at a later time.*

*<u>If you do not submit a request for a hearing within the ten-day (10) period, it will be assumed that you do not wish to proceed any further with this matter. Therefore, the administrative decision on your termination will be final.</u>*

**(3)**

*Please be reminded that the purpose of disciplinary action to correct and/or improve employee performance.  Any further instances of non-compliance to Departmental Rules and Regulations will be dealt with on the seriousness of the occasion, which could lead to disciplinary action up to and including termination.*

*I acknowledge receipt of this document on the _____ day of August 2008.*

_____



_(3)_

_Please be reminded that the purpose of disciplinary action to correct and/or improve employee performance. Any further instances of non-compliance to Departmental Rules and Regulations will be dealt with on the seriousness of the occasion, which could lead to disciplinary action up to and including termination._

_I acknowledge receipt of this document on the ___27___ day of August 2008._

**ORIGINAL**

TRANSCRIPT

OF

JEFFERSON COUNTY CIVIL SERVICE HEARING

HELD ON OCTOBER 22, 2008

COMMENCING AT 9:00 a.m.

APPEARANCES:

STEPHANIE GROVE, ESQUIRE On Behalf of the Sheriff's

Department.

MICHAEL SCALES, ESQUIRE On Behalf of the Respondent.

EXHIBIT
3

```
 1                        I-N-D-E-X

 2                                                    PAGE

 3    OPENING STATEMENT MS. GROVE                        3

 4    OPENING STATEMENT MR. SCALES                       5

 5    DIRECT EXAMINATION LT. COLBERT             9, 42, 48

 6    CROSS-EXAMINATION LT. COLBERT                 24, 46

 7    DIRECT EXAMINATION CORP. EDWARDS          49, 65, 69

 8    CROSS-EXAMINATION CORP. EDWARDS               54, 69

 9    DIRECT EXAMINATION DEPUTY KILMER         70, 79, 82

10    CROSS-EXAMINATION DEPUTY KILMER              72, 81

11    DIRECT EXAMINATION SHERIFF BOOBER            83, 97

12    CROSS-EXAMINATION SHERIFF BOOBER             91, 97

13    DIRECT EXAMINATION SGT. SELL                96, 102

14    CROSS-EXAMINATION SGT. SELL                      98

15    DIRECT EXAMINATION DEPUTY BOYCE            104, 122

16    CROSS-EXAMINATION DEPUTY BOYCE             119, 123

17    DIRECT EXAMINATION SGT. DODSON                  125

18    CROSS-EXAMINATION SGT. DODSON                  137

19    DIRECT EXAMINATION LT. HANSEN                  143

20    CROSS-EXAMINATION LT. HANSEN                   144

21    CLOSING ARGUMENT MS. GROVE                     146

22    CLOSING ARGUMENT MR. SCALES                    149

23

24    REPORTER'S CERTIFICATE                         169
```

P-R-O-C-E-E-D-I-N-G-S

1

2   COMMISSIONER LEMASTER:  Everybody ready.

3   MS. GROVE:  Do you want me to give a brief opening

4   statement?

5   COMMISSIONER LEMASTER:  Yes.

6                   OPENING STATEMENT

7   MS. GROVE:  I'm Stephanie Grove.  I work with the

8   Jefferson County Prosecutor's Office in the civil division

9   and this is Lieutenant Dave Colbert.  He conducted the

10  investigation of Sergeant Dodson.

11          On June 13th Sergeant Dodson responded to a home

12  on 229 Allstadts Hill Road where a victim reported being

13  shot at by the owner of the house by a Tech-Nine.

14  Sergeant Dodson secured the suspect after he arrived and

15  then instructed his team to conduct a thorough search of

16  the entire house.  After the incident Sergeant Dodson

17  filed a complaint against Corporal Edwards who was

18  watching the suspect at that time saying that she had

19  given legal advice to the suspect while she was watching

20  him.

21          In this complaint Sergeant Dodson justified his

22  search of the house under exigent circumstances and

23  provides the rationale for the search as exigent

24  circumstances and also explains his understanding of what

1   that means and what he's entitled to do under that

2   doctrine.  While Lieutenant Colbert was investigating the

3   complaint that Sergeant Dodson had filed against Corporal

4   Edwards it became apparent to the sheriff that the search

5   of the suspect's home may have been unlawful.  He was

6   concerned about the legal ramifications of such a search

7   and instructed Lieutenant Colbert to open another

8   investigation into the search.

9        After conducting an investigation of the search

10  Lieutenant Colbert concluded that the search was indeed

11  unconstitutional in violation of the laws of West Virginia

12  and the United States.  As such Lieutenant Colbert

13  concluded that Sergeant Dodson had committed conduct

14  unbecoming a deputy.  After receiving the final

15  investigation Sheriff Boober decided that an appropriate

16  action and his recommended action he has not taken that

17  action -- you're here to decide today if that action is

18  appropriate -- to reduce Sergeant Dodson in rank from

19  sergeant to corporal.  The sheriff concluded that a deputy

20  who did not understand the laws of search and seizure and

21  who was responsible for making sure in his absence that

22  all the laws of the state and the United States are

23  followed could not be trusted in the position as shift

24  supervisor.  An unlawful search has the potential to open

1   up both the county and all the officers to criminal and

2   civil liability.

3       In addition an officer who is the shift

4   supervisor is responsible for making sure that all,

5   everybody under his command, follows the rules.  As such

6   Sheriff Boober does not feel that he can trust Sergeant

7   Dodson in that role as shift supervisor any longer and had

8   decided on the recommended action of reducing his rank

9   from sergeant to corporal.

10               OPENING STATEMENT

11     MR. SCALES:  Gentlemen, my name is Michael Scales.  I

12   represent Sergeant Dodson.  We're here today to determine

13   whether or not there's just cause to demote Sergeant

14   Dodson from sergeant to corporal based upon an incident

15   which took place on June 13, 2008.  We believe that the

16   record will show that this was a all units dispatch to the

17   area.  There was a report that there was a Tech-Nine,

18   which I'm not familiar with that -- I'm sure you all are

19   -- an assault type weapon discharged on the scene that

20   evening, that there was a complaining witness who was

21   interviewed by deputy sheriffs and it was determined that

22   this Tech-Nine type weapon was discharged toward the

23   complaining witness, that it was brandished, this location

24   of this particular area was at a residence that was

1   adjoining a flea market where there was private

2   individuals looking at tables of whatever they look at at

3   flea markets.  It was in close proximity to U.S. Route 340

4   approximately 50 yards, that there was no less than four,

5   I believe, four different law enforcement agencies that

6   responded.  There was the Charles Town Police Department.

7   I believe Harpers Ferry Police Department, and West

8   Virginia State police, and also Jefferson County Sheriff's

9   Department also responded.

10          During the course of the initial scene one of

11  deputies, Deputy Boyce went around to the back of the

12  home, apparently looked through windows to try to

13  determine who all was present.  Could not determine from

14  the shadows who all was there.  Went around the front of

15  the house and Sergeant Dodson yelled several times,

16  identified himself as a law enforcement officer, asked the

17  subject to come out.  The subject at least at first

18  initially refused.

19          It's somewhat controverted but there was knocks

20  at the door, continuing knocks at the door.  There was an

21  exchange of curse words from the subject who defied

22  Sergeant Dodson and finally, I think, the door finally

23  swung open and the gentleman was close to the door and

24  Sergeant Dodson apprehended him at that time but there was

1   still an issue that because the Tech-Nine was not located

2   during the course of the arrest so there was issues about

3   the continuing safety, how many other folks were in there.

4   And what I rely upon and what I believe that Sergeant

5   Dodson did was refer to it as a protective sweep and I'm

6   sure that you all are versed in search and seizure and are

7   familiar with West Virginia law.

8           I rely on the case of *State v. Lacey*.  I have a

9   copy of it for each one of you all to review for your own

10  records.  It's a 1996 West Virginia case.  It's citation

11  is 196 W.Va. 104, 486 S.E. 2d. 719.  A 1996 West Virginia

12  case which is based upon three Supreme Court cases,

13  *Maryland v. Buie*, B-U-I-E.  I believe it's a 1990 U.S.

14  Supreme Court case.  *Terry v. Ohio* and *Michigan v. Long*

15  and what is commonly referred to as a protective sweep.

16          I'm sure if you all are familiar with a

17  protective sweep it permits law enforcement officers in

18  the course of an in-house arrest if he believes that

19  himself or other officers may still be in danger, or the

20  surrounding bystanders, and there's still an issue about

21  weaponry not being located that that particular law

22  enforcement agency may make a protective sweep.  I'm not

23  talking about a full blown search top to bottom, open all

24  the drawers and everything else, but number one to secure

1   the area to make sure there's no other assailants present

2   and to find whatever weaponry might have been used during

3   the course of the incident which took place.  Precisely

4   what Sergeant Dodson and his associates did on that

5   evening and once they located two weapons that were in

6   plain view in the adjoining room and the cases that I've

7   cited to you -- and I'll give you a copy of the case that

8   also are cited in there -- that indicate that a police

9   officer's entitled to go into an adjoining room if there

10  might have been a participating accomplice, or there might

11  be a location where the weapons involved might be located.

12  He went in.

13          He found -- I'm not sure it was Sergeant Dodson

14  or one of the gentlemen that were under his command found

15  two weapons that were in a gun case that was out in plain

16  view.  Took them out and checked their registrations on

17  the state police registration system and also found an air

18  pistol and questioned the subject about the air pistol.

19  Asked him what it was.  Found out it was an air pistol.

20  After they determined that everything was proper there was

21  no stolen weapons, did not appear that there was a

22  Tech-Nine weapon there, they returned it all to their

23  proper place.  Secured the house and took the subject in

24  for processing.  That's clearly a protective sweep.

1    In fact, what Sergeant Dodson did during his

2  command was entirely proper.  He did it for the protection

3  of his fellow officers and for the other citizens who were

4  located in the adjoining area which was the flea market.

5  So quite frankly I don't believe that these charges should

6  be sustained.  I believe that Sergeant Dodson should be

7  returned to his full rank of sergeant and back to work.

8  Thank you.

9    MS. GROVE:  At this time I'd like to call Dave

10 Colbert.

11                    DIRECT EXAMINATION

12   BY MS. GROVE:

13   Q    Could you please state your name for the record?

14   A    Lieutenant David Colbert.

15   Q    And where are you employed?

16   MR. SCALES:  Excuse me.  Should this gentleman be

17 placed under oath?

18   MS. GROVE:  Usually the Board places them under oath.

19 Whereupon,

20                    DAVID COLBERT

21 called as a witness, having been first duly sworn,

22 was examined and testified as follows:

23   BY MS. GROVE:

24   Q    Where are you employed?

1       A      Jefferson County Sheriff's Office.

2       Q      How long have you been employed there?

3       A      Since August 22nd of 1999.

4       Q      And what is your current position within the

5  sheriff's office?

6       A      Lieutenant.

7       Q      And how long have you held that position?

8       A      Approximately coming up on two years, two years

9  January.

10      Q      Did you conduct an investigation into the search

11  performed under Sergeant Dodson's command on June 19,

12  2008, also known as investigation 2008-02?

13      A      Yes, ma'am.

14      Q      And why did you conduct an investigation into

15  this incident?

16      A      I was assigned by the sheriff as a result of

17  information that is provided in the complaint that

18  Sergeant Dodson filed on June 19th when he actually filed

19  that first complaint, the original complaint.

20      Q      Against another officer.

21      A      Yes, against Tracy Edwards.

22      Q      Okay.  And were you able to determine whether the

23  allegations contained in Sergeant Dodson's complaint were

24  legitimate?

1      A    There were several allegations, some concerns,

2  comments.  While speaking with Sergeant Dodson I found

3  that there were issues that needed to be addressed that

4  dealt with reporting to supervisors on duty and some of

5  the statements he made I support a hundred percent and

6  some of the things that were more pointed towards the

7  conduct of Detective Edwards were unfounded.

8      Q    Okay.  But it was this complaint that led to the

9  investigation of Sergeant Dodson?

10     A    Yes.

11     Q    Now, I'd like to turn to the investigation of the

12  search on June 13, 2008.

13     A    Yes.

14     Q    Could you please tell the board members why

15  Sergeant Dodson was called to 229 Allstadts Hill Road on

16  that evening?

17     A    On June 13th there was a call of shots being

18  fired.  The two subjects knew each other allegedly.  Mr.

19  Hoffman-Smith discharged a Tech-Nine, very specific, a

20  Tech-Nine firearm at a victim, the complainant.  He fled

21  from the house at which time I'm not sure if he went to

22  another residence or used a cell phone.  He called 911 and

23  officers responded.

24          Upon their initial response they surrounded the

1   house.   I believe it was Corporal Boyce tried to initiate

2   contact using his PA system on his cruiser.   The SWAT team

3   was notified and from that point sometime when this was

4   all going on Sergeant Dodson arrived.

5       Q     What type of gun is a Tech-Nine?

6       A     It's about the size -- a little bit larger than a

7   standard handgun.   It's got usually an extended magazine.

8       Q     So it's a small --

9       A     It's a pretty small gun.   Definitely a subcompact

10  as far as that goes.

11      Q     Do you know that if after Sergeant Dodson arrived

12  on the scene was he able to secure the suspect?

13      A     Well, from what I understand from the

14  investigation Sergeant Dodson made the decision to

15  approach the door and he did he knocked on the door.   He

16  said while knocking on the door the door came open a

17  little bit and he continued to identify hisself as the

18  sheriff's department to have this guy come out.   He said

19  he yelled several times.   There was no response.   Later

20  found that the guy was, I believe, he was intoxicated or

21  was not all responsive in the initial attempt to contact

22  to him.

23          He said eventually the guy walked down the hall

24  towards him.   As the door was opening he could see him.

1    He was kind of standing behind the door and Sergeant

2    Dodson said, you know, he wasn't sure what was going on

3    behind the door and I understand that.  And he kind of

4    pushed the door aside and pulled Mr. Hoffman-Smith out of

5    the residence, and placed him in handcuffs.  So it would

6    be in the general front porch area where they placed him

7    in handcuffs.

8        Q    So that the arrest was made on the front porch?

9        A    He was placed in custody on the front porch at

10   which time he was removed from the front porch and placed

11   under the observation, security, I believe it was Corporal

12   Edwards at that time.

13       Q    According to your understanding did Sergeant

14   Dodson then undertake a search of the residence?

15       A    Yes.  Actually, I was up in Deep Creek Lake

16   camping with my family and I received a message on my cell

17   phone and it was Detective Edwards which I was put in

18   charge of supervising investigations and patrol.  She

19   called me and by the time I had gotten the message --

20   'cause I didn't have cell service where I was at -- by the

21   time I'd got the message, and it was very brief, and it

22   said, "Lieutenant Colbert, I need you to give me a call."

23            So I gave her a call and she said, "You have to

24   do something.  There's an illegal search going on."  You

1  know, she said, "I don't even know why the guy was

2  arrested."  You know, "They're searching this guy's house

3  and it's not a lawful search under the Fourth Amendment.

4  You need to do something."

5      At which time I explained to her that I was in

6  Deep Creek Lake several hours away and I said, "Well, let

7  me make a phone call."  I knew Sergeant Sell was working

8  on Friday so I contacted Sergeant Sell and he told me that

9  the guy was placed under arrest for obstructing and that

10  the house was being searched.  And I said you know, well,

11  just the information he was providing me it didn't -- it

12  wasn't adding up.  It concerned me.

13      So I told him I said, "Just hang tight."  You

14  know, "Just stay put there and just stop what you're

15  doing.  Somebody's going to be in contact with you

16  immediately."  So, and I said, "It's probably not going to

17  be me."

18      So I contacted Lieutenant Hanson.  Lieutenant

19  Hanson called Sergeant Sell.  Lieutenant Hanson said he is

20  on top of it and that is the end of it, you know.  And

21  then June 19th I received a complaint from Sergeant Dodson

22  and that led into this investigation.

23      Upon, you know, starting this investigation and

24  interviewing the deputies that were on the scene they

**Joint Appendix Pg. 246**

1   pulled Mr. Hoffman-Smith out of his residence and placed

2   him in custody.  And I agree with protective sweep, I do.

3   I believe that you have the right under these circumstance

4   to enter that house to make sure somebody's not shot.

5   Make sure somebody's not loading that gun putting officers

6   in danger and to believe that somebody's not in there

7   destroying evidence.  I a hundred percent agree that there

8   should have been a quick initial sweep and then at that

9   point I believe that residence should have been secured

10  and search warrants should have been obtained.

11          From information I have there were small bags --

12  that under officers' own statements they went through a

13  small black bag that was on the floor.  They lifted

14  bedsheets, pulled couch cushions, opened cupboards.  There

15  was a plastic container they lifted the lid in it and felt

16  down in it looking for this weapon.  From what I

17  understand from the statement there was a gun case that

18  was closed that was pulled out of a closet that they

19  opened it up and I don't have the exact description of the

20  rifles, but I understand they were hunting type rifles,

21  full sized rifles, definitely not a Tech-Nine and they

22  pulled these out.

23          According to Deputy Kilmer he was advised by

24  Sergeant Dodson to run the serial numbers.  He ran the

1    serial numbers on those weapons and they came back not

2    stolen.   They never found the Tech-Nine and they left the

3    house.

4        Q    Was there according to your investigation at any

5    time any allegation that there was someone else in the

6    house or that the suspect had an accomplice?  Did the

7    victim indicate that?  Did anyone indicate that the

8    suspect had an accomplice within the house?

9        A    Not that I'm aware of.

10       Q    Okay.   During your investigation when you

11   interviewed Sergeant Dodson did he indicate why he thought

12   such a thorough search was warranted?

13       A    He explained -- in his initial complaint says, "I

14   then at this time entered the residence and checked it for

15   another person.   We then searched for a Tech-Nine weapon

16   which would have been evidence for a felony crime we were

17   called there for as a search incident to an arrest.

18       Since this is a lawful arrest and we did not have --

19   we did not need permission to search a residence because

20   that is where the suspect was hiding at the time we made

21   contact with him and it was within a reasonable timeframe

22   of the crime, since we also did not leave the residence

23   and come back later we did not need to obtain a search

24   warrant."  And he goes on at some point he mentions

1   exigent circumstances and search incident to an arrest.

2       Q    Okay.  Could you explain to me first the doctrine

3   of exigent circumstances and what that allows an officer

4   to do?

5       A    Exigent circumstances is -- there are three types

6   exigent circumstances and that's the threat of life and

7   safety, the destruction or removal of evidence or

8   property, and escape.  And like I said I totally agree

9   that -- you know, I can't recall if there's any

10  information on somebody being in the house or not but I

11  totally agree with going in the house and doing a

12  protective sweep to ensure the safety and wellbeing of

13  anybody in that house or the officers on the scene but

14  obviously after that point no exigent circumstances exist.

15      Q    Do you believe -- so you don't believe that the

16  search was warranted?

17      A    Absolutely not.  After you establish exigent

18  circumstances do not exist, there's nobody in that house,

19  nobody's destroying property, nobody's bleeding from a

20  gunshot wound, and nobody's trying to get that gun and

21  hurt those officers in that house.

22      Q    What about a search incident to an arrest, can't

23  I look for the Tech-Nine?  There was an allegation of --

24      A    Search incident to the arrest deals with officer

1  safety and that deals typically with the area surrounding

2  the officer at which time he is a arrested.  And being

3  that, you know, he walked to the front porch, he was

4  pulled from the porch -- I mean, I'm sorry.  He walked to

5  the front door.  He was pulled from the door, placed in

6  custody, that's your immediate area, that's where the

7  threat is to the officer and you know once that arrest is

8  made, you search that immediate area, that should be the

9  end of it.

10     Q    If you wanted to search for the Tech-Nine that

11  was allegedly used how would you go about that?

12     A    Well, there was enough information there that

13  without a doubt you would do your protective sweep which I

14  agree with.  Get that done.  Secure the house.  You had

15  plenty of officers there at which time he should have

16  stopped, secured the house and gotten -- got a search

17  warrant from the magistrate.

18     Q    When you did your investigation what did you use

19  to determine the constitutionality of the search?

20     A    I reviewed the Fourth Amendment.  I used a field

21  guide that was provided to all officers.  The guide was

22  provided when we were at the academy and then there's

23  updated versions which are constantly coming out.  I met

24  with the Jefferson County Prosecutor's Office and I talked

to some of the criminal prosecutors there referenced the

situation.

Q    Is this the field guide that you used?

A    Yes.

Q    And this is the West Virginia Law Enforcement

Field Guide Sixth Edition by Steven Cogar?

A    Yes.

Q    And you said every officer gets a copy of this?

A    Well, we received a copy at the academy, the

original one.  I believe everybody received a copy of that

but I'm not in charge of distributing them.  So I could

not tell you that Sergeant Dodson or Lieutenant Hanson got

a copy.  Everybody to the best of my knowledge receives a

copy or should receive a copy.

Q    And you actually went through the academy with

Sergeant Dodson?

A    Yes, ma'am.

Q    Okay.  So you got a copy of this and Sergeant

Dodson -- you got a copy of this during your training at

the academy?

A    Older version.

Q    But is the law of search and seizure the same in

this field guide?

A    Right.  I looked through the original field guide

1    and yeah I didn't see where anything had changed.

2        Q    So just to sum up, can you tell the Board what

3    conclusion you reached about the constitutionality of the

4    search conducted under Sergeant Dodson's supervision on

5    June 13, 2008?

6        MR. SCALES:   I object to this witness's ability to

7    answer that, but you may respond.

8        THE WITNESS:   To my conclusion?

9        BY MS. GROVE:

10       Q    Yes, your conclusion.

11       A    That it was unlawful and under the laws of search

12   and seizure and the state of West Virginia he did not have

13   the right to order, supervise, a full blown search of that

14   residence on that night in question, that he should have

15   stopped and gotten a search warrant.

16       Q    At this time I would ask of the Board -- I know

17   that you have copies of this.  Is this the report that you

18   prepared of your investigation of the June 13, 2008

19   incident?

20       A    Yes, ma'am.

21       MS. GROVE:   At this time I would ask that this become

22   an official part of the record since this does contain the

23   investigation and it is what Sheriff Boober used to make

24   his recommendation of reduction in rank.

1          MR. SCALES:  I object on the grounds it's hearsay but

2     because I don't think as this witness has already

3     testified he wasn't even at the scene.  People who are to

4     be testifying as to what happened are those that were

5     actually there.  The West Virginia Supreme Court indicates

6     that the existence of reason to believe should be analyzed

7     from a perspective of the police officers at the scene

8     rather than from a 20-20 hindsight and I'm looking at 468

9     S.E. 2d, 732, that *State v. Lacey* case.

10         So the people that ought to be making the

11    decision, remember we're talking about police officers,

12    law enforcement officers in the line of duty, and

13    according to the *State v. Lacey* case they're the ones who

14    were at the scene, who were making split second decisions

15    based upon a set of facts that's relevant to them and

16    while they're in line of duty.  And those decisions that

17    they make should be a snapshot at that time period not

18    Lieutenant Colbert, respectfully, who is coming back and

19    trying to make 20-20 hindsight on maybe what could have

20    happened, what should have happened.

21         At that time there was an element -- there was

22    reports of the use of a Tech-Nine weapon which I think is

23    an assault weapon.  There was an indication that it was

24    discharged.  I'm going to have Lieutenant Boyce -- I sorry

**Joint Appendix Pg. 253**

1  I apologize Corporal Boyce testify in a few minutes -- I

2  hope he's here -- about what he saw in the back of the

3  building.  We don't know how many people were there.

4  Sergeant Dodson didn't know that and these were split

5  second decisions.  It's nice to sit back after it's all

6  over with and say, "Well, if we knew then what we know now

7  we probably shouldn't have done this.  We should have done

8  that," but the case clearly says is you're talking about a

9  law enforcement officer in the line of duty who's making

10  split second decisions based upon a set of facts that's

11  told to him and he's unaware about who's in the next room;

12  how many folks are in there; how many weapons are there;

13  and he's just trying to do his duty.

14          So I think the people that ought to be testifying

15  as to what happened were the ones that were actually there

16  so they can tell us what was going through their minds at

17  the time that these split second decision were made.  And

18  respectfully to Lieutenant Colbert, and I'm not showing

19  any disrespect, I think his 20-20 hindsight is good, is

20  good analysis but the testimony should be coming from the

21  folks that were actually there, that's my objection.

22      MS. GROVE:  During his investigation Lieutenant

23  Colbert interviewed everybody at the scene all the

24  sheriff's deputies that --

THE WITNESS:  I reviewed all the sheriff's deputies that were reported to me as actually being involved in the search.

MS. GROVE:  Yes.  And we will be calling those deputies after Lieutenant Colbert.  He's here to present his investigation which again forms the basis for the recommendation.  So he interviewed all the witnesses.  The report contains a transcript of some of those interviews, the complaint by Sergeant Dodson.

So again, this was his investigation based upon his interview of those people at the scene and under that rationale we could never conduct an investigation as to whether a search is illegal or not if you can only use the people at the scene.  So I think you have to consider this report.  Otherwise, you have nothing to know what the sheriff based his decision on if you don't look at this report, that's where his recommendation is actually contained and it's what was given to Sergeant Dodson for even this hearing.  It's what he's actually responding to and you're here to make a decision on this report.

MR. SCALES:  I don't have any problem with the statements that were made by Sergeant Dodson.  I don't have any problem with the statements that were made by Corporal Edwards.  The only thing I'm suggesting is that I

1  think the standard that needs to be reviewed when you all

2  are making your decision about what Sergeant Dodson did

3  what was a snapshot of what he knew, when he knew it and

4  then what actions he took with what information he had at

5  that time, that's all I'm trying to suggest to you.

6      COMMISSIONER LEMASTER:  We're off the record.

7                          (Whereupon, the Board held

8                          discussions off the record.)

9      COMMISSIONER LEMASTER:  After discussion with us and

10  understanding that this Board is -- we have an appeal

11  process and whatever this Board allows in is later

12  reviewed on any appeals that we have, and to keep from

13  precluding any other information from the review of any

14  other bodies we're going to go ahead and let the report go

15  in and then also your argument has already been

16  established on record and anything that you want to maybe

17  attest to as an evidentiary type of piece into the record.

18      MR. SCALES:  Okay.

19      MS. GROVE:  Thank you.  I don't have any further

20  questions at this time for Lieutenant Colbert.

21                  CROSS-EXAMINATION

22      BY MR. SCALES:

23      Q    Lieutenant Colbert, did you indicate you were

24  telephoned on the evening of the incident?

```
 1    A    Yes, sir.

 2    Q    While you were on vacation at Deep Creek Lake?

 3    A    Yes, sir.

 4    Q    And so when was the incident?

 5    A    The incident which occurred on June 13 a search

 6  of the residence.

 7    Q    2008, is that correct?

 8    A    Yes, sir.

 9    Q    Tell me when you began your investigation of

10  Sergeant Dodson's conduct?

11    A    Sergeant Dodson's -- the investigation reference

12  the search would have began -- I'm not sure when I

13  interviewed him.  I received an order from Sheriff Boober

14  to initiate an investigation and I believe it was July

15  22nd after the release and review of the information that

16  was brought by 2008-01.  I have that document here and

17  it's in the packet.

18    Q    Okay.  So let me make sure I understand this.  So

19  this alleged improper conduct --

20    A    July 15th -- I'm sorry.  It was July 15th is what

21  the document that I reviewed from Sheriff Boober.

22    Q    Okay.  So let me make sure I understand this.

23    A    Yes.

24    Q    You were called on the evening of June 13, 2008.
```

**Joint Appendix Pg. 257**

1   Who called you?

2        A    Detective Edwards.

3        Q    Is that Corporal Edwards?

4        A    Yes, Corporal Edwards.  Corporal Tracy Edwards.

5        Q    And this was such a serious matter that no

6   investigation was even commenced of the conduct of

7   Sergeant Dodson until five weeks later?

8        A    What had occurred was I made contact with

9   Lieutenant Hanson.  I didn't have all the specifics.  As

10  you advised I wasn't on the scene.  I contacted Lieutenant

11  Hanson who was here who could make numerous phone calls or

12  do whatever he needed to do to ensure that the situation

13  was taken care of.  His words were, "I'm on top of it,"

14  and I heard no more about that investigation until I

15  received a letter of complaint from Sergeant Dodson and

16  that was on June 19th.

17            And then the information came ahead and we said

18  we were going to go ahead under the direction of Sheriff

19  Boober we were going to go ahead and complete that

20  investigation.  Since I couldn't do -- I didn't want to do

21  all of them at that exact same time we would complete the

22  initial investigation of Sergeant Dodson that led to

23  information, statements, interviewing people in reference

24  to Sergeant Dodson's complaint supported the information

1    that another investigation needed to be conducted.

2        Q    Well, let me make sure I understand this.

3        A    Yes.

4        Q    This conduct was allegedly so egregious that

5    Corporal Edwards called you on the evening of the incident

6    on June 13, 2008, while you were on vacation.

7        A    She didn't know I was on vacation.  It was a

8    weekend trip.  She had no knowledge -- she called my cell

9    phone.  I was her supervisor overseeing investigations.

10       Q    Okay.  But having known this on June the 13th no

11   one initiated an investigation of Sergeant Dodson's

12   conduct until after he had made a complaint on June the

13   18th about Corporal Edwards allegedly telling this

14   arrestee that -- about this illegal search or some

15   conversation about it, isn't that correct?

16       A    Yes.

17       Q    Okay.  And Sergeant Dodson had indicated to you

18   that the reason why he had done this is because he was

19   unaware about who her commanding officer was that evening

20   and how he could get in contact with her commanding

21   officer, isn't that correct?

22       A    I'm sorry.  I didn't quite understand that.

23       Q    Well, didn't Sergeant Dodson express to you some

24   concern about why Corporal Edwards was even at the scene

1    that evening and who was her commanding officer?

2        A    After the fact.  After the fact, yes, sir.

3        Q    That's why he had filed the complaint against her

4    to make sure that there was proper chain of command being

5    followed?

6        A    That was part of the substance of his complaint,

7    yes, sir, which I agreed with.  I mean, I agree that if

8    she's out in uniform that the shift supervisor, the

9    sergeant on duty should be aware that she's out in uniform

10   working.

11       Q    Now, tell me now how many different law

12   enforcement agencies actually went to the scene on the

13   evening of June 13, 2008, in response to this all units

14   dispatch?

15       A    There would be Jefferson County Sheriff's

16   Department, of course.  I think there was state police.

17   I'm not sure about Charles Town.  I don't recall that

18   information.

19       Q    How about Officer Sam Smith, do you know him?

20       A    Yes, I do.

21       Q    Is he part of the Charles Town PD?

22       A    Yes.

23       Q    Was he there that night?

24       A    I believe so.

1      Q    Well, let me see if I can't identify them all for
2  you.

3      A    Okay.

4      Q    Was Charles Town Police Department Patrolman Tony
5  Mancini there?

6      A    Yes, but not involved in the search.

7      Q    But he was present on the scene?

8      A    I believe so.

9      Q    Charles Town Police Department Sam Smith?

10     A    I believe his name came up.

11     Q    Sergeant Sell from Jefferson County Sheriff's
12  Department?

13     A    Yes.

14     Q    Deputy Demory?

15     A    I don't recall Demory being -- I think he showed
16  up well after the fact.  I'm not for sure about Demory but
17  I know I'm thinking the information I had is that he
18  showed up after the fact.

19     Q    Deputy Kilmer from Jefferson County?

20     A    Yes, sir.

21     Q    Trooper Martin from the West Virginia State
22  Police?

23     A    Yes, sir.

24     Q    Trooper Stohl?

1    A    I have no idea.

2    Q    Trooper Bush, West Virginia State Police?

3    A    No idea.  I don't recall I should say.

4    Q    Harpers Ferry Police Department Burkholtz?

5    A    Somebody -- now that you say that I recall

6    somebody saying about a Harpers -- I've never met that

7    gentlemen.  The name isn't familiar to me but that sounds

8    correct.  Maybe a Harpers Ferry unit was I believe to be

9    there pretty early on.

10   Q    How about Trooper Underwood?

11   A    I don't recall.

12   Q    Did you interview any of these people?

13   A    I reviewed the officers within our department

14   that were directly involved in the search that was the

15   concern then if this was the search that was conducted and

16   I interviewed officers from our department.  I didn't want

17   to drag everybody into this, you know.  The facts are what

18   we've established what I belive the facts to be and I

19   interviewed the members of our department that

20   participated in the search.

21   Q    Well, what I'm getting around to is now it seems

22   like we have four different law enforcement agencies

23   there.  Did any of them express a complaint to the

24   Jefferson County Sheriff's Department that Sergeant Dodson

1    had performed an illegal search?

2         A    No, sir.

3         Q    Has anyone filed a complaint against Sergeant

4    Dodson other than what you initiated as a result of the

5    sheriff's request five weeks after the alleged incident to

6    start an investigation?

7         A    Other than what this -- from the result of the

8    information that Deputy Dodson's provided originally, no,

9    sir.

10        Q    Now, tell me did you interview Sergeant Sell?

11        A    Yes, sir.

12        Q    And isn't it a fact he told you it was a good

13   search?

14        A    He also -- well, he's the one I talked to on the

15   phone that said we have exigent circumstances and what he

16   said as I advised you it didn't sound right and that's

17   when I said, "Hang tight.  I'm going to get hold of

18   Lieutenant Hansen.  Somebody will be getting in contact

19   with you," but yes I did contact Sergeant Sell.  I

20   interviewed him and I don't recall his exact words.  I

21   mean it's all documented.  He advised that he participated

22   in it and I don't think he realized that the search was

23   unlawful.  I don't know.

24        Q    He didn't realize it?  A sergeant?  Another

1    sergeant didn't realize it?

2         A    Due to the fact that he came and --

3         Q    Well, did you write him up because he didn't

4    realize that he had performed an illegal search?

5         A    No, sir.

6         Q    Well, tell me when are you supposed to be writing

7    these charges up?  How soon after the incident?

8         A    I was ordered by the sheriff to investigate this

9    specific situation at which time I gave the sheriff all

10   the facts in the investigation.

11        Q    Are you familiar with this manual that's about an

12   inch and a half thick called JCSO Manual of Rules and

13   Regulations and Department Policy?

14        A    Yes, sir.

15        Q    Is everyone of the officers supposed to have one

16   of these?

17        A    Yes, sir.

18        Q    And know the contents of these?

19        A    Yes, sir.

20        Q    Are you familiar with Section 4.8, Disciplinary

21   Action?

22        A    I'd have to see it.  I mean, I'm familiar with

23   it, but it's a big manual.

24        Q    May I approach?  I made a photo copy of it.  If I

1    could have this identified as Exhibit 1 I would appreciate

2    it.   Dodson Exhibit 1, I would appreciate it.

3                          (Whereupon Dodson Exhibit 1 was

4                          marked for identification.)

5    BY MR. SCALES:

6        Q     Directing your attention if I could, Lieutenant

7    Colbert, starting where it says, "Formal charges of

8    Violations."

9        A    Yes, sir.

10       Q    Could you read that for me?

11       A    "Formal charges of violations of the rules and

12   regulations contained within this manual should be

13   submitted in writing immediately upon the discovery of the

14   violation and submitted to the chief deputy for

15   processing."

16       Q    Now, correct me if I'm wrong you were telephoned

17   while on vacation on the evening of June 13, 2008, and

18   advised that an illegal search had taken place?

19       A    Yes, sir.

20       Q    And nothing happened for five weeks?

21       A    Yes, sir.

22       Q    And I named you about a dozen officers who had

23   some knowledge of what took place and nothing happened

24   until Sergeant Dodson filed a complaint against another

1    officer and there was a review of that and then it took

2    place, is that right?

3         A    Yes, sir.

4         Q    So you're telling me then that all the officers

5    that were involved in this should have known that there

6    was an illegal search and seizure that took place and

7    there should have been some formal charges taken

8    immediately after the incident, correct, according to

9    manual?

10        A    Well, the manual is what it is.  I mean it says

11   -- well, I already read it.  "Formal charges violations

12   operations violations result in -- formal charges of

13   violation of the rules and regulations contained within

14   this manual should be submitted in writing immediately

15   upon the discovery of the violation and submitted to the

16   chief deputy for processing."

17             So through the course of the investigation I feel

18   information was brought forward which led us to believe

19   that the investigation needed to be conducted referenced

20   the search.

21        Q    So it was not initiated immediately after its

22   discovery then was it?

23        A    No.

24        Q    Okay.  Now, tell me what do you know about

**Joint Appendix Pg. 266**

1   Sergeant Dodson's and Corporal Edwards' relationship?

2       MS. GROVE:  Objection.  I don't think that's relevant

3   for this hearing this is about search and seizure.  It was

4   not Corporal Edwards' complaint that led to the

5   investigation.  It was actually the complaint Sergeant

6   Dodson filed against Corporal Edwards when all the details

7   came out about the search which were not heretofore known

8   and therefore the relationship between Sergeant Dodson and

9   Corporal Edwards is completely irrelevant at this hearing.

10      MR. SCALES:  I respectfully disagree.  She was the

11  complaining witness who initiated the entire phone call to

12  Lieutenant Colbert which began the whole process which

13  apparently was aborted until my client, Sergeant Dodson,

14  filed a complaint against Corporal Edwards.  Now, my

15  questions to him goes to that, that isn't it a fact that

16  there's some bad relationship between them now.

17      MS. GROVE:  Again, I object.  I don't think that

18  that's relevant.  There was no investigation initiated

19  until the complaint was received on June 19, 2008.  There

20  was never an investigation initiated until that point in

21  time.

22      MR. SCALES:  Well, let me limit this to just two

23  questions, if I could and then maybe we can wrap this up

24  quick.

1    BY MR. SCALES:

2    Q    Were you aware that they were former lovers until

3    about a year ago?

4    MS. GROVE:  Again, I object to that.  It's completely

5    irrelevant at this hearing.

6    COMMISSIONER LEMASTER:  Could you hold for a second.

7    THE COURT REPORTER:  Off the record?

8    COMMISSIONER LEMASTER:  Off the record.

9                            (Whereupon, Commissioners left

10                           the hearing room for their

11                           discussions.)

12   COMMISSIONER LEMASTER:  We're ready to go back on the

13   record.  After some discussion, and it's very difficult

14   for us to rule on relevant evidence because we're not

15   judges, but I think that we'll allow counsel maybe to go

16   on record that there was maybe hard feelings and bad blood

17   without getting into the details of what the cause was and

18   what the incident was because that really doesn't have a

19   lot of bearing on what this case is about but we'll allow

20   it to be noted that there was some contentiousy [sic]

21   prior to the complaint being filed.  Is that satisfactory

22   to you?

23   MR. SCALES:  Thank you.

24   BY MR. SCALES:

1    Q    So Lieutenant Colbert, you do understand that

2  there was some animosity between Sergeant Dodson and

3  Corporal Edwards prior to the June 13, 2008, did you not?

4    A    Yes.

5    Q    Okay.  And they didn't get along too well.  Would

6  that be fair?

7    A    I truly didn't know a whole lot about their --

8  what was going on at that current time but I would say to

9  the best of my knowledge which is not direct knowledge,

10  yes.

11    Q    And Corporal Edwards does receive a lot of

12  complaints; does she not?

13    A    Not that I'm aware of.

14    Q    Didn't you just have to do one here a couple

15  weeks ago with a separate hearing Maggie -- Tammy Hoak?

16  Didn't you have to intercede in that complaint against

17  her?

18    A    A complaint in reference to this?

19    Q    No, sir.

20    A    Oh, in reference to another --

21    MS. GROVE:  We're not here to discuss Corporal

22  Edwards' record with complaints.  We're not here to

23  discuss her or take any action against her.  This hearing

24  is for the purpose of Sergeant Dodson and whether the

1    search he conducted on the evening of June 13, 2008, was

2    legal.

3         MR. SCALES:  I'll withdraw the question and reserve

4    that question for Corporal Edwards.  I'm sure she'll

5    testify.  I apologize.

6         BY MR. SCALES:

7         Q    Now, Lieutenant Colbert, who told you that

8    Sergeant Dodson ordered a full blown search of the

9    Hoffman-Smith residence?

10        A    Who told me that he ordered a full blown search?

11        Q    I think those were you terms "full blown search."

12        A    I may have used that term loosely.  I don't

13   recall anybody directly telling me that.  To me it was a

14   full blown search.  He was the patrol supervisor.  He was

15   in the house.

16             Kilmer told him -- or according to Deputy Kilmer

17   Sergeant Dodson -- I believe by his own admittance -- told

18   Deputy Kilmer to run the serial numbers on weapons.  To me

19   that is a full blown search.  Open the cabinets, closets,

20   it's a full blown search.  That was probably my own words

21   not directly taken from Sergeant Dodson.

22        Q    And now the deputies that you interviewed told

23   you that Sergeant Dodson ordered a full blown search, did

24   they?

```
 1      A    No one used those words, no.

 2      Q    Those were your words.

 3      A    A supervisor?  No.  Those are my words.  You know

 4  the one order that we do have is that, I guess, he told

 5  again Deputy Kilmer to run the serial numbers on the

 6  weapons that were found in the gun case.

 7      Q    Isn't that normal procedure to run the serial

 8  numbers?

 9      A    No.

10      Q    It isn't?

11      A    No, sir.  I would say those weapons have no --

12  there's no probable cause to run those weapons.

13      Q    Do you need probable cause when you're doing a

14  permissive sweep?

15      A    I don't see how a permissive sweep is running

16  serial numbers on somebody's weapons that aren't even

17  alleged to be used in a crime, or reported stolen, or

18  anything of that nature.

19      Q    That's your opinion.

20      A    That is my opinion, yes, sir.

21      Q    We've already substantiated that you didn't

22  interview anybody except those members of the Jefferson

23  County Deputies, is that right?

24      A    That were involved, yes, sir, that I got -- had
```

1    involvement in the search.

2        Q    Now, did you confirm with any other officers of

3    the Jefferson County Sheriff's Department that the accused

4    allegedly stated that the officers had no right to be

5    inside his house and that he was going to sue everyone

6    involved other than from Corporal Edwards?

7        A    Could you repeat that?

8        Q    I believe your report indicated that there was a

9    statement allegedly made by the accused that the officers

10   had no right to be inside his house and that he was going

11   to sue everybody involved.  Who told you that?

12       A    I believe that was Corporal Edwards while she was

13   watching the suspect.

14       Q    And were you able to confirm that with anyone

15   other than Corporal Edwards?

16       A    In 2008-01 I interviewed several subjects and

17   nobody established -- could establish that they saw or

18   heard interaction of Corporal Edwards and Mr.

19   Hoffman-Smith in reference to the legal advice or the, I

20   guess, him saying that to her.  I think -- is that what

21   you're asking?

22       Q    Yes.  Did anybody else independent of Corporal

23   Edwards tell you during their interview that they heard

24   him say that?

1        A    Not that I recall.

2        Q    Okay.  Now, has Mr. Hoffman-Smith filed any

3    complaint with the Jefferson County Sheriff's Department

4    about the actions of Sergeant Dodson?

5        A    Not as of the incident.

6        Q    Were you aware that he's been arrested since June

7    13, 2008, by members of the Jefferson County Sheriff's

8    Department?

9        A    I think maybe Corporal Boyce.  One time I asked

10   him what the status was on the case and I think he told me

11   that he had picked -- somebody advised me that he had been

12   picked up since then on other charges.  I don't recall

13   exactly who, when, or where, or what, but I did hear just

14   talking to the fellows they -- I believe he was arrested.

15       Q    Now, tell me what as a result of this allegedly

16   illegal search what evidence did Sergeant Dodson take from

17   the accused?

18       A    He did not take anything.

19       Q    Did he return everything that he examined back to

20   its proper place?

21       A    Yes, sir.

22       Q    Okay.  Tell me does Sergeant Dodson have any

23   other prior disciplinary complaints or actions against

24   him?

1    A    Not that I'm aware of.

2    Q    How long has he been on the Jefferson County

3  Sheriff's Department?

4    A    I don't know.  I don't really know.  At least six

5  years, seven years, eight years.  Seven and a half he

6  said.

7    Q    You have no reason to dispute that, do you?

8    A    No.  No, not at all.  He's a sergeant so he's got

9  a minimum of six.

10   MR. SCALES:  That's all I have.  Thank you.

11   MS. GROVE:  Can I redirect?

12                  REDIRECT EXAMINATION

13   BY MS. GROVE:

14   Q    Lieutenant Colbert, when did you become aware of

15  all the details of the search that took place on June

16  13th?

17   A    Throughout the investigation of 2008-01 while

18  interviewing people, while interviewing the deputies, in

19  reference to the search itself.

20   Q    Were you aware on the night the June 13th of how

21  thorough the search was?

22   A    No, not at all.

23   Q    And you never received a formal written complaint

24  in compliance with this policy?

1    A    No.  No.

2    Q    In fact, the formal written -- who was the formal

3    written complaint under this policy filed by?

4    A    Sergeant Dodson.

5    Q    And when you -- did you receive a formal written

6    complaint from Sheriff Boober?

7    A    I received a -- yes.  You mean in order to

8    conduct the investigation?  He gave me a verbal order to

9    conduct the investigation.

10   Q    Did he write you a letter to conduct the

11   investigation of this case?

12   A    I don't believe so.

13   Q    The complaint filed by Sergeant Dodson against

14   Corporal Edwards, the only complaint in that letter wasn't

15   there more than just a chain of command issue?

16   A    Yes.

17   Q    He questioned her actions?

18   A    Yes.

19   Q    And in fact would you characterize that complaint

20   as retaliation?

21   A    As far as retaliation he says in his complaint --

22   let me find his complaint.  As Mr. Scales advised, I mean,

23   there was some -- it was a little tense as far as their

24   relationship at that time.  Let me find the exact -- I

1    haven't read over his complaint in some time.

2          It says, "I also believe that these are personal

3    attacks against me from Corporal Edwards.  I say this not

4    only because she had told deputies in this department that

5    she was looking to file a lawsuit against me, but has also

6    told several persons outside this department including

7    someone running for the position of sheriff."

8          So I mean in that sentence itself it sounds like

9    there was something going on and I think it's kind of

10   leading to the fact that -- I mean he'd be the best to

11   testify about this.

12   Q    Okay.

13   A    It sounds like there was maybe some thoughts of

14   going ahead and initiating some information.

15   Q    Okay.  And, again, did Corporal Edwards ever file

16   a formal written complaint against Sergeant Dodson?

17   A    No, ma'am.

18   Q    I'd just like to turn to the issue of Sergeant

19   Sell.  Why wasn't Sergeant Sell investigated if he's of

20   equal rank?

21   A    I provided all the information to Sheriff Boober

22   as far as my investigation goes.  He had all the

23   information from day one on the CDs, a recording.  The

24   thought is that Sergeant Dodson was the commanding

1    officer.   He is in the absence of Sheriff Boober is his

2    designee to ensure that the shift is run smoothly, and

3    that the actions that are conducted are lawful and are in

4    the officer's best interest or the department's best

5    interest.

6        Q    And was it key in your investigation did this

7    really play a big role that the subject said that -- Mr.

8    Hoffman-Smith said that he was going to sue?  Was that a

9    big concern for you or did that play a key role in the

10   complaint in bringing these charges?

11       A    No.   No.   I mean it's -- well, the report says

12   how I feel and what I found.   I mean the thought of him

13   threatening to sue isn't unusual that somebody would

14   threaten to sue us so it didn't have a bearing on why this

15   investigation was conducted.   The actions were what made

16   this investigation occur.

17       Q    And if the weapons had been stolen could those

18   have been used as evidence?

19       A    I don't see how the could be, or if they found

20   the Tech-Nine.   I mean I'm not an attorney but if you

21   found the Tech-Nine, I mean, I don't see how you could use

22   it in court as evidence that you could bring forward

23   because, you know, my views as a lieutenant with this

24   department it's unlawful possession of the evidence.

1      Q     Thank you.

2      MR. SCALES:   I'd like to have *State v. Lacy* admitted

3 as Dodson's Exhibit Number 2 if I could please.

4                    (Whereupon, Dodson Exhibit

5                    Number 2 was marked for

6                    identification.)

7             RECROSS EXAMINATION

8     BY MR. SCALES:

9      Q     Lieutenant Colbert, are familiar with the

10 decision of state supreme court -- West Virginia State

11 Supreme Court case of *State v. Lacy*?

12      A     Not by name.

13      Q     When did you go to the academy?

14      A     1997, graduated in '98.

15      Q     Okay.   Well, this was decided in 1996.

16      A     Okay.

17      Q     A 1996 decision so it would have been fresh off

18 the presses about that time.

19      A     Yes, sir.

20      Q     Are you familiar with it at all about whether or

21 not you can even -- what the evidence that can be educed

22 as a result of a protective sweep?

23      A     No, I'm not but I don't believe this was a

24 protective sweep.   Maybe it defines protective sweep that

1  would help me --

2       Q    Well, you've already testified that a full blown

3  search is what you called it, nobody else has called it.

4  Apparently, Sergeant Dodson's not going to call it that.

5       So, if it wasn't a full blown sweep and if it is

6  as I believe it was a search for weapons and possible

7  accomplices for the protection of law enforcement officers

8  and citizens what evidence could he have used if he'd have

9  found the Tech-Nine?  Are you telling me it's your opinion

10  he couldn't use the Tech-Nine as evidence?

11       A    No, I don't believe he could have used it in

12  court.  I mean, I'm not an attorney, but to me he's

13  unlawfully searching that house to that degree.

14       Q    But doesn't he have probable cause if he has a

15  complaining witness who's there on the sidewalk outside

16  the house saying the guy pointed and discharged a

17  Tech-Nine weapon at me?  Isn't that probable cause?

18       A    I believe he should have checked the house for

19  any injured people, anybody that could harm the officers,

20  anybody that could be destroying the evidence, secure it

21  and get a search warrant and --

22       Q    Come back later.

23       A    Absolutely.  Secure it; leave a couple guys

24  there; secure a perimeter go; get a search warrant and

1    come back with a magistrate's signature and secure any all

2    evidence that apply.

3        Q    Okay.   That's all I have.

4        MS. GROVE:   Can I have a quick second to point out

5    Syllabus Pt. 8 to the court?  Syllabus Pt. 8 says, "A

6    protective search is defined as a quick and limited search

7    of the premises for weapons.   Once an officer has

8    individualized suspicion that a dangerous weapon is

9    present and poses a threat to the wellbeing of himself and

10   others."

11                    REDIRECT EXAMINATION

12       BY MS. GROVE:

13       Q    Lieutenant Colbert, do you believe that searching

14   under couch cushions, do you think that a suspect could

15   hide there and po se a threat to an officer?

16       MR. SCALES:   I object to that question again because

17   if you look at page 732 it's the same thing I talked about

18   earlier.   What it looks like on 20-20 hindsight is one

19   thing.   The issue is what did he know at the time when he

20   made the decision.   It says on page 732, "The existence of

21   a reasonable belief should be analyzed from the

22   perspective of police officers at the scene rather than

23   from your 20-20 vision of hindsight.

24            How can this gentlemen know what was going

**Joint Appendix Pg. 280**

```
 1   through Sergeant Dodson's mind after he was there and had

 2   spoken to the complaining witness, or had received

 3   information from that, was sitting there in front of the

 4   gentleman and I think the record's going to show that he

 5   was cursing at him and was belligerent, was drunk and did

 6   not know whether -- who all was in the house and how many

 7   was there?   How can this gentleman know at this point

 8   from 20-20 hindsight whether it was a good or not.

 9          The issue's got to be when Sergeant Dodson's

10   called upon to testify what he believed at the time and

11   whether what he believed was reasonable at the time he had

12   to make the decision and a split second decision.

13      MS. GROVE:  I'll withdraw the question.

14      COMMISSIONER LEMASTER:  Do you have any other

15   questions for the witness?

16      MR. SCALES:  No, sir.

17      MS. GROVE:  I'd like to call Corporal Edwards at this

18   time.

19      COMMISSIONER LEMASTER:  Corporal Edwards.

20   Whereupon,

21                    TRACY EDWARDS

22   called as a witness, having been first duly sworn,

23   was  examined and testified as follows:

24                 DIRECT EXAMINATION
```

**Joint Appendix Pg. 281**

```
 1        BY MS. GROVE:

 2        Q    Could you please state your name for the record?

 3        A    Tracy Lynn Edwards.

 4        Q    And you're employed by the Jefferson County

 5   Sheriff's Department?

 6        A    Yes.

 7        Q    How long have you been so employed?

 8        A    Approximately four years.

 9        Q    And what's you current position with the

10   sheriff's department?

11        A    Investigations.

12        Q    Were you present on June 13, 2008 at 229

13   Allstadts Hill Road?

14        A    Yes, ma'am.

15        Q    Okay.  And did you witness the search of the

16   suspect's home at that time?

17        A    Yes, ma'am, from the outside.

18        Q    How long do you estimate the search lasted?

19        A    Approximately 30, 40 minutes.

20        Q    Could you see from where you were the areas of

21   the home that were being searched?

22        A    Just the living area.

23        Q    How thorough was the search of what you could

24   see?
```

1    A    Very thorough.

2    Q    Could you provide more detail?

3    A    Appliances were being moved, cushions being

4 picked up off the furniture, items being removed from the

5 home.

6    Q    Okay.  Did you question the search on that

7 evening?

8    A    Yes, ma'am, I did.  I was standing outside and

9 when Deputy Kilmer came walking from out of the residence

10 I pulled him to the side and I said, "Did you get this

11 guy's consent to search his house?"  And he said, "No."

12 And I said, "I think we should stop and get a search

13 warrant then," and then he went inside the house.

14    Q    Did you believe anyone to be in danger once the

15 suspect had been secured?

16    A    No.

17    Q    Was their any allegation that there was someone

18 else in the house?

19    A    No.

20    Q    Did the victim indicate anyone else in the house?

21    A    No.

22    Q    So you brought it to the attention of Sergeant

23 Dodson that evening, or did you speak to someone else?

24    A    I spoke to a Deputy Kilmer and that was it while

1    on the scene there.

2        Q    Did Deputy Kilmer come back and indicate that he

3    had spoken to Sergeant Dodson?

4        A    He did not indicate to me who he had spoken to

5    inside of the house.  When he came walking out of the

6    house before we had gone to the side again as he was

7    walking he was saying we got -- he didn't say exigent but

8    that's the word he was meaning to say.  He mispronounced

9    it but that's the word he was meaning to say.

10       Q    What was the word?

11       A    Exigent circumstances.  I said, "I don't think

12   so."

13       Q    Why did you call Lieutenant Colbert that night?

14       A    Because I'm already being sued in circuit court

15   and in federal court and I don't want to have nothing to

16   do with any more lawsuits.

17       Q    Did you have a search warrant in those cases that

18   you are being sued?

19       A    Yes, ma'am, I did.

20       Q    Can you tell me your understanding of exigent

21   circumstances?

22       A    Yes, ma'am.  Someone's life being in danger.  A

23   good example would be your dispatched for a domestic call,

24   you arrive on scene, nobody's answering the door and you

start hearing somebody scream from the inside.  You can

pretty much use better judgment, assume that someone's

life may be in danger if you believe in that particular

instance, after a suspect's been detained if someone else

is in there destroying evidence.

Q    Did you believe that another suspect might be

hiding under the couch cushions?

A    No, ma'am.

Q    Do you believe that exigent circumstances

justified the search that you witnessed that night?

A    No, ma'am.

Q    If an officer wanted to search for the weapon

that was allegedly used which was a Tech-Nine -- do you

know what a Tech-Nine is?

A    My understanding is a smaller weapon not quite as

big as a rifle which I seen them carrying out of the

house.

Q    If you had wanted to search for a Tech-Nine what

do you believe the appropriate procedure would have been?

A    I would have stopped and got a search warrant

immediately after he was detained.

Q    Would you have searched the residence without a

search warrant?

A    Absolutely not.

1      Q    And again, did you feel that there was any -- a

2    reasonable belief that any officer's life was in danger

3    that evening after the subject was secured?

4      A    No.

5      Q    Thank you.

6      MR. SCALES:  Can I have this marked?  I guess this

7    would be Dodson Number 3.

8                              (Whereupon, Dodson Exhibit

9                              Number 3 was marked for

10                             identification.)

11                    CROSS-EXAMINATION

12     BY MR. SCALES:

13     Q    Now, Corporal Edwards that appears to be a

14   lawsuit filed in the United States District Court for the

15   Northern District of West Virginia not circuit court where

16   you were sued for violation -- allegedly for the violation

17   of a person's civil rights in the execution of a search

18   warrant, is that right?

19     A    I have two pending lawsuits, one in circuit court

20   and in the district court.

21     Q    For violations of search warrants?

22     A    That is correct, violation of rights of those

23   subjects.

24     Q    So the sheriff wrote in a letter on July 15,

1    2008, "As law enforcement officials and managers we must

2    remain cognizant of the civil rights of our citizens and

3    must assure that those privileges are never violated."

4          Now, how many disciplinary actions investigations

5    have been initiated against you by the sheriff as a result

6    of the two lawsuits?  How many?

7       A    I haven't spoken to anybody about these cases

8    except my attorney.

9       Q    So there's been no investigations of you for your

10   alleged violation of a citizen's right for which there's

11   lawsuits pending only my client, Sergeant Dodson, who

12   allegedly did an illegal search according to what you

13   said, is that right?

14      A    Yes.

15      Q    Now, let's go back to your testimony, Corporal

16   Edwards.  Were you on duty that night?

17      A    Yes, I was.

18      Q    And were you in uniform?

19      A    Yes, I was.

20      Q    Where were you during the time in which the

21   subject was subdued and handcuffed?

22      A    I was on what would be considered, I guess, the

23   rear side residence.

24      Q    The back side of it.  So you don't know what was

1    going on in the front side of the residence at that time,

2    did you?

3        A    And I never testified to ever knowing anything

4    going on in the front side of the residence.

5        Q    Well, how can you see where the living room is

6    from the back of the house?

7        A    That was after the subject was subdued and

8    handcuffed.

9        Q    So you don't know then what was being said to

10   Sergeant Dodson at the time he was arresting this

11   gentlemen, correct?

12       A    Correct.  Only what the suspect was telling me

13   when he was speaking.

14       Q    Was he drunk?

15       A    He appeared to be not mentally stable.

16       Q    Not mentally stable?

17       A    Correct.

18       Q    Okay.  Let's go back to your statement that

19   Lieutenant Colbert took from you and you understand now

20   that this whole investigation started as a result of

21   Sergeant Dodson's allegations that you told the assailant

22   that he should sue because this was an illegal search?

23   You understand this is what started the investigation of

24   Sergeant Dotson?

1      A    His complaint filed against me, yes.

2      Q    Of course you stated that you never said that to

3 this unstable victim, did you?

4      A    Correct.

5      Q    Okay.  Let's go back to what you said you did.

6 And you understand that Sergeant Dodson's testified that

7 the man was drunk.  He was cursing him.  He was

8 uncooperative.  Was saying "F" this, "F" that and he was

9 obstructing an officer.  You understand that's what

10 Sergeant Dodson has said?

11     A    I don't know what Sergeant Dodson has said.

12     Q    Okay.  But your statement -- and I'm looking on

13 page which would be page 3.  It says, "At no time did I

14 direct, advise, or suggest to the subject he should sue

15 anyone or any department.  I did not believe the search

16 was appropriate at the time.  However, I did not advise

17 the subject of this.  I cannot speak on whether or not the

18 subject overheard mine and Deputy Kilmer's conversation

19 because I am not him and would not be able to state

20 whether or not he heard me or not."

21          Is that what your conversation was with the

22 subject?

23     A    That is what I said, that is correct.

24     Q    Let's go on down here.

1      MR. FORMAN:  Sir, what section are looking at?

2      MR. SCALES:  Oh, I'm sorry.  It's tab -- it would be

3  Tab E.  I apologize, the third page.

4      BY MR. SCALES:

5      Q    Let's go down to the one, two, three, four, five.

6  It says, "After leaving the scene I notified my direct

7  supervisor, Lieutenant Colbert, and explained the incident

8  and gave my opinion.  I told Lieutenant Colbert that I did

9  know that he was screaming lawsuit and it could become a

10  problem later."

11      "I also explained to Lieutenant Colbert I did not

12  know what occurred at the front.  I did not know what

13  occurred at the front the officers never advised us in the

14  rear they were entering the front but I believe they

15  conducted an illegal search and search warrants should

16  have been obtained."

17      Now, where it says in here that you saw them in

18  the front opening up pillows, pulling pillows and

19  cushions?

20      A    You may be confused.  I'm not talking about what

21  occurred in the front.  I'm talking about after the fact,

22  after this suspect was secured and everybody was inside

23  the house searching the premises.

24      Q    Okay.  So, you don't know --

59

1    A    I never said I knew what occurred in the front

2 ever at any time.  I was in the rear and I am only

3 testifying to what I saw after the suspect was already

4 detained and handcuffed and they had already established

5 there was nobody else in the house and there was no

6 evidence being destroyed.  They continued searching and

7 that's what I'm talking about.  Over a 30 minute, 40

8 minutes they were in there searching that house and that's

9 what I witnessed them -- there was several officers inside

10 the house and I could see the living room from where I was

11 standing.

12    Q    And were you very upset about what you thought

13 was an illegal search?

14    A    No, I didn't -- I voiced my opinion to Deputy

15 Kilmer and said, "I think we should probably stop and get

16 a search warrant," and when he came back out he said, "We

17 don't need it.  We got exigent circumstances."  So I just

18 left it alone.  It's not my call.

19    Q    Well, you were so concerned that you called your

20 commanding officer Lieutenant Colbert that same night and

21 explained to him why you objected to it; did you not?

22    A    Yes, I did.

23    Q    Now tell me if you thought it was so bad why

24 didn't you file a formal complaint?

**Joint Appendix Pg. 291**

1    A    Why would I file a formal complaint?

2    Q    Well, apparently the sheriff considers this to be

a very serious offense so much the he believes that my

client, Sergeant Dodson, should be demoted for it.

5    A    It's not my position to reprimand Sergeant

Dodson.  I'm a corporal and he's a sergeant.  It's not my

position to reprimand a sergeant, that is for his

supervisor to reprimand him not me.  It's not for me to

argue with him and tell him I disagree.  And if you didn't

know me and Sergeant Dodson are not on speaking terms and

had not spoken for a very long time do to previous

incidences.

13    Q    Well, my question for you though is when you

observe an officer who you believe has improperly

performed his duty --

16    A    I'm not going to embarrass an officer in front of

people on scene and correct him and say you are doing

wrong because I am trying to protect -- and I was trying

to calm the suspect and talk him out and talk him down.

He was very irate, screaming, "I work for attorneys.

They're going to have a field day for this.  You're

violating my rights.  I'm standing out here in my

underwear."

24    And I said, "You got boxer shorts on.  You're

1   fine.  I understand you're upset.  You understand why

2   you're in handcuffs.  It's only for our safety.  Put

3   yourself in our position just for a second," and he calmed

4   down.

5        Q    I think you're missing my question.  There is a

6   procedure which you have if you have a complaint against

7   another officer, another deputy, that you can go through

8   chain of command and file a formal complaint; can you not?

9        A    Yes, you can.

10       Q    Okay.  And that's not a public reprimand.

11       A    That's not what I do.  I don't file formal

12  complaints on other officers.

13       Q    You don't have a duty to do that?

14       A    Why would I intentionally try and get somebody in

15  trouble?

16       Q    The point is -- well, let's --

17       A    Regardless if I like someone or I didn't I'm not

18  going to intentionally try to get another officer in

19  trouble, that's just not me.

20       Q    So the answer to my question is you did not file

21  a formal complaint against Sergeant Dodson?

22       A    No, I did not.

23       Q    And you will agree your relationship with

24  Sergeant Dodson professionally has not been very good for

1    the past year, is that fair?

2        A    That's fair.

3        Q    Did you ever tell Deputy Boyce that you intended

4    to hire a lawyer and file charges against Sergeant Dodson?

5        MS. GROVE:   That's irrelevant to this case which

6    again is about the search.

7        MR. SCALES:   Well, that's the only question I'm going

8    to ask her and it may -- it shows her prejudice for bias,

9    that's the only question I'm going to ask her about it.

10       BY MR. SCALES:

11       Q    Did you state that to Deputy Boyce that you were

12   going to hire a lawyer and file charges against sergeant

13   --

14       COMMISSIONER LEMASTER:   Give us second.  There's

15   been an objection.  Let us confer.

16       MR. SCALES:  I apologize.

17       COMMISSIONER LEMASTER:  Let's go off record.

18                              (Whereupon, the commissioners

19                              left the hearing room to

20                              confer.)

21       COMMISSIONER LEMASTER:  Back on the record.

22       COMMISSIONER CODERRE:  In order for us to maintain a

23   manner of consistency earlier we agreed to -- we would

24   recognize that there's a bad relationship here.  We don't

1   need to know the details of the relationship.  We

2   recognized earlier that there's certainly some friction

3   between the two officers, taking kind of note that

4   friction exists.

5         However, we are here for the purpose of

6   determining the legality of the search.  We don't need to

7   get into the specific questions about the relationship and

8   the he said, she said, but we will take note of it as we

9   did earlier and just stick to the matter of the complaint.

10       MR. SCALES:  I'll move on.

11       BY MR. SCALES:

12       Q    Corporal Edwards, can you tell -- did you tell

13  Lieutenant Colbert when you called him later on that

14  evening that Sergeant Dodson was the senior sergeant on

15  duty that night?

16       A    I don't recall if I told him that or not.  I

17  might have.

18       Q    You don't recall?

19       A    No, I do not.

20       Q    I'd like to direct your attention back to your

21  statement the second page of Tab E.  In the middle of the

22  page it says, "The subject, who I guess was the detainee,

23  the arrestee, then again said he wanted badge numbers and

24  kept talking and I asked the subject if I knew what

1  exigent circumstances was."

2        Can you tell me why you'd ever be having any

3  conversation with an individual that had just been

4  arrested for obstructing about what exigent circumstances

5  were?

6     A   As I said earlier when Deputy Kilmer walked out

7  from out of the residence before he had pulled me to the

8  side he had voiced that pretty loudly and I used that as

9  an excuse why we were in there searching the house, that's

10  what I explained to him.  Again, I was just trying to

11  protect the officers in our department and even though I

12  didn't agree with that that's what I told him.

13     Q   It says, "I don't know what his reply was.

14  However, I then explained what it was to the subject and

15  told him we were operating under exigent circumstances."

16        Can you tell me, Corporal Edwards, why would you

17  be having such a conversation with --

18     A   I just explained 'cause when Deputy Kilmer walked

19  out of the house he said it loudly before he pulled me to

20  the side and I told him that's what we were -- that's what

21  we were doing.  We were operating under exigent

22  circumstances that's why we were searching.

23     Q   And you're telling me today under oath you didn't

24  tell this gentleman to file a lawsuit?

```
1        A    Absolutely not.

2        Q    And you didn't believe that what you were giving

3   him was legal advice.

4        A    No.

5   MR. SCALES:   That's all I have.   Thank you.

6   MS. GROVE:   Just a few follow up questions.

7                   REDIRECT EXAMINATION

8   BY MS. GROVE:

9        Q    Corporal Edwards, let's go back to this lawsuit

10  that's recently been filed.   Could you explain to the

11  Board the circumstances of this lawsuit?

12       A    Yes, ma'am.   At some time I was contacted by my

13  department.   I don't recall who it may have been

14  Lieutenant Colbert.   It may have been Deputy Fletcher.

15  Investigators from Virginia were contacting me.   They

16  stated that a subject had printed up pornographic

17  materials at their local Wal-Mart.   Deputy Fletcher went

18  down there to obtain the photographs.

19       What occurred was a man was printing up these

20  photographs in the Wal-Mart at a kiosk on his thumb drive.

21  He went up to the counter but he had already wrote on the

22  envelope and stuffed the photograph in his own envelope

23  and when the clerk said, "I need to see the photographs

24  before you pay, sir."
```

1    He got rude with her and said, "These are my

2  photographs.  I don't want you to see them."  They said,

3  "Well, it's policy, you know, that we see the photographs

4  before you pay to make sure they're not nudity photos or

5  copyrighted material."  He said, "Well, I don't want you

6  to see it and I'm not paying for them."

7    He threw the package down on the table, I guess,

8  or on the counter there and they went to shred the photos

9  and they observed what they believed to be a five or six

10  year old little girl next to the genitalia area of a man

11  and they were extremely concerned.  They contacted law

12  enforcement.  The Virginia authorities responded to the

13  scene.  They also became extremely concerned.  Their

14  investigator looked at it and they forwarded it down to

15  me.

16    They tracked this subject down through Wal-Mart.

17  He checked out through the check out aisle and used his

18  credit card and they were able to obtain his identity and

19  his residence which is here in Jefferson County.  After

20  they brought the information to me I started doing a lot

21  of investigating his background work up; who he was; where

22  he lived; if he had a child that age; if this could

23  possibly be a neighbor's child.

24    At no time did anybody who looked at that

1   photograph, which is probably 40 people, believe it was

2   anything other than a five to six year old little girl in

3   this photograph, including the magistrate who signed the

4   warrant.

5        A search warrant was obtained after receiving

6   statements and we were trying to do a search warrant for

7   the man's clothing that he wore when he was in Wal-Mart

8   and the thumb drive to see which these paragraphs were on

9   and what other photographs may be present.

10       We did a search warrant.  He was not at his

11   residence.  He had went up to his cabin where he said he

12   deleted all the photographs off his thumb drive.  They

13   came in.  They were interviewed.  He explained to me that

14   this was a Filipino woman, and his wife was there with

15   him, said this is a Filipino woman that he as sex with

16   when he's visiting the Philippines and that she's a 35 --

17   34-35 years old.

18       At this time I realized that it was a possibility

19   that this is all occurring in another country.  There's no

20   real way for me to prove that this woman is 35 or 6, or if

21   this is her or her daughter or not and at that time no

22   further charges were filed.  We had a lengthy interview in

23   which the Belotti's seemed satisfied and then I was

24   notified later that they believed the search was unjust

1    because it was 35-year old woman.

2        Q    But you had a search warrant at the time?

3        A    That is correct.

4        Q    Is Sergeant Dodson your supervisor?

5        A    No, he's not.

6        Q    Was he at any time your supervisor?

7        A    Yes.

8        Q    Okay.  Is it common -- was he your supervisor at

9    the time of the incident on June 13, 2008?

10       A    No.

11       Q    But he was your supervisor at one time?

12       A    Yes, ma'am.

13       Q    Is it general practice for subordinates to write

14   up their supervisors in the sheriff's department?  Have

15   you ever known that to happen?

16       A    No, I've never known another officer to file a

17   formal complaint against another officer.  I thought we

18   just, you know, if someone had a problem with me I'd

19   assume that they would come to me and discuss it with me.

20       Q    I just want to go back to the event of that

21   evening.  When you first arrived on the scene where were

22   you in the house -- where you were on the scene?

23       A    When I pulled in I pulled -- Sergeant Sell asked

24   me to take his position on the back of the residence and I

1    did with a Harpers Ferry unit and we were the only two

2    back there.  Then the next thing I know they said they had

3    the guy.

4        Q    And then what happened after that?  Where did you

5    go after --

6        A    I walked around up to the front of the residence

7    where I was -- if I was here the doorway to the front of

8    house would be like maybe just right past that wall.

9    (Indicating.)  The doorway was open and I just had a

10   direct view of the front of the house.

11       Q    And you testified that the defendant was irate

12   and screaming at you?

13       A    Yes.

14       Q    But did you at any time fear for your safety or

15   the safety of the other officers?

16       A    No.

17       Q    Okay.  Thank you.

18                    RECROSS EXAMINATION

19   BY MR. SCALES:

20       Q    He was handcuffed, wasn't he?

21       A    Yes.

22       Q    That's all I have.

23                    REDIRECT EXAMINATION

24   BY MS. GROVE:

1      Q    And he was handcuffed while they were searching

2  the house, is that correct?

3      A    That's correct.

4      Q    Thank you.

5      COMMISSIONER LEMASTER:  Are you all finished?

6      MS. GROVE:  I'm finished, yes.  I'd like to call

7  Deputy Kilmer at this time.

8      COMMISSIONER LEMASTER:  Ma'am, a matter of

9  housekeeping.  Did you want to enter this.

10     MS. GROVE:  I did want to enter it into evidence.

11     COMMISSIONER LEMASTER:  I think we ruled on it

12  earlier but you never finished admitting it.

13                         (Whereupon, Sheriff's Exhibit

14                         Number One was marked for

15                         identification.)

16  Whereupon,

17                    GLEN W. KILMER

18  called as a witness, having been first duly sworn,

19  was  examined and testified as follows:

20                  DIRECT EXAMINATION

21  BY MS. GROVE:

22     Q    Could you please state your name for the record?

23     A    Deputy Glen W. Kilmer.

24     Q    Okay.  Are employed by the Jefferson County

1    Sheriff's Department?

2         A    Yes.

3         Q    And how long have you been employed?

4         A    Almost four years.

5         Q    Okay.  What's your current position?

6         A    Deputy.

7         Q    Were you on duty the evening of June 13, 2008?

8         A    Yes.

9         Q    Did you participate -- did you respond -- I'm

10   sorry to 229 Allstadts Hill Road that evening?

11        A    Yes, I believe that was the address.

12        Q    You think that was the address?

13        A    Yes, I did.

14        Q    Okay.  Did you participate in the search of the

15   subject's house that evening?

16        A    I did.

17        Q    Okay.  Can you tell the board what type of areas

18   you searched that evening?

19        A    Basically, it was, I guess, a two room apartment

20   and we just didn't really move anything around.  We just

21   went in and looked for the possible weapon used and looked

22   for any other people that may have been in there injured

23   or not.

24        Q    Did anyone open any drawers or cupboards?

```
 1        A    I don't remember.  To be honest with you most of

 2   the time I was outside looking for casings and looking

 3   around the residence because the supposed victim said that

 4   he may have stashed a gun in the bushes.

 5        Q    Did you find any casings or the gun?

 6        A    I did not, no.

 7        Q    Okay.  Did the victim indicate that there was

 8   anyone else in the house?

 9        A    He didn't tell us there was, no.

10        Q    Did you find the rifles that evening?

11        A    No.

12        Q    Did you run the numbers on the rifles?

13        A    I did.

14        Q    Who found the rifles?

15        A    I have no idea to be honest with you.

16        Q    Were you told to run the numbers on the rifles?

17        A    Yes.

18        Q    By who?  Who instructed you to run the numbers?

19        A    The sergeant.

20        Q    Sergeant Dodson?

21        A    Yes.

22        Q    Okay.  I have no further questions at this time.

23                     CROSS-EXAMINATION

24   BY MR. SCALES:
```

1    Q    Deputy Kilmer, I'm Mike Scales.  I represent

2  Sergeant Dodson.

3    A    Yes, sir.

4    Q    Now, on the evening of June 13, 2008, who was

5  your immediate supervisor?

6    A    Sergeant Dodson.

7    Q    So did you arrive at the scene on Allstadts'

8  Drive before or after Sergeant Dodson?

9    A    Before.

10    Q    And did you have any conversations -- was there a

11  complaining witness who was present?

12    A    Complaining witness?

13    Q    Yes, sir.

14    A    You mean the possible victim?

15    Q    Yes, sir.

16    A    Yes.  I didn't talk to him but, yes, another

17  deputy was talking to him and relaying the messages back

18  to us.

19    Q    Did you receive any message about whether or not

20  there was a weapon which matched the description of a

21  Tech-Nine?

22    A    Yes, actually he said it was a Tech-Nine.

23    Q    The complaining witness told you that?

24    A    Yes.

```
 1      Q    Or told the other deputy and relayed to you.

 2      A    Yes.

 3      Q    And was that weapon discharged?

 4      A    He said he was fired at twice.

 5      Q    From what you learned were you convinced or were

 6  you -- that that actually occurred after you saw this

 7  witness or was the other deputy assured that happened?

 8      A    Yes.

 9      Q    Tell me, the scene, what is beside this

10  apartment?

11      A    Beside it?

12      Q    Yes, sir.

13      A    Actually, it's a large house and I guess he only

14  had the two rooms downstairs that he lived in.

15      Q    Were there other occupants in other parts of the

16  house?

17      A    I don't believe there was.  I'm not sure.

18      Q    Were you able to tell from the outside?

19      A    All the lights were off in the rest of the house

20  I can say that.

21      Q    What is beside the house?

22      A    Woods.  I think there's a shed maybe.  There

23  might have been a shed.  I don't remember.

24      Q    Is there a flea market close by?
```

```
1        A    Oh, yeah.  Yeah, there is.  It's right beside the
2   flea market.
3        Q    And do you recall where there -- was any other
4   persons at the flea market?
5        A    Yes, there was.
6        Q    Okay.  And how many were there do you have any
7   idea?
8        A    I went over there and talked to a couple of them.
9   I talked to I think two, a lady and a gentleman.
10       Q    From your own recollection approximately how far
11  was it from the front door of the apartment where you were
12  -- where the accused was holding out to the flea market?
13       A    Maybe a hundred yards.
14       Q    Is that within range of a Tech-Nine?
15       A    Oh, yes.
16       Q    And how far is the front door to U.S. Route 340?
17       A    Maybe a few, 150-200 yards.  Go right through the
18  flea market you're at 340.
19       Q    Okay.  And were there other people out on the
20  street that evening?
21       A    You mean on 340?
22       Q    No, on Allstadts Drive?  Were there other --
23       A    Well, yes there was.  There was a -- I did not
24  speak to them but there was a neighbor and somewhere
```

1    somebody said that they had spoke to the neighbor's child

2    and that he did hear two pops and saw a guy walking

3    through his yard holding something that looked like a gun,

4    but I didn't speak to him personally.  I honestly don't

5    remember who it was, but I remember them saying that.

6         Q    So you did have that report when you got there?

7         A    It was little while after I think.  I don't

8    remember when it was.

9         Q    Was it before or after the accused was detained,

10   if you can recall?

11        A    I honestly don't recall.

12        Q    Did you have any conversations with the accused,

13   I think his name was Mr. Hoffman-Smith, after he was

14   detained?

15        A    I basically just asked him questions like did he

16   shoot at this guy.  Simple questions that we'd ask

17   everybody in a case like that and he answered, "No. No."

18        Q    Was he belligerent?

19        A    Yes, he was.  He was belligerent the whole time

20   we were there.

21        Q    Was he cursing?

22        A    Yes.

23        Q    Would you consider him to be dangerous?

24        A    At the time, yes, I would.  He was very

1   intoxicated and who knows what else he was on.

2        Q    Did you overhear any conversations between the

3   accused and Corporal Edwards?

4        A    No, I did not.

5        Q    Did you ever hear Corporal Edwards tell him to

6   sue?

7        A    No, I did not.

8        Q    Did you have any conversations with Corporal

9   Edwards about whether or not the search that was taking

10  place was lawful?

11       A    Yes, I did.

12       Q    What did she tell you?

13       A    I walked outside and she pulled me aside and said

14  that -- well, she asked what we were doing and I told her

15  we were looking for the weapon and she basically said,

16  "No, no, no, that's an illegal search.  You need to tell

17  whoever's in charge they need to get out of there."

18       Q    Tell me as best you can recall exactly what

19  Sergeant Dodson told you to do when you went inside the

20  house.

21       A    What do you mean what he told me to do?

22       Q    Yes, sir.  And what I'm trying to get to is what

23  was the scope of what the search was supposed to be.

24       A    Oh, we were just -- basically, we were going to

78

 1    make sure nobody else was in there and to try to find the
 2    weapon that was possibly used.
 3        Q    And you only went in the two rooms that you
 4    talked about?
 5        A    Yes.
 6        Q    Did you open up any drawers?
 7        A    I did not and like I said before I wasn't in
 8    there the whole time so while I was in there nobody opened
 9    up any drawers or anything.
10        Q    Okay.  Now, there's been some testimony about two
11    I think it was rifles that were found.  Did you see those?
12        A    Yes, they were laying on the bed when I walked
13    in.
14        Q    They were laying on the bed?
15        A    Uh-huh.
16    THE COURT REPORTER:  Was that a "yes"?
17    THE WITNESS:  Yes.
18    BY MR. SCALES:
19        Q    You have to be verbal or she can't take it down.
20    She can't take a head nod or "uh-huh."  So did those
21    rifles ever leave the house?
22        A    Not that I can recall.  They weren't taken
23    anywhere.
24        Q    Did Sergeant Dodson obtain the registration

1    suspect was in handcuffs?

2         A    Yeah.

3         Q    And he was left outside with Corporal Edwards

4    alone?

5         A    Yes, he was I believe.

6         Q    That's fine.  Do you recall a conversation that

7    you had with the victim where he said there might be

8    marijuana in the house?

9         A    Yeah, he said that he was on drugs and all kinds

10   of stuff.

11        Q    Okay.  And do you recall telling him that -- do

12   you recall what you may -- what the legality was if you

13   found marijuana if you could search for that?

14        A    We can't search for that.

15        Q    You told him that was not within the --

16        A    I told him if we had found -- when I talked to

17   the victim I told him that's not the reason we're there

18   and if we find it we have to back out and get a search

19   warrant, yes.

20        Q    But you found rifles that were also not part of

21   this.

22        A    Well, the rifles were there.  The victim said

23   Tech-Nine and then somebody went and talked to the

24   neighbor who said they heard two pops and the guy was

1   walking through here carrying something like this

2   (indicating) walking through the yard.  So I mean the

3   rifles could have been used.  The victim specified a

4   Tech-Nine.

5       Q    You said the rifles were on the bed when you got

6   in the house?

7       A    Yeah.

8       Q    Do you know if they were there the whole time?

9       A    I have no idea.

10      Q    Okay.  Thank you.

11                  RECROSS EXAMINATION

12  BY MR. SCALES:

13      Q    Deputy Kilmer, you put your arms like this

14  (indicating.)  Can describe how you have this for the

15  record 'cause when we get a record back we're not going to

16  be able to see how your hands where?  You made a position

17  of holding a rifle.

18      A    Well, that's the way it was described to me while

19  we were there.  Apparently, it was an eight year old child

20  who told one of the other officers that they heard two

21  pops and the guy was walking through here like he was

22  carrying a gun, walking through the yard like he was

23  carrying a gun.

24      Q    A rifle or shot gun not a Tech-Nine.

**Joint Appendix Pg. 312**

1    A    He just said walking like this (indicating.)

2                    REDIRECT EXAMINATION

3    BY MS. GROVE:

4    Q    Well, can you describe the witness who provided

5    that information?

6    A    No.  Honestly, I don't even remember the officer

7    that talked to him, but I know it was brought to my

8    attention so.

9    Q    All right.  Thank you.

10   MS. GROVE:  I don't have any further questions.

11   MR. SCALES:  I don't having anything.  Thank you.

12   COMMISSIONER LEMASTER:  You may step down.

13   MS. GROVE:  Can we check on the availability of one

14   of our witnesses for a second?

15   COMMISSIONER LEMASTER:  We can take a break.

16                           (Whereupon, the hearing was

17                            recessed.)

18   MS. GROVE:  I'd like to call Sheriff Boober as my

19   next witness.

20   Whereupon,

21               SHERIFF EVERETT W. BOOBER

22   called as a witness, having been first duly sworn,

23   was  examined and testified as follows:

24                    DIRECT EXAMINATION

83

1    BY MS. GROVE:

2        Q    Could you please state your name for the record?

3        A    Everett W. Boober.

4        Q    And you hold the position of elected sheriff of

5    Jefferson County?

6        A    That is correct.

7        Q    What did you do before you were the sheriff in

8    Jefferson County?

9        A    I was a police officer in Washington, DC for

10   21 years.  I served as chief of police in Ranson for nine

11   years and I was in private industry for approximately

12   three years before becoming elected to sheriff -- office

13   of sheriff in 2000.

14       Q    So you feel you have a good understanding of the

15   laws of search and seizure?

16       A    I believe so, yes, ma'am.

17       Q    Why did you ask Lieutenant Colbert to open this

18   investigation 2008-02?

19       A    The issue came up in the complaint filed by

20   Sergeant Dodson dealing with the chain of command and one

21   of the issues in that document that concerned me was the

22   search itself and in reviewing the document known as

23   2008-01 it appeared that proper procedures were not

24   utilized in the search of this person's residence.

**Joint Appendix Pg. 314**

1    Q    Were you aware of this before the investigation

2    2008-01?

3    A    No, I was not aware of it.  No, ma'am.

4    Q    After reviewing the investigation did you believe

5    that the search was lawful?

6    A    No, I did not and I do not now.

7    Q    Do you believe that it was justified under the

8    doctrine of exigent circumstances?

9    A    It was not proven to me that exigent

10   circumstances existed therefore my answer is no.

11   Q    Could you explain the doctrine of exigent

12   circumstances?

13   A    Very simply under emergency conditions the search

14   of any type takes place that someone's life is in

15   endangerment; there's a possibility of persons being

16   injured; whether evidence is being destroyed, but

17   certainly under emergency circumstances.

18   Q    What about a search incident to an arrest?  What

19   does that enable an officer to do?

20   A    Incident -- searches incident to arrest are those

21   searches which, for instance, a traffic stop along the

22   highway where a person is taken into custody is being

23   questioned and for your own welfare and protection the

24   person is frisked, if you would, that would be a search

1    incident to that stop.  And then incident to the arrest

2    immediately after the arrest is made, is culminated, the

3    person is secured that his person is searched to make sure

4    that he or she does not have anything on themselves to

5    injure themselves or the officers.

6        Q    Does it justify searching a residence for a

7    weapon that was allegedly used in a crime?

8        A    Not in my mind, no.

9        Q    What's the appropriate procedure to search a

10   residence for a weapon that may have been used in a crime,

11   or that was allegedly used in a crime?

12       A    If you're referencing this particular situation

13   the appropriate manner in which it should have been

14   handled was to check for any victims that were in the

15   house itself; whether there was anybody in there, and my

16   thought as I was reading the document if there was

17   somebody else in there and there was a Tech-Nine involved

18   that that person didn't have the Tech-Nine in his or

19   possession; and the destruction of evidence.

20            Once the -- once they made this walk through, if

21   you would, to make sure that their lives weren't in

22   endangerment; there was no evidence being destroyed; there

23   were no victims lying on the floor that had been injured

24   however to depart and secure the -- obviously, the

1    probable cause would lead -- what they had was probable

2    cause would lead to the issuance of a search warrant of

3    the premises.  There was certainly no reason they couldn't

4    have secured the perimeter as it was in the absence of any

5    of the things that I've just talked about.

6        Q    Are there possible repercussions that an unlawful

7    search could have for your department?

8        A    Well, there certainly are.  Obviously, it's

9    contrary to our rules and regulations and it's contrary to

10   the Fourth Amendment of the Constitution.

11       Q    Do you believe that Sergeant Dodson was justified

12   in instructing this deputy to run the numbers of the

13   rifles that were found through NCIC?

14       A    Let me ask you this first if one of those

15   weapons, one of those two weapons that were found -- and

16   first of all they didn't fit the description of a

17   Tech-Nine and I should have asked this before but if one

18   of those weapons had come up stolen, or hit on one of

19   those two weapons what Sergeant Dodson would have done

20   with the weapon, a weapon, two weapons that you were

21   taken.

22            Now whether they were seized or removed from the

23   premises or just merely taken from their place in the

24   residence, which they were found on the bed as I've heard

1    testimony here earlier, they were lying on the bed which

2    most likely is not their original location, that they were

3    taken from somewhere else and put on the bed itself so

4    some sort of a search took place.

5        Q    Do you believe that it was an abuse of NCIC to

6    run the numbers?

7        A    We could -- under NCIC Rules and Regulations that

8    if we improperly utilize NCIC to run anything through the

9    system including serial numbers of weapons, vehicles, and

10   other things, that we could be -- that right could be

11   taken away from us.  So we'd be removed from the use of

12   the -- the whole county -- the use of the NCIC procedure

13   process.

14       Q    And you think that this incident could justify

15   such a removal?

16       A    If it got into the right hands it surely would,

17   yes.

18       Q    Let me just ask you about your recommended

19   action.  Why do you believe a reduction in rank is the

20   appropriate penalty under the -- for Sergeant Dodson's

21   actions?

22       A    When I leave this building I entrust the

23   operation of this department in the hands of Sergeant

24   Dodson and other persons of equal rank to supervise, to

1    manage, to make those decisions on my behalf, that officer

2    that responsibility's entrusted in these individuals when

3    I -- upon my departure from the department.

4            In this case, I consulted with the prosecuting

5    attorney, Mike Thompson, and Lieutenant Colbert did so and

6    Mr. Thompson said that if --

7        MR. SCALES:  Objection.  Hearsay.  It's hearsay.

8        THE WITNESS:  It was reported to me through

9    Lieutenant Colbert.  May I proceed?

10       MR. SCALES:  What Mr. Thompson told you I believe is

11   hearsay.

12       MS. GROVE:  I don't think the formal rules of

13   evidence apply in an administrative hearing.

14       THE WITNESS:  We're in an administrative hearing this

15   is not a criminal proceeding and I don't think that rule

16   applies to hearsay applies to an administrative hearing.

17       MR. SCALES:  Well, I believe it does, but it's

18   substantial evidence is what has to come through here but

19   it's up to --

20       COMMISSIONER LEMASTER:  Well, why don't you just

21   state your objection for the record.

22       MR. SCALES:  That's what he says, it's hearsay.

23       COMMISSIONER LEMASTER:  That's your objection?

24       MR. SCALES:  Yes, sir.

1    COMMISSIONER LEMASTER:  Okay.

2    MS. GROVE:  He can proceed with testimony?

3    COMMISSIONER LEMASTER:  Yeah, limited.

4    BY MS. GROVE:

5    Q    You were talking about the ramifications why you

6    believe that the reduction in rank is an appropriate

7    penalty.

8    A    Right.  Once that Mr. Hoffman-Smith had been

9    removed from the residence and I think we have determined

10   that here today, that he was secure, custodial care if you

11   would and outside of the residence by a sworn deputy, and

12   that deputies, other deputies entered the residence

13   supposedly looking for a Tech-Nine but assuring that there

14   was no harm to them by other persons in the residence, no

15   persons who were injured, no evidence being destroyed,

16   what was the emergency at that point?

17        The room once it is secured by law enforcement

18   officers there's nobody else in there.  There's no threat.

19   There's no harm.  There's no potential for harm to any of

20   the deputies.  What is the emergency at that point?  You

21   have things under control.  All of us have been removed

22   from this room.  What is the threat?  Is the gun going to

23   -- if there's a gun going to go off by itself and injure

24   somebody in the premises?  What's the urgency at the point

1   in time?  What's the need to go ahead and search under

2   every crook and cranny looking for a Tech-Nine?

3           And I submit that probably some of the areas that

4   they searched a Tech-Nine wouldn't even fit into it, but

5   nevertheless under cushions and, you know, it's been asked

6   could a person be hiding under a cushion, or in a drawer,

7   or any other places that supposedly were searched.  Why

8   didn't Sergeant Dodson have the scene secured from the

9   outside, go down -- he had probable cause for sure for a

10  search warrant.  What was the urgency for him to have to

11  go in right now and search that residence?  I cannot

12  remove that from my mind, folks.

13      Q    Do you feel that you can trust him in a position

14  as shift supervisor?

15      A    Not at this -- not since finding out about this

16  situation, no, ma'am.

17      Q    Why?  If you could sum up for the board.

18      A    Well, he has been -- it's been testified to by

19  Lieutenant Colbert that he has received the training

20  through the state police academy.  He's got a certificate

21  in his folder stating that, and a letter, that he's

22  qualified to go out and do the things that law enforcement

23  officers do.

24          He's gone -- he went through the field training

program which is in addition to the training academy

itself and he doesn't appear to be able to apply logic

with what he has learned through the academy and other

forms of learning.

Q    Thank you.  No further questions at this time.

CROSS-EXAMINATION

BY MR. SCALES:

Q    Now, Sheriff Boober, what prior disciplinary

action has ever been taken against Sergeant Dodson?

A    Known that I know of.

Q    No there's never been any complaints filed

against Sergeant Dodson before this, was there?

A    No written complaints, no sir.

Q    No written complaints.  Nothing that involved

disciplinary or punitive action on your part, correct?

A    You are right, sir.

Q    Okay.  So you're asking that he be demoted, is

that right?

A    I am.

Q    Have you ever heard of the case of *State v.*

*Lacey*?  I gave a copy to everyone.  You heard of that

case?

A    I heard it earlier in your summation or your

presentation, sir.

1      Q    Are you familiar with Syllabus Pt. Number 6 on

2    page 722?  Let me read it to you and ask if you've ever

3    heard of it before.

4        "Neither a showing of exigent circumstances nor

5    probable cause is required to justify a protective sweep

6    for weapons as long as a two part test is satisfied.  An

7    officer must show there are specific articulable facts

8    indicating danger and this suspicion of danger to the

9    officer or others must be reasonable.  If these two "full

10   blown" were his words and not Deputy Kilmer.  Deputy

11   Kilmer just testified that they were looking for weapons

12   and the only thing that they found was I think they said a

13   pair of rifles that were left on a bed that they checked

14   the registration through NCIC, and then after they did

15   that they put them back.

16      MS. GROVE:  Actually, he's mischaracterizing Deputy

17   Kilmer's testimony which was that when he came in the

18   house he saw them on the bed.  He does not know what

19   happened to them before.  I'd like that corrected for the

20   record.

21      BY MR. SCALES:

22      Q    Whose testimony do you have in the internal

23   investigation report prepared by Lieutenant Colbert of who

24   actually performed the search, or whatever it was?

1   A   I was given information that a search was done,

2   sir.  Lieutenant Colbert will have to testify as to who

3   actually provided that.

4   Q   Well, he did.  He said, it was his words that it

5   was a full blown not anybody he interviewed and you heard

6   Deputy Kilmer's testimony I think they were just looking

7   for weapons.  So are you telling me you would change your

8   --

9   A   If they were looking for weapons what is the

10  endangerment?

11  Q   The endangerment there might have been a second

12  person inside that did have a weapon.

13  A   And, sir, we have -- let's get beyond that.

14  There was no second person in there.  They didn't find a

15  second person.  What are the exigent circumstances at this

16  point?

17  Q   We can't -- don't need exigent circumstances.

18  A   There's no persons in there to pull the trigger

19  on any other weapon that you may find, sir, you keep

20  harping on.  Where was the second person?  The second

21  person wasn't found.  So, where's the endangerment,

22  please?

23  Q   Well, that's what happened.  They closed it down

24  as soon as they didn't find anybody.

**Joint Appendix Pg. 324**

1          A    Oh, they did not.  No, sir, they did not.  They

2    continued to search.  Even after Deputy Edwards challenged

3    the validity of the search they continued to search.

4          Q    Who continued to search?

5          A    This man here under his authority.

6          Q    Well, we'll have his testimony in a few minutes.

7          A    Okay.

8          Q    But I'm suggesting that to you that we haven't

9    heard anybody that said they continued to search except

10   for what was apparently Lieutenant Colbert's belief after

11   he spoke to Corporal Edwards who said she wasn't in the

12   house and apparently he did not take anything from Deputy

13   Kilmer because there's no reference to what he did.

14         A    Well, they ran the serial numbers on two weapons

15   and I would be very inquisitive as to know where they came

16   from.

17         Q    A put them back and left.

18         A    Oh, that makes it right because they didn't take

19   it out of there.

20         Q    I have no further questions.

21                      REDIRECT EXAMINATION

22   BY MS. GROVE:

23         Q    Sheriff Boober, did Lieutenant Colbert provide

24   you with copies of all the statements of every deputy that

**Joint Appendix Pg. 325**

1   he spoke with during the investigation?

2       A    I believe so.

3       Q    Did you review those?

4       A    I did.  Anything that was given to me I did

5   review.

6       Q    Okay.  Thank you.

7                    RECROSS EXAMINATION

8   BY MR. SCALES:

9       Q    And isn't it a fact that those were on tape.

10  They weren't transcribed; isn't that correct?

11      A    I reviewed all the written documentation that was

12  given to me and then the consensus of the lieutenant's

13  summation of the tapes that he heard.

14      Q    Okay.  I requested copies of any statements and I

15  didn't get them.  All I got was the investigation report

16  and disc.

17      A    That's consistent.

18      Q    Okay.  Thank you.

19  COMMISSIONER LEMASTER:  Any further questions?

20  MS. GROVE:  No, I do not.

21  COMMISSIONER LEMASTER:  Mr. Scales?

22  MR. SCALES:  No further questions.  Thank you.

23  MS. GROVE:  I would like to call Sergeant Sell at

24  this time.

1    Whereupon,

2                         ROBERT SELL

3    called as a witness, having been first duly sworn, was

4    examined and testified as follows:

5                      DIRECT EXAMINATION

6        BY MS. GROVE:

7        Q    Can you please state your name for the record?

8        A    Robert Sell.

9        Q    You're employed by the Jefferson County Sheriff's

10   Department?

11       A    I am, ma'am.

12       Q    And what's your rank?

13       A    Sergeant.

14       Q    Okay.  How long have you held that rank?

15       A    Promoted to the rank of sergeant in February of

16   this year, I believe.

17       Q    Okay.  Were you on duty the evening of June 13,

18   2008?

19       A    Yes, ma'am.

20       Q    And did you respond to 229 Allstadts Hill Road

21   that evening?

22       A    Yes, ma'am.

23       Q    Okay.  And did you search the house that evening?

24       A    I was inside the residence, yes, ma'am.

1    Q    Do you recall what type of areas you searched

2  during that time?

3    A    The bedroom area.  It's not a very large bedroom.

4  I focused in on a series of clear plastic containers,

5  slightly opaque but I could still see in there and then I

6  did open those drawers to check the contents.

7    Q    Did you see the rifles lying on the bed?

8    A    There were rifles laying on the bed.  They had

9  already been positioned on the bed.

10    Q    Do you know who positioned them on the bed?

11    A    I do not know.

12    Q    Did you not know?  Okay.  And you said you opened

13  the clear plastic containers and looked in them?

14    A    Yes, ma'am.

15    Q    Okay.  Did you search any other areas, drawers,

16  anything like that?

17    A    I believe there was a shooter's bag that was

18  sitting on op of a night stand area directly when you come

19  into the bedroom on the right hand side.  I did look in

20  the shooter's bag as well.

21    Q    Can you tell me what a shooter's bag is?

22    A    Sorry.  It was a -- I belive it was a red bag

23  that had some ammunition maybe some clips for it.  Someone

24  would take it to the range if they were going to go shoot.

1    Just keeps everything tidy and together.

2         Q    But could a gun fit in the bag?

3         A    A pistol could have fit in the bag, yes, ma'am.

4         Q    Could a Tech-Nine have fit in the bag, do you

5    know?

6         A    Probably.

7         Q    Okay.  You said you didn't find the firearms.

8    When you got in the bedroom they were already on the bed?

9         A    Yes, ma'am.

10        Q    Okay.  That's all the questions I have for you.

11   Thank you.

12                       CROSS-EXAMINATION

13   BY MR. SCALES:

14        Q    Sergeant Sell, I'm Mike Scales.  I represent

15   Sergeant Dodson.

16        A    Yes, sir.

17        Q    Did you have a conversation -- after this

18   incident on June 13, 2008, did you have a conversation on

19   the telephone with Lieutenant Colbert?

20        A    The night of the incident, yes, sir.

21        Q    And did you tell Lieutenant Colbert that you

22   believed that it was a good search?

23        A    If not that night there then when we had our

24   conversation the night of the search there, are you asking

my opinion, sir?

    Q    Yes.

    A    In my opinion I think the gentlemen needed to be in jail that night.  The search in my view was necessary just to ensure the safety there.

    Q    Is that what you were doing?

    A    That's what I believe, sir.  Yes, sir.

    Q    Did you convey that to Lieutenant Colbert?

    A    I believe I explained to Lieutenant Colbert there the circumstances around it and that for exigent circumstances we wanted to make sure that we covered everything that we could.

    Q    Were you aware of all of the statements from the witnesses that were on site?

    A    Well, I spoke to the initial complainant.  He was actually located up on top of the hill there.  There was some confusion about where the actual residence was and I also spoke to the neighbor who lived just above the house and her nine year old daughter who was outside playing at the time.  Those are the only two statements that I took that night.

    Q    Well, was there any statement from these two witnesses that you were referring to was there a weapon discharged?

1    A    According to both the initial victim and

2  according to the nine year old a firearm was discharged.

3    Q    And did they give you the description of the same

4  firearm?

5    A    The little girl could only indicate and her exact

6  motion was it looked like this (indicating) but she wasn't

7  able to describe what type of weapons just that the

8  gentleman had his hands in a position like this

9  (indicating) and she heard two shots.  I asked her what

10  did she do after that she said, "I ran inside."  I said,

11  "That's probably a smart girl."

12    Q    The complaining witness gave you a statement as

13  to the weapon; did he not?

14    A    He described it as a Tech-Nine.

15    Q    And you wouldn't hold that in the same manner

16  that you would -- you showed me the little girl showed

17  you, would you?

18    A    Tech-Nine would be a smaller type weapon, yes,

19  sir.

20    Q    Okay.  And did you fine either one of those

21  weapons during the course of this search that you did?

22    A    There were long guns found within the residence.

23  I did not find nor am I aware of any Tech-Nine being found

24  within the residence.  I believe there was a smaller air

1    type pistol.  Maybe the victim confused that but it was

2    just like a regular handgun.

3        Q    Were you able to determine whether any of those

4    weapons that you found inside the house had been

5    discharged recently?

6        A    No, sir.  I didn't have any interaction with any

7    of the weapons that were actually found inside the

8    residence.

9        Q    Who was supervising the search for the Jefferson

10    County Sheriff's Department?

11        A    Well, Sergeant Dodson was the shift supervisor

12    for that evening, sir.

13        Q    Even though you're the same rank would he have

14    been your commanding officer on that evening?

15        A    Yes, sir.

16        Q    And did he give you any instructions about what

17    you were supposed to have looked for?

18        A    Sergeant Dodson didn't directly instruct me, no,

19    sir.

20        Q    Did you overhear any instructions that he gave?

21        A    No, sir.

22        Q    But in your opinion was it necessary to look for

23    those weapons?

24        A    In my opinion yes, sir.

1    Q    And why?

2    A    To again just to ensure the safety there. We had

3    a victim who had made a complaint. I also had a mother

4    with two young children just up the hill there. Also

5    according to the victim's initial statement he wasn't sure

6    if the subject we were looking for was even still in the

7    residence. So just to in my opinion to ensure the safety

8    of all it was necessary to make sure that we did as much

9    as we could.

10    Q    Thank you. One more question. Once you were

11    unable to find the weapons which were identified by the

12    two witnesses is that when the search was ceased?

13    A    There was no active searching beyond that point

14    there when those were located.

15    Q    Thank you.

16    MS. GROVE: Just a few follow up questions.

17    THE WITNESS: Yes, ma'am.

18                    REDIRECT EXAMINATION

19    Q    Why do you believe there was a safety concern

20    when the suspect was locked up in handcuffs and there was

21    no one else in the residence?

22    A    Well, once the residence was cleared to make sure

23    there was no one else in there the suspect was outside

24    there, perhaps safety is wrong term to use. I still think

1    it was necessary to find if this person did discharge a

2    weapon, you know, just to make sure nothing else would

3    occur that evening.

4        Q    But you would say once he was under control of a

5    sworn deputy and you determined there was no one else in

6    the house there wasn't really a safety concern at that

7    time after that.

8        A    Once the subject is in custody there in the back

9    of the cruiser or possession or observation of another

10    officer then that safety issue would be greatly be

11    diminished, yes, ma'am.

12        Q    Thank you.

13    MR. SCALES:  I have nothing further.

14    COMMISSIONER LEMASTER:  Ma'am, is that all?

15    MS. GROVE:  That's all I have.  Thank you.

16    COMMISSIONER LAMSTER:  You my stand down.

17    MS. GROVE:  I don't have any further witness at this

18    time.

19    MR. SCALES:  I have.  I'd like to call Corporal

20    Boyce.

21    Whereupon,

22                        KEVIN J. BOYCE

23    called as a witness, having been first duly sworn,

24    was  examined and testified as follows:

```
 1                    DIRECT EXAMINATION

 2        BY MR. SCALES:

 3        Q    Could you state your name for the record please?

 4        A    Kevin J. Boyce.

 5        Q    And you are employed by the Jefferson County

 6   Sheriff's Department?

 7        A    Yes, I am.

 8        Q    And what is your rank?

 9        A    Corporal.

10        Q    And how long have you been at the Jefferson

11   County Sheriff's Department?

12        A    This December 11th it will be five years.

13        Q    How long have you been corporal?

14        A    I've been corporal for -- January 7th it will be

15   two years.

16        Q    And who is your immediate supervisor?

17        A    My immediate supervisor's Sergeant Dodson.

18        Q    And can you tell me what happened on the evening

19   of June 13, 2008?  What was your call and how did you

20   respond?

21        A    We received a call from Jefferson County

22   Emergency Headquarters in reference to a shots fired

23   complaint.

24        Q    Was this an all units dispatch?
```

```
 1        A    It was an all units dispatch.  It come out with a

 2   tone that they give before an all units dispatch and they

 3   gave the tone all units dispatch.  There was shots fired

 4   Allstadts Hill Road right there by River Riders up 340

 5   North by the flea market.

 6        I took the call as the primary unit and I

 7   responded to the call running code, lights and siren.

 8   Responded.  Got there.  There were some other units that

 9   had just gotten there prior to me.  We started setting up

10   a parameter around the residence.  We figured out what

11   particular residence.  There was an alleged victim across

12   the road.  We got there.  We started -- we had pretty much

13   --

14        Q    Can you tell me approximately what time was it

15   when you arrived?

16        A    I'm not for sure.  I'd have to look at all my

17   paperwork.  It was somewhere around the hour of eight

18   thirty, I believe.

19        Q    P.m.?

20        A    Yeah, twenty after eight, quarter after eight,

21   eight thirty, something like that.

22        Q    What was the weather?

23        A    Clear.  Wasn't cloudy or rainy or anything like

24   that.  It was clear weather.  I don't remember the
```

1    temperature or anything like that.

2        Q    Okay.

3        A    When I get there we basically have two different

4    things going on.  We have guys that are setting up the

5    perimeter around the residence.  Sergeant Sell got there.

6    He got there just prior to me I believe or somewhere --

7    everything was just sort of rushed but it was close to the

8    same time that I got there.  He started making contact

9    with the victim and in talking to him who advised that the

10    guy was in -- that the guy who had shot at him had ran

11    back into the residence but he and this other guy were

12    staying out there, they had a disagreement, I guess,

13    earlier in the day and it spilled over to the evening.

14            So we set a perimeter on the residence.  We found

15    out his name from the victim.  So Sergeant Sell was

16    dealing with the victim talking to him, getting

17    information, gathering intel and then I started dealing

18    with the perimeter and the actual house of the suspect and

19    where he was an all that.  We had units from Charles Town

20    PD, Harpers Ferry PD, and the West Virginia State Police.

21            I had the SWAT team sniper set up in the field.

22    I asked him to set up.  He picked the spot so that he

23    could have an overall view of residence in case something,

24    you know, went wrong and we needed that help.  Patrolman

1    Mancini or Corporal Mancini and Sergeant Lutz they set up

2    out in the field kind of west of the residence.

3         Q    You mentioned the flea market.  Were there people

4    in the flea market that night?

5         A    Yes, there were people in the flea market.  It

6    wasn't packed but there was -- there were people in the

7    flea market area.  I started sending units to check the

8    wood line.

9         Even though the victim told us he was in the

10   house sometimes what they tell us is not exactly as it is.

11   So we started checking the wood line to make sure that he

12   hadn't run into the woods and sent units over to the flea

13   market to also check that area.

14        Also asked if they had heard any kind of gun

15   shots or, you know, what they considered to be a firearm

16   discharge.  So we started doing that.  Some of the other

17   Charles Town Police Officers, Patrolman Smith, State

18   Police, Sergeant Martin of the State Police, Trooper

19   Underwood, and Trooper Bush they started helping me set up

20   a perimeter waiting for, you know, whatever we needed to

21   do next.

22        So after we pretty much had all that established I

23   called him on the PA a few times, asked him to come out of

24   the residence we wanted to talk to him.

Q     On your police car, correct?

A     Yeah, on my police car PA.  I got on that, called the suspect by name and asked him if he'd, you know, you need to come out so we could talk to him.  Identified myself as sheriff's office.  I think I put in my criminal complaint I did it five times.  It did it, it was several times.  Five is probably an understatement, if anything.

So I asked him to come out.  There was no response from the residence whatsoever.  After talking to the people in the flea market they didn't notice anything particular, you know, gunfire, or anything like that. They said they thought that they had heard, I think, somebody over there had said that they thought they had heard what appeared to be fire crackers.  They thought it was kids out playing.

So that's the only intel we had at that point. As to anything closely relating to any kind of gunshot or any kind of explosion like that.  So just we set up the perimeter.  We got all that stuff to order and straight. Sergeant Dodson showed up on the scene.  When he showed up on the scene Sergeant Sell and myself briefed as to the aspect of what was going on.

Sergeant Sell addressed him as to what he knew from the victim and what, you know, what intel he had

1   gathered.  I addressed him on the physical location of

2   what we had going on as far as perimeter; if we knew he

3   was in there; contact, no contact; what we checked out;

4   where I sent guys, all that stuff.

5       Q    Was Corporal Edwards part of any of these

6   conversations?

7       A    No, she was not.

8       Q    Did you ever see Corporal Edwards?

9       A    I saw her when I get there.  I saw her get out of

10  her vehicle.  She was getting out of her vehicle when I

11  pulled up.  From that point on I did not see her until the

12  end of everything but closer to the end, not the end but

13  closer to the end.

14      Q    Okay.

15      A    But I never saw her up -- after that I never saw

16  her.  So we advised Sergeant Dodson as to what was going

17  on.  He advised, you know, his intel and stuff that he had

18  got from the victim.  I advised what was going on with the

19  perimeter and what we were doing, you know, to try to make

20  contact with the suspect.

21          At that point Sergeant Dodson asked if anybody

22  had approached the door.  We said, no, you know we haven't

23  yet.  We were still in the process of trying to get

24  everything figured and exactly, you know, what -- you

1  know, what we needed to do and so he said, "Well, let's go

2  knock on the door and just see if we get an answer."

3      Q    Did you go around back?

4      A    I did go around back, yes.

5      Q    What did you find -- before Sergeant Dodson

6  knocked on the door did you go around back?

7      A    Not prior, no.

8      Q    Okay.

9      A    We all walked up together.  We started walking up

10 to the door.  Sergeant Dodson was the lead and then I was

11 behind him and then Deputy Kilmer was there.  I believe

12 Sergeant Sell was there and then Trooper Underwood and

13 Patrolman Smith.  Patrolman Smith he had an assault rifle

14 that he was walking with Sergeant Dodson.

15     As we were approaching the house Sergeant Dodson

16 went to the front door and I saw him bang on the door.

17 Again, performed the police knock real hard stiff knock

18 but, you know, didn't get an answer and when he did that I

19 saw the door swing open and I thought that the suspect was

20 coming out.  So I stopped for a second and looked.  There

21 was nothing and so I saw him crack the door a little bit,

22 holler the guy's name, then and told him, you know, you

23 know I'm Sergeant Dodson from the sheriff's office, or

24 whatever it -- I remember him identifying the sheriff's

1    office and that we needed to talk to him.

2          At that point I hear the guy say, "F you" or

3    something, something to that nature.  I couldn't really

4    make out what he was saying 'cause as I started hearing

5    him talk then I started going around the rear of the

6    residence to see if there was anything, you know, what if

7    there was a back entrance or exit, or what.  So went

8    around the end of the building.  There were no windows for

9    that room except for on the back side, on the east side of

10   the building.

11         So I went around to the side of the building on

12   the north side of the building.  Went around to the back

13   to the east side of the building and I could see in the

14   window there was an air conditioner there an it was

15   running.  Now that you say about weather it was warm out

16   'cause the air conditioner was running.  I remember

17   sweating, but I looked in the window and I could see the

18   suspect standing right in the inside of the window.  And I

19   couldn't hear what he was saying.  Because of the air

20   conditioner roar I couldn't hear what the suspect was

21   saying to Sergeant Dodson.  I could just see the exchange.

22         Q    Could you tell how many people were in the room?

23         A    No, no.  Mr. Hoffman-Smith is a -- I've arrested

24   him since and he's -- I believe he's a little better than

six foot tall and I could only see from about midway of his bicep up is all I could see. So I could see -- I could see his head. I could see his face. I could see where he was looking. I could see that he was talking. I could see his body movement, but I couldn't see his hands. I could see his feet. I couldn't see anything below probably about midway of his bicep down I couldn't see anything and that was primarily because of the air conditioner that was in the window, but I was watching him.

The apartment's extremely small. It's extremely small. It's basically two rooms that are joined by a short hallway. Then on one side is just big enough for a really small apartment style stove and a sink and the other side of the hallway is a door and it basically leads to a bathroom, that is just barely wider then the door, that had a standup shower and a sink in it and that was it. It was -- well, and a commode but just extremely small.

So he was standing at the entrance of the bedroom which is the second room back. He was standing there talking to Sergeant Dodson. So I could see a perfect shot of him, but to tell you how small it is I'm looking at him and his bedroom and he's looking at him through the front

1    door.  He can see just the side of his face, I believe,

2    but anyway I see him move around the bedroom.  He's

3    talking to him.  I see him move around the bedroom walking

4    around.  Well, later I know it was now a bed.  He was

5    walking around that bed and stuff, but I couldn't hear

6    anything.  I couldn't hear what he was saying.  I couldn't

7    hear what was going on.

8            So I went back around to the front of the

9    residence to see what was going on and hear 'cause I

10    couldn't tell if he was being compliant, if he wasn't

11    being compliant.  I didn't know what was going on.  When I

12    got back around to the front to hear him still -- Sergeant

13    Dodson was still trying to get him to come out of the

14    residence and trying to talk to him.

15            I remember St. Dodson talking to him, trying to

16    get him out.  I went back around to the rear of the

17    residence and 'cause there was nobody back there.  I was

18    it.  So I went back around the rear of the residence and

19    to look through there trying to gain whatever intel I

20    could gain by just watching him and did that three

21    different times.  I kept going back to the residence --

22    back of the residence, come back around, check, and I did

23    that.

24            Finally, on the third time when I came back the

1    suspect was gone.  I didn't know where he went.  I saw a

2    shadow moving towards the front of the residence.  So I

3    went back around to the front.  When I went back around

4    the front they were putting him in a pair of handcuffs.

5    They finished handcuffing him and we went from there.

6         Q    At any time during your three times you went

7    around the back were you able to determine how many people

8    were in that apartment?

9         A    No.  I got a very limited field of view.  I could

10    basically just see the suspect.  I guess I could see his

11    shadow moving down the hall.  I didn't know if that was

12    him or if there was anybody else.  I had no idea who was

13    there if anybody else.

14         We pulled him out and put him in handcuffs.

15    Pulled him out.  At that time that's -- it was sometime

16    after that I saw Corporal Edwards.  She was watching --

17    she ended up watching Mr. Hoffman-Smith.  We went in the

18    residence to do a quick check of the residence for, you

19    know, any other assailants, any other persons, victims,

20    hostages, weapons, just basically your officer safety and

21    the safety of the people nearby.

22         During that search Patrolman Smith of the Charles

23    Town PD found a gun case with what is -- you know it's a

24    gun case if you're in law enforcement or know anything

1    about guns.  You look at it you know it's a gun case.

2        Q    Now could you see it in plain view or did you

3    have to open something to find it?

4        A    No, it was in plain view.  It was -- the bed just

5    had like a basic bed frame and the bed was sitting on

6    that.  There was no headboard no nothing just a basic bed

7    frame and beside the bed was that gun case an Patrolman

8    Smith said, "Hey, you know I got a gun case over here."

9    And I said, "Well, I saw him walking around the bed."

10        So Patrolman Smith pulls it up and looks in it

11    and there's two assault rifles which we'd been told a

12    Tech-Nine or an assault style rifle.  So it somewhat

13    matched the description of what, you know, like I say a

14    lot of times when you get to these calls what they tell

15    you and what you're actually -- what it actually is are

16    different things.  They may have been similar but they're

17    different.  So we pulled those out.  They had bayonets on

18    them.  They were assault rifles.  So we ran the VIN

19    number.  I'm sorry not the VIN number.  The serial number

20    on those just to make sure they weren't stolen or anything

21    like that.  We checked to make sure they were not fully

22    automatic which is a federal offense.  They were not fully

23    automatic.  They came back they were not stolen so we put

24    them right back in the case.  Shut the case and put it

1    back beside the bed where it belonged where we found it.

2        Q    Did you ever remove those weapons from the

3    house?

4        A    No, sir.  They didn't leave that bedroom.  The

5    only other weapon we found was laying on a shelf on the

6    south side wall of that bed room.  There was a bookshelf

7    and on that shelf was laying it was like a clear pistol of

8    some sort, air rifle, air assault gun, something.  We

9    didn't know what it was.  Deputy Kilmer took it out and

10   asked him.  I believed he asked -- I wasn't out there -- I

11   believe he asked him, you know, was it this that you had,

12   you know, was it just you know, saw this we thought it was

13   the gun.  The guy said, "Oh, no, that's just an air

14   pistol."

15           And so we brought it back in sat right back on

16   the shelf.  That was the only weapon -- the only weapon

17   that left the residence and it just went out to the

18   suspect and then we put it right back where we found it.

19           Anyway, we did a quick search.  Looked around.

20   Didn't find any other persons.  Didn't find any hostages

21   or assailants.  The only weapons we did encounter he

22   lawfully owned and had.  So we put everything back like we

23   found it and we ended up securing the residence.

24           I'm sorry.  Let me go back.  We did all that and

then Mr. Hoffman-Smith -- we still hadn't gotten an ID own

him so the only ID we had was the victim saying that

that's Mr. Hoffman-Smith.  So we asked him if he had an ID

he said, yes, he did it was in the house.  So we're like,

okay.

　　　　　We take him in the house and say, you know,

where's it at and he said, "Oh, it's in my wallet."  He

was very intoxicated.  He said, "Well, it's in my wallet."

"Well, where's your wallet at?"  He said, "Well, it's

somewhere around here."  He said, "This is an illegal

search.  This is illegal.  You can't be in here."

　　　　　He goes through this whole thing and he wants to

complain so he's asking for my name and my badge number.

I told him my name.  I told him we did not have badge

numbers, which our department does not.  So then he said,

"So you're refusing to give me your badge number."  I

said, "I'm not refusing.  We don't have them."  Then he

asked me again.  I said, "Mr. Hoffman-Smith, I can't give

you what I don't have."

　　　　　So anyway he started talking about the, you know,

that nobody understood him but the little blonde female

deputy outside and, you know, so on so forth about lawsuit

information that, whatever.  I then, you know -- then he

started cussing at me and stuff.  So I went out and took

1   him out and Deputy Kilmer said, "Put him in a car."

2       I went back in the residence 'cause he had told

3   me his wallet was right there and he had kind of like

4   nodded in a certain area on the bed.  There was a whole

5   bunch of clothes or something on the bed.  So I went back

6   in the house.  Went back to the bed and just was pulling

7   the covers and stuff around just seeing if his wallet was

8   laying on top.  As I'm doing that Corporal Edwards hollers

9   in, "Is he under arrest?"  I said, "Yes, he is."  She

10  says, "For what?"  "For obstructing."  That was the last I

11  heard or saw of Corporal Edwards.

12      I didn't see his wallet there.  It was just a

13  quick check.  I didn't see it.  I left the house.  We

14  secured the residence.  We looked around the yard a little

15  bit more and on the front porch and stuff.  We ended up

16  not seeing anything, not finding a weapon that the victim

17  had accused him of having but then like I say he was under

18  arrest for obstructing an officer and I took him on back

19  to the sheriff's office, processed him and took him to the

20  Eastern Regional Jail.

21      Q   Was Corporal Edwards ever in the house?

22      A   Not to my knowledge she was not.  I never saw her

23  and I was in there pretty much the whole time.

24      Q   How long -- the entire time you were in the house

**Joint Appendix Pg. 349**

1   how long was that?

2       A    I have no idea.  Maybe 15, 20 minutes would be my

3   guess.  I don't know.  It wasn't long.

4       Q    Did Sergeant Dodson give you any instructions

5   about what you were to search for, what you were to do

6   when you were in the house?

7       A    Not that I'm aware.  I've been here long enough I

8   know what my rules are.  Not that I'm aware of.  I don't

9   remember any conversations of, you know, any direct

10  conversation to me as to what I was looking for.

11      Q    Did you ever refer to your search as a "cursory

12  search for weapons and persons"?

13      A    Yeah, I did.  Later on when we were talking about

14  I said, "Well, you know, we just did a cursory search for

15  weapons and especially when I got -- when I was questioned

16  about it by Lieutenant Colbert I told him I said, "We were

17  just doing a cursory search for weapons and persons, you

18  know, for officer safety and for the public safety."

19      Q    Did you tell Lieutenant Colbert that you believed

20  it was a good search?

21      A    Yes, I did.

22      Q    That's all I have.  Thank you.

23                    CROSS-EXAMINATION

24  BY MS. GROVE:

1      Q    Sergeant Dodson is your direct supervisor, is he

2  not?

3      A    He is.

4      Q    And he conducts your evaluations and perform

5  reviews?

6      A    Yes, he does.  I think it's my understanding that

7  he does and then it goes through a chain of other

8  supervisors and agrees and stuff like that, yes.

9      Q    He's responsible for conducting it?

10     A    Yes.

11     Q    Initially?

12     A    Right, initially.

13     Q    You testified there was nobody at the rear of the

14  residence, but isn't it true that Harpers Ferry and

15  Corporal Edwards were at the rear of the residence

16  securing the rear?

17     A    No, that is not true.

18     Q    There was never anyone at the rear of the

19  residence?

20     A    There was no one at the rear of the residence.

21     Q    You said you didn't see anyone else in the house.

22     A    Correct.

23     Q    You didn't see anyone else.  Did the victim

24  indicate that there was anyone else in the house?

1    A    The victim did not know.  He didn't give us any

2  of that information.  All he said was that the guy had

3  went in the house.

4    Q    But he didn't indicate that there could be

5  another person?

6    A    He wasn't -- yeah, he didn't indicate it.

7    Q    And the apartment was "extremely small" to quote

8  you, is that correct?

9    A    It was.

10    Q    So once you were at the door you could see --

11    A    No, because of the hallway and the way the design

12  of the place, no, you could not see.

13    Q    It took you 15 to 20 minutes to determine that

14  there was no one in the house in an extremely small

15  apartment?

16    A    No one in the house and the weapons and then

17  finding the weapons then running to make sure they were

18  not stolen as is working policy, yes.

19    Q    Did you believe that those rifles were used to

20  commit the crime that you were called there for?

21    A    I didn't know, that's why I was there.

22    Q    Did you run a gunshot residue test to determine

23  if they were used?

24    A    To be honest with you I'm not sure if we even ran

1    a gunshot residue test.

2        Q    You didn't.

3        A    Okay, then I don't know why you're asking me.

4        Q    Well, I wanted to know if it was such a major

5    crime and you ran those rifle numbers that you believed to

6    be involved in the crime why you didn't run a gunshot

7    residue to charge this person with more than obstructing?

8        A    I don't have a response for you.

9        Q    You said that the gun case was found -- the guns

10   were in the case when you found them?

11       A    Correct.

12       Q    Was the residence secure at this point?

13       A    Was it secure at the point where we found the

14   weapons?  Yes, it was.

15       Q    But yet you opened the gun case and got the

16   weapons out, is that correct?

17       A    That is correct.

18       Q    And the residence was secure at that time?

19       A    That is correct.

20       Q    Thank you.

21                   REDIRECT EXAMINATION

22   BY MR. SCALES:

23       Q    Deputy, was any of those weapons used for

24   evidence?

```
 1        A    No.  We didn't take anything from the residence
 2   at all.
 3        Q    And you indicated before that you have -- you
 4   have arrested Mr. Hoffman-Smith since that time, have you
 5   not?
 6        A    Yes, he fled while DUI.
 7        Q    Would you characterize his demeanor on the
 8   evening of June 13, 2008, to be belligerent?
 9        A    He was very belligerent and very intoxicated.
10        Q    And was he cursing you as well?
11        A    He cursed me all the way to the jail, yes, sir
12   and even peed in the holding cell in there.
13        Q    Did you overhear him cursing Sergeant Dodson?
14        A    No, I don't think I remember him it was just me
15   'cause I arrested him.
16        Q    That's all I have.
17                        RECROSS EXAMINATION
18   BY MS. GROVE:
19        Q    Do you believe there was probable cause to
20   believe that those weapons were stolen?
21        A    It's always -- yeah, I mean I don't know.  I have
22   no idea.
23        Q    You had no information that they were stolen.
24        A    I had no information.  I'm just carrying out the
```

1    investigation that I was called there to do.

2        Q    But you said it was a Tech-Nine.  The victim said

3    it was a Tech-Nine.

4        A    He said a Tech-Nine and then he also said at some

5    point that it was an assault style rifle.  So we really

6    weren't sure if it was a Tech-Nine or if it was an assault

7    style rifle.  It was just we knew it was some kind of a

8    longer gun but we didn't know exactly what it was.

9        Q    In your complaint you refer to one weapon not

10   weapons.

11       A    Correct.  One weapon used in the crime, yes.

12       Q    And again, you did not feel the need to get a

13   search warrant to do a gunshot residue to determine if

14   those weapons -  even though you felt the need to run the

15   numbers you never got a search warrant to determine if

16   those weapons were used.

17       A    Yeah, running the numbers is just working policy

18   'cause every deputy on the road does.  When you encounter

19   a weapon just to make sure it's not stolen and that it's

20   valid and they can have it to make sure of the public

21   safety.

22       Q    Thank you.

23   MR. SCALES:  I don't know have anything else.

24   COMMISSIONER LEMASTER:  Thank you.

1      MR. SCALES:  Call Sergeant Dodson.

2  Whereupon,

3                   MICHAEL TODD DODSON

4  called as a witness, having been first duly sworn, was

5  examined and testified as follows:

6                   DIRECT EXAMINATION

7      BY MR. SCALES:

8      Q    Sergeant Dodson, would you state your full name,

9  please?

10     A    Michael Todd Dodson.

11     Q    And how long have you been an employee with the

12  sheriff's department in Jefferson County?

13     A    Approximately seven and a half years.  It'll be

14  eight years this coming March.

15     Q    And how long have you held the position of

16  ranking sergeant?

17     A    I believe just about four years.

18     Q    Who's your immediate supervisor?

19     A    Lieutenant Colbert.

20     Q    Have you been the subject of any prior

21  disciplinary actions before this one?

22     A    No, sir.

23     Q    Were you on duty on the evening of Friday, June

24  18, 2008?

1    A    Yes, sir.

2    Q    How and many deputies were under your supervision

3    that evening?

4    A    Boyce, Sell, Emerick, Hockman, Kilmer, I think

5    Regan and Wendell were off.

6    Q    Is that a normal Friday evening shift for you in

7    June?

8    A    Yes, sir.

9    Q    And can you tell me did you receive an all units

10    call that night?

11    A    Yes, sir.

12    Q    And where were you and what did you do?

13    A    I was on routine patrol in the southwest part of

14    the county which is towards the Summit Point area and I

15    heard the call come out.  Corporal Boyce took it and at

16    that time I proceeded from there to the address at

17    Allstadts Hill where the call was given out to for shots

18    fired.

19    Q    Do you recall approximately what time the call

20    was?

21    A    A little bit after 8 o'clock, maybe quarter or 20

22    after eight.

23    Q    That's p.m., correct?

24    A    Yes, sir.

1  Q   And tell me about the location.  Are you familiar

2  with the location?

3  A   Yes, sir.  I've been there in that area several

4  times.  It's an old road that was shut down when they

5  opened up U.S. 340.  It used to be the access road to go

6  into Frederick that way.  They opened 340 and now dead

7  ends at a place called River Riders.

8       There's several residences around.  There's a

9  flea market and U.S. 340's to the north side of the

10 residence where we were at.

11 Q   Approximately how far from 340?

12 A   From the back of the residence straight across to

13 340, 50 yards, maybe less.

14 Q   When you arrived at the scene was there other law

15 enforcement already present?

16 A   Yes, sir.

17 Q   Who all was present?

18 A   Trooper Boyce was present.  Sergeant Sell was

19 there.  Sam Smith of the Charles Town PD and Harpers Ferry

20 PD was there and then there was four or five others that

21 all came in at the same time which was the three guys from

22 state police, myself, and Deputy Kilmer.

23 Q   Did you speak to the complaining witness?

24 A   Yes.

1      Q    And what all did you learn about the situation at

2  that time?

3      A    I spoke to him.  They were having some problems

4  understanding which residence he was talking about 'cause

5  there's two rather close.  Being at the residence we

6  searched that night I was try to gather information from

7  him because I'd been there before when somebody else was

8  living there and through talking to him he said him and

9  his roommate where he was living -- he was living with

10  this guy at the time 'cause he had no where else to live

11  and the guy allowed him to live there -- got into an

12  argument and he pulled out a gun.  He thought it was a

13  Tech-Nine and he took off running and he fired at least

14  two shots at him.

15      Q    And what did you do after you learned all this

16  information?

17      A    We continued to talk to him to get more

18  information of whether or not the inside of the house was

19  changed, the bedroom had changed and, you know, they were

20  using the bedroom as a living room now, or the living room

21  still the living room everything else.

22          And I believe at that time I was talking to him

23  Sergeant Sell had been notified that a neighbor had saw

24  something as well and he went and talked to that neighbor

1  and that was the little girl and the mom.  And that's when

2  he came back and said, well, the little girl said she'd

3  seen it looked like he was holding a rifle type gun the

4  way he had his hands positioned and so we took it was a

5  Tech-Nine what is an assault style pistol which you hold

6  and spray around with or maybe a rifle that's as far as we

7  used --

8      Q    Did you approach the front door?

9      A    Yes, sir, I did.  Myself, Deputy Boyce, Deputy

10  Kilmer, Trooper Underwood, Trooper Martin and the new

11  trooper -- I can't remember his name -- and Deputy Kilmer

12  all approached the residence at the same time.  I went up

13  in front 'cause, you know, if something's going to happen

14  it's going to happen to me.  It's not going to be one of

15  my guys.

16        So I go up to the front.  I knock on the door.

17  The door comes open and stops.  The door swings open two

18  or three feet and stops.  Couldn't see if anything was

19  behind it or not.  At that time I'm standing to the left

20  side of the door looking in and hollering, "Sheriff's

21  department.  We need you to come out so we can talk to you

22  about the incident that we were called here for."

23        Did that three or four times before I got a

24  response.  Then I finally got a response of -- pardon my

**Joint Appendix Pg. 360**

French for the ladies -- "Fuck you. I'm not coming out."
Again, I announced who we were as loud as I possibly could
several more times. Got that response again and he said
come in, do and take whatever you want I'm not coming out.

So I hollered two or three more times. He
finally pokes his head around the corner of the hallway
area and looks at me and all you can see is this
(indicating). He's got his hands back here. So I had my
weapon facing him on him and he comes -- finally comes out
hands back here like this (indicating) back behind him and
he comes walking towards the door. Well, he steps over
towards the door like he's going to slam it shut in my
face.

At that time I grab him, pull him out, don't take
my eyes off the inside of the interior 'cause I don't know
if somebody else is coming out, you know, that might have
a gun. Hand him off to whoever's behind me. I don't know
who it was generally. They took control of him at that
time. I asked him two or three more times, "Is there
anybody else in the house?" I yelled, "Sheriff's
department. Is there anybody else in the house?" His
response was, "Fuck you."

So at that time not knowing whether or not
somebody else was in there that he might have shot, not

1  knowing that there's not somebody else in there that is

2  not with him I entered the house.  There was probably four

3  or five guys behind me that entered the house all at the

4  same time.  We come in.  Went back to the bedroom.  I --

5  there was sheets where somebody -- the bedroom bed sheets

6  somebody could have been underneath those.  They were

7  rumpled up in a like, you know, a pile or pillows

8  underneath of it.

9          As I'm coming into the bedroom I grabbed those,

10  flipped those over, see that there's nothing there.  I go

11  to a closet that has no door on it.  It's open.  I turn

12  around and I look in that closet, move the shirts out of

13  the way look.  I look down I see a box.  I take my hand

14  push down on the box, didn't feel anything, immediately on

15  top.

16          I turned back around, Patrolman Smith from

17  Charles Town P.D. is at that time is lifting up a silver

18  gun case.  Placed it on the bed in the bedroom and opened

19  it up and there was two assault style rifles in it.  At

20  that time probably less than ten minutes all together from

21  the door in, turning around and looking we stopped,

22  everybody exited.  I stayed in with the weapons.  The

23  weapons never left the room even though Corporal Edwards

24  in her statement swears that I took one out of the house.

1    Don't know what I did with it, but never took it back.

2    But yet we've had no complaint of any guns being stolen,

3    you know.

4              I stayed with the weapons.  Deputy Kilmer took

5    what he thought was a pistol out to the guy.  It wasn't

6    one of the ones the way I took it he described it to me

7    the new ones have like an orange tip on them so you can

8    tell that they're toys.  Asked the guy about it.  Brought

9    it back in.  I stayed with the weapons.  At that time we

10   were concerned whether or not they were legal to have.

11   Could be fully automatic, or whatever.  Corporal Boyce

12   left the inside of the residence 'cause you couldn't get

13   service on your cell phone in there and the radios weren't

14   that great in there.  Went outside and called somebody

15   from ATF and I told him how to check that.

16             In the meantime I picked the weapons up, showed

17   them to Deputy Kilmer.  He wrote down the serial numbers.

18   Went outside and ran those.  I stayed with the weapons.

19   Three or four minutes went by, maybe five.  They, of

20   course, came back with them not being stolen, proper, the

21   whole nine yards.  We checked to make sure they weren't

22   fully automatic.  Closed up the case, put them back on the

23   floor and we were done.

24        Q    Do you ever give an order to anyone who was there

1    to do a full blown search of Mr. Hoffman-Smith's

2    residence?

3         A    Absolutely not.

4         Q    Did anyone do a full blown search of Mr.

5    Hoffman-Smith's residence?

6         A    Not that I know of.

7         Q    Did you see it when you were in there?

8         A    No, sir.

9         Q    And why did you go into the residence and look

10   for these weapons?

11        A    The first thing was we were called there for a

12   call that -- where shots had been fired at someone in the

13   public and we didn't know if there was anybody else in the

14   house.  Couldn't obtain information of whether or not

15   there was or there wasn't from the victim and from the

16   arrestee, from his answers of "Fuck you."

17             So, I had no choice but to go in to make sure

18   number one that there wasn't -- he didn't grab somebody

19   that was out in the general public, take them in there,

20   tie them up, or harm them in anyway, or in the meantime

21   while we were setting there yelling at him and he knows

22   who we were he didn't go back in the room, take a hammer

23   and smash the gun all over the place that he possibly

24   used.

1       Q    Was anything taken out of the house other than

2  that one air pistol that was returned?

3       A    Not that I saw no, sir.

4       Q    Were any drawers opened other than -- or closets

5  opened other than what you described before as the closet

6  that had no door on it, did you open any doors or drawers

7  anything?

8       A    I did not no, sir.

9       Q    Or did you see anyone?

10       A    Sergeant Sell said he opened up that plastic

11  case.  I didn't see that.  I believe when I was turning

12  around from the closet to the bed and saw the weapons that

13  I may have saw one of the troopers open up a big cabinet

14  drawer that was in the hallway there but if he was opening

15  -- not opening but closing it.  So if he opened it I don't

16  know.  I know he was at least closing it.

17       Q    Why did you find it necessary to go into the

18  house to look at all these things?

19       A    For officer safety and the safety of the general

20  public.

21       Q    And you stated before the whole time you were in

22  the house was how long?

23       A    The whole time we were in the house according to

24  headquarter's taped record is we took him into custody at

1   2100 and we left the entire area at 2143 minutes.  So in

2   the meantime of being in the house probably in the house

3   waiting on response from headquarters 15 minutes or less

4   'cause we stood outside and discussed everything and

5   talked.  Sergeant Sell went over and talked to the

6   neighbor again and we discussed all that.

7            I was also present when Sergeant Sell was on the

8   phone with Lieutenant Colbert and could hear Lieutenant

9   Colbert asking if he thought it was a good search and

10  Sergeant Sell said yes.

11       Q    And until you received some information from

12  Lieutenant Colbert five -- for our five weeks later did

13  anyone ever question the fact that it was a good or bad

14  search?

15       A    The only thing I know is he brought several of us

16  in.

17       Q    Who's he?

18       A    Lieutenant Colbert talked to myself.  Talked to

19  Sergeant Sell, I believe, Deputy Kilmer, and Corporal

20  Boyce.  I took it it was in reference to whether or not

21  they heard the conversation about Corporal Edwards giving

22  the arrestee legal advice.

23            I have never -- according to our SOPs or anything

24  else, I've never been told I was under investigation or I

1  was never given anything in writing saying I was under

2  investigation for it until they give me a letter stating

3  that I'm being demoted, that's when I found out I was

4  investigated and they already done it.

5      Q    How long was that after June 13, 2008?

6      A    A good month, maybe month and a half.

7      Q    Had you had it to do over again would you have

8  done anything different than you I did that night?

9      A    No, sir.

10     Q    Were you deliberately trying to deny Mr.

11 Hoffman-Smith his Fourth Amendment rights?

12     A    No, sir.

13     Q    And what you did do you believe it to be proper

14 law enforcement procedure?

15     A    Yes, sir, I do.

16     Q    And what about the use of the NCIC system?  How

17 is that -- what is the policy on that?

18     A    When you're doing an investigation it's pertinent

19 to collect all the information that you can collect.  Not

20 knowing whether or not they were the weapons used we ran

21 that for the serial numbers on them not only to collect

22 information of them being stolen or not stolen properly

23 owned but to have a record showing that they were in the

24 residence if we found out through later investigation of

1  it that, yes, he did use these so we could charge him with
2  it.
3      Q    That's all I have.

                      CROSS-EXAMINATION
5  BY MS. GROVE:
6      Q    You never did do a follow up investigation to see
7  if those rifles were used, did you?
8      A    I believe Sergeant Sell did.
9      Q    You never did a gunshot residue.  Why didn't you
10 get a search warrant that evening?
11     A    I asked the arrestee if he would submit to a
12 gunshot residue and again he told me, "Fuck you."
13     Q    And then you could have gotten a search warrant
14 at that point but you did not, did you?
15     A    No, ma'am, I did not.
16     Q    Wanton endangerment's a pretty big crime.  Don't
17 you think you should have if you had suspicion that these
18 guns were stolen or used in the crime don't you think you
19 should have followed up on that?
20     A    After setting down after the incident and
21 conversing with myself, Sergeant Sell, Corporal Boyce and
22 I think Deputy Kilmer and Deputy Demory we didn't feel
23 that there was enough information at this time to proceed
24 with that that's why Sergeant Sell was supposed to follow

1   up with it.

2        Q   Did you order him to follow up with it?

3        A   Yes, ma'am.

4        Q   Did you make sure he followed up with it?

5        A   I have not checked with him since, no.

6        Q   You arrested the suspect on the porch?

7        A   I grabbed him while he was still inside the

8   residence.

9        Q   And you arrested him -- he was under arrest on

10  the porch after you dragged him out.

11       A   He was under arrest when I grabbed inside the

12  residence that's why I took him into custody.

13       Q   You actually restained him on the porch?

14       A   No, I restrained him inside the doorway of the

15  residence.

16       Q   And pulled him out.

17       A   Yes.

18       Q   Did anyone tell you that -- were you ever told

19  that there was anyone else in the house?

20       A   Never told that there was and never was told that

21  there wasn't.

22       Q   So nobody ever indicated that there was another

23  person in the house to you?

24       A   Never indicated that there was or wasn't.

Q    My question is did anyone indicate that there was
another person in the house, that's a yes or no question?

A    No.  No, ma'am.

Q    Did you have any probable cause to believe that
the weapons were stolen?  What was your probable cause to
run those numbers.

A    My probable cause was in conducting an
investigation.

Q    You had probable cause to believe that there were
weapons stolen --

A    I had probable cause of weapons being used in a
crime.

Q    To run the numbers to see if they were stolen?

A    To see -- not only stolen, ma'am, to see if they
were used in a crime and to have the record showing that
we ran those weapons to use later in an investigation at
that residence.

Q    But you never did the gunshot residue to
determine if they were used in that crime.

A    No, ma'am.  After the incident we didn't have
enough information to do what I felt was a search warrant
to do a gun residue.

Q    But you thought you had probable cause to search
-- to run the numbers to see if they were stolen but not

1   to do the gunshot residue when you had the victim telling

2   you they'd been shot at when you had a nine-year old girl

3   --

4       A    I'm sorry?

5       Q    When you had a girl saying that this possibly

6   could have been the weapon used in the crime?

7       A    Yes, ma'am.

8       Q    So you did have the probable cause to get the

9   search warrant for the gunshot residue then that's what

10  you just testified to?

11      A    After we searched the house and conversed outside

12  the house for 15, 20 minutes?  No ma'am, I didn't feel

13  like we did have enough information to get a search

14  warrant for a gunshot residue that's why I asked Sergeant

15  Sell to follow up with the investigation on it.

16      Q    So you left the evidence of a potential crime

17  inside the house?

18      A    Yes, ma'am, 'cause at that time I had no

19  reasonable way to take it and I wasn't sure if I was sure

20  that there was a crime that those guns were happening in I

21  would have took them and/or I would have got a search

22  warrant.

23      Q    So you the left the evidence there.

24      A    Possible evidence.

1    Q    You left it.

2    A    Possible evidence.

3    Q    Yes or no.

4    A    Yes.

5    Q    Thank you.  I'm finished.  I don't have anything

6  further.

7    COMMISSIONER LEMASTER:  Any questions?

8    MR. SCALES:  No questions.

9    COMMISSIONER LEMASTER:  You may step down, sir.

10   MR. SCALES:  I have no further witnesses.

11   COMMISSIONER LEMASTER:  Okay.  Ma'am, did you have

12  further witnesses?

13   MS. GROVE:  Can I confer with my client for just one

14  second?

15   COMMISSIONER LEMASTER:  Okay.  Why don't we take

16  maybe a five minute break.  Do you all want to prepare a

17  closings?  Okay.  Maybe a five minute break before we go

18  into closings.

19                    (Whereupon, the hearing was

20                    recessed.)

21   COMMISSIONER LEMASTER:  Okay.  Back on the record.

22   MS. GROVE:  Can I ask to call one additional witness?

23  He was on air guard duty.

24   MR. SCALES:  I object.

1    COMMISSIONER LEMASTER:   You object?

2    MR. SCALES:   Yes, sir.

3    MS. GROVE:   We're entitled to rebuttal witnesses.

4    COMMISSIONER LEMASTER:   Why don't we --

5    MR. SCALES:   Do you want to go talk about it?

6    MS. GROVE:   Lieutenant Hansen he spoke to Sergeant

7    Sell that evening regarding the search and he can provide

8    information about the weapons that they were supposedly

9    looking for and what he was informed they were looking for

10   which contradicts testimony presented by Corporal Boyce.

11   COMMISSIONER LEMASTER:   Counsel, do you have any

12   reason for your objection since this is kind of an

13   administrative hearing?   There's no real guidelines like

14   court rules that we can go by.   Do you have anything that

15   you can cite to offset the --

16   MR. SCALES:   No.

17   COMMISSIONER LEMASTER:   Okay.   Why don't we just note

18   your objection, go with it, and if it gets to the appeal

19   process the circuit judge can overrule us.

20   Whereupon,

21                     THOMAS HANSEN

22   called as a witness, having been first duly sworn, was

23   examined and testified as follows:

24                  DIRECT EXAMINATION

BY MS. GROVE:

Q    Could you please state your name for the record?

A    Thomas Hansen.

Q    And you're employed by the Jefferson County Sheriff's Department?

A    Yes.

Q    What's your rank?

A    I'm a lieutenant.

Q    And how long have you held that rank?

A    It's be two years this January.

Q    Okay.  Did you speak with Sergeant Sell on the night of the night of June 13, 2008 regarding the search of the residence?

A    Yes, I did.

Q    Were you informed as to what type of weapon they were looking for that evening?

A    I don't remember him saying anything about a weapon.  I knew they were looking for some sort of weapon but I don't remember him saying.

Q    Did you ever know that they were looking for -- that they ran the numbers of rifles?

A    No.

Q    You did not know that at the time?

A    No.

1    Q    At the time did you think the search was lawful

2    with the information you were given?

3    A    Yes.

4    Q    Have you changed your opinion about that now that

5    you have all the information?

6    A    I believe it went further than it was supposed to

7    have and I was advised of, yes.

8    Q    Now I'll ask you is it department policy of

9    running serial numbers any time you find a weapon?

10    A    I don't know about that policy, ma'am.

11    Q    That's not -- you would say that that's not the

12    policy?

13    A    I don't know of that policy, no.

14    Q    Okay.  You don't think it -- you're not aware --

15    A    I don't know of the policy.

16    Q    Okay.  Thank you.

17                    CROSS-EXAMINATION

18    BY MR. SCALES:

19    Q    Lt. Hansen, I'm Michael Scales.  I represent

20    Sergeant Dodson.

21    A    Yes, sir.

22    Q    You indicated that you did think it was a good

23    search at one point; did you not?

24    A    Yes, sir.

1    Q    Why have you changed your mind that it went too

2    far?

3    A    Well, it was my understanding when I talked to

4    Sergeant Sell on the phone that it was an exigent

5    circumstances search for officer safety and for the weapon

6    that was involved.

7    Q    Yes, sir.

8    A    I don't know exactly what the weapon was at the

9    time.  I belive now it was a Tech-Nine or something like

10   that.  I found out later on, but they went with -- my

11   understanding again I wasn't there -- was that they

12   searched -- they ran serial numbers of the weapons that

13   didn't match what they were looking for.

14   Q    Were you aware that there was second witness that

15   testified that someone was holding what appeared to be

16   like a web in this fashion like a rifle would be held?

17   A    I wasn't aware of any second witness, sir.  All I

18   was what I had.  I literally had Sergeant Sell on one

19   phone and the sheriff on the other phone and relaying to

20   the sheriff what Sergeant Sell was telling me.

21   Q    Well, didn't you have an extended conversation

22   with Sergeant Dodson about a week after this incident and

23   you rendered an opinion that you believe it was a good

24   search?

1      A     At the time again I had no -- as far as I knew

2  what I had the opinion I gave him was with the information

3  I had.

4      Q     Okay.  I thank you.

5      MS. GROVE:  I don't have any further questions.

6      MR. SCALES:  Nothing else, sir.

7      COMMISSIONER LEMASTER:  You may step down.

8      THE WITNESS:  Thank you.  Do you need me anymore?

9      MS. GROVE:  We don't.

10     COMMISSIONER LEMASTER:  Counsel need any more time

11  before we go into closing?

12     MS. GROVE:  I don't.

13     MR. SCALES:  I don't.

14                     CLOSING ARGUMENT

15     MS. GROVE:  I'd like to start out with reading

16  Syllabus Pt. 8 'cause I thinks it's important of the case

17  that Mr. Scale has provided you.

18          A protective search is defined as a "quick and

19  limited search of premises for weapons once an officer has

20  individualized suspicion that a dangerous weapon is

21  present and poses a threat to the wellbeing of himself and

22  others.  This cursory visual inspection is limited to the

23  area where the suspected weapon could be contained and

24  must end once the weapon is found and secured.  It also

**Joint Appendix Pg. 377**

1  must end once that threat to the wellbeing of himself and

2  others ends."

3          We have an officer testifying that when the

4  rifles were run the residence was secured.  He was outside

5  with Corporal Edwards.  He was detained.  They did not

6  find anyone else in the house yet they continued to

7  search.  They continued to look in the rifle case.  They

8  continued to run the numbers for which they had no

9  probable cause to suspect those were stolen or used in the

10  crime.  If they had probable cause they should have gotten

11  a search warrant at that time to look for those weapons.

12  They did not.  They could have used the testimony of the

13  nine-year old girl to secure a search warrant for that and

14  they chose not to.

15          We have Corporal Edwards testifying that even

16  though she was in the presence of this man who was irate

17  with her she never feared for her safety.  We have three

18  officers testifying that they believed the search was

19  unlawful and they would not have done it again and that

20  they believed that a search warrant should have been

21  obtained to look for the Tech-Nine which is the weapon

22  that the victim was adamant was used in the crime.

23          You cannot just search a residence for a weapon

24  used in a crime incident to an arrest.  You have to have a

1    search warrant.  You can sweep the area to secure officer

2    safety as Lieutenant Colbert testified and all the others

3    testified.  You can secure the residence but once it's

4    secured you have to get a search warrant to look for

5    evidence of the crime and to look for the weapons.  That

6    did not happen in this case.

7          You also heard Corporal Boyce say that it's the

8    policy to run the serial numbers and we've heard

9    Lieutenant Hansen, who is one of the top officers in this

10   department, say that he's not aware of any policy that

11   states that.  So they had no probable cause to run the

12   weapons.  There was no reason to believe that those

13   weapons were stolen.  They had no evidence of that.  And

14   again they left the weapons there even though their story

15   they may have been used in the crime.  They never did any

16   follow up investigation to determine if those weapons were

17   used in the crime.

18         Again, the issue is not whether they can search

19   the residence for the Tech-Nine.  They certainly can.

20   They certainly can search the residence for a gun that was

21   used in the commission of a crime but they can only do

22   that once they have a search warrant.  You cannot just go

23   into a residence, extremely small apartment, and look and

24   open plastic containers and look in and look in a bag

**Joint Appendix Pg. 379**

1    with, you know, of -- I forget what he called it -- a bag

2    with ammunition that was closed, remove bed sheets, look

3    under couch cushions.  You cannot do that type of thorough

4    search without a search warrant.

5         Sheriff Boober depends on people in charge to

6    uphold the laws and instruct their team.  They are the

7    sheriff's representatives when the sheriff is not here and

8    he believes that -- and Sergeant Dodson you heard, he

9    testified that he still believes that the search was a

10   good search although we have three officers that testified

11   that it was not who rank higher than he does.

12        Although Sergeant Dodson has been fully trained

13   it's clear that he still doesn't understand the applicable

14   law of search and seizure and at this time the sheriff

15   cannot trust him in a position of power over a team and as

16   shift supervisor and that's why he's recommended the

17   action of reduction in rank.

18        COMMISSIONER LEMASTER:  Thank you.

19                   CLOSING ARGUMENT

20   MR. SCALES:  Well, let me start off by saying this is

21   a case where the three members of the hearing board are

22   charged with the obligation to determine whether or not

23   there was just cause for a demotion of my client, Sergeant

24   Dodson, to the rank of corporal from sergeant as the

1    result of what the sheriff believes was an illegal search.

2    I don't think any of these folks were quite clear on what

3    the standard is.

4         I've tried to tell you what I believe the law is

5    in West Virginia and it's the *State verses Lacey* case and

6    I do believe that it's dispositive of the issues in the

7    case and I respectfully request that you all look at

8    Syllabus Pt. 6, 7, and 8 which are on page 722 of that

9    case.  And I think when you take them together I think

10   you'll understand that my client did nothing wrong.  In

11   fact, did everything correct.

12        Number six says, "Neither a showing of exigent

13   circumstances or probable cause is required to justify a

14   protective sweep for weapons as long as a two part test is

15   satisfied an officer must show there's specific

16   articulable facts indicating danger and this suspicion of

17   danger to the officer or others must be reasonable.  If

18   these two eliminates are satisfied an officer's entitled

19   to take protective precautions and search in a limited

20   fashion for weapons."

21        Now, when we first heard Lieutenant Colbert

22   testify he talked about there being a full blown search.

23   Well, nobody's testified there was a full blown search.

24   The only thing we heard from Sergeant Dodson, from Deputy

1   Kilmer, from Corporal Boyce was that all they were

2   searching for was to make sure that there was not a second

3   accomplice, that the weapon was secured, and that there

4   was no other victims in the house that was it.

5        Number seven of that same case says, "The

6   existence of a reasonable belief should be analyzed from

7   the perspective of the police officer at the scene."  "An

8   inquiring court" -- which in this case would be you three

9   sitting as the hearing board -- "should not ask what the

10  police could have done but whether they had at the time a

11  reasonable belief that there was a need to act without a

12  warrant."

13       Eight.  It's just as Ms. Grove said.  "A

14  protective search is defined as a quick and limited search

15  of premises for weapons once an officer has individualized

16  suspicion that a dangerous weapon is present and poses a

17  threat to the wellbeing of himself and others.  This

18  cursory visual inspection is limited to the area where the

19  suspect or the suspected weapon could be contained and

20  must end once the weapon is found and secured."

21       Well, we don't know whether the weapon was ever

22  found or not.  We never found a Tech-Nine and we're not

23  sure whether these rifles that were found were even the

24  weapons that were involved but remember we're looking at

1   it from the prospective of the officers that were there at

2   the time.

3           The articulable facts are the following:  Number

4   one, we had an all units dispatch and you all are

5   certainly more familiar with that than I am, but I don't

6   think you get too many all units dispatches which tells me

7   that at least the dispatcher believed that this was a

8   fairly serious incident.

9           Number two, there was a report of the discharge

10  of the weapon and there's at least two witnesses or three

11  witnesses who substantiated that.  You had the gentlemen

12  who was the complaining witness who testified that he

13  believed it was a Tech-Nine type weapons that was directed

14  toward him and there were two shots fired.  You had the

15  eight-year old girl who described a different weapon that

16  was being held in the fashion of a rifle.  And apparently,

17  from what I understand from deputy -- I believe it was

18  Kilmer or Sergeant Sell indicated that the interviewed

19  some people at the flea market who indicated they thought

20  it was a discharge of fireworks but they did hear a couple

21  of pops.

22          So the location was in a residential section.  It

23  had other residential units in the same house.  There were

24  other houses around it and it was right beside a flea

market public areas where there was individuals at least frequenting the flea market and close to a primary thoroughfare U.S. Rt. 340. Sergeant Dodson appeared, had some hostile verbal communications with the suspect. Was not getting any cooperation. Kept identifying himself, he and Deputy Kilmer and was not getting any response.

Finally, the gentlemen after cursing him several times at least stuck his head out close enough where Sergeant Dodson could grab him and hold him and neutralize him but when I asked Deputy Kilmer were you able to substantiate from your vision at the back whether there was anybody else in the apartment he indicated, no, he didn't know.

So the circumstances that took place from that point on is whether or not Sergeant Dodson acted reasonably and he didn't know what was there. He didn't know exactly what the weapon was. He didn't know how many people were there but he knew he was in a place where there were other officers present. There was the public present. He was in a residential area, that it was dark. He couldn't see. He had a belligerent suspect who was cursing him and irate and was not getting any cooperation and he walked into what was apparently a fairly dark apartment and didn't know what he was going to get into.

1          So once he got in there he found -- he testified

2     that he didn't think anybody was opening any drawers.  The

3     only thing that he opened was he looked inside the closet

4     and moved the coat hangers back so he could see what was

5     in the closet.  He checked because it looked like the

6     bedsheets were balled up in a fashion where somewhere

7     could be hiding and then apparently trooper -- I mean

8     Patrolman Smith found the case with the two weapons in it.

9     It was not locked.  It was unlocked.  They opened it.

10    They looked at the weapons.  They didn't remove them from

11    the scene.

12         I think Deputy Kilmer indicated that he called

13    ATF to find out whether they could have bayonets or some

14    type of things -- other type of weapons attached to them

15    whether that was legal and after they were able to confirm

16    all the weapons that they weren't stolen or being used as

17    part of a crime they put them back, secured the area, took

18    the suspect to process and left.  That's exactly what he

19    was supposed to have done.  And to sit back now and have

20    the sheriff question whether or not what he was done was

21    reasonable, whether he had exigent circumstances is not

22    what the case said.  He didn't even need exigent

23    circumstances.  All he has to show is he had a reasonable

24    belief from the perspective of the officers at the scene

1    that number one there's specifics which I just gave you

2    indicating danger, and the suspicion of danger to the

3    officer or others, must be reasonable.

4        And all he did was do what he was supposed to

5    have done and the fact that several other officers now

6    want to sit back and say, "Well, after we've looked at it,

7    scratched our heads and saw what was happening and found

8    out that there was nobody there you should have left

9    earlier." Well, how did he know that? I mean, he's the

10   one that was in the line of fire. Law enforcement

11   officers have to be able to make split decisions when the

12   safety of themselves or others are imperiled and that's

13   exactly what Sergeant Dodson did and what he did was

14   reasonable under the circumstances.

15       He did not impair any of Mr. Hoffman-Smith's

16   rights. He didn't take any of his personal property. The

17   only thing that was removed was this air pistol that went

18   out and was shown to the suspect and asked him what it

19   was. We had it being identified as being an air pistol

20   and it was immediately taken back to the house and

21   replaced where it was. There was nothing that was

22   improperly done in this case and to suggest now that an

23   officer of seven and a half years the first time he's ever

24   had any disciplinary action taken that the sheriff can't

```
 1   trust him I think is just incredible and what we're asking

 2   for the hearing board to do is to find that there is no

 3   just cause for his demotion and award him his attorneys

 4   fees.

 5          And I also have some bad news for you that I

 6   don't know if you all were aware of it but you have to

 7   make findings of fact so -- under the statute, which is

 8   oftentimes not easy, but what we're asking for Sergeant

 9   Dodson is that to find that there is no just cause for his

10   demotion and to award him his attorney's fees.

11          COMMISSIONER LEMASTER:  Okay.

12          COMMISSIONER:  We'll meet in about an hour to meet

13   and discuss some ideas and some things and let's come

14   back.

15                         (Whereupon, the hearing was

16                          recessed.)

17          COMMISSIONER LEMASTER:  Sorry it took a little bit

18   longer but we've come to a decision.  Do we need -- is the

19   sheriff coming or --

20          MS. GROVE:  Yes.

21          COMMISSIONER CODERRE:  Basically, what we've been

22   discussing and how we would like to present this chief

23   deputy has a meeting.  He needs to be back at 3 o'clock.

24   He guesstimates it would be 30 to 45 minutes for his
```

1   meeting and then return.  In the meantime Deputy Foreman

2   and I will sit down and basically put everything in

3   writing so that we'll be able to present that as well as a

4   verbal explanation.

5           So he's going to return to his department for the

6   meeting.  We'll type everything up and then hopefully

7   roughly an hour and a half from now we'll come back and

8   give the full explanation, the written findings, go from

9   there.  I apologize it took a little longer than initially

10  we expected but long lines at Roy's.  Is that agreeable?

11  No problem?

12      MS. GROVE:  Um-hum.  (Indicating yes.)

13      MR. SCALES:  You want us to come back then in an hour

14  and a half?

15      COMMISSIONER LEMASTER:  It depends on if you want to

16  just go on the explanation of the written part of it or if

17  you want a verbal explanation.  I mean, hopefully, we can

18  enunciate everything we say verbally and just give it to

19  them.

20      COMMISSIONER CODERRE:  How long do you think you need

21  total for a round trip and meeting?

22      COMMISSIONER LEMASTER:  It starts at 3:00.  I should

23  be done by 4:00.

24      COMMISSIONER CODERRE:  So how long will it take you

1    to get back here?

2        COMMISSIONER LEMASTER:  I don't have to go all the

3    way back to Martinsburg thank goodness, about 15 minutes

4    to get back from the meeting.  So I'd say maybe 4:00, 4:15

5    at least.

6        MR. SCALES:  Back at 4:15.  Okay.  Thank you.

7                            (Whereupon, the hearing was

8                            recessed.)

9        COMMISSIONER LEMASTER:  Let the record show that

10   we've given the Board's decision to both sides for their

11   review.  Do we need anything from either counsel other

12   than just acknowledgment that both counsels have received

13   it?

14       MS. GROVE:  I acknowledge I've received it.

15       MR. SCALES:  I've received it.  With all due respect

16   I don't think it complies with the statute 'cause there's

17   no findings of fact.  I think it's a final determination

18   but I think there's a requirement that you indicate what

19   happened and how and please, I'm not trying to be

20   disrespectful.  I want you to understand I just believe

21   that you need to put down the findings that you had as to

22   what happened that day, and what the circumstances were,

23   and how if you found as you did what all he did not do or

24   should have done, and to that extent I want to object to

**Joint Appendix Pg. 389**

```
 1   it.
 2            That's my only objection 'cause the statute
 3   requires that it says "Any decision, order, or action" --
 4   and I'm reading from 7-14 C-3d -- it says, "Any decision,
 5   order, or action taken as a result of the hearing shall be
 6   in writing and shall be accompanied by findings of fact.
 7   The findings shall consist of a concise statement upon
 8   each issue in the case, a copy of the decision or order
 9   accompanying findings and conclusions on written
10   recommendations for actions shall be delivered or mailed
11   promptly to the deputy sheriff or his or her attorney of
12   record."
13            With all due respect, I'm not trying to be
14   disrespectful but I think that it needs to indicate the
15   facts and what happened but that's my objection.
16            COMMISSIONER LEMASTER:  Okay.
17            COMMISSIONER CODERRE:  I think that the example that
18   were given from the previous incident basically does
19   include I believe what you're talking which is basically
20   just a summation of the facts of the charges essentially.
21            MR. SCALES:  What you all found as the facts and what
22   happened and the reason why I say that is assuming for a
23   moment that Sergeant Dodson desires to appeal I don't
24   think we're entitled to a hearing de novo meaning we can't
```

1    start over again and have a whole new hearing with all the

2    same witnesses, that the limitation of the civil service

3    commission review will be solely on the record that you

4    all found from this hearing today.

5         So I think with all due respect that there needs

6    to be some findings of fact as to what happened and when

7    it happened and those type things.

8    COMMISSIONER CODERRE:  We can go forward with what we

9    were talking about earlier, add the facts afterward, or we

10   can go back and type them in and then come back.

11   MR. SCALES:  I think you have a lot of latitude to do

12   it in your discretion to do that.  I mean obviously as

13   promptly as you can but I think that's necessary in the

14   event Sergeant Dodson elects to appeal 'cause he has --

15   there's no other way for the --

16   COMMISSIONER CODERRE:  I think for our discussions we

17   each in our mind knew what had happened and just kind of

18   skipped right ahead through basically the charges and

19   conclusions in our decision rather than indicating what

20   all was written in between.

21   COMMISSIONER FORMAN:  I guess in my mind it was

22   anything that you had that the two of you had put into

23   evidence.  All of that information would be forwarded to

24   the hearing board if it went any further so they would

1   have access to the entirety of that information was my

2   understanding.

3       COMMISSIONER LEMASTER:  We didn't want to give a

4   conclusion.  It picked up certain points whereas all of it

5   is important to both parties and basically by us giving a

6   finding of facts it really limits the scope that may be

7   looked at by any appeal process.  So with all that has

8   been put, I mean, you know we were hearing testimony for

9   off and on probably a good four hours or more and that's a

10  lot of finding of fact for us to try to compile and

11  condense into it.

12       So, hopefully, I don't know.  We haven't heard

13  from the other side -- that record would stand for itself

14  for the finding of fact with everything that has been

15  submitted by both parties and the objections and the

16  defense that you have -- both have brought out and I feel

17  that if we tried to reach and do conclusions for it it

18  could even hamper either side's case.  I understand the

19  findings of fact but a lot of fact was presented today.

20      MR. SCALES:  Well, my problem with it is I guess you

21  know what I'm looking for as far as you all need to make a

22  decision as far as Sergeant Dodson is concerned is such

23  items about what was the extent of the search; how

24  extensive was the search; if you found the search to have

1    been over broad to what extent, and you've addressed some

2    of that; how long you believe it should have been; the

3    parameters for it; whether he acted reasonable in the

4    circumstances; those type of issues.

5            I think because really when we get to, assuming

6    that he desires to appeal, if we get to the civil service

7    commission we're going to have those same issues addressed

8    again and they're not going to know if there's no findings

9    that you all have made as to what you believed was wrong,

10   or excessive, or what they did and didn't do and if we get

11   to circuit court let's say and we're going to have an

12   argument with the judge was this reasonable?  Well, how do

13   I know?  The hearing board never told me whether they

14   thought it was reasonable, those issues, and you're really

15   the sole trier of the facts and the ones that have to make

16   those decisions because we don't get a second bite at the

17   apple.

18      MS. GROVE:  I agree that you should do some -- this

19   can serve as the order.  I think the Code talked about an

20   order and a separate finding of fact.  You don't have to

21   render that today.  I know you're from Loudoun County so

22   you may not want -- you may not have the opportunity to

23   get together.  You may want to do it today but you know I

24   think just a summary of the facts that you used to arrive

1    at your decision would be best for an appeal.

2         Those serve as the order basically this is your

3    decision and then maybe just a summary of the facts that u

4    used to come to this decision and like I said that doesn't

5    have to be done today but I know with board member from

6    Loudoun County it may be better to do it today.

7         COMMISSIONER CODERRE:  Well, I guess I'm a little

8    confused here.  The purpose for having it recorded I

9    assume at some point it would be typewritten and

10   transcribed and be a factual document.

11        MS. GROVE:  Yes.

12        COMMISSIONER CODERRE:  If we continued on with what

13   we were talking about while these were printing as far as

14   doing some of this verbal and if it were still transcribed

15   it would be basically the facts and findings just in a

16   different format.  So the document you received would be

17   through the transcript.

18        MR. SCALES:  I respectfully disagree.

19        COMMISSIONER CODERRE:  I'm asking I'm not suggesting.

20        MR. SCALES:  Okay.  Here's the problem.  There was

21   some controverted testimony.  I can't tell you exactly who

22   said it and the context it was said but I believe that

23   Lieutenant Colbert started out with he indicated it was a

24   full blown search.  I believe that Corporal Edwards said

1  it was a full blown search.  I believe Sergeant Dodson,

2  Deputy Kilmer, and deputy -- and Corporal Boyce said it

3  was not a full blown search.  You all need to find out

4  what the truth is as to what you found from the evidence

5  as who you believed and what you believed from the

6  evidence was the extent of the search, that's one of the

7  things.

8          And the other thing is I think you need to

9  determine is some issue about what exactly do you find the

10 circumstances were during the pre-search at the time that

11 Sergeant Dodson apprehended the accused.  What do you

12 believe he should have reasonably believed at that point

13 in time whether there was ample evidence in the record to

14 believe that he -- that a reasonably prudent officer

15 should have believed at that point in time that there was

16 still some safety issues, that there was -- it was still

17 unclear about whether or not what weapon was being used,

18 whether it was a Tech-Nine or some assault rifle, and

19 whether you believed that there was still some issues at

20 that point.  These are all things that you all need to

21 sort out from the evidence because it was contradicted.

22          I believe I mean Corporal Edwards testified that

23 she said that as soon as Mr. Hoffman-Smith was apprehended

24 the whole place was all safe at that point in time.  Of

1    course Sergeant Dodson disputed that and I believe that

2    Deputy Kilmer disputed that and unless you all tell us

3    what you found from the evidence it's not going to be a

4    part of the record.  And a cold record that the reporter's

5    going to make is going to have conflicting evidence in it.

6    And you're the ones that have to make the decision of what

7    you find from the evidence as the facts were in those

8    peculiar circumstances, that's where I'm going with it.

9         I'm not saying this thing has to be a 50 page

10   volume but there should be a couple pages of what happened

11   when, and what you believe from the evidence Sergeant

12   Dodson's reasonable fears were, if any, at the time that

13   he entered the house, and what he should have been

14   concerned about based on what you heard the circumstances

15   were.

16        That case I gave, the Lacey case, is very clear

17   about you need to asses what actions were taken and what

18   the limits were of the abridgment of the accused rights

19   were based upon a totality of the circumstances and

20   there's been a -- there's a whole array of different

21   circumstances that were presented to you and some said it

22   was such circumstances that he should have stopped right

23   then and not even gone past apprehending Mr. Hoffman-Smith

24   to a complete search of the house, and I think it's

**Joint Appendix Pg. 396**

1  important to know from you findings what you believed he

2  should done and what circumstances you believe he

3  reasonably should have thought were --

4      COMMISSIONER LEMASTER:  I think we've got the point,

5  counsel.  I mean you're kind of reviewing the whole case

6  for us again.

7      MR. SCALES:  We'll, I'm only trying to say what the

8  factual issues are that I think need to be addressed.  And

9  you all the only findings of fact -- finders of fact that

10 we have.

11     COMMISSIONER LEMASTER:  Any further comments?

12     MS. GROVE:  Yeah, I think it just needs to be a brief

13 summary of why you decided what you did.

14     COMMISSIONER LEMASTER:  Okay.

15     MR. SCALES:  It doesn't have to be done today.  I'm

16 just saying to you if you need ten days, two weeks

17 whatever you need to do it I certainly understand that's

18 --

19     SHERIFF BOOBER:  Appeal process would take place at

20 the time that counsel is in receipt of the final

21 documentation you're asking for if you choose to appeal,

22 is that correct, Counsel?

23     MR. SCALES:  Yes, sir.

24     SHERIFF BOOBER:  The time limit I'm saying for the

1  time for appeal from the time that you received the final

2  document, is that understanding?  To the next level to

3  civil service if you're going to appeal that the time in

4  filing that begins at the time of your receipt of the

5  documentation from this board, is that correct?

6      MR. SCALES:  Findings of fact, yes, sir.

7      SHERIFF BOOBER:  For either side.

8      MR. SCALES:  Either side, yes, sir.

9      SHERIFF BOOBER:  Yes, sir.

10     MR. SCALES:  It very well maybe that both sides

11 appeal.  I don't know but I think a lot of it's going to

12 depend on the findings of fact.

13     SHERIFF BOOBER:  Yes, sir.

14     MR. SCALES:  I'm sure you would want to know as well.

15     COMMISSIONER CODERRE:  We'll go back to the office.

16 We'll go back and work on it.

17     MR. SCALES:  Okay.

18     Off the record.

19     COMMISSIONER LEMASTER:  All right.  The board's going

20 to go ahead and adjourn.  During adjournment the board

21 will render a finding of fact.  The finding of fact will

22 be will be forwarded to both parties at the conclusion

23 either through mail or personal delivery.

24     MR. SCALES:  Thank you.  We need to have this as part

**Joint Appendix Pg. 398**

1  of the record.  And then you're going to supplement it

2  with findings of fact, is that correct?

3       COMMISSIONER LEMASTER:  Right.  I don't know how --

4  how do you do the final record?  We just give a copy and

5  put it on?

6       MS. GROVE:  Yeah.

7       MR. SCALES:  As far as I'm concerned if you want to

8  give one to her or maybe the sheriff will give one to her

9  and one to Ms. Grove and one to I that's it.

10       COMMISSIONER LEMASTER:  We'll get it to her.

11       MR. SCALES:  Thank you.

12       MS. GROVE:  Thank you, gentlemen, for your time.

13            (Hearing concluded at 4:50 p.m.)

14

15

16

17

18

19

20

21

22

23

24

CERTIFICATE

I, Pamela Patterson, a Notary Public of the State of West Virginia, do hereby certify that the within-named proceedings took place before me at the time and place herein set out.

I further certify that the proceedings were recorded stenographically by me and this transcript is a true record of the proceedings.

I further certify that I am not of counsel to any of the parties, nor an employee of counsel, nor related to any of the parties, nor in any way interested in the outcome of this action.

As witness my hand and notarial seal this 13th day of November, 2008.



_Pamela A. Patterson_
Pamela A. Patterson

My Commission Expires:
August 13, 2017